**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| TIAR McCART, | ) | CIVIL ACTION |
| | ) | FILE NO. _____ |
| Plaintiff, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| EQUITY PRIME MORTGAGE, LLC. | ) | |
| AND MARK MOLOUGHNEY | ) | |
| in his Individual Capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Tiar McCart ("Plaintiff" or "Ms. McCart") respectfully submits the following Complaint:

## INTRODUCTION

1.      Plaintiff is a former employee of Defendant Equity Prime Mortgage, LLC ("EPM") in Atlanta, Georgia. Defendant Mark Moloughney ("Mr. Moloughney") is the Chief Technology Officer at EPM. Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. as amended by the Civil Rights Act of 1991, ("Title VII") and various state laws to correct the unlawful employment practices alleged herein. Plaintiff seeks declaratory and injunctive relief, equitable relief, damages, and attorneys' fees and costs.

1

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over Plaintiff's Title VII claims under 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

3.     This Court is a proper venue for Plaintiff's claims under 28 U.S.C. § 1391(b), because Defendant EPM is based in the Northern District of Georgia and because the unlawful conduct giving rise to the claims occurred in this District.

## THE PARTIES

4.     Plaintiff is a resident of Athens, Georgia and submits herself to the jurisdiction of this Court.

5.     Defendant Equity Prime Mortgage, LLC ("EPM") is a domestic limited liability company licensed to conduct business in the state of Georgia.

6.     At the times of the events of which Plaintiff complains, EPM conduced business, maintained facilities, and derived substantial revenue in the State of Georgia and is subject to the jurisdiction and venue of this Court.

7.     EPM may be served with process by serving a copy of the Complaint and Summons on its registered agent, Eduardo G. Perez, Jr. at 5 Concourse Parkway, Suite 2250, Atlanta, Georgia 30328.

8.     EPM is an employer as defined by Title VII.

2

9.     Defendant Mr. Moloughney has substantial contacts with the State of Georgia through his employment with EPM and frequent travel to the state related to that employment.  Mr. Moloughney's conduct, which is complained of herein, occurred within the State of Georgia and with this Court's District.  Therefore, Mr. Moloughney is subject to the jurisdiction and venue of this Court.

10.     Mr. Moloughney may be served with process via personal service at 1018 Gillis Place, Secaucus, NJ 07904.  In the alternative, Mr. Moloughney may be served with process via personal service at 1125 Hammond Drive NE, Unit 649, Sandy Springs, GA 30328.

## ADMINISTRATIVE PROCEEDINGS

11.     Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 7, 2021.

12.     Plaintiff filed a timely Amendment to the Charge of Discrimination with the EEOC on September 2, 2021.

13.     Plaintiff files this lawsuit within ninety (90) days of receiving the Notice of Right to Sue.

## FACTUAL ALLEGATIONS

14.     EPM hired Ms. McCart, a female, as a Rehab Loan Specialist in approximately March 2020.

15.     Ms. McCart was promoted to the position of Processor effective on or about September 1, 2020.

16.     In her Processor position, Ms. McCart reported to Jason Callan ("Mr. Callan").

17.     Mr. Callan told Ms. McCart that he intended to promote her to the position of Processing Manager within the next year.

18.     EPM has a culture of sexual harassment in the workplace.

19.     Throughout her employment with EPM, Ms. McCart was subjected to a sexually hostile work environment.

20.     EPM management and employees, including but not limited to Jason Callan, Jeffrey Batson, Eddie Perez, Frank Ferrans, and Ken Hartman, subjected to sexual comments, touching, images, and solicitations at least weekly.

21.     Members of EPM management circulated an email titled "ass a nine" with a picture of Plaintiff, taken from her social media, in a bathing suit. Among others, EPM's COO Jason Callan, CEO Eddy Perez, and Secondary Marketing Manager Jeffrey Batson received and/or viewed the email.

22.     CEO Eddy Perez asked Ms. McCart's platonic work acquaintance if "he'd hit that," referring to having sex with Ms. McCart.

23.     During a company-wide video meeting, a male co-worker, who is still employed by EPM, did a dance and pretended to unzip his jeans while presenting.

24.     Ms. McCart arrived at work one day to find her desk covered with penis-shaped confetti.

25.     Co-workers and management of EPM repeatedly made unwelcomed comments about Ms. McCart's appearance.

26.     COO Jason Callan repeatedly told Ms. McCart that he couldn't believe a woman like her was still single and imply and gesture that he would have sex with Ms. McCart if he wasn't married.

27.     COO Jason Callan would ogle Ms. McCart by staring up and down her body.

28.     COO Jason Callan described to Ms. McCart a list of female co-workers with whom he would have sex, including but not limited to Ms. McCart, Christie Hernandez, and Jayza Ayla.

29.     COO Jason Callan repeatedly referred to Ms. McCart as "my bitch."

30.     Co-workers and management repeatedly asked Plaintiff and other co-workers about Plaintiff's private life, such as whether she was dating or having sex with anyone.

31.     Co-workers and management asked Plaintiff if she "got some dick over the weekend."

32.     Frank Ferrans, EPM's Business Development Manager, told Ms. McCart that in his next life he hoped to marry Ms. McCart, buy her a home in Greece, and take care of her forever.

33.     Co-workers and management told Plaintiff she should have sex with a male co-worker, Ken Hartman for "charity's sake."

34.     Co-workers and management nicknamed Ken Hartman "Dickman," frequently discussed the size of his penis, and used a mark on a ruler to demonstrate its length.

35.     EPM hired Mr. Mark Moloughney in May 2020 as its Chief Technology Officer.

36.     EPM still employs Mr. Moloughney as its Chief Technology Officer.

37.     Mr. Moloughney subjected Plaintiff to unwelcomed advances and to sexual assault and battery as well as to ongoing harassment and threats to her career.

38.     EPM placed Mr. Moloughney in a position to have access to female coworkers.

6

39.     EPM knew, or through reasonable diligence should have known, that Mr. Moloughney has a propensity to sexually harass female coworkers and that he had harassed, assaulted, and battered Plaintiff.

40.     On December 20, 2020, EPM rented a suite for the Atlanta Falcons game at the Mercedes-Benz Stadium in Atlanta.

41.     CEO Eddy Perez, Ms. McCart, Mr. Moloughney, and other EPM employees attended the game as a work event.

42.     After the game, Mr. Perez drove Ms. McCart, Mr. Moloughney, and Sarah Rodriguez, another EPM employee, to EPM's corporate apartment.

43.     Mr. Moloughney was staying at EPM's corporate apartment.

44.     Mr. Moloughney's rental car was parked at EPM's corporate apartment.

45.     Mr. Perez left after dropping the others off, and the others planned to go to dinner.

46.     Mr. Moloughney knew that Ms. McCart did not have a personal vehicle with her and offered to drive her home after dinner. Ms. McCart agreed, believing his offer was a courtesy between colleagues.

47.     Mr. Moloughney drank heavily at dinner but seemed sober enough to drive around 10:00 pm when everyone was leaving the restaurant, so Ms. McCart got into his car, expecting him to drive her home as promised.

48.     Mr. Moloughney began driving south toward Ms. McCart's apartment, but once they were already on the highway he said that he was too drunk to drive all the way to her apartment and would instead stop by the corporate apartment for a few minutes until he felt he was sober enough to drive to her apartment.

49.     Ms. McCart was not happy about that plan but had no practical option other than to agree.

50.     Mr. Moloughney and Ms. McCart arrived at the corporate apartment and engaged in professional, work-related conversations.

51.     Ms. McCart did not know that Mr. Moloughney had an ulterior, inappropriate motive in going back to the corporate apartment instead of to her apartment.

52.     Mr. Moloughney then said he still felt too intoxicated to drive Ms. McCart home but offered to let her take the primary bedroom in the corporate apartment. He said that he would sleep on a couch upstairs and drive her home in the morning.

53.     Ms. McCart did not believe Mr. Moloughney had any ill intentions in waiting until the morning to drive her, and she did not want to take a rideshare service alone at night, so she agreed and went to sleep alone in the bedroom.

54.     Very early the next morning, on December 21, 2020, Ms. McCart abruptly woke up in the bed and realized that Mr. Moloughney was on top of her, sliding his hand into her underwear and inside her vagina.

55.     She also heard him saying that she was "stunning" and "irresistible."

56.     Panicked, Ms. McCart physically pushed Mr. Moloughney off of her and told him "This is not happening!"

57.     Mr. Moloughney laughed off her objections, saying "Just let me hold you," and began to forcefully pull Ms. McCart toward him.

58.     She was able to free herself from his grasp and get away from him.

59.     Mr. Moloughney appeared upset and tried to convince her to stay in the corporate apartment for the day and then go to dinner with him that evening. He told her that otherwise she would need to find her own way home.

60.     Ms. McCart refused, and Mr. Moloughney ultimately agreed to drive her home that morning as he had originally promised.

61.     In the car, Mr. Moloughney began to try to cover up his actions and discouraged Ms. McCart from reporting him at work or filing a police report.

62.    He told her to tell people that she had left dinner with another employee, Jorge Ramos and stated that he would speak to Jorge to make sure he would corroborate this fake story.

63.    Approximately two hours after dropping her off, Mr. Moloughney messaged Ms. McCart on the EPM messaging system to ask if she was okay. She did not respond.

64.    At approximately 7:00 p.m. that night, Mr. Moloughney sent Ms. McCart an e-mail asking if they could talk and giving his cell number.

65.    On the call, Mr. Moloughney apologized for assaulting her that morning and claimed to take "full responsibility" for the assault.

66.    However, Mr. Moloughney then made a direct threat to Ms. McCart's continued employment at EPM and told her not to tell anyone about the assault.

67.    Mr. Moloughney stated that things were going very well in Ms. McCart's career at EPM and that he would hate for anything to interfere with her career, implying that a complaint to EPM would harm her career.

68.    Mr. Moloughney even implied that Ms. McCart had done something wrong by going to the EPM corporate apartment, although the CEO, Mr. Perez, had initially driven her there and she had only returned there after dinner because Mr. Moloughney had not driven her home as she had expected.

10

69.   Because of Mr. Moloughney's threats, Ms. McCart feared retaliation and losing her job if she reported the assault, so she spent the next few weeks trying to focus on her job and avoid or limit her interactions with Mr. Moloughney.

70.   Mr. Moloughney continued to pursue unnecessary personal contact with Ms. McCart, mentioning her professional aspirations as a reminder that he could derail her career and getting upset if she did not respond to his personal messages.

71.   Ms. McCart felt that she had no choice but to tolerate these harassing communications until finally, on January 4, 2021, she asked Mr. Moloughney not to contact her for personal reasons and to only speak to her if it was work-related.

72.   Ms. McCart then began to agonize over whether Mr. Moloughney might interfere with her career.

73.   Ms. McCart wanted to resolve the ongoing uncertainty that was contributing to her stress and anguish, and she also wanted to ensure that Mr. Moloughney did not take advantage of anyone else.

74.   In January 2021, her trauma and ongoing stress led her to meet with Deneshia Davenport ("Ms. Davenport"), EPM's in-house licensed professional counselor and wellness coordinator.

75.   In February, Ms. McCart asked Human Resources for a copy of the employee handbook to gain some insight into how her complaint would be handled if she filed a complaint with EPM.

76.   EPM's handbook includes an anti-harassment policy, which prohibits harassment and promises that any violation of the policy "will result in disciplinary action, up to and including immediate discharge" of the offending employee.

77.   The policy also states that EPM "absolutely prohibit[s] retaliation" against anyone who reports a possible violation of the policy.

78.   Upon reading EPM's handbook, Ms. McCart decided to report Mr. Moloughney's actions and threats to EPM, believing that the company would respond in line with its policies.

79.   Ms. McCart reported Mr. Moloughney's conduct on or about February 26 and was told that EPM would investigate her complaint.

80.   About two weeks later, on March 10, 2021, Nyree Green ("Ms. Green"), EPM's Human Resources employee, notified Ms. McCart that EPM's investigation had concluded and that EPM had decided that the incident was unrelated to work.

81.   The incident was in fact inextricably related to work, as it took place between two employees, after a work event, in a corporate apartment owned and occupied by EPM and resulted in threats to Ms. McCart's job.

82.   Ms. Green repeatedly stated the company's opinion that Mr. Moloughney's assault of Ms. McCart was a consensual encounter.

83.   Ms. McCart made it clear that she never consented to the assault as it would not have been possible to consent, because she was asleep and woke up to Mr. Moloughney already on top of her and assaulting her.

84.   EPM took no action against Mr. Moloughney in response to his unlawful acts or his acts in violation of company policy.

85.   On March 12, 2021, only two days after it completed its investigation into Ms. McCart's report regarding Mr. Moloughney's actions and threats, EPM terminated Ms. McCart's employment.

86.   EPM alleged it terminated Ms. McCart for poor performance.

87.   However, EPM had never mentioned or counseled Ms. McCart on any alleged poor performance prior to her complaints of sexual harassment, assault, and battery.

88.   Ms. McCart had recently been promoted and was on track for another promotion within the next year.

89.     EPM had paid Ms. McCart bonuses for her production and featured her in a company newsletter shortly before her protected complaints.

90.     After Ms. McCart reported Mr. Moloughney's actions and threats, EPM blatantly retaliated against her by terminating her employment.

91.     EPM ratified Mr. Moloughney's actions when it retained Mr. Moloughney as its Chief Technology Officer but terminated Ms. McCart's employment.

92.     Ms. McCart has suffered financial loss, out of pocket expenses, mental anguish, humiliation, and other emotional and physical harm as a result of Mr. Moloughney's and EPM's violations of federal and state law.

**COUNT I**
**Sexual Harassment in Violation of Title VII**
**(Against Defendant EPM)**

93.     Plaintiff incorporates each of the above factual allegations as if fully set forth herein.

94.     Defendant EPM violated Plaintiff's rights under Title VII by, among other things, subjecting her to unwelcomed sexual comments, solicitations, and touchings, failing to take reasonable preventive or corrective measures with respect to the unlawful sexual conduct, allowing her continued employment to be threatened, and terminating her employment.

14

95.     Defendant EPM's conduct in creating an unlawful hostile working environment based upon gender constitutes unlawful sexual harassment in violation of Title VII.

96.     Defendant EPM's conduct in taking a tangible employment action based upon gender against Ms. McCart constitutes unlawful sexual harassment in violation of Title VII.

97.     As a direct and proximate result of Defendant EPM's actions, Plaintiff has suffered damages including emotional distress, inconvenience, loss of income and benefits, out of pocket expenses, attorneys' fees and costs, humiliation, and other indignities.

48.     Defendant EPM undertook its unlawful conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, entitling Plaintiff to recover punitive damages against it.

49.     Alternatively, Defendant EPM undertook its unlawful conduct recklessly with respect to the Plaintiff and her federally protected rights, entitling Plaintiff to recover punitive damages against it.

## COUNT II
### Retaliation in Violation of Title VII
### (Against Defendant EPM)

98.     Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

15

99.   Title VII prohibits employers from retaliating against employees who report or oppose sexual harassment.

100.   Defendant EPM unlawfully retaliated against Plaintiff, in violation of her rights under Title VII by, among other things, terminating her employment because she opposed and/or reported Defendant Moloughney's unwelcomed sexual conduct.

101.   Defendant EPM terminated Plaintiff's employment only two weeks after she reported Mr. Moloughney's sexual harassment, assault, and battery and only two days after it completed its investigation of her report.

102.   Defendant EPM's termination of Plaintiff's employment constitutes unlawful retaliation in violation of Title VII.

103.   As a direct and proximate result of Defendant EPM's actions, Plaintiff has suffered damages including emotional distress, inconvenience, loss of income and benefits, out of pocket expenses, attorneys' fees and costs, humiliation, and other indignities.

104.   Defendant EPM undertook its unlawful conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, entitling Plaintiff to recover punitive damages against it.

105.    Alternatively, Defendant EPM undertook its unlawful conduct recklessly with respect to the Plaintiff and her federally protected rights, entitling Plaintiff to recover punitive damages against it.

## COUNT III
**Assault**
**(Against Defendant Moloughney in his Individual/Personal Capacity)**

106.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

107.    The actions of Defendant Moloughney described above constitute assault as he threatened to and did in fact make unjustified, unwelcomed, harmful, and offensive physical contact with Plaintiff's body.

108.    As a direct and proximate result of the assault committed by Defendant Moloughney, Plaintiff suffered and will in the future suffer from physical and emotional harm and other damages.

109.    Defendant Moloughney acted with malice when he assaulted Plaintiff.

## COUNT IV
**Battery**
**(Against Defendant Moloughney in his Individual/Personal Capacity)**

110.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

111.    The actions of Defendant Moloughney described above constitute battery as he made unjustified, unwelcomed, harmful, and offensive physical contact with Plaintiff's body.

112.   As a direct and proximate result of the battery committed by Defendant Moloughney, Plaintiff suffered and will in the future suffer from physical and emotion harm and other damages.

113.   Defendant Moloughney acted with malice when he battered Plaintiff.

**COUNT V**
**Negligent Hiring, Retention, and Supervision**
**(Against Defendant EPM)**

114.   Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

115.   EPM owed a duty of care to Plaintiff to exercise reasonable caution and diligence when hiring, retaining, and/or supervising Defendant Moloughney so as to avoid employing a man who could be reasonably foreseen to sexually harass, assault, or otherwise endanger female employees as Defendant Moloughney did in this case.

116.   Defendant EPM breached this duty of care by, *inter alia*, failing to perform reasonable pre-employment investigation and inquiry concerning Defendant Moloughney and by otherwise failing to exercise reasonable caution and diligence when hiring him.

117.   Defendant EPM further breached this duty of care when it, *inter alia*, became aware that Defendant Moloughney was sexually harassing women, including but not limited to Ms. McCart, and took no action to review Defendant

Moloughney's employment or remove him from employment. Instead, EPM terminated Ms. McCart's employment.

118.   As a direct and proximate result of Defendant EPM's breach of this duty of care, Plaintiff has suffered damages, including emotional damages and loss of employment and compensation.

119.   After hiring Defendant Moloughney, Defendant EPM owed a continuing duty of care to Plaintiff to exercise reasonable caution and diligence in retaining, supervising, and training Defendant Moloughney to avoid reasonably foreseeable conduct amounting to sexual harassment, assault, battery, or otherwise endangering female employees like Plaintiff as Defendant Moloughney did in this case.

120.   Defendant EPM breached this duty of care by, *inter alia*, failing to intercede despite actual and/or constructive knowledge making it reasonably foreseeable that Defendant Moloughney would sexually harass, assault, batter, or otherwise endanger female employees like Plaintiff as Defendant Moloughney did in this case.

121.   As a direct and proximate result of Defendant EPM's breach of its duty of care, Plaintiff has suffered damages, including emotional damages and loss of employment and compensation.

## COUNT VI
### Ratification
### (Against Defendant EPM)

122.   Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

123.   Defendant EPM ratified Defendant Moloughney's assault and battery of Plaintiff by, *inter alia*, retaining Defendant Moloughney after having actual or constructive knowledge of his unlawful behavior and/or by retaliating against Plaintiff by terminating her employment after she reported Defendant Moloughney's unlawful behavior.

124.   Defendant EPM is thus liable for all damages which the jury may determine are appropriate to compensate Plaintiff for the harm done.

## COUNT VII
### Punitive Damages O.C.G.A. § 51-12-5.1
### (Against All Defendants)

125.   Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

126.   Defendants above-pled actions were willful, malicious, wanton and/or oppressive within the meaning of O.C.G.A. § 51-12-5.1(b).

127.   Additionally, and in the alternative, Defendants' actions display, within the meaning of that statute, an entire want of care indicative of a conscious indifference to their actions' consequences.

## COUNT VIII
### Attorneys' Fees and Expenses of Litigation O.C.G.A. § 13-6-11
### (Against All Defendants)

128. Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

129. Defendants have acted in bad faith, been stubbornly litigious, and/or caused Plaintiff unnecessary trouble and expense in litigating this case, and Plaintiff is thus entitled to recovery of the expenses of this litigation, including attorneys' fees, under Georgia law, including but not limited to O.C.G.A. § 13-6-11.

## PRAYER FOR RELIEF

Plaintiff respectfully requests the following relief:

a.   declaratory judgment that Defendants violated the Plaintiff's rights under Title VII and violated state tort laws;

b.   an injunction prohibiting the Defendants from engaging in such unlawful conduct in the future;

c.   compensatory damages, in an amount to be determined by the enlightened conscience of the jury, for Plaintiff's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages;

d.   punitive damages, against Defendants, in an amount to be determined by the enlightened conscience of the jury, to sufficiently punish

Defendants for their conduct toward Plaintiff and deter Defendants

from similar conduct in the future;

e.     reasonable attorneys' fees and costs; and

f.     other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 12th day of October, 2021.

**LEGARE, ATTWOOD & WOLFE, LLC**

/s/ *Amelia A. Ragan*
Amelia A. Ragan
Georgia Bar No. 831387
aaragan@law-llc.com

125 Clairemont Ave, Suite 380
Decatur, GA 30030
Tel: (470) 823-4000
Fax: (470) 201-1212

Counsel for Plaintiff