Case 1:21-cv-04247-CAP-LTW  Document 86  Filed 03/21/23  Page 1 of 315
Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 1

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF GEORGIA

3                   ATLANTA DIVISION

4    _____

5    TIAR McCART,

6          Plaintiff,

7       v.                           Civil Action No.

8    EQUITY PRIME MORTGAGE, LLC       1:21-cv-04247-

9    AND MARK MOLOUGHNEY              CAP-LTW

10   in his Individual Capacity,

11         Defendants.

12   _____

13                  DEPOSITION OF

14                   EDDY PEREZ

15   DATE:        Monday, August 15, 2022

16   TIME:        10:05 a.m.

17   LOCATION:    Elarbee, Thompson, Sapp & Wilson, LLP

18                800 International Tower

19                229 Peachtree Street Northeast

20                Atlanta, GA 30303

21   REPORTED BY:  Ariel Dallas, Notary Public

22   JOB NO.:      5316895

23

24

25

Case 1:21-cv-04247-CAP-LTW   Document 86   Filed 03/21/23   Page 2 of 315
Eddy Perez                                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 2

1                    A P P E A R A N C E S

2     ON BEHALF OF PLAINTIFF TIAR McCART:

3          AMELIA A. RAGAN, ESQUIRE

4          Legare, Attwood & Wolfe, LLC

5          125 Clairemont Avenue, Suite 380

6          Decatur, GA 30030

7          aaragan@law-llc.com

8          (470) 823-4000

9

10    ON BEHALF OF DEFENDANTS EQUITY PRIME MORTGAGE, LLC AND

11    MARK MOLOUGHNEY:

12         BRENT L. WILSON, ESQUIRE

13         Elarbee, Thompson, Sapp & Wilson, LLP

14         229 Peachtree Street

15         Atlanta, GA 30303

16         bwilson@elarbeethompson.com

17         (404) 582-8427

18

19         SHANNON L. SMITH, ESQUIRE

20         Elarbee, Thompson, Sapp & Wilson, LLP

21         229 Peachtree Street

22         Atlanta, GA 30303

23         (404) 582-8419

24

25

Eddy Perez                                   August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 3

1              A P P E A R A N C E S (Cont'd)

2      ON BEHALF OF DEFENDANTS EQUITY PRIME MORTGAGE, LLC AND

3      WITNESS EDDY PEREZ:

4           SETH A. KREINER, ESQUIRE

5           Kreiner Burns

6           950 Peninsula Corporate, Suite 3001

7           Boca Raton, FL 33487

8           (561) 901-8400

9           seth@kreinerlawfirm.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eddy Perez                                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

                                                        Page 4

1                           I N D E X

2    EXAMINATION:                                      PAGE

3         By Ms. Ragan                                 8

4

5                         E X H I B I T S

6    NO.               DESCRIPTION                     PAGE

7    Exhibit 55     E-Mail, Indeed.com Review

8                   Incentive                          228

9    Exhibit 56     E-Mail, YouTube Review Incentive   233

10   Exhibit 57     E-Mail, Referencing Jeff Batson    239

11             (Exhibits retained by counsel.)

12

13        P R E V I O U S L Y   M A R K E D   E X H I B I T S

14   NO.               DESCRIPTION                     PAGE

15   Exhibit 32     E-Mail                             214

16   Exhibit 34     Photographs                        225

17   Exhibit 35     Online Reviews of Equity Prime

18                  Mortgage                           238

19             (Exhibits retained by counsel.)

20

21             QUESTION INSTRUCTED NOT TO ANSWER

22                     PAGE       LINE

23                     54         8

24

25

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

                                                    Page 5

1                     P R O C E E D I N G S

2                     THE REPORTER:  Good morning, everyone.

3      My name is Ariel Dallas, and I am the reporter

4      assigned by Veritext to take the record of this

5      proceeding.  We are now on the record at 10:05 a.m.

6                     This will be the deposition of Eddy

7      Perez taken in the matter of Tiar McCart vs. Equity

8      Prime Mortgage, LLC and Mark Moloughney in his

9      Individual Capacity, on August 15, 2021 [sic], at 229

10     Peachtree Street Northeast, Atlanta, Georgia 30303.

11                    I am a notary authorized to take

12     acknowledgments and administer oaths in Georgia.

13                    Absent an objection on the record

14     before the witness is sworn, all parties and the

15     witness understand and agree that any certified

16     transcript produced from the recording of this

17     proceeding:

18                         - is intended for all uses permitted

19                         under applicable procedural and

20                         evidentiary rules and laws in the same

21                         manner as a deposition recorded by

22                         stenographic means; and

23                         - shall constitute written stipulation

24                         of such.

25                    Also before I continue, I will ask if

Eddy Perez                                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 6

1    you will just click this microphone onto yourself

2    here, Mr. Perez.

3                        And are you both going to be asking

4    questions today?

5                        MR. WILSON:  I doubt it.

6                        THE REPORTER:  Okay.  Well, whichever

7    of you will be asking questions, I'll just ask that

8    you wear the microphone here.

9                        And for you as well.  You have a

10   microphone.

11                       MS. RAGAN:  Oh.  Okay.

12                       THE REPORTER:  This stretches and you

13   just put it on yourself.

14                       MR. PEREZ:  I don't know if I heard it

15   wrong, but I thought you said August 15, 2021.

16                       THE REPORTER:  Well, I'll correct

17   myself if you did hear that.

18                       MR. PEREZ:  I thought I did.

19                       THE REPORTER:  You might have.  You

20   might have.

21                       MR. PEREZ:  Maybe I'm off.

22                       THE REPORTER:  But just to clarify,

23   today is August 15, 2022.  Thank you for that, Mr.

24   Perez.

25                       And also while you're wearing the

Eddy Perez                                   August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 7

1    microphones, just be aware that they are sensitive to

2    touch, whispering, and cell phone noises.

3                    And we'll agree to stay on the record

4    until all parties agree to go off the record.

5                    And at this time if y'all wouldn't mind

6    to introduce yourselves for the record, starting here

7    from my left.

8                    MR. PEREZ:  Legal name?  Everything?

9    What?

10                   THE REPORTER:  All of the above.

11                   MR. PEREZ:  Okay.  Hi.  Eduardo G.

12   Perez, Jr.  I go by Eddy.

13                   THE REPORTER:  Thank you, sir.

14                   MR. WILSON:  And representing the

15   defendants, Brent L. Wilson, Elarbee, Thompson, Sapp &

16   Wilson.

17                   MS. SMITH:  Shannon Smith, also

18   Elarbee, Thompson.

19                   MR. KREINER:  Hi.  Good morning.  Seth

20   Kreiner, Kreiner Burns.  Counsel for Equity Prime and

21   Mr. Perez.

22                   MS. RAGAN:  Amelia Ragan, counsel for

23   plaintiff, Tiar McCart.

24                   THE REPORTER:  Perfect.  And then

25   hearing no objection, I will now swear in the witness.

Case 1:21-cv-04247-CAP-LTW  Document 86  Filed 03/21/23  Page 8 of 315
Eddy Perez                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 8

1              Mr. Perez, please raise your right

2    hand.

3    WHEREUPON,

4                      EDDY PEREZ,

5    called as a witness, and having been first duly sworn

6    to tell the truth, the whole truth, and nothing but

7    the truth, was examined and testified as follows:

8                THE REPORTER:  Thank you, sir.

9                And please begin.

10               MS. RAGAN:  Thank you so much.

11                     EXAMINATION

12   BY MS. RAGAN:

13       Q    Good morning, Mr. Perez.

14       A    Good morning.

15       Q    As I said, my name is Amelia Ragan.  I

16   represent Tiar McCart in her claims against Equity

17   Prime Mortgage and Mark Moloughney.  I'm going to be

18   asking you a few questions today related to her

19   claims.  Have you ever been deposed before, Mr. Perez?

20       A    [No audible response.]

21       Q    Okay.  If you can --

22       A    Yes.  Sorry.

23       Q    Thank you.

24       A    I caught myself.  Apologies.  Give

25   me -- it's been a while.  So give me a little bit of

Eddy Perez                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 9

1    some grace.  But I'll get there.  I caught myself.

2         Q    It's human nature and literally every

3    witness does it.  So please don't worry.  And if you

4    catch me correcting you or noting that, please note

5    I'm not being nitpicky.  I'm just making

6    clarifications for the record.

7         A    She's got to get it on the record.

8         Q    Yes, sir.  So I anticipate that today's

9    deposition will go very similarly to any prior

10   deposition you've been in.  I will just remind you of

11   a couple of logistical rules that will help us proceed

12   as smoothly as possible.

13            The first you've already, sort of, picked up

14   on.  If you want to respond with a yes or a no to any

15   of my questions, just make sure to vocalize --

16        A    Say it.

17        Q    -- yes or no.  If any time I ask you a

18   question that's in any way confusing or unclear to

19   you, please let me know.  I'll be glad to rephrase it

20   until it is clear to you.  However, if you answer my

21   question without indicating any confusion, I'll assume

22   that you understood the question when you answered it.

23   Okay?

24        A    Sounds good.  Yes.

25        Q    Okay.  Thank you.  If you need a break at

Eddy Perez                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 10

1    any time, please let me know.  We'll be glad to go off

2    the record, and allow you to take whatever break that

3    you need.  My hope is that I won't be taking up too

4    much of your time today.  But if I have asked you a

5    question, I will ask that you completely respond to

6    that question before we go off the record for the

7    break.  Okay?

8         A    I might need bathroom breaks.  I just drank

9    a lot of water.

10        Q    That's fine.  Whenever you need one, let me

11   know.  And then, let's see.  Oh.  If you can, I

12   anticipate that the vast majority of the questions I'm

13   going to be asking you today, you're going to know

14   where I'm going before I even complete the question.

15              For the clarity in the record, if you'll

16   allow me to complete the question in the record before

17   you begin your answer so we're not talking over each

18   other.  I'll extend the same courtesy to you.  I'll

19   let you complete your response before I move on to my

20   next question.  Okay?

21        A    I understand.

22        Q    All right.  Good deal.  So we'll just jump

23   right in.  Can you tell me what, if anything, you did

24   to prepare for your testimony today?

25        A    Talked to Legal.

Eddy Perez                                August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

                                                    Page 11

1        Q    Okay.  Did you speak to anybody other than

2   counsel in preparing for your testimony?

3        A    No.

4        Q    Okay.  Did you speak to any coworkers or

5   other employees of Equity Prime Mortgage?

6        A    No.

7        Q    Okay.  Throughout the day today I might

8   refer to Equity Prime Mortgage using the acronym EPM.

9   Will you understand what I'm talking --

10       A    Please do.  It would be easier.

11       Q    Okay.  Great.  Did you review any documents

12   in preparing to testify today?

13       A    The Complaint.

14       Q    Okay.  Any other documents other than Ms.

15   McCart's Complaint?

16       A    [No audible response.]

17               MR. WILSON:  Verbal answer.

18               THE WITNESS:  Oh.  No.  Sorry.

19               MS. RAGAN:  Thank you.

20   BY MS. RAGAN:

21       Q    I'm going to ask you a couple of questions

22   about your background now.  Can you tell me what's

23   your highest level of education?

24       A    I graduated with a degree in finance and the

25   major in -- excuse me.  I graduated with a degree in

Eddy Perez                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 12

1    bachelor's business administration in finance from

2    Georgia State University with a minor in sociology.

3         Q    Okay.  And what year did you receive that

4    degree?

5         A    1999.

6         Q    Okay.  And that's the highest degree you

7    attained?

8         A    Degree.  Yes.  But I have a certification in

9    the industry of a certified mortgage banker, which is

10   what they consider like an MBA for the industry.  It's

11   like 150 hours.  Pretty intense, so.  But from an

12   accredited university, I guess, yes.

13        Q    Okay.  Well, you already anticipated my next

14   question.  Do you hold any other certifications other

15   than the certified mortgage banker certification?

16        A    I hold that one.  I hold a DE which is an

17   underwriting.  I also hold state licenses in --

18                  THE WITNESS:  -- thirty-eight, Seth?

19   Forty?

20                  I can't remember when they changed the

21   law.  I used to have to take it for every state.  And

22   then they passed one that allowed for everything, so.

23   I hold all those as well, so.

24   BY MS. RAGAN:

25        Q    And what is that --

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 13

1        A    I take a lot of CE classes.

2        Q    See?  I broke the rule about time.  So

3    excuse me for talking over you.  What is the license

4    that you're referring to that you have to --

5        A    You have to have a license by the SAFE Act

6    to be an originator.  And every organization has to

7    have a responsible individual.  And I'm the

8    responsible individual for the organization.  And that

9    requires licensing and passing a lot of tests.  It's

10   easier today than 12 years ago or so.  Thirteen years

11   ago.

12       Q    Good deal.  All right.  Let's talk about

13   your employment.  Do I understand correctly that

14   you're currently employed by Equity Prime Mortgage?

15       A    Yes.

16       Q    And what is your position there?

17       A    CEO and president.

18       Q    Okay.  How long have you been in that role?

19       A    Which one?

20       Q    Well, to the extent that they're different

21   I'm asking about both CEO and president roles.

22       A    The -- what date was that?  March of 2020.

23       Q    Okay.  You became CEO and president?

24       A    I was president just previously before that.

25       Q    Okay.  So when did you first become

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 14

1    president?

2         A     Founding.  February of 2008.

3         Q     So when you say founding what you mean is

4    that from the beginning of the company, you were in

5    the president role?

6         A     Yeah.  Its formation.  We had had another

7    company three years before.  And then we transferred

8    from being a mortgage broker to a mortgage lender.

9         Q     Okay.  Tell me what was the name of the

10   company that you had prior to transitioning into

11   Equity Prime Mortgage.

12        A     We were an affiliate office for Global

13   Mortgage.

14        Q     Okay.  All right.  Can you just generally

15   describe the business of Equity Prime Mortgage?

16        A     We are a residential mortgage lender and

17   servicer, licensed in all 50 states including -- well,

18   it's more than 50 states.  Including Puerto Rico and

19   D.C., because they require different licenses.

20        Q     Okay.  And approximately how many employees

21   does the company have?

22        A     A little under 500.  I don't know the exact.

23   That's HR.

24        Q     Okay.  Understood.  I want to talk to you

25   about valuation in the company.  Can you estimate for

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 15

1    me the amount of profits that the company earned in

2    2021?

3         A    What do you define as profits?

4         Q    Well, the amount of money received after all

5    expenses are paid.

6         A    That -- the only reason I say that is 'cause

7    a lot of the income is deferred.  So it may not be

8    calculated, and a lot of times it's not.  So that's

9    why I had to ask that.

10        Q    So for you to describe it in the terms that

11   feel most comfortable to you.  It doesn't have to be

12   profit by my definition.

13        A    I don't want to say in '21 because of how

14   much was deferred.  And I had a very low tax

15   liability.  I'd say almost the profits were minimal.

16        Q    Okay.  And when you say deferred, describe

17   that for me.

18        A    Asset that we collect, that by the

19   regulations we defer the income.

20        Q    Okay.  And to what did you defer it?

21        A    You keep it on your books and you just defer

22   it and --

23        Q    To the next year?

24        A    -- as you collect -- no.  What happens is

25   you collect the monthly.  That's why we're a servicer.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 16

1    So when the servicing income comes, that's when you

2    pay your taxes.  That's obviously a lot smaller than

3    how you'd defer it.

4            Q    Okay.  And how much did you defer in 2021?

5            A    Eighteen million.

6            Q    Okay.  All right.  Same question for 2020.

7            A    Mm-hmm.

8            Q    Estimation to the best of your ability.

9            A    How much did we defer?  I had to

10   pay -- million in taxes.  Seven.  Capital gains.  I'd

11   ballpark it that we deferred probably about

12   50,000,000.

13           Q    Okay.  And can you estimate what the profits

14   were?  Or was it the same scenario for 2020 where you

15   deferred the majority of --

16           A    No.  That one had some 'cause I had to pay

17   some taxes.  So I'd say that the income was about

18   15,000,000.  Sixteen.  Somewhere around there.

19           Q    And for 2019, what would have been the

20   profits that year?

21           A    It was like 300,000.  No deferred.

22           Q    Okay.  What was the reasoning, to the best

23   of your ability to describe it, for the significant

24   difference between 2019 and 2020?

25           A    My business partner had a heart attack late

Eddy Perez                                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 17

1    '18.  I took the reins.  He signed away day-to-day

2    leadership 'cause he said the stress was too hard of

3    the industry.  And we refined the organization and

4    that led to a low of growth.

5          Q    Okay.  Good for you.

6          A    Thank you.

7          Q    Who is your business partner that had the

8    heart attack in 2018?

9          A    Kunjan Patel.

10              THE REPORTER:  Would you mind to spell

11   his first name for me, please?

12              THE WITNESS:  K-U-N-J-A-N Patel.

13   BY MS. RAGAN:

14         Q    Okay.  Is he involved in the company at all

15   at this point?

16         A    Not as of ten minutes ago.

17         Q    Oh.  Okay.

18         A    I'm not even exaggerating.  Or 20 minutes

19   ago.  Whatever.  Right before we got in here.

20         Q    Okay.  Well, perfect timing then.

21              All right.  I want to talk to you about the

22   policies of Equity Prime Mortgage.  Are you familiar

23   with the sexual harassment policy of the company?

24         A    I know that that's something that Jim

25   Minghini, our head of compliance, as well as head of

Eddy Perez                                         August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 18

1    HR.  I'm aware of them, but I don't know them in great

2    detail.

3         Q    Okay.  How long has Mr. -- is it Minghini?

4    How long has Mr. Minghini been the head of HR?

5         A    He's not the head of HR.  He's the chief

6    compliance officer.

7         Q    Chief compliance officer.  Thank you for

8    clarifying that.  How long has he been the chief

9    compliance officer?

10        A    Either May or June of 2015.  I want to say

11   May.

12        Q    Thank you for the estimation.  Did he have a

13   hand in drafting the policies?  Is that why you

14   referred to him?

15        A    Well, he was over HR for a long time.  HR

16   reported to him.  It does not today.  But I don't know

17   when to talk about past or present depending on dates.

18             So I like to give the information so that

19   way -- I don't know if he did.  I'm sure he oversees

20   it.  He does a good job.  But I don't know if he

21   drafted it or who did it exactly.

22        Q    Okay.  And I appreciate you clarifying

23   dates.  You're doing a fine job.  So to the extent

24   that I ask you a question that the answer was one way

25   in a certain period of time and a different way in a

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 19

1    different, please feel free to --

2         A    That's why I'll probably ask you what dates.

3    That's why I was asking about certain things.

4         Q    That's just fine.  You said he used to be

5    the head of HR.  Did I understand that correctly?

6         A    [No audible response.]

7         Q    Is that a yes?

8         A    Yes.  Oh.  Sorry.  Yes.

9         Q    It's totally fine.  Again everyone does

10   that.

11        A    There was a head of HR but she reported to

12   him.

13        Q    Okay.  And that was whom?

14        A    Nyree Green at the time.

15        Q    And who --

16        A    Oh.  Wait.  Excuse me.  What date are you

17   referring to?

18        Q    Well, I was about to ask you.

19        A    Dates are going to be very important.  So

20   that's why.  A lot of things have changed.  So I have

21   to make sure I'm dead accurate.

22        Q    So let's back up then.  You were

23   telegraphing my next question.  At what point did Mr.

24   Minghini's role as HR end?

25        A    Eric became the chief people officer, if I

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 20

1     had to guess, June of '21.  July.  Maybe May.

2     Summer-ish.

3          Q    Okay.  More like spring, summer?

4          A    Summer-ish of '21.

5          Q    An estimation is fine.  I appreciate that.

6     So if I'm understanding, sort of, the bookends that

7     you've created, Mr. Minghini was the chief compliance

8     officer.  And in that role heading up the HR division

9     from approximately May 2015 through approximately

10    early summer of 2021.

11         A    I don't know if he started May of '15, but I

12    know it was not long after that.

13         Q    Okay.  But the ending date is accurate?

14         A    Accurate.  Correct.

15         Q    Okay.  And so to get back to our point about

16    Ms. Green, he would have been supervising Ms. Green in

17    that period of time between approximately mid-2015

18    through --

19         A    Yes.

20         Q    -- mid-2021.

21         A    I've been shaking my head yes.

22         Q    Okay.  2021.

23         A    Oh.  Wait.  No.  Ms. Green wasn't the head

24    of HR that whole time either.

25         Q    Okay.  So let's clarify that then.  Do you

Eddy Perez                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 21

1    know when Ms. Green took over the HR director role?

2         A    July of 2020.  Or maybe August.  Somewhere

3    around there.

4         Q    Okay.  And how long did she stay in that

5    role?

6         A    A year.

7         Q    A year.  So approximately late summer of

8    2021?

9         A    Early spring.

10        Q    In the spring?

11        A    Early fall.  Excuse me.  Yes.  Somewhere

12   around there.

13        Q    Okay.  And just to clarify, can you tell me

14   what her title was?

15        A    Oh, God.  You're going to quote me on it.  I

16   don't know if it was director of HR.  Head of HR.

17        Q    Head of HR.

18        A    I -- I don't know the exact title to be

19   honest with you.

20        Q    The estimation is fine.  I appreciate it.

21   Okay.  Do you understand what the circumstances were

22   that resulted in Ms. Green leaving that role of

23   director of HR?

24        A    I think she just had another opportunity.

25        Q    Okay.  She voluntarily resigned?

Eddy Perez                                      August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

                                                        Page 22

1          A     Mm-hmm.

2          Q     Is that a yes?

3          A     Yes.

4          Q     Okay.  All right.  So we were talking about

5     your knowledge of the policies.  I do understand that

6     you stated that you're not familiar with the specifics

7     of the sexual harassment policy.  Is that fair to say?

8          A     That is very fair to say.

9          Q     Okay.  Have you had any training on that

10    policy?

11         A     On what policy?

12         Q     The sexual harassment policy.

13         A     Ours?  Or any one in general?

14         Q     Well, let's talk about Equity Prime first.

15         A     Yes.  I've had the training.

16         Q     All right.  When did you take the training

17    that Equity Prime offers on its sexual harassment

18    policy?

19         A     Oh, God.  First time?

20         Q     Sure.  If you've taken it multiple times,

21    you can provide that as well.

22         A     Yeah.  No.  I've -- I've taken it a lot.

23         Q     Okay.  Can you recall the first time?

24         A     It's been a while.  And a while, and I'm not

25    talking about months.  I'm talking about years.  I

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

                                                       Page 23

1      mean, it's been, I don't know.  Five, ten years.  Some

2      range like that.

3              I mean, I know I had business training

4      before that because that's required in our licensing

5      in the state of Florida.

6          Q    Okay.  Focusing for the time being on the

7      training that Equity Prime Mortgage does, do I

8      understand correctly that you're saying it's been

9      approximately five to ten years ago that you took that

10     training for the first time?

11         A    Yes.

12         Q    Okay.  And do you take that training

13     annually?

14         A    Yes.

15         Q    Without fail?

16         A    Yes.

17         Q    Have you ever missed a year of that

18     training?

19         A    [No audible response.]

20         Q    Is that a no?

21         A    Yeah.  That's a no.  Sorry.  I would lose my

22     licenses.  That's part of the CEs that we also have to

23     take.

24         Q    Okay.  And again, we're talking about the

25     training that Equity Prime Mortgage offers.  Correct?

Eddy Perez                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 24

1          A     Yes.

2          Q     And how do you take that training?  Describe

3      for me the process that you go through for the

4      training.

5          A     Over the years we've had a few iterations.

6      We've moved more to an advanced way now that's a lot

7      more effective which is BAI, I believe.  Or one of

8      those vendors.

9                We had a previous vendor.  At one point in

10     time we would have refreshers company-wide.  So we had

11     iterations.  So I hate to say a hodgepodge, but a few

12     different ways.

13         Q     Okay.  How long have you -- has Equity Prime

14     Mortgage been using the BAI training?

15         A     I don't know.

16         Q     Okay.  Is that training an online training?

17     Is it an in-person training?  Are you sitting in a

18     classroom?

19         A     Over the years we've done all of the above.

20         Q     Okay.  What about since 2019?  Between 2019

21     and the present?  Can you describe for me the way in

22     which that training is administered?

23         A     I believe it's just been online.  But I'm

24     not sure if it was '19 or '20 that that -- I'm not

25     sure.

Eddy Perez                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 25

1          Q     All right.   Approximately somewhere between

2     2019, 2020, Equity Prime Mortgage started training

3     employees on its sexual harassment policy through an

4     online training --

5          A     I think it was before that.   But I'm not

6     sure if it was BAU [sic].   I know at one point in time

7     we used TrainingPro.   That also tied in with our

8     licensing.   That's why I say that's important with our

9     licensing because it's required by all originators.

10    So they, kind of, universally tied together.

11               So I'm not sure exactly when it changed.

12    But they wanted to remove it.

13         Q     Okay.   But both TrainingPro and BAI were

14    online training courses?

15         A     Some of the times they -- they would send

16    people out.   And I don't know who got what.

17         Q     Okay.   Do you know when the last time that

18    you can recall Equity Prime Mortgage offering

19    in-person training on its sexual harassment policy?

20         A     I guess what I would say is what do you

21    define in-person today?

22         Q     Well, use it how you would characterize that

23    phrase.   An in-person training from my perspective is

24    you're sitting in a room --

25         A     Like this?

Eddy Perez                                                   August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 26

```
 1        Q    -- with someone standing in front of you
 2    teaching a class.  But you're the one with the
 3    knowledge of the training course.  So if it's
 4    something different than that, then answer --
 5        A    Well, sometimes it just depends.  Sometimes
 6    they do those virtuals.  Sometimes you could consider
 7    a virtual in-person training.  Sometimes it's the
 8    instructor is virtual and it's there.  I'm not sure.
 9    'Cause I know that I've heard different ways.
10            That's why I just say as the expert on all
11    this is chief people officer and Jim.  I -- I empower
12    them and never had any challenges.  So they take it.
13        Q    Okay.  I'm mostly asking about your
14    experience in taking the training.  I think we've
15    established in the record that you've taken it every
16    year for at least somewhere going back to five to ten
17    years ago.
18            So in your experience, can you tell me the
19    last time that you sat either virtually or in person
20    for a training where it's being conducted and led by a
21    trainer or a teacher?
22        A    For EPM or in general?
23        Q    EPM.  Yes, sir.  At this point the only
24    training I'm asking you about at all is the training
25    that is offered by Equity Prime Mortgage.
```

Eddy Perez                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 27

1        A    I don't -- I don't -- dates are running in.

2    I'm not sure.

3        Q    Okay.  Have you ever to date, in the entire

4    history of Equity Prime Mortgage, sat for an in-person

5    training where the company has brought in a person,

6    either virtually or in-person, in a classroom to lead

7    or teach a training on the sexual harassment policy?

8        A    Yeah.

9        Q    Okay.  You have.  But you just don't recall

10   what year or years that occurred?

11       A    No.

12       Q    Okay.  To your knowledge, was there any

13   in-person training, whether it be in a room together

14   or virtually, in 2019 on the sexual harassment policy

15   offered by Equity Prime?

16       A    I yield the floor on that one to my experts.

17       Q    Okay.  So you're not sure?

18       A    Yeah.  I'm unaware.

19       Q    What about in 2020?  To your recollection

20   did you sit in person either in a room with a teacher

21   or virtually to receive training on Equity Prime

22   Mortgage's sexual harassment policy in 2020?

23       A    As we know, 2020 was COVID year.  So I'm

24   just not sure 'cause I know that we -- we did stay

25   open because we were deemed a essential industry.  We

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 28

```
 1    had to drive around with that thing in our car so if

 2    we got pulled over.  I'm not sure.

 3              A lot of those '21 and '20 run -- a lot of

 4    those years run -- a lot of -- a lot of years run

 5    since my business partner's heart attack almost four

 6    years ago.  A lot of things run counterintuitive.  So

 7    I'm not sure.

 8         Q    Okay.  So just to be clear, the answer to my

 9    question is you are not sure as you sit here today

10    whether or not you received in-person -- whether

11    virtually or in a room together -- training on Equity

12    Prime Mortgage's sexual harassment policy in 2020.

13         A    Yeah.  I'm not sure.

14         Q    Okay.  Same question for 2021.  Can you

15    recall whether last year you received any in-person

16    training either virtually or in a room with a teacher

17    on Equity Prime Mortgage's sexual harassment policy?

18         A    As I stated I'm not sure of those years, how

19    they run into each other.

20         Q    Okay.  What about this year, 2022?  Have you

21    received any in-person training on Equity Prime

22    Mortgage's sexual harassment policy either virtually

23    or in a room with a teacher?

24         A    No.  I think this year is -- is online if I

25    recall properly.
```

Eddy Perez                                August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 29

1      Q    Okay.  And have you taken that online

2    training already this year for 2022?

3      A    I don't know.  I know I have to by the end

4    of the year for my licenses.

5      Q    Okay.  What about -- so we will go back

6    through these questions for 2019 through 2021 as well.

7           In the year 2019, do you recall receiving

8    any online training that was self-led by you on Equity

9    Prime Mortgage's sexual harassment policy?

10     A    I wouldn't have led it.

11     Q    Whenever I say led, I mean you yourself

12   logged into some online platform on your own volition

13   is what I mean by --

14     A    Oh.  I thought you said me.  I'm not -- I'm

15   not an expert on that stuff plus that -- that has to

16   be lead by compliance and you have to have that

17   separation.

18     Q    Right.  Thank you for clarifying.  What I

19   mean by self-led was that you yourself -- as opposed

20   to someone teaching you and otherwise leading

21   you -- were required to log into some online platform

22   and go through an online training course that provided

23   training in EPM's sexual harassment policy in 2019.

24   Did you do that?

25     A    I kept all my licenses.  So I have to

Eddy Perez                                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 30

1    imagine I've done something.

2         Q    Okay.  And do you know whether or not it was

3    online training in 2019?

4         A    It wasn't in person.

5         Q    Okay.  So is that a yes?  It was an online

6    training?

7         A    Speculatively, I'd have to say yes.

8         Q    Okay.  Same question for 2020.  Do you

9    recall receiving online training on Equity Prime

10   Mortgage's sexual harassment policy in 2020?

11        A    Like I said, you -- I turned those in for my

12   licenses.  And I know that you say they're separated

13   but they're not because I am the responsible

14   individual.  So if I lose my licenses, then the

15   organization is in some trouble of having to find a

16   new one.

17             So I would -- 'cause that's part of the

18   ethics and everything to keep licenses in the state of

19   Florida and all the states that we're licensed in.  So

20   I would tell you that it had to get done.

21        Q    Okay.  So your answer is yes, you do believe

22   that you received some online --

23        A    To the --

24        Q    -- training --

25        A    To the best of my ability.  Yes.

Eddy Perez         August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 31

```
 1        Q    Okay.  And that online training would have
 2    been something that Equity Prime Mortgage offered to
 3    you and your employees?
 4        A    Not necessarily.  Well, no.  I know that EPM
 5    provides it.  But I'm in a different anomaly because
 6    I'm the -- not only principal shareholder, but like I
 7    said, I'm depending on the state's -- some is
 8    responsible individual; some call it a qualifying
 9    individual.  Potato, potato.
10        Q    Okay.  So I want to make sure your answer is
11    clear in the record.  Are you telling me that you did
12    receive some online training for Equity Prime
13    Mortgage's sexual harassment policy in 2020?
14        A    EPM's or the industry's or whatever
15    standards.  One of those.
16        Q    Okay.  What you're saying is you know you
17    received online training in 2020 on sexual harassment.
18    You're not certain whether it was something that EPM
19    offered or something that was industry standard
20    training that you needed for your licensure?
21        A    I know by our PMPs that it's -- it's offered
22    annually to the employees.  I'm an employee myself.
23    But I know that I have to take so many CEs, you know,
24    it's -- it's tough to recall if it was one this way,
25    one the other.  I know how that works very well.
```

Eddy Perez                           August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 32

1        Q    Okay.  So again to clarify your answer in

2    the record, you're saying you, as you sit here today,

3    are not certain whether or not you received online

4    training on sexual -- the EPM's sexual harassment

5    policy either through EPM or through some industry

6    standard training?

7        A    No.  I'm certain I did it.  Because --

8        Q    Okay.  You're certain you did it.  You just

9    don't know if it was through EPM or through the

10   industry --

11       A    No.  I'm certain I did it.  Because if not,

12   I'd lose my licenses.

13       Q    Okay.  But again being certain that you did

14   it, you're not certain whether it was something that

15   was provided and tracked by EPM.  Or something that

16   came through some industry standard training.

17       A    Yes.  Correct.

18       Q    All right.  Same question for 2021.  Do you

19   recall receiving any training provided by Equity Prime

20   Mortgage online on its sexual harassment policy in

21   2021?

22       A    Myself?

23       Q    Yes, sir.

24       A    Or in general?  The company?

25       Q    You.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 33

1        A     Like I said, I'm not sure if it was through

2     that or it was through my CE classes that, you know,

3     depending on how somebody can take an argument, you

4     can say that that was through EPM as well.  Because

5     EPM is who pays and provides those classes for CEs for

6     all of us that are licensed.

7             So I'm not sure if it was EPM's or if it was

8     the other one.  But they, kind of, work in

9     conjuncture.

10        Q     Okay.  Can you tell me what is the provider

11     of the industry sexual harassment policy that you have

12     been referring to that you must take in order to

13     maintain your licensure?

14        A     I forget.  They change on who all the CEs we

15     take 'cause that's always a negotiation depending on

16     what the company takes.  And sometimes -- some of the

17     classes, some of the CEs are met because of

18     conferences.  And then workshops.  That's talked about

19     because that's a subject that's talked about

20     extensively.

21             I mean, when we talked about my CMB

22     certification, that was a huge part of it.  And I have

23     to keep certifications on those hours every year.  So

24     it is not a subject that is not addressed early and

25     often.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

                                              Page 34

1        Q    Right.  Okay.  So how do you report having

2   received sexual harassment training to your licensing

3   body or agency for the purposes of complying with the

4   requirement that you've described?

5        A    It's a good question because I don't handle

6   it myself.  That's all handled by Jim Lyons who's

7   under Jim Minghini.

8        Q    And what is Mr. Lyons' position?

9        A    Oh, Lord.  Can I ask Seth if he can help me?

10  He may know it better than me.

11       Q    Not on the record.

12       A    Okay.

13       Q    But maybe you guys can talk about it after

14  the fact.

15       A    I want to say -- I mean, he's

16  essentially -- I know he's over licensing.  He's

17  over -- he does a lot of compliance work.  I mean,

18  he's -- he's a higher earner.  So he's up there.  I

19  just don't know.  I don't know if it's director of

20  compliance.

21       Q    That's okay.  I appreciate the estimation.

22  So do I understand correctly that Mr. Lyons is the

23  person that would make the reports to your licensing

24  agency to confirm for them that you had received

25  the -- whatever CEs that you need to

Eddy Perez                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 35

1    complete -- annually to maintain your license?

2         A    Yeah.  He -- yes.

3         Q    Okay.  And as a part of that reporting that

4    Mr. Lyons does on your behalf, he would have also been

5    confirming for the licensing agency that you had

6    received the sexual harassment training that you've

7    described is required?

8         A    Yes.

9         Q    Okay.  All right.  So Mr. Lyons should have

10   the records that shows what training you received on

11   sexual harassment in what years?

12        A    He'll have all the certifications and

13   everything approved because everything has to be put

14   in electronically.  And then it has a past according

15   to the NMLS, which is the National Mortgage Licensing

16   System.

17             My licenses are all in there.  And they're

18   up to date, and they'll show if anything is violated

19   or anything of that nature.

20        Q    Okay.  And you said that that's something

21   that he inputs online in the --

22        A    He handles it for the whole organization.

23   'Cause when you are leading a lot of people in that

24   realm and it's very delicate, you've got to have a

25   point person.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 36

1          Q    Okay.  And so when you say he does that for

2    the whole organization, he would handle gathering and

3    reporting the records of sexual harassment training

4    for any individual employed by EPM that has to

5    maintain this licensure?

6          A    If it's in the states that they're required.

7    Not all states require it.

8          Q    Okay.  Does the state of Georgia require

9    that sexual harassment policy?

10         A    I'm not sure.

11         Q    Okay.  And I believe you've you noted that

12   the state of Florida does require it?

13         A    Florida does.

14         Q    Okay.  What about the state of New Jersey?

15         A    Your guess is as good as mine.  I just know

16   Florida is vital.  So I can answer that.  'Cause

17   that's what they made me take when I took a test in

18   2008.

19         Q    And what was the test that you took in 2008?

20         A    To get your mortgage lender's license -- as

21   crazy as it sounds -- you had to pass back then what

22   was known as the mortgage broker's license.  And part

23   of that was a three-day training in Florida and it had

24   to be the people that were shareholders.

25              So it had to be somebody that is owning

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 37

1     shares, like myself.  And one of the big subjects even

2     back then was what defines sexual harassment.  And it

3     was almost a full day of the three-day class.

4            So you had to do that.  You had to pass it.

5     And then you can go take the test, old school with

6     No. 2 pencil and Scantron as I remember.  It's a true

7     story.  And you had to pass it.  And -- and that was

8     2008.

9            Q    Okay.  All right.  So in order --

10           A    Now I will say this for the record --

11           Q    Sure.

12           A    -- I don't know if the standards are still

13    the same in different states.  You know, I

14    don't -- I'm not a regulator.  I don't know what they

15    change or what they add or anything like that.

16           Q    Okay.  Understood.  Now we talked earlier

17    about your knowledge of Equity Prime's sexual

18    harassment policy.  Are you able to tell me what

19    Equity Prime's retaliation policy is?

20           A    What?

21           Q    Well, all right.  Let me repeat that

22    question.  First of all, to your knowledge, does

23    Equity Prime Mortgage have a policy related to

24    retaliation in the workplace?

25           A    Like you can't retaliate?  Or you should

Eddy Perez                                August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 38

1    retaliate?  I'm confused as heck on this question.

2         Q    Well, I am simply asking whether or not you,

3    in your role as CEO and president, have any knowledge

4    as to whether or not the company has any policy

5    relating to retaliation in the workplace.

6         A    Like, I'm not sure if it's, like, anti-

7    retaliation.  Or, like, pro.  Like, the way you're

8    asking that question it's too open-ended.  I'm not

9    sure.

10        Q    Well, I don't -- I'm going to have to

11   disagree with you.  In fact, I think it's a pretty

12   straightforward question.

13             Does the company, to your knowledge, have a

14   retaliation policy?  Whether it's pro-retaliation or

15   anti-retaliation or any other, you know, qualifying

16   term, it's up to you to describe.

17             But my question to you is simply:  To your

18   knowledge, does Equity Prime Mortgage have a policy

19   related to retaliation in the workplace?

20        A    I'm not sure.  That's a question for Jim

21   Minghini, our chief people officer.

22        Q    Okay.  Got it.  All right.  And then lastly

23   as it relates to Equity Prime's policies, to your

24   knowledge, does Equity Prime Mortgage have any policy

25   that instructs its employees on how to report either

Page 39

1    discrimination, sexual harassment, or retaliation in

2    the workplace to the extent that they experience it?

3         A    And I would assume, but I don't -- you know,

4    assumption as they say makes an ass of you and me.

5              I know that in cases in the past people have

6    come to me and I've told them that this is not a

7    matter for me.  You have to go to HR.

8              I would probably -- I don't know.  I don't

9    know if there's a step-by-step process.  I just know

10   that it has been talked and verbalized.  So, but I

11   don't -- I'm not sure of exactly what's in the policy

12   and procedure there.

13        Q    Okay.  Understood.  All right.  In your role

14   as CEO and president, do you have any involvement

15   whatsoever in hiring employees?

16        A    It depends.

17        Q    Okay.  On what does it depend?

18        A    If they report to me.

19        Q    Okay.  So what positions report to you?

20        A    You want them all?

21        Q    Yeah.  To the extent that you can

22   characterize them.  You don't have to list them

23   individually if it's easiest.

24        A    I was going to say, can I -- can I look at

25   my phone?

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 40

1          Q    I would --

2          A    I can list them all if I look at my phone.

3     I hate to say that but I can go to my Microsoft Teams,

4     and I can tell you everybody that reports to me.

5          Q    Okay.  I'm mostly looking for positions as

6     opposed to individual persons or --

7          A    No.  I was going to say positions.  I don't

8     remember all the C's.

9          Q    I have no problem with you looking at your

10    phone if you want to.

11         A    Okay.  It's easy that way.  I rely more on

12    that.

13         Q    It's not a memory test.

14         A    Well, I -- I would leave something off.  So

15    other question.  What dates would you like me to tell

16    you about?  Today?  Things change.  That's why I have

17    to ask.

18         Q    Okay.  That's a good clarification.  Let's

19    talk about in 2019.  To whom were the employees that

20    reported to you?

21         A    I was just president then.  I wasn't

22    president and CEO.

23         Q    That's fine.

24         A    God.  Who?  Oh, man.  COVID brain.

25         Q    Just an estimation.

Page 41

1      A    I mean, I know sales reported to me.  And we

2    have wholesale and retail then.  I know -- oh, God.

3    Who is everybody?  I mean, today it's a lot easier and

4    I can explain even once I became both.  But 2019.

5           We had nobody in tech back -- well, we had

6    two or three people in tech.  But our COO was over

7    that.  He didn't report to me.

8           Compliance didn't report to me.  Marketing

9    did report to me.  But that's before we grew and it

10    became a C-level.  Marketing.  Sales.  Business

11    development.  Oh, God.

12           That's a great question.  CFO.  Chief

13    investment officer.  That may be it.  We were a lot

14    smaller back then.

15      Q    Okay.  So I believe that the ones that you

16    stated, just to make sure I followed you, were

17    marketing, sales, business development, retail, the

18    CFO position, and the CIO position, chief investment

19    officer.  Is that correct?

20      A    Correct.

21      Q    Okay.  And then that changed in March of

22    2020 when you became CEO and president?

23      A    Mm-hmm.

24      Q    Okay.  Is that a yes?

25      A    Yes.  Yes.  Sorry.  Mm-hmm.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 42

1          Q    All right.  So tell me how that -- the

2     positions that reported to you changed in March of

3     2020.

4          A    Every executive reported to me at that

5     point.

6          Q    Okay.  So every C-level position?

7          A    [No audible response.]

8          Q    Is that a yes?

9          A    Yes.  Sorry.

10         Q    That's okay.  How many C-level positions

11    does EPM have?

12         A    Today?

13         Q    Yes, sir.  Well --

14         A    Including myself?

15         Q    -- from -- let's backtrack on that.  From

16    March of 2020 to the present, how many C-level

17    positions?  Yes.  Including yourself.

18         A    Oh, Lord.  You're asking me great questions

19    'cause we've grown 500 percent.  It's tough to keep a

20    pace.  Today is easy as shit 'cause I can tell you

21    right now.

22              We didn't have a -- we didn't have a chief

23    strategy officer then.  That -- that evolved after

24    March.  COO did start reporting to me then.  CIO still

25    did.  CFO did.  No.  Shit.  No.  CFO started reporting

Eddy Perez                                August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 43

1      to CIO.  No.  Not true.  Not true.  Not accurate.

2               Sales.  You know, I have a chief retail

3      officer and a chief wholesale officer.  That -- that

4      was definitely me, even though now it's called the

5      chief lending officer.  But potato, potato again.

6               Can I look at my phone?

7          Q    Sure.

8          A    I'll remember what titles existed then.  So

9      chief compliance officer started reporting to me.  I

10     said COO.  Correct?

11         Q    You did.  Yes, sir.

12         A    And a few then.  We've added some titles

13     after that.  We've added some executive positions

14     after that with the growth of the organization.

15         Q    After March of 2020?

16         A    Mm-hmm.

17         Q    Is that a yes?

18         A    Yes.  Sorry.

19         Q    That's okay.

20         A    I'm looking here.

21         Q    Okay.  So tell me the positions that were

22     added after March of 2020.  Executive positions only.

23         A    Chief growth officer.  Chief of staff.

24     Chief technology officer.  Chief people officer.

25     Chief strategy officer.

Eddy Perez                                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

                                                          Page 44

1          Q     Any others?

2          A     Nn-mmm.

3          Q     No?

4          A     Nn-mmm.  I mean, I think some titles

5    changed.  Sort of got upgraded to C-level.  But no.

6    No.  Nothing.

7          Q     All right.  Good deal.  So we talked about

8    in 2019, the only C-level positions that you mentioned

9    that reported to you were chief finance officer and

10   chief investment officer.  And then when we talked

11   about the change in March of 2020, you added COO to

12   that.

13             Was that a new position in March of 2020?

14   Or just didn't report to you?

15         A     No.  That reported to my business partner.

16         Q     Okay.  So it just -- the position existed.

17   It just changed, the reporting structure in March --

18         A     Correct.

19         Q     -- of 2020?

20         A     Correct.

21         Q     Okay.  If you will just let ask my question.

22         A     Yes.  Yes.  Yes.  Sorry.  Yes.

23         Q     It's okay.  And then same question for chief

24   compliance officer.  Did that position exist prior to

25   March of 2020?

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 45

1        A    It existed beforehand.  Yes.  It did.  And

2    then, yes.  After March 2020, it started reporting to

3    myself.

4        Q    Okay.  What about chief wholesale officer?

5    Did the position exist prior to March of 2020?

6        A    No.  That was created.

7        Q    When was that position created?

8        A    God.  Before our first retreat which was

9    August.  No.  Wait.  That was September.  August 2020.

10   I was going to say probably August or July of 2020.

11       Q    Okay.  And then is the chief wholesale

12   officer the position that you described changing to

13   chief lending officer?

14       A    Correct.

15       Q    Okay.  Understood.  All right.  And then you

16   also mentioned chief retail officer.  Did that

17   position exist prior to 2020?

18       A    No.

19       Q    Okay.  When was that position --

20       A    In January of '21.

21       Q    Okay.  And let's see here.  We talked about

22   the CFO.  Okay.

23            THE REPORTER:  What might help, too, is

24   if you give a bit of a pause between when she asks the

25   question and your answer just to --

Case 1:21-cv-04247-CAP-LTW   Document 86   Filed 03/21/23   Page 46 of 315

Eddy Perez                                     August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 46

1              THE WITNESS:  I'm trying to think.  I'm

2      trying to -- a lot of these dates.  There was a -- it

3      was my business partner leading basically.  There's a

4      lot of nuance.  Yeah.  There was.  And 2020 and 2021

5      were also an explosion in volume.  So that brought

6      with it its own moving parts.

7      BY MS. RAGAN:

8          Q    Okay.  Understood.  So my understanding is

9      the only positions that you have any involvement in

10     hiring for are positions that report directly to you.

11     Is that correct?

12         A    That's correct.

13         Q    Okay.  And that would have been true

14     pre-March of 2020 and post-March of 2020 when you took

15     on the CEO role?

16         A    Correct.

17         Q    Okay.  Did you have involvement in hiring

18     Tiar McCart?

19         A    No.

20         Q    Okay.  Did you have any involvement in

21     hiring Mark Moloughney?

22         A    Yes.

23         Q    Okay.  When did you hire Mark Moloughney?

24         A    May 2020.

25         Q    Okay.  And can you just describe for me

Eddy Perez                                      August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 47

1    generally what the process was through which you, I

2    guess, interacted with Mr. Moloughney for the purposes

3    of bringing him onto the company?

4         A    He was recommended by my CIO and my general

5    counsel who both had known him for a long time at a

6    previous engagement.  We had no tech department.  We

7    were horrible at it.  We had three people and it was

8    our number one Achilles heel.

9              So we had past people that tried to head up

10   tech and it always was going sideways.  And they

11   recommended 'cause they said that they knew Mark.  And

12   that's how it went down.

13             I interviewed him.  And I agreed with their

14   assessment.  And then we moved forward to hire him.

15        Q    Okay.  Who was the -- I think you said the

16   chief investment officer.  Who was that person that

17   recommended Mr. Moloughney?

18        A    Phil Mancuso.

19        Q    Okay.  And you said legal counsel also

20   recommended him.  Is that Mr. Kreiner?

21        A    Not recommended.  But he knew him.  So I

22   called him to check how he was and everything like

23   that.

24        Q    Okay.  Understood.

25        A    Phil recommended him.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

                                                    Page 48

1        Q    Okay.  Understood.  All right.  And you said

2    you interviewed Mr. Moloughney.  Are you aware of

3    whether or not anyone else in the company interviewed

4    Mr. Moloughney before he was hired?

5        A    I mean, I wouldn't call it an interview.  I

6    guess Phil Mancuso interviewed him.

7        Q    Okay.  And after you and Mr. Mancuso

8    interviewed Mr. Moloughney, you determined he would be

9    a good fit for the company?

10       A    Correct.  Yes.  Sorry.

11       Q    No.  That's --

12       A    Since correct is not a good enough one.

13       Q    Actually, no.  That's -- correct is fine.

14       A    Okay.

15       Q    Okay.  Other than talking to Phil and Seth

16   about their interactions with Mr. Moloughney, you

17   interviewing Mr. Moloughney, and Phil interviewing

18   Mr. Moloughney, were there any other steps taken in

19   the process of determining that Mr. Moloughney should

20   be hired by EPM?

21       A    Nn-mmm.  I mean, they have to pass a

22   background check because the state of Georgia has very

23   strict rules.  So HR has to do their part.  So all

24   offers of ours are pending the -- God dang.  You're

25   really racking my brain.  The GCIC report that I

Page 49

```
 1    believe is required for a background check.

 2        Q    Okay.  And that background check report

 3    checks for what information to your knowledge?

 4        A    Felonies is a big one.  You cannot have a

 5    felony.  It doesn't matter if it was 20 years ago and

 6    you were a foolish kid.  It has led to some serious

 7    challenges in the industry.

 8             Now we've helped change that as an industry,

 9    and I was a part of that.  But we couldn't even hire,

10    say, a janitor in Washington State if they had a

11    felony and they touched no Georgia loans.  That is a

12    very -- Georgia is one of the most stringent when it

13    comes to that.

14             So any felony.  Doesn't really matter.  If

15    it shows up, there's -- sadly, you can go work at a

16    bank.  They don't follow -- they don't have to follow

17    the same criteria and they can get away with that.

18    That's what we usually recommend.

19             But yeah.  No.  That's -- that's very

20    important because in the past we've had to let go

21    people 'cause of that.  Then we've gotten sued over it

22    even though it's a law.  But whatever.

23        Q    Okay.  So the background check that you

24    described checks for felonies at any time.  Or at

25    least it used to.  What else does it check for to your
```

Eddy Perez                                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 50

1    knowledge?

2         A    I don't know.  That's a good question.  I

3    mean, the felony is such a hot button of sensitivity

4    that I'm a little bit -- vastly more aware of that one

5    over -- I don't know if it checks for credit.  I'm not

6    sure.  I don't -- I don't know.  I'm not sure.  I

7    mean, it does -- I mean, anything is on there.

8              But if it's a misdemeanor, you're okay.  But

9    even if you've got -- I believe even if you've been

10   arrested and it was found not guilty, I think it shows

11   up.  I don't -- I don't -- Georgia is so specific.

12             If you don't have those letters on your

13   report, they fine you a thousand per person.  And you

14   have to run those annually, I believe.  I believe.

15   Often.

16        Q    Okay.  To your knowledge, did either you or

17   anyone else that was employed by Equity Prime Mortgage

18   take any action to investigate Mr. Moloughney's

19   employment history as opposed to criminal backgrounds?

20        A    What do you mean?  Just that he had worked

21   at certain places to check his resume?  What do you

22   mean?

23        Q    Well, I mean any checking of any employment

24   history that he had, whether it be just checking his

25   resume.  Whether it be confirming the status of his

Eddy Perez                                August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 51

1    employment or the reasons for the end of his

2    employment.  Any issues that came up in any other

3    iterations of his employment, et cetera.  Any --

4          A    I -- I'm not sure.

5          Q    It's a potentially broad question.

6          A    I'm not sure if HR digs deeper, like the

7    current employer, to make sure there's no challenges

8    there.  I'm not sure of that.  I don't know the

9    procedures.  I know today it's different.  But we're

10   not talking about today.

11         Q    That's right.

12         A    So I mean, they vouched for many, many moons

13   together.  I think they were altogether like eight,

14   ten years at one spot.  And then, you know, yeah.  I

15   don't -- I don't know if HR went besides that.  But I

16   know, like I said, Phil and Seth knew him for a

17   substantial amount of years.

18         Q    Okay.  Did anybody at any point when you

19   were considering Mr. Moloughney for employment express

20   to you that he had had any history of claims of sexual

21   harassment or claims of inappropriate conduct towards

22   women in the workplace?

23         A    No.

24         Q    Okay.  So understanding that you're not sure

25   whether or not HR did any investigation into Mr.

Eddy Perez                                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 52

1      Moloughney's employment history, is it fair for me to

2      understand from your response that you yourself did no

3      investigation into Mr. Moloughney's employment history

4      other than speaking with Phil and Seth about their

5      experiences with him?

6          A    That's fair.  Yes.  I can't, like I said,

7      comment about HR.

8          Q    Understood.  And if someone in HR had

9      investigated Mr. Moloughney's employment history, who

10     would that have been?

11         A    Yeah.  That was -- oh.  No.  He was

12     under -- no, no, no.  He was under the prior HR person

13     that we had a huge problem with.  It would have been

14     the prior one.  It wasn't Nyree.

15         Q    Okay.  Would Mr. Minghini have been involved

16     in that?  Or it would have been --

17         A    It would have been our head of HR at the

18     time.

19         Q    Okay.  And that wasn't Mr. Minghini?

20         A    Mr. Minghini is the chief compliance, like I

21     said.  And Nyree was later on the dates.  But before

22     that, it was a gal by the name of Melissa Rolfe.

23         Q    You said Rolfe?

24         A    Mm-hmm.  R-O-L-F-E, I believe.

25         Q    Thank you.

Eddy Perez                                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 53

```
 1        A     She's pretty famous.

 2                   MR. WILSON:  Yes.  She is.

 3                   THE WITNESS:  She's pretty famous.

 4     BY MS. RAGAN:

 5        Q     What is she famous for?

 6                   MR. WILSON:  She's --

 7                   THE WITNESS:  Her son was the --

 8                   MR. WILSON:  Her son's a cop who killed

 9     a kid.

10                   THE WITNESS:  And then --

11                   MR. WILSON:  Over at the Wendy's.

12                   THE WITNESS:  At the Wendy's and then

13     she -- we kindly put her on paid leave.  And then

14     people lined up outside my door and told me about some

15     of her behaviors.

16                   So I didn't tolerate it, especially

17     what she said about one female employee.  And about

18     Jim Lyons, who is disabled.  I wasn't tolerating it.

19     I knew that I was going to deal with shit.  So we

20     terminated her.

21                   And we got on Fox News and then we had

22     bomb threats and death threats and we had armed guards

23     to take care of everybody for an awfully long time.

24     BY MS. RAGAN:

25        Q     Okay.  What -- that's a lot to unpack.  I'm
```

Eddy Perez             August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 54

1    sure it was for you as well.

2         A    It was.  I felt really bad for the

3    employees.

4         Q    All right.  Tell me about the comments that

5    you described Ms. Rolfe making that you found to be a

6    terminable offense.  I believe you said there was some

7    comments about female employees.  Some comments --

8                   MR. WILSON:  I'm going to direct him

9    not to answer that.  We're in litigation.

10                   THE WITNESS:  Oh.  I fucked that up.

11   Pardon my language.

12                   MR. WILSON:  With respect to those

13   issues and I'm going to respectfully direct him not to

14   respond.

15                   I mean, unless you're representing Ms.

16   Rolfe and ...

17                   MS. RAGAN:  No.  I'm not.  However,

18   he's -- the reason for me to ask that question is that

19   he's implicated questions about a woman and this

20   case --

21                   MR. WILSON:  Well, it had nothing to do

22   with sexual harassment.

23                   MS. RAGAN:  Well, I don't know that

24   though because I don't have the information.

25                   MR. WILSON:  Well, I --

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

                                                    Page 55

1                    MS. RAGAN:  Can we go off the record?

2                    MR. WILSON:  We can go off the record.

3                    MS. RAGAN:  Okay.

4                    MR. WILSON:  Okay.

5                    THE REPORTER:  We're off the record at

6        10:57 a.m.

7                    (Off the record.)

8                    THE REPORTER:  We are back on the

9        record at 11:04 a.m.

10       BY MS. RAGAN:

11            Q    Okay.  The counsel for parties has agreed to

12       handle the questions regarding Ms. Rolfe without

13       questioning Mr. Perez further on that.  So we'll move

14       on from that.

15                 Okay.  Ms. Rolfe came up because we were

16       talking about Mr. Moloughney's hiring.  And so do I

17       understand that what you were saying is that Ms.

18       Melissa Rolfe would have been the head of HR at the

19       time that Mr. Moloughney was hired?

20            A    Correct.

21            Q    Okay.  Understood.  And do I understand

22       correctly that Mr. Moloughney was not working out of

23       the Atlanta location at the time that he was hired?

24            A    No.  He lived in Jersey.

25            Q    Okay.  And does Mr. Moloughney currently

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 56

1    work out of a New Jersey location?

2         A    So okay.  How technical do you want me to

3    get?

4         Q    I just want you to answer my question.

5         A    No.  It's a technical one.  That's why I

6    asked.

7         Q    Okay.  I'll let you choose.  My question is

8    what location does he work out of?

9         A    He's tied to home office.  However, he works

10   predominantly out of Fort Myers.

11        Q    Florida?

12        A    Naples maybe.  In that area.

13        Q    Okay.  And what's the home office?  Is that

14   Atlanta?

15        A    That's Atlanta.

16        Q    Okay.  Understood.  When you say tied to

17   home office, you mean that --

18        A    Executives that -- all executives that do

19   not live in Atlanta are tied to Atlanta.

20        Q    Okay.  So their home office would be

21   Atlanta, but they may work remotely from other

22   locations?

23        A    Correct.

24        Q    Understood.  Okay.  So anybody with a

25   C-title, their home office is technically Atlanta

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 57

1    office?

2         A    We had to license Rhode Island.  So that may

3    be the exception.

4         Q    Okay.  So if there are C-level employees

5    that work in Rhode Island, their home office would be

6    Rhode Island?

7         A    I'm not sure.  He may still be -- it's just

8    one of those.  I'm not sure if he's still tied to

9    Atlanta.  That's a great question for my CFO and how

10   licensing has to get pulled.

11        Q    When you said he, are you referring to Mr.

12   Moloughney?

13        A    No.  I'm referring to my CFO.  He's a he.

14        Q    Understood.  Okay.  All right.  Do you work

15   out of the Atlanta office?

16        A    I do.

17        Q    How often do you work in the office?

18        A    Four days a week.

19        Q    Okay.  And that would have been the same

20   office that Ms. McCart worked out of.  Is that

21   correct?

22        A    I think she worked remote a lot.  Not sure.

23   But yeah.  She would have been tied to that.

24        Q    Okay.  When she worked in the office, she

25   would have been in the Atlanta office.  Is that

Eddy Perez                                   August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 58

```
 1    correct?
 2        A    Unless she went to the Buckhead or one of
 3    the other ones.  I'm not sure if she ever did.
 4        Q    Okay.  You said you think she worked
 5    remotely a lot.  Do you know how often she worked
 6    remotely?
 7        A    No.
 8        Q    How often would you have been interacting
 9    with Ms. McCart on an average basis?  Interacting in
10    person I should say.
11        A    I mean, we're kind of a tight floor.  So we
12    interact a lot.  And I try to say hello to everybody
13    and I try to be as engaging as possible.  So I don't
14    know how to answer that.  I don't know if you want to
15    say a good amount; not a good amount.  I mean,
16    obviously people are sometimes wanting more of my time
17    and I can't give it.  So I don't -- I guess that is
18    speculative to the individual.
19        Q    Okay.  Would you have interacted with her
20    daily?
21        A    If she was there.  I mean, at least a hello.
22    'Cause I do a -- like I said, it's kind of a dead
23    center area and I walk by and say hello to everybody
24    and talk to people.
25        Q    Okay.  How often would you have interacted
```

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 59

1    with her for the purposes of work?  As opposed to

2    pleasantries?

3         A    She would ask me questions about what's

4    going on in the industry from a high level especially

5    during COVID.  You know, we were bringing lunches in

6    to all the employees.  We were trying to keep it very

7    bubble-ish to avoid spreads.

8              There was a lot of fear at that time and it

9    wasn't just COVID.  The industry was also almost on

10   the brink of going down.  And I happened at the time

11   to be the MORPAC chairman for the industry.  So I sat

12   on a lot of information and I was always sharing it

13   with everybody.  So there was a lot of, are we going

14   to have an industry?  What's going on here?  A lot of

15   fear that generally a lot of people had.  And I was

16   trying to provide as much information as I could.

17        Q    Okay.  What about on the day-to-day average?

18   As opposed to her asking you questions about the

19   overall industry, on the day-to-day operations level,

20   how often would you interact with Ms. McCart?

21        A    Business?

22        Q    Yes, sir.

23        A    Probably -- I don't know, like, her role.  I

24   don't know that side.  I've never done it.

25        Q    Okay.  Understood.  You wouldn't have been

Eddy Perez                                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 60

1    directing her actions in any way?

2        A    Oh, God.  No.  I wouldn't know what to

3    direct.

4        Q    You wouldn't have been monitoring her

5    performance in any way?

6        A    Not my duty.

7        Q    As you sit here today, do you have any

8    knowledge about how Ms. McCart performed her job?

9        A    Today?

10       Q    Yes, sir.

11       A    Or at the time?

12       Q    Well, let's -- my question was for today.

13   So let's start there.

14       A    Yes.

15       Q    All right.  Tell me about that.

16       A    I know that the four months prior to her

17   termination she averaged two loans a month.  That is

18   vastly underperforming.

19       Q    How did you come to know that?

20       A    Steve Carpitella did the analysis and the

21   data that the company put together.

22       Q    Okay.  And when did Mr. Carpitella do that

23   analysis?

24       A    I'm not sure exactly when he took over

25   overseeing that 'cause we had some shifts.  And it

Eddy Perez                            August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 61

1     wasn't just him.  It was also Ali Karess [ph] who is

2     the senior vice president of ops.  She's over that

3     over the retail side 'cause we have to keep separate

4     retail versus wholesale.  I want to say that was mid

5     to late January.

6          Q    Of what year?

7          A    2021.

8          Q    Okay.  What makes you say that that's when

9     it was that Mr. Carpitella did that analysis?

10         A    'Cause I knew he took over -- that was -- I

11    introduced him as the head of retail at our annual

12    conference in January.  And that was one of our

13    realignments.

14         Q    Okay.  And was Ms. McCart at that annual

15    conference?

16         A    I know she was at the party.

17         Q    Was she at the conference where you

18    introduced Mr. Carpitella as the head of retail?

19         A    I don't know if she was in the crowd.

20         Q    Okay.  What party are you referring to?

21         A    It's that same -- we have an annual -- we

22    got rid of our Christmas party because employees voted

23    to have the day before Christmas off and MLK.  And

24    they wanted us to have a full -- where everybody is

25    together instead of this place here so that there's

Page 62

1    more inclusion and not certain areas.

2            So we started doing an annual conference

3    where we invite people throughout the organization.

4    And we bring speakers.  And we bring -- we talk about

5    the numbers.  We give out all our awards.  So the

6    party was like our awards ceremony and gala you can

7    say.  But we're not dressed up in tuxes or crazy

8    dresses.  Just, you know, stuff like this.

9        Q    Okay.  When you say stuff like this, you're

10   referring to what you're wearing.

11       A    Yeah.  Like jeans.  I mean, some people can

12   dressed up if they want.  But just what I would I call

13   business professional today.

14       Q    Okay.  Do you know where the conference was

15   held in January of 2021?

16       A    Yeah, yeah, yeah.  It's always held here in

17   Atlanta.

18       Q    And was the conference a multi-day

19   conference or was --

20       A    Yes.

21       Q    And where in Atlanta was the conference?

22       A    That one -- oh.  Wait.  Are you talking

23   about 2021?

24       Q    Yes, sir.

25       A    That was -- the first half was held on our

Page 63

1    floor in the back.  And then the -- the gala and

2    everything was next door at the Westin that's in our

3    complex.

4         Q    Okay.  So what you're saying is that the

5    meeting part that was held in the EPM offices on the

6    floor in the back was the location at which you

7    introduced Mr. Carpitella as the --

8         A    Correct.  And then we sent out a video to

9    the whole organization making the announcement.

10        Q    Okay.  When did that video go out?

11        A    I mean, that same day.  And it was somewhere

12   in mid-January.  Around there.

13        Q    And how did you send that video out?

14        A    Well, I didn't send it.  The marketing team

15   did.  I would say that they did it over the e-mail

16   system.

17        Q    Okay.  And who is the marketing team?

18        A    Today or then?

19        Q    Who would have been the employees in the

20   positions that would have sent this video out via

21   e-mail that you described?

22        A    Who was in charge of -- I'm not sure.  I've

23   forgot who was in charge of communication.

24        Q    Okay.  Can you name any of the employees

25   that would have been employed in the marketing roles

Page 64

1    that would have been responsible for sending this

2    video out via e-mail?

3         A    Who was there?  That department was tiny

4    back then.  It's not the size it is today.  I'd have

5    to look it up.

6         Q    You can't identify one employee that was

7    employed in the marketing team in January of 2021?

8         A    Sent out the press release and everything

9    and the videos and the announcement online.  I mean,

10   the only thing I can think of is Eric Skates.  That's

11   it.  I don't know the rest of the team back then.

12        Q    Okay.  So you're saying there was a press

13   release and a video.  And both would have been sent

14   out --

15        A    I'm not sure, but that's usually what the

16   procedure goes.

17        Q    Okay.  So the press release and the video

18   would have both --

19        A    I know a company announcement went out.  I

20   know that.

21        Q    Let me get the question on the record.

22        A    Oh.  Sorry.  Excuse me.

23        Q    All right.  So you're saying that there

24   would have been a press release and a video sent out

25   company-wide, and I believe you said online as well,

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 65

1      introducing Mr. Carpitella as being the new head of

2      retail.

3           A    Could have.  I'm not sure if it did.  I do

4      know that a communication internally, at least an

5      e-mail, went out announcing the promotion of Steve

6      Carpitella.

7           Q    Okay.  And to whom did that internal e-mail

8      announcing his promotion go?

9           A    They always go to all users.

10          Q    So all employees of the company?

11          A    Correct.  As long as they're on that e-mail,

12     which they should be, but you know.  Knickknack stuff

13     happens.

14          Q    And do you know when that e-mail went out?

15          A    January.

16          Q    Of 2021?

17          A    Correct.  And I'm pretty sure she was in the

18     crowd.  Pretty sure she was.

19          Q    You think she was in the crowd at the actual

20     meeting as opposed to just the party that you

21     described?

22          A    Yeah.  I'm pretty sure she was at the crowd.

23     I'm not 100 percent sure, but I'm -- I remember 'cause

24     there was 70 people back there.

25               And we did a lot of things about wellness

Page 66

1     and my doctor was there and other things -- other

2     speakers were there.  Janine Driver was there.

3              So I believe she was in the crowd.  Because

4     it was open to the people on the floor if they wanted

5     to come back and forth.  And a lot of people would

6     work and then come back for one speaker.  But she was

7     a part of the festivities so she knows about that.

8         Q    Okay.  All right.  Okay.  And you said that

9     it was Mr. -- we were talking about your knowledge of

10    Ms. McCart's performance.  Do I understand correctly

11    that you did not have any knowledge about -- any

12    concerns about her performance at the time that she

13    was employed?

14        A    What do you mean exactly?  Like, ongoing

15    monthly or?

16        Q    Well, my understanding is that your

17    testimony a moment ago was that as you sit here today

18    you now know that --

19        A    Mm-hmm.

20        Q    -- Ms. McCart was underperforming --

21        A    Mm-hmm.

22        Q    -- as a processor.  Is that correct?

23        A    That was brought to my attention by Steve

24    who reports to me.

25        Q    Okay.  When did Mr. Carpitella report to you

Eddy Perez                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 67

1    that Ms. McCart was underperforming?

2         A    It was either late January or early

3    February.

4         Q    Okay.  And how did he report to you in

5    either late January or early February that Ms. McCart

6    was underperforming?

7         A    He explained to me his one-on-one with her.

8    And then he said that he was having her meet with Ali.

9    So I'm not sure if he met with Ali.

10             I'm not sure if he talked to her first and

11   then Ali 'cause that was the introduction into who's

12   the new leadership you're under 'cause she was going

13   to report to Ali.  And then Steve is over all that.

14   And he vetted through it 'cause he's very thorough.

15             And he also said that he was not sure that

16   she could perform at the level that he wanted.  And

17   that she hadn't been performing and was basically

18   milking a check and not asking anybody for more

19   business when there was plenty of business to go

20   around.  That's how it went down.

21        Q    Okay.  And so my question to you is how he

22   communicated these concerns to you.  Was it via

23   e-mail?  Was it in person?  Was it over the phone?

24        A    We do all one-on-ones or Zooms.  I'm not

25   sure if there's stuff in writing.

Eddy Perez                            August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 68

1      Q    Okay.  So you would have had a meeting via

2   Zoom with Mr. Carpitella sometime in late January or

3   early February wherein he explained what you just

4   described about Ms. McCart's performance?

5      A    Yeah.

6      Q    And did he explain to you how he reached the

7   conclusions that you just described about her

8   underperforming?

9      A    He has access to all the tracking and

10  reporting and he can pull it 'cause that's how he

11  leads to make sure that people are meeting

12  their -- their numbers and meeting the standard.

13     Q    And what did he explain to you that he

14  tracked or reports that he pulled in order to reach

15  that conclusion?

16     A    They can check on how many files people work

17  on.  And he says she's working on about two files a

18  month.

19     Q    Okay.  And what records was he pulling or

20  tracking to see how many files she was working on per

21  month?

22     A    Our LOS, our loan origination software

23  system, named Encompass.  And he did a four-month

24  backcheck history.

25     Q    All right.  When you say he did a four-month

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 69

1    backcheck history, what does that mean?

2         A    He checked to see her performance for the

3    four prior months.

4         Q    So from January -- at some point in late

5    January or early February, Mr. Carpitella looked

6    backwards four months to see how much Ms. McCart had

7    been performing?

8         A    Correct.  Yes.  Sorry.

9         Q    So if we assume that it was in late January

10   or early February when he did that check, he would

11   have checked going back -- let's see -- to October --

12        A    Or possibly --

13        Q    -- approximately October or --

14        A    Or possibly September.

15        Q    -- September.

16        A    Yeah.  Somewhere around there.

17        Q    Okay.  All right.  And what was the standard

18   that Ms. McCart should have been meeting if she had

19   been performing up to his expectations?

20        A    I'm not sure what his expectations are.  But

21   do you want me to tell you my speculation or industry

22   average?

23        Q    Sure.  What were the expectations that Ms.

24   McCart was expected to meet in order to be performing

25   well in the role of processor?

Eddy Perez                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 70

 1      A    I'd say -- see I'm talking on behalf of
 2    Steve.  So I'm not sure if I can say that.
 3            I would say that industry average is the
 4    average person in her role does 25, 30 loans a month.
 5      Q    In a processing role at EPM the processor
 6    should be closing 20 to 30 loans a month?
 7      A    Correct.
 8      Q    And how does the processor have the ability
 9    to control the number of loans that they process per
10    month?
11      A    Files are assigned to them.
12      Q    And by whom are the files assigned?
13      A    Not sure.  Great question.
14      Q    In this lawsuit, Jason Callan has testified
15    that the employees in the processing role had no
16    ability to control the number of files that they
17    closed per month because the number of files that were
18    presented to them for closing was determined by the
19    employee that was next up the chain, the loan officer.
20            The loan officer was the position that
21    actually controlled the number of files that came to a
22    processor for closing.
23            Is Mr. Callan incorrect?
24            MR. WILSON:  I'm going to object.  I'm
25    not sure that that accurately reflects the record.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 71

```
 1                  MS. RAGAN:  Okay.  Off the record for a

 2     moment --

 3                  THE REPORTER:  We are off the record --

 4                  MS. RAGAN:  -- if you agree.

 5                  THE REPORTER:  -- at 11:21 a.m.

 6                  (Off the record.)

 7                  THE REPORTER:  Back on the record at

 8     11:26 a.m.

 9                  MS. RAGAN:  Thank you so much.  So

10     sorry to interrupt.

11     BY MS. RAGAN:

12          Q    I'm going to repeat and rephrase the

13     question for you to allow you to answer it.  And well,

14     let me just say it like this:  If Mr. Callan in this

15     lawsuit has already testified that any employee in the

16     processing position, including Ms. McCart, was not in

17     the position to be able to control the number of loans

18     that came to them such that they also did not have the

19     ability to control the number of closings that they

20     did per month, is he mistaken?

21          A    What do you mean by mistaken?

22          Q    Sir, I think you know what the definition of

23     the word mistaken is.  I'll allow you to use your

24     everyday knowledge and definition of the word

25     mistaken.
```

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 72

```
 1        A    See, I'm also wondering about control.

 2   Because originators put in files.  So if there's less

 3   originations, then yes.  If there's more originations,

 4   then no.  But there's also -- it also depends on a lot

 5   of factors.

 6             So it's not that I'm going to say he's

 7   mistaken.  I'm just going to say that a lot of things

 8   are circumstantial.

 9        Q    Okay.  Let me ask you this then.  If Mr.

10   Callan has testified in this matter specifically that

11   Ms. McCart had no metric or number of closings that

12   she was expected to meet on any measurable

13   basis -- either monthly, weekly, or et cetera -- as a

14   result of the fact that she did not control the number

15   of loans that were presented to her, is he mistaken?

16        A    I can't really comment for Mr. Callan.

17   He's over that department.

18        Q    Meaning he's the person that actually would

19   be in the position to make the decisions about what

20   the performance standards for the processing role

21   would have been?

22        A    No.  Not necessarily because you know, like

23   I said, Ali earlier who is over -- she's the senior

24   vice president of ops.  She was the one that when they

25   moved her over that met with Ms. McCart and not only
```

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 73

1    looked at her performance but also looked at her

2    knowledge base of the job as well.  So not

3    necessarily.  So that's why I say that.

4            Also I believe McCart was in another role at

5    one point.  I'm not sure.  I know that she moved a few

6    roles from what I've been told.  So I'm not sure who

7    assigned those at those times either.

8            So maybe when she was with Jason.  But like

9    I said is, that is up to Jason.  I can't.  Because he

10   reports to me at that time, so.

11       Q   Okay.  So during the period of time that Ms.

12   McCart was in the processing role, which is the role

13   that we're talking about, your testimony is that Mr.

14   Callan would have been the person making the decisions

15   about the number of loans that she should have closed

16   per month in order to have acceptable performance?

17               MR. WILSON:  Objection as to form.

18               You can answer.

19               THE WITNESS:  Oh.  Didn't she have

20   other jobs too?

21   BY MS. RAGAN:

22       Q   We're asking you about the processing role

23   that was defined in my question.  Please answer my

24   question as asked.

25       A   Can you rephrase it again?

Eddy Perez                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 74

1      Q    I'd be glad to.  We're talking about for the

2      purpose of this question the period of time that

3      Ms. McCart was in the processing role.

4      A    Mm-hmm.

5      Q    Okay?

6      A    Mm-hmm.  I don't know how long she was in

7      it.

8      Q    Again, I'm not asking you how long.  During

9      the period of time that she was in the processing

10     role, Mr. Callan would have been, based on your

11     testimony, the person that made the decision about

12     what number of loans she should have been closing per

13     month in order to have acceptable performance.

14     Correct?

15     A    What I'll say again is I'm not sure if he

16     was doing it.  I cannot comment for him.  It could

17     have been Ali or somebody else.

18     Q    What I am asking you about -- the reason I'm

19     phrasing the question this way is because you

20     testified a moment ago that you couldn't speak to that

21     because you couldn't speak for Mr. Callan.  So given

22     that Mr. --

23     A    I don't --

24     Q    -- Callan is the person that you're

25     referring to would be the person that should speak on

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 75

1    this issue, wouldn't you agree with me that he's also

2    the person that would be setting the measurables for

3    the processing role?

4         A    Was he even over processing then?

5         Q    Please answer my question, sir.

6         A    I'm still trying to remember.  I'm not sure

7    if he's mistaken or not.  I don't know.

8         Q    We've moved on from that question.  My

9    current question is:  Based on your testimony as you

10   sit here today --

11        A    Mm-hmm.

12        Q    -- that you can't speak for Mr. Callan

13   because he's the person that would make those calls,

14   is it correct for me to understand that Mr. Callan

15   would have been the supervisor over Ms. McCart and the

16   other processors determining what any measurables --

17        A    He wasn't over retail processing then.

18        Q    Why is it that you testified a moment ago

19   that Mr. Callan would have been the person to make

20   that call then?

21        A    What?  On a role or what?

22        Q    On the measurables.  On the number of --

23        A    Steve Carpitella did the measurables.

24        Q    All right.  Let me get the question on the

25   record.

Eddy Perez                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 76

```
1        A     Okay.

2        Q     Do I understand you correctly that you

3   testified just moments ago that Mr. Callan is the

4   person that would have made the call -- I believe

5   that's the language that you used -- about the number

6   of loans that a processor should have been closing in

7   order to --

8        A     Yes.  Him or somebody that reports to him.

9        Q     -- have an acceptable performance?  Okay.

10       A     I don't know if it was him physically is

11  what I was trying to say.

12       Q     Understood.  So given that that was your

13  testimony -- that he is the person that makes that

14  call -- isn't also stand to reason that if Mr. Callan

15  testifies that there were no measurable standards for

16  a processor as it relates to the number of loans they

17  had to close per month in order to have acceptable

18  performance, then I can rely on his testimony as to

19  that number.  Is that correct?

20                 MR. WILSON:  Objection.  Compound

21  question.

22                 MS. RAGAN:  You can answer the

23  question.

24                 MR. WILSON:  You can answer.

25                 THE WITNESS:  Okay.  Repeat it again
```

Page 77

1      'cause that had, like, four parts.

2                    MS. RAGAN:  See how instructing the

3      witness works?  When you say compound, he picks up on

4      multiple parts.

5                    MR. WILSON:  Well, I'm -- that's fair.

6                    THE WITNESS:  I picked up on it before

7      that.

8      BY MS. RAGAN:

9         Q    My question to you is:  Given that you have

10     confirmed in your testimony today that Mr. Callan is

11     the person who would have been making the call as to

12     the number of loans that a processor should close per

13     month in order to have acceptable performance, it also

14     stands to reason that he is correct when he

15     testifies -- if he has testified that there was no

16     such measurable standard for the processor role.

17                    MR. WILSON:  Objection.

18                    You can answer.

19                    THE WITNESS:  Okay.  Man.  Y'all are

20     confusing me.  You can tell I never studied law.  I'm

21     waiting for a sustained or overruled.  That's how much

22     I've watched it on TV and I know.  So y'all -- y'all

23     got me all confused here.

24                    I would say that yes.  Jason sends the

25     measurable but that's -- there's a lot more to that.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 78

1    BY MS. RAGAN:

2        Q    Okay.  What more is there to that?

3        A    There's a code of conduct.  You know, if

4    you're not getting enough work, files were overflowing

5    out the wazoo.  So she maybe not in her one, little

6    realm couldn't have had files.  But that's why we

7    moved it under Steve Carpitella and everything.

8             You know, I would venture to say if somebody

9    is just sitting around and collecting a check,

10   that -- and not working, they would raise their hand

11   so that they wouldn't get cut when it was realized

12   what they did.  So that's what I say to that.

13            But would Mr. Callan have measurables?

14   That's -- that's up to him.

15   BY MS. RAGAN:

16       Q    Okay.  You said Ms. McCart was sitting

17   around collecting a check.

18       A    Mm-hmm.

19       Q    Based on what information did you reach that

20   conclusion?

21       A    Two loans a month for four months in a row.

22   Or maybe three.  Whatever it is.  Very low number.

23       Q    Okay.  And you said there were files

24   overflowing.  How many files were sent to Ms. McCart

25   in that four-month period that you said she did two

Eddy Perez                                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 79

```
 1    per month?
 2         A    No idea.
 3         Q    Okay.  So do you have any knowledge as you
 4    sit here today that suggests that she received more
 5    than two files per month to close?
 6         A    I don't know if she did or didn't.
 7         Q    Okay.  Would you agree with me that if she
 8    did not receive more than two loans to close per
 9    month, she could not have closed more than two in a
10    month?
11         A    Nope.
12         Q    You don't agree with that?
13         A    Nope.
14         Q    Okay.  Tell me why.
15         A    'Cause we have a policy that if there's not
16    enough work that you raise your hand and there's other
17    areas to do work.  And she did not.
18         Q    Okay.  How do you know that?
19         A    Because Steve Carpitella asked her.  And
20    Steve Carpitella also asked her about her job
21    knowledge, and she didn't know what she was doing
22    there either.  And so did Ali.
23         Q    And so your knowledge based on the
24    fact -- your knowledge of the statement that Ms.
25    McCart never raised her hand to ask for more work is
```

Eddy Perez                                       August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 80

1    based on what Steve Carpitella told you?

2         A    And the data that he showed.

3         Q    Okay.  What data did he show you?

4         A    That she was averaging two or whatever loans

5    per month.  Same one I've been saying about 19 times.

6         Q    So that data that you looked at showed you

7    that Ms. McCart didn't raise her hand and ask for more

8    work?

9         A    Correct.

10        Q    How did it show that?  What was the

11   information within the data that specifically showed

12   Ms. McCart never asked for more work?

13        A    Two files a month.  My 12-year-old could

14   probably do that.

15        Q    Okay.  So my question is:  What was the data

16   that you saw that showed you that Ms. McCart never

17   raised her hand and asked for more files?

18        A    Files worked on and fundings.

19        Q    And what did that data show you?  How many

20   files was McCart working on?  And how many were

21   funded?

22        A    The same ones I've been saying.  Two.  Two

23   to three.  Something like that.  It was very low.

24        Q    Okay.  And that was two to -- the data that

25   you looked at showed Ms. McCart was working on two to

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 81

1    three and funded two to three per month between the

2    period of time of approximately September or October

3    of 2020 and late January, early February of 2021?

4         A    Correct.

5                   MR. WILSON:  You have to give a verbal

6    answer.

7                   THE WITNESS:  Yes.  Sorry.

8                   MS. RAGAN:  That's all right.

9                   THE WITNESS:  I'm -- I'm used to

10   correct over yes or no.

11   BY MS. RAGAN:

12        Q    And who showed you that data?

13        A    Steve Carpitella.

14        Q    Okay.  How did Steve provide that data to

15   you?

16        A    Well, it was all verbal in our meetings.

17        Q    Okay.  So he quoted these numbers to you?

18   You never actually saw -- physically saw or looked at

19   any data?

20        A    I don't look at reports.

21        Q    I'm sorry?

22        A    I don't look at reports.  I trust the people

23   that report to me.

24        Q    Okay.  And specifically what Mr. Carpitella

25   told you is that from the period of approximately

Page 82

1    September or October of 2020 through late January,

2    early February of 2021 Ms. McCart was provided

3    approximately two to three loans and was working on

4    approximately two to three loans per month and funded

5    approximately two to three loans per month?

6                    MR. WILSON:  Objection.

7                    You can answer.

8                    THE WITNESS:  Okay.  Y'all are

9    confusing me.

10                   Yes.  Also Ali was involved 'cause they

11   both reinterviewed her.

12   BY MS. RAGAN:

13       Q    Okay.  So my question to you was about the

14   data you received.  How was Ali involved in --

15       A    She's the senior vice president of

16   operations.

17       Q    I've got to get the question on the record.

18       A    Oh.  Sorry.

19       Q    That's okay.

20       A    I thought you said how.

21       Q    I did say how.  I just wasn't done with the

22   question.

23                   The question that I asked you was about the

24   data you received.  How was Ali involved in the data

25   you received?

Eddy Perez                                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 83

1         A    Her and Steve pulled it.  And then they

2    talked to Tiar about it.

3         Q    Okay.  When you say her and Steve pulled it,

4    you mean her and Steve -- Ali and Steve -- went into

5    this loan origination system, Encompass, pulled

6    some --

7         A    Yes.

8         Q    -- data report --

9              MR. WILSON:  You've got to let her --

10   BY MS. RAGAN:

11        Q    -- reviewed that data and then shared

12   verbally the information that they saw with you?

13        A    Yes.

14        Q    Okay.  And that they shared that information

15   verbally with you in a Zoom meeting?

16        A    Steve did.  Not Ali.  I just know she was

17   involved.

18        Q    Ali was involved in pulling the data?

19        A    Yes.

20        Q    Steve was involved in communicating that

21   data to you?

22        A    Yes.

23        Q    And that communication happened in a Zoom

24   meeting sometime between late January or early

25   February.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 84

 1        A    [No audible response.]

 2        Q    Is that a yes?

 3        A    Yes.  That's a yes.

 4        Q    And how do you and Steve set up your Zoom

 5    meetings whenever you hold those?

 6        A    Every week.  I have one-on-ones with

 7    everybody that reports to me.

 8        Q    Okay.  And is that something that appears on

 9    your calendar every week?

10        A    Yes.

11        Q    And there's a standing Zoom link for those

12    meetings?

13        A    Teams.  But yes.

14        Q    Teams.  Okay.

15        A    Zooms, most people just understand that

16    more.

17        Q    Okay.  So if I went back and looked at your

18    calendar from late January or early February there

19    would be a Teams meeting with a link to a Teams

20    virtual meeting --

21        A    I don't know if we were doing Teams just yet

22    then.  I know we're doing it today, but it would have

23    been a Zoom.

24        Q    Okay.  Either Zoom or Teams --

25        A    Correct.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 85

1       Q    -- link will be on your calendar from at

2    some point in late January or early February where you

3    met with Mr. Carpitella and he shared this data with

4    you verbally?

5       A    Correct.

6       Q    Okay.  All right.  And then you also said

7    that -- well, let me back up.

8            Did Mr. -- in this meeting in late January

9    or early February, did Mr. Carpitella talk to you

10   about any other concerns about the performance of

11   anyone else in the processing role?

12      A    He talked about -- he was -- because he was

13   taking it all over.  He was reinterviewing and looking

14   at everybody.

15      Q    Okay.  So in the same meeting in late

16   January or early February, he expressed to you

17   concerns about everyone in the processing role.

18      A    If there was a concern.  We talked quite a

19   few.

20      Q    All right.  Who all did he express concerns

21   to you about other than Ms. McCart?

22      A    I don't recall their names.  But I know one

23   lady just 'cause her and I would talk Spanish

24   together.  A Latina lady.

25      Q    And who is that?

Eddy Perez                                      August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 86

```
 1        A     I don't remember her name.

 2        Q     You just said you did remember her name.

 3        A     She was a Latina lady.

 4        Q     That's all you remember about her?

 5        A     So we would talk Spanish.  I don't remember

 6   her name 'cause if I tell you it, it would probably be

 7   wrong.

 8        Q     Is it -- was her name Jayza [ph]?

 9        A     I did talk to Jayza [ph] a lot.  No.  I know

10   Jayza [ph].  No.  This was -- God.  What is her name?

11   Her sister worked.  Now you're making me rack between

12   her sister and her.  I want to say her last name was

13   Padilla.

14        Q     Is it Delsi [ph] Padilla?

15        A     Yes.

16        Q     Okay.  So in the same meeting that he

17   expressed to you concerns about Ms. McCart, Mr.

18   Carpitella also expressed concerns to you about

19   Delsi [ph] Padilla?

20        A     Yes.

21        Q     Okay.  And what concerns did he express to

22   you about Ms. Padilla?

23        A     Knowledge base.

24        Q     All right.

25        A     Jayza [ph], he didn't.  He spoke well of
```

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 87

1    her.

2         Q    All right.  So the only concerns he

3    expressed about Ms. Padilla was knowledge base?

4         A    Knowledge.  He said that she had closed

5    more, but she had also raised her hand to get more

6    help.  So he didn't have an issue with that.  He just

7    said -- he didn't know if it could be up to the

8    standard because Steve's standard is -- and Ali's

9    standard is -- very high.

10        Q    And what was their standard?

11        A    They're just pros at it.  I can't explain it

12   to you, but they have this whole system and how much

13   they have knowledge that they just -- they expect a

14   lot more out of everybody.

15        Q    Okay.  But didn't you tell me earlier that

16   their standard was 20 to 30 loans cleared for a

17   processor per month?

18             MR. WILSON:  Objection.

19        A    Some of theirs do 50.  So I would say that

20   that's -- I'm speculating on their standard.  It also

21   depends on what type of loans.  Some loans are easier

22   than others.

23        Q    All right.  But to your knowledge, the only

24   concerns that Mr. Carpitella expressed to you about

25   Ms. Padilla was her knowledge base, not the number of

Eddy Perez                                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 88

1      loans that she was closing per month?

2             A      No.   'Cause she had raised her hand.

3             Q      Okay.   And to whom did she raise her hand?

4             A      I'm not sure to who.

5             Q      Okay.   And how --

6             A      I couldn't tell you.

7             Q      And how did Mr. Carpitella know that she had

8      raised her hand?

9             A      Inquiries.   Everybody talks, especially on

10     the retail side.   People talk.   They bounce ideas.

11     His area in Jersey produces a lot.   So a lot of people

12     are always reaching out because they're the best of

13     the best.

14             You know, a lot of people yearn to go work

15     under that group and that's part of the reason he got

16     the promotion and was taking over the whole equation.

17     And that was even getting removed and handled by him.

18             Q      So your testimony is that Mr. Carpitella

19     expressed to you that he had made inquiries to other

20     employees of EPM who confirmed that at some point Ms.

21     Padilla had been asking to have more loans come to her

22     to close?

23             A      I don't know if he made inquiries.   That's

24     just what he told me.

25             Q      Okay.   Yeah.   My question was about what he

Eddy Perez                                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 89

1      told you.  So your --

2          A    I don't know if he talked to other people or

3      how he came to it.  I don't know if he also -- there's

4      a lot of ways to track online digitally to see if

5      people are moving in other files and doing things.

6               I'm not sure how he came to that conclusion.

7      I can't talk for him.  I just know what he expressed

8      to me.

9          Q    Okay.  So what he expressed to you is that

10     he made inquiries around EPM that confirmed to him

11     that Ms. Padilla had been asking for more files to be

12     sent to her so that she could close them?

13         A    Yes.

14         Q    Okay.  Did he tell you who he made inquiries

15     to?

16         A    No.

17         Q    Did he tell you how many loans Ms. Padilla

18     was closing per month?

19         A    No.

20         Q    Just that he didn't have any concern about

21     the number?

22         A    Correct.

23         Q    All right.  Any other concerns that Mr.

24     Carpitella expressed to you about Ms. Padilla's

25     performance other than knowledge base?

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 90

1       A     Not that I recall.

2       Q     Okay.  All right.  Any other employees in

3    the processing role that Mr. Carpitella explained to

4    you he had concerns about?

5       A     He explained some of the other people

6    throughout the organization, but I don't remember all

7    their names.

8       Q     Okay.  As you sit here today, the only two

9    people that you can recall that Mr. Carpitella told

10   you that he had concerns about were --

11      A     He had some other people in his --

12      Q     Please let me get the question on the

13   record.

14                  MR. WILSON:  Wait.

15                  THE WITNESS:  Sorry.

16                  MR. WILSON:  Let her ask the question.

17                  THE WITNESS:  Sorry.

18   BY MS. RAGAN:

19      Q     As you sit here today, the only individuals

20   that you can recall Mr. Carpitella expressing you

21   concerns about their performance were Ms. McCart and

22   Ms. Padilla?

23      A     By name, yes.  But I didn't even remember

24   Delsi's [ph] name.  You had to remind me.

25      Q     Well, you remembered Padilla.  And I gave

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 91

1    you her first name.

2         A    Well, I had to guess.  I had to speculate

3    backwards.  I know that he had mentioned some of the

4    people that he was overseeing.  I know he had

5    mentioned people in Orlando.  He had mentioned other

6    locations.

7              Do I remember all their names?  No.  I just

8    know that they have removed people and upgraded the

9    team.

10        Q    Okay.  When you say removed people and

11   upgraded the team, what do you mean?

12        A    Termination.  Or some people left on their

13   own accord or they resigned.

14        Q    Okay.  And when you say they removed people,

15   you're referring to Mr. Carpitella?

16        A    Or Ali.  Yes.

17        Q    Who -- other than Ms. McCart -- do you

18   allege that Mr. Carpitella removed because of concerns

19   about performance?

20        A    That's a good question for HR.

21        Q    Okay.  So as you sit here today, the only

22   person that you know that Mr. Carpitella removed

23   because of performance concerns was Tiar McCart?

24        A    No.

25        Q    Well, then answer my question.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 92

1          A     He didn't remove her.  I made the call.

2          Q     Okay.  You made the decision?

3          A     Yep.  He gave me the recommendation.

4          Q     I see.  When did he make that recommendation

5     to you?

6          A     He reinterviewed her.  Ali interviewed her.

7     Then he interviewed her.  Then Ali.  They went through

8     a few interviews.  Early, mid-February.

9          Q     Okay.  And how did he make that

10    recommendation to you?

11         A     In our one-on-one.

12         Q     All right.  So this is a separate --

13         A     We had many discussions around it all.

14    'Cause like I said, I said look, it's you to run it.

15    You've got to make some recommendations.  I know that

16    you're inheriting this.

17               So in other words, I can help you along the

18    way and if I've got to make the tough decisions for

19    you, I get it.  It's not your mess to clean up.  It's

20    mine.  So I've got to make the tough decisions that

21    are never fun as CEO, but you got to do it.

22         Q     Okay.  So in early to mid-February in a

23    separate Zoom meeting or Teams meeting between you

24    and --

25         A     It could have been a phone call too.  'Cause

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 93

1     he calls me.  Me and him talk three, four times a day.

2          Q    Okay.  If you'll just let me get the

3     question --

4          A    Oh.  Sorry.

5          Q    -- on the record, I'll be glad to let you

6     answer it however you'd like even it if it's

7     clarifying my question, which I do appreciate you

8     doing.

9              Do I understand correctly that in early or

10    mid-February you had a separate Zoom meeting or

11    potentially phone call with Mr. Carpitella wherein he

12    now was expressing to you not just concerns about Ms.

13    McCart's performance but was specifically recommending

14    to you that her employment be terminated?

15         A    Yes.

16         Q    Okay.  And as you sit here today, you're not

17    sure whether it was a telephone call or a Teams

18    meeting or a Zoom meeting?

19         A    I did not.

20         Q    Okay.  But you are certain it was in early

21    to mid-February?

22         A    Yeah.

23         Q    And you are certain that this would have

24    been a separate meeting after the initial meeting

25    where he recommended to you that or he -- excuse

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 94

1   me -- expressed to you he had concerns about Ms.

2   McCart's performance?

3        A    Yes.

4        Q    Okay.  All right.  What action did you take

5   after Ms. McCart -- excuse me -- Mr. Carpitella

6   recommended to you that Ms. McCart should be

7   terminated?

8        A    I couldn't.

9        Q    Excuse me?

10       A    I couldn't take any action.

11       Q    Okay.  Why not?

12       A    Because after that is when she sent out her

13  e-mail, and there had to be an investigation.

14       Q    Okay.  So your understanding is that Mr.

15  Carpitella recommended to you in early to mid-February

16  that Ms. McCart should be terminated.  And after you

17  received that recommendation Ms. McCart made a

18  complaint about sexual harassment?

19       A    [No audible response.]

20       Q    Is that a yes?

21       A    Correct.  Yeah.  That's a yes.

22       Q    Okay.  When did you first receive notice of

23  Ms. McCart's complaint of sexual harassment?

24       A    She sent an e-mail right around that same

25  time that had me on it.  A few people on it.  I don't

Case 1:21-cv-04247-CAP-LTW   Document 86   Filed 03/21/23   Page 95 of 315
Eddy Perez                                      August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 95

1    know everybody that was on it.

2         Q    Okay.  So you were copied on an e-mail that

3    was sent directly from Ms. McCart --

4         A    Yes.

5         Q    -- to you.

6         A    I don't know if it was to me or to HR.  I

7    was on it.

8         Q    Okay.  So you were copied on an e-mail that

9    Ms. McCart sent to either HR or someone else?

10        A    Yes.  Copied or in the -- if it wasn't

11   cc'ed, just to be clear.  It may have been -- I may

12   have been in the To line.  I wasn't bcc'ed.  I can

13   tell you that much.

14             I was not -- you know, sometimes people try

15   to throw people under the bus with the bcc move.

16   We've all been there.

17        Q    Okay.  All right.  And why is that you

18   didn't immediately act to terminate Ms. McCart's

19   employment once Mr. Carpitella had recommended that

20   she be terminated?

21        A    I don't know the exact dates, but they were

22   almost eerily I'll just say coincidental.  Very close

23   to each other.

24        Q    Mm-hmm.  Okay.  So you're saying you didn't

25   have enough time to act to terminate her employment?

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 96

1      A    Yep.  I called Legal 'cause I always call

2   Legal just to get their thoughts.  And then there's

3   always a process.  'Cause we try to end things

4   amicably.  But that's not always the case.

5      Q    When you say you called Legal, what were you

6   calling to get their thoughts about?  Her termination

7   or her sexual harassment complaint?

8      A    Well, before I could call Legal is when that

9   came out.  So then I said, you know, here's what's

10   going on.  But here's what was going on previously.

11   And we have all the information.  We said we had to

12   let the investigation work itself out.

13      Q    Okay.  So you called Legal after receiving

14   the sexual harassment complaint?  Not in response to

15   receiving the recommendation for termination?

16      A    Correct.  I didn't have enough time to call

17   them about the termination.

18      Q    Okay.  And that was a telephone call as

19   opposed to a Teams meeting or a Zoom meeting or

20   something of that nature?

21      A    Yes.  Seth never likes to get on video.  I'm

22   joking.  Sorry.  I had to -- I had to have some fun in

23   there.

24      Q    That's okay.  It wasn't a meeting in person?

25      A    He lives in Florida.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 97

1          Q     And you contacted Seth for the purpose of

2     receiving legal advice related to the sexual

3     harassment claim?

4          A     After our internal investigation had been

5     done.  I mean, we talked throughout the whole time.

6     But we also talked about it throughout and afterwards.

7          Q     So I want to clarify this because my

8     understanding of your initial response to that

9     question is a bit different than what you just said.

10    So let's clarify.

11         A     Okay.

12         Q     When is the first time you contacted legal

13    counsel related to Ms. McCart, whether it was as a

14    result of the recommendation that she be terminated or

15    the sexual harassment claim?

16         A     It was -- like I said, it was around -- the

17    first communication was around those times.  'Cause

18    Seth is very strict, we will say, on making sure that

19    people sign releases.

20         Q     Okay.  So when you say around that time,

21    when I first asked you this question my understanding

22    of your response was that you had called shortly

23    after, very close in temporal proximity to receiving

24    Ms. McCart's complaint.

25               But what you just testified to was that it

Eddy Perez                                         August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 98

1    was after the internal investigation was concluded.

2    So I'd like you to --

3         A    I did both.

4         Q    -- clarify.

5         A    I did all of it.  I -- I talked the whole

6    time with him.  I had to.

7         Q    Okay.  So I'm asking about the first

8    occasion that you contacted him for advice related to

9    Ms. McCart.

10             Was the first occasion shortly after

11   she [sic] received her complaint?  Or after the

12   internal investigation was completed?

13        A    Well, I talked to him right after Steve had

14   made his recommendation to see if we needed to do some

15   severance or something like that.

16             And then we were leaving for Florida.  And

17   coincidentally is when her e-mail went out, when all

18   the executives were going to be together.  So that

19   obviously stopped it in its tracks.  Couldn't really

20   do anything after that.

21        Q    Okay.  So the first occasion that you

22   reached out to Mr. Kreiner for the purpose of

23   receiving advice related to Ms. McCart was after you

24   received Mr. Carpitella's recommendation?

25        A    And I had made the determination.  Correct.

Eddy Perez                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 99

1        Q    Okay.  And you made the determination that

2    she should be fired?

3        A    Yes.

4        Q    Okay.  After Mr. -- we're going to establish

5    a timeline here.  After Mr. Carpitella recommended to

6    you that Ms. McCart been fired and you had made the

7    determination that you would proceed as he

8    recommended, you contacted Mr. Kreiner for advice

9    related to the termination.

10       A    Correct.

11       Q    After you had contacted Mr. Kreiner to

12   receive advice related to the termination, Ms. McCart

13   submitted a written complaint in an e-mail that she

14   copied you on alleging sexual harassment.

15       A    Yes.  It was on that Thursday.  I remember.

16       Q    Okay.  Thursday in what month?

17       A    Can I look at my phone?

18       Q    Absolutely.

19       A    All right.

20       Q    In fact if you're able to determine an exact

21   date by looking at your phone, that would be --

22       A    Oh.  I can.  'Cause I know when we all went

23   to my beach house to do our quarterly retreat.

24            '21.  '21.  '21.  What year is this?  '21.

25   No.  That's April.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 100

1              25th of February.  I have nailed it.  I

2       remember.  I'm pretty sure it was that morning.

3            Q    That's the date that you received the e-mail

4       from Ms. McCart?

5            A    Correct.

6            Q    Okay.  So --

7                 MR. WILSON:  Excuse me.  Do you have a

8       question pending right now?

9                 MS. RAGAN:  I do.  We're not taking a

10      break right now.  I do.  Yeah.  We're going to finish

11      this line of questioning and then we're going to take

12      a break if you'd like.

13                MR. WILSON:  Okay.  No.  Go ahead.

14      BY MS. RAGAN:

15           Q    Okay.  All right.  So you received the

16      e-mail that you expressed regarding Ms. McCart's

17      sexual harassment complaint on February 25, 2021.  And

18      you're certain of that date because that's the date

19      that you were going for the retreat?

20           A    Well, somebody told me when we were all

21      flying out.  Hey.  By the way, check your e-mail.

22           Q    Okay.  So you hadn't seen it, but someone

23      said there's this e-mail in your inbox?

24           A    Hey, dude.  Look what's going on.

25           Q    Yeah.  Who was that that told you that?

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 101

1          A     Jason Callan.

2          Q     Okay.  And what did you do next after being

3     informed that there was this e-mail that you were

4     going to have to look --

5          A     Jim was with us.  And that's when he was

6     still over HR.  So I went to him and said hey, look.

7     HR has got to investigate and we got to look at

8     everything and anything.

9          Q     Okay.  And how did Mr. Minghini respond?

10         A     He understood.  I mean, he had

11    Nyree -- 'cause that was the new HR person -- start

12    the investigation.  And he told Mark 'cause he was

13    with us what was going on.  I think he was on the

14    e-mail.  Don't quote me though.

15         Q     Okay.  You think that Mark was copied on the

16    e-mail that you're referring to receiving in February?

17         A     Yeah.  I think.  I'm not 100 percent sure.

18         Q     Okay.  Can you think of anyone else as you

19    sit here today that would have received that February

20    25th e-mail that was either copied or in the To line?

21         A     I mean, I'd speculate only.  Like, I'd have

22    to say HR I'd guess.

23         Q     Okay.  So that would have been Ms. Green?

24         A     Mm-hmm.

25         Q     Okay.  So to your knowledge you

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 102

1     believe -- and I understand that you're estimating

2     here and I'm couching this based on the estimation

3     from you -- your estimation is that you believe that

4     February 25th e-mail that you received included you,

5     Mr. Moloughney, and possibly Ms. Green?

6         A    It had a few people.  I don't know.  It may

7     have had more.  I don't -- I don't recall everybody.

8     I do know.  'Cause I didn't think I was on it.  But I

9     was later told I was and then when I pulled up my

10    e-mail, I was on it.

11        Q    Okay.  So you're certain that you were on

12    it.  You believe Mr. Moloughney was on it.  You

13    believe Ms. Green was on it.  You're not certain about

14    those --

15        A    Or it could have been done to HR at EPM,

16    which that hits multiple people.  So it could have

17    been to the general HR one.

18        Q    Okay.  But you are certain that you were on

19    it.  Possibly the general HR e-mail.  And possibly Mr.

20    Moloughney as well.

21        A    Correct.  Yeah.

22        Q    Okay.  Is there anyone else that you believe

23    could have been on that February 25th e-mail?

24        A    I mean, I could speculatively say Steve

25    Carpitella, Ali.  But I'm not sure.  I don't know who

Page 103

1     Ms. McCart decided she wanted to add to it.  She may

2     have not wanted to add them.  I don't know.  I can't

3     really speculate for her.

4          Q    Okay.  Anyone else that you think may have

5     been on it, other than those you've already

6     identified?

7          A    I don't know if another attorney was on

8     there.  I don't know.  I have no idea.

9          Q    Okay.  Understood.  So you said that you

10    mentioned the complaint to Mark.  You mentioned the

11    complaint to Mr. Minghini.  Because you all were

12    together when you realized that you had received the

13    complaint via e-mail on February 25th.

14         A    Mm-hmm.

15         Q    Is that yes?

16         A    Yes.  Yes.

17         Q    Where were you together when you had this

18    conversation that you just described?

19         A    It was at the airport before we left.

20         Q    Okay.  Were you all flying together on the

21    same plane?

22         A    Two planes.  Yes.

23         Q    Okay.  Who all was there and present?

24         A    For the weekend?

25         Q    That were leaving for the retreat that you

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 104

1    described?

2         A    Every exec.

3         Q    Every exec.  Okay.

4         A    Mm-hmm.

5         Q    That would include Mr. Callan?

6         A    Mm-hmm.

7         Q    Was Mr. Carpitella there?

8         A    Yes.

9              MR. WILSON:  Not mm-hmm.  Yes or

10   correct.

11             THE WITNESS:  Oh.  Sorry.  Yes.  Yes.

12   Sorry.  Yes.  Yes.

13   BY MS. RAGAN:

14        Q    Mr. Carpitella was there as well?

15        A    Yes.

16        Q    Was Ali there as well?

17        A    No.  She's not an executive.  Senior

18   leadership.

19        Q    Understood.  Would Mr. Minghini been the

20   only HR representative there or compliance person

21   there?

22        A    Yes.

23        Q    Okay.  All right.  So you're at the airport.

24   You're about to leave for this retreat.  You have a

25   conversation with Mark informing him of the complaint.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 105

1      Correct?

2           A     Yeah.   'Cause I had no awareness.   I said,

3      you know, what the F is this?

4           Q     Mm-hmm.   Okay.

5           A     What the heck?   This is two months ago.

6      What -- what in the world?

7           Q     Okay.   And you had a conversation with

8      Mr. Minghini directing him to start an investigation?

9           A     Mm-hmm.

10          Q     Is that a yes?

11          A     Yes.   Sorry.

12          Q     Okay.   Did you have a conversation with

13     anyone else there at the airport about Ms. McCart's

14     complaint?

15          A     I don't know if it was at the airport, but I

16     know that day that we told all the executives 'cause I

17     thought that was the only fair transparency to let

18     them all know.

19          Q     Okay.   As best as you can recall, can you

20     explain to me what it was that you told all of the

21     executives about Ms. McCart's complaint?

22          A     We -- we didn't name it by name.   We just

23     said that there was a complaint against Mark.   That

24     whatever was in it.   Sexual harassment or whatever it

25     was.   I don't know exactly what was in that.   And that

Eddy Perez                                   August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 106

1    we were starting an investigation.

2        Q    Okay.  So essentially it was just notice,

3    Ms. McCart has made a complaint against Mr.

4    Moloughney.  Correct?

5        A    Yeah.  It's in touch with HR.  Unless you're

6    asked, keep things confidential.  You know, this isn't

7    something where you create gossip.  You just -- you've

8    got to let the pros handle it.

9        Q    Understood.  And that was -- that sentiment

10   that Ms. McCart had made this complaint against Mr.

11   Moloughney, HR is taking care of it, let's not create

12   gossip about it.  That sentiment was expressed to all

13   of the executives that were at that retreat?

14       A    Correct.

15       Q    Okay.  And it was expressed on that same

16   day, February 25th?

17       A    Correct.  They may not remember the date,

18   but I do.

19       Q    Okay.  And you remember it because that was

20   the day you were leaving for the trip?

21       A    That and coincidentally it was month end.

22   So everybody was complaining to me that I planned this

23   retreat at month end.  And I said if you don't have

24   good enough troops back there leading, we got much

25   bigger challenges that we need to dive in during this

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 107

1    retreat.

2         Q    Okay.  And where all did you -- where did

3    you go for the retreat?

4         A    My beach house.

5         Q    Okay.  And that's where?

6         A    WaterSound, Florida, 30A.  You may know

7    that.

8         Q    I do know that area.  Can you estimate for

9    me how many executives were there?

10        A    Man.  That's a good question.  Well, I had

11   to sleep on the couch.  And the place fits 16, but

12   obviously some beds you can't share.  A few of our

13   female executives were very kind to share a bed.  And

14   we didn't think that that would be a challenge, and

15   they all agreed.  Oh, Lord.  Eleven, 12, 13.

16   Somewhere around there.

17        Q    Okay.  Got it.  And that would have included

18   all of the C-level employees?

19        A    Yes.

20        Q    Executive.  When you say executive, that's

21   what you mean?

22        A    Yeah.  Yeah.  Yeah.

23        Q    Understood.  Okay.

24        A    Yes.  Sorry if I didn't say that.

25        Q    Thank you.

Eddy Perez                                     August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 108

1     A    Yes.

2     Q    Okay.  So you make this announcement as you

3     described, sort of just letting the executives know.

4     What is your next involvement as it relates to either

5     the investigation into Ms. McCart's complaint or the

6     decision to terminate her employment?

7     A    In what sense?  Like, just with her?  Or in

8     general?

9     Q    In general.  Any steps that you took that

10    would have in any way related to either her complaint

11    of sexual harassment and the response that the company

12    made to it, or the decision to terminate her

13    employment?

14    A    Well, we talked about it.  And we said, you

15    know, it's an unfortunate situation.  We need to let

16    it run its course.  We got to let HR stay in it.  I

17    did say that statement a few times 'cause sometimes

18    you've got to remind people a few times.  Or some

19    people you say 17 times, but.  And that was it.  I

20    waited till the investigation was over.

21    Q    Okay.  Was Mr. Kreiner at the retreat?

22    A    No.  Nn-mmm.

23    Q    Okay.  So how close in relation to receiving

24    that e-mail on February 25th did you reach out to Mr.

25    Kreiner about Ms. McCart's sexual harassment e-mail?

Eddy Perez                                            August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 109

1         A    I mean, I let him know it was existing.  But
2    we never went into details like after --
3                   MR. WILSON:  And I'm just going
4    to -- this -- on the record, I'm going to caution you
5    not to testify about any conversation that you had
6    with Mr. Kreiner.
7                   THE WITNESS:  Oh.
8                   MR. WILSON:  She can ask you about
9    when.
10                  MS. RAGAN:  When.
11                  THE WITNESS:  Okay.  That's it.
12   BY MS. RAGAN:
13        Q    I'm asking you about the fact of the
14   communication as opposed to what you were
15   communicating.
16        A    Got you.  Got you.  Man.  This stuff's
17   complicated.  I apologize.  Man.  It's a lot easier to
18   do a mortgage.
19        Q    You're doing fine.
20        A    Fuck, man.  I'm just being honest.
21        Q    So that would have been the second occasion.
22   Somewhere approximately around February 25th when you
23   received the e-mail of Ms. McCart's complaint --
24        A    Mm-hmm.
25        Q    -- that would have been the second

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 110

1    communication that you had with Mr. Kreiner related to

2    Ms. McCart?

3         A    Yeah.

4         Q    But it would have been the first occasion

5    related to her sexual harassment complaint?

6         A    I just said a complaint.  I didn't know what

7    was all in it.

8         Q    Understood.

9         A    And I let him know, like, hey, I know we

10   have talked about this.  Well, this now has to be

11   paused.

12        Q    Okay.  So at that point you made the

13   decision to not take any action regarding Ms. McCart

14   or her employment until the investigation into her

15   sexual harassment complaint was complete?

16        A    Correct.  Yeah.

17        Q    Okay.  And what was your understanding of

18   what happened in the course of EPM's investigation

19   into Ms. McCart's sexual harassment complaint?

20        A    What do you mean?  Like, what HR did or?

21        Q    Well, anything.  Any steps --

22        A    I stayed --

23        Q    -- that the company took.

24        A    I had to -- I believe in taking myself out

25   of it 'cause I didn't want any influence of anything.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 111

1      And I didn't want to make it seem like I'm steering

2      one way or another.  So I let HR do their job.

3          Q    Okay.  So you don't know what all steps HR

4      took in investigating this complaint?

5          A    I know Nyree very well.  And she was very

6      thorough.  I know she met with multiple people because

7      I know that she had met with one gentleman that had

8      come to me, DeAngelo.  Because DeAngelo had come to me

9      for some advice at one part about Tiar.  He gave me

10     some details on some things.

11              And I told him, you got to take that to HR.

12     Don't know if he ever did because he made some

13     comments that he doesn't know if he wants to take it

14     to HR 'cause he said that typical guy stuff.  Guys

15     don't go to HR.  That's what he said to me.  So he

16     was -- I know he met with her.

17              I know Jeff Batson 'cause Jeff Batson had

18     also come to me with some concerns.  And I told them

19     guys, I am not HR.  I appreciate you can talk to me.

20     However, whatever your concerns are, you need to take

21     those to HR.  It does not matter.

22          Q    So your understanding as you sit here today

23     as opposed to when it was happening is that in the

24     course of Ms. Green's investigation into Ms. McCart's

25     sexual harassment complaint, she spoke with both

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 112

1    DeAngelo, I believe is the gentleman's first name.

2         A    Yeah.  I don't remember his last name --

3         Q    And Jeff Batson.

4         A    I know she talked to other people.  I know

5    she obviously had to talk to Mark.  We all know.  We

6    can make that assumption.  I know she talked to Steve.

7    I know she talked to Callan.  I mean, she talked to a

8    lot of people.

9              Now if she took notes or records or what she

10   did.  I know she put together a -- a proposal and

11   everything that went there.  I know that Minghini was

12   involved because she reported to him.  Jim.  Excuse

13   me.  We call him by his last name.

14             I don't know how many people she

15   interviewed.  That -- that would be speculatory.  But

16   I know she interviewed quite a bit of people.

17        Q    Okay.  You don't know who all she

18   interviewed, but as you sit here you know for certain

19   she interviewed DeAngelo, Mr. Batson, Mr. Moloughney,

20   Steve Carpitella, and Jason Callan.

21        A    Yeah.  'Cause she gave me some of the

22   details that I was unaware of from Jeff and DeAngelo

23   so they stick out in my mind.

24        Q    Okay.  Understood.  And you said she made a

25   proposal.  To whom did she make that proposal?

Eddy Perez                                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 113

1       A     She presented it to me.  She just -- she
2   gave me her findings.
3       Q     And you said that Mr. Minghini was involved.
4   What was his involvement?
5       A     She reported to him.
6       Q     Okay.  So she just reported her findings to
7   him in the same way that she did with you?
8       A     I'm not sure to be honest with you.  You'd
9   have to ask her if they interacted and did some things
10  or if he had certain conversations.
11           I know that some of the conversations were
12  obviously uncomfortable.  So I don't know if maybe
13  instead of one-on-one, I don't know if they did two
14  on -- I'm not sure.  I would tell you that those
15  people would know those details a lot better than
16  myself.
17      Q     Understood.  How did Ms. Green compile the
18  proposal that she made to you?
19      A     What do you mean compile like?
20      Q     Well, did she present you a written report
21  with her findings?
22      A     I know that she put a report together.  But
23  I didn't ask to read it all.  I said guys, can you
24  please summarize it.  I'm busy.  What are your
25  thoughts?  I need to know if you think there's merit

Eddy Perez                                   August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 114

1     or there's not merit.  Because that depends on the

2     next actions.

3           Q    Okay.  You said that your response was guys,

4     can you summarize it?  Who were the guys that you said

5     that to?

6           A    Oh.  I said that to Nyree and -- and Jim.

7           Q    Okay.  So you know she put together a

8     written report, but you just asked for her to

9     summarize it to you?  You didn't read the whole

10    report?

11                    MR. WILSON:  Objection.

12                    You can answer.

13                    THE WITNESS:  No.  I didn't.

14    Y'all -- confuse me, man.

15    BY MS. RAGAN:

16          Q    You're saying no, you didn't read the whole

17    report.  But yes; you knew the written report existed?

18          A    I trusted her.  So I wanted to see what her

19    thoughts were.

20          Q    Did you ever see the written report even

21    though you didn't read it all?

22          A    No.

23          Q    Okay.  She just had expressed to you I've

24    completed a written report now that my investigation

25    is done?

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 115

1        A     Mm-hmm.

2        Q     Is that a yes?

3        A     Yes.  That's a yes.  Sorry.

4        Q     Got it.  Okay.  Do you know if Mr. Minghini

5     reviewed the written report, given that he was her

6     supervisor?

7        A     Do I know for a fact is I guess what --

8        Q     Did he ever communicate that to you?

9        A     I don't recall.  I don't know.  If I had to

10    speculate, I'd say yes.  But that's a speculation.

11       Q     Understood.  You said that you asked Mr.

12    Minghini and Ms. Green to summarize her findings to

13    you.  Did I understand that correctly?

14       A     Mm-hmm.

15       Q     Is that a yes?

16       A     Yes.  That's a yes.  Sorry.

17       Q     Thank you.  What was the summary that she

18    provided to you?  Or Mr. Minghini?

19       A     She gave me some of the names.  She gave me

20    some of the details of what they had expressed.

21             'Cause she did a thorough background.  She

22    did a background on not just Mark, but Tiar.  And

23    trying to situation and trying to formulate what led

24    to this to see if there was merit or no merit.

25             And then she came forward and told me that

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 116

1      she didn't believe -- she thought it was consensual

2      and that there was no merit for the basis.

3            Q    Okay.  She thought what was consensual?

4            A    She explained to me what had gone with her

5      and Mark.  Because like I said, I was unaware and I

6      didn't -- in the e-mail it didn't really put details

7      in there.  So I left it at that.

8            Q    Okay.  Can you describe for me to the best

9      of your recollection what Ms. Green explained to you

10     was her findings in detail?

11           A    She just said there was no merit.  And she

12     believed that there wasn't -- I mean, if you're saying

13     there's no merit to a sexual harassment claim, then I

14     would just assume that there's no merit to the sexual

15     harassment claim.

16           Q    Okay.  So she didn't describe for you what

17     she found actually occurred between Mr. Moloughney and

18     Ms. McCart?

19           A    She gave me details on DeAngelo.  She gave

20     me details on Jeff's concerns.  She gave me vagueness

21     'cause I said I don't -- if it's graphic or not

22     graphic, I don't -- I don't want to be a part of that.

23           Q    Okay.  So at your direction, Ms. Green

24     didn't give you specific details of any physical

25     encounter between Mr. Moloughney and Ms. McCart?

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 117

1        A     No.  She gave me physical encounters with

2    DeAngelo and Ms. McCart.

3        Q     Okay.  So in the course of Ms. Green's

4    investigation into Ms. McCart's sexual harassment

5    complaint when she was reporting her findings to you

6    about the complaint involving Ms. McCart and Mr.

7    Moloughney, she did not describe for you what she

8    found to have occurred between Ms. McCart and

9    Mr. Moloughney?

10       A     She said from the testimony that she got

11   from them -- to summarize it -- that she believes what

12   went on was consensual.

13       Q     Okay.  And that was the most detail that you

14   received from Ms. Green about any physical

15   interaction --

16       A     She said there was no --

17       Q     Please let me finish my question.

18       A     Oh.  Sorry.  Sorry.  I'm sorry.

19       Q     Ms. Green saying to you that she determined

20   that any physical interaction between Ms. McCart and

21   Mr. Moloughney was consensual was the most detail that

22   she gave to you about the interactions with Ms. McCart

23   and Mr. Moloughney?

24       A     No.  She said that there was -- I don't know

25   her exact term so I'll just say some sexual behavior,

Eddy Perez                                      August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 118

1    but no sexual intercourse or anything like that.

2         Q    Okay.  Any other details that you can

3    describe that Ms. Green gave you about what she found

4    to be the interactions between Mr. Moloughney and

5    Ms. McCart other than that she found it to be

6    consensual and there was non-intercourse sexual

7    interaction?

8         A    She told me that she found some similarities

9    between the story of DeAngelo and Mark.

10        Q    Okay.  Anything else that she told you about

11   the interaction between Ms. McCart and Mr. Moloughney?

12        A    In what -- like, what part of the

13   interaction is I guess the best way to put it?

14        Q    I'm asking a very intentionally broad

15   question.  I want to know anything that you can recall

16   that Ms. Green reported to you as a result of her

17   findings in the investigation into Ms. McCart's

18   complaint about Mr. Moloughney.

19        A    Like I said, just some of the behaviors with

20   her and Mark were very similar to her and DeAngelo.

21        Q    Okay.  Anything else that you can recall

22   Ms. Green informed you about her findings in the

23   investigation into what occurred between Ms. McCart

24   and Mr. Moloughney?

25        A    Like, that's where I'm, I guess, a little

Eddy Perez                                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 119

1    confused.  'Cause I -- I don't know what to disclose.

2    'Cause like I said is --

3         Q    You need to disclose what you know that's

4    responsive to my question.

5         A    That's what I'm saying is I'm not sure

6    what's responsive because I don't know if I should get

7    into the graphic details that she told me about

8    DeAngelo and some of those things.

9         Q    It seems really important for you to talk

10   about.  Let me assure you I'm going to let you talk

11   about it.

12        My question to you right now in the moment

13   has repeatedly been very clear to limit it to the

14   interaction between Ms. McCart and Mr. Moloughney.

15        So hopefully now that you're assured I will

16   let you talk about DeAngelo you can respond to my

17   question which is:  What did Ms. Green tell you about

18   her findings from her investigation into what occurred

19   between Ms. McCart and Mr. Moloughney?

20        A    She said it was consensual.

21        Q    Okay.  Other than what you've testified

22   to -- Ms. Green saying she found the interaction to be

23   consensual and that there was non-sexual intercourse,

24   sexual activity between Ms. McCart and Mr.

25   Moloughney -- as you sit today can you think of any

Eddy Perez                                August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 120

1     other details that Ms. Green provided to you in

2     summarizing the findings from her investigation?

3          A     Not that I recall.

4          Q     Okay.  Good deal.  All right.  Did Mr.

5     Minghini provide you any detail about the

6     investigation into Ms. McCart's complaint about Mr.

7     Moloughney other than what Ms. Green had provided to

8     you?

9          A     We chatted about it.  But no.  I mean, we

10    just -- Nyree was the expert, so.

11         Q     Okay.  What did you and Mr. Minghini chat

12    about as it related to Ms. McCart's complaint against

13    Mr. Moloughney?

14         A     That her findings were that she didn't

15    believe there was merit, and we were accepting her

16    findings.

17         Q     Okay.  Let's see here.  Did Ms. -- excuse

18    me -- Ms. Green give you any information about what

19    Mr. Callan provided to her when she interviewed him?

20         A     Nn-mmm.

21         Q     Okay.  But you're certain she interviewed

22    him?

23         A     I'm not 100 percent certain, but I -- I

24    believe so.

25         Q     Okay.  Did Ms. Green provide you any

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 121

1      information about what she learned from Mr. Carpitella

2      when she interviewed him?

3           A    I mean, we talked about the numbers.  And we

4      talked about the performance.  And that he talked

5      about her knowledge base.  Things like that.  That's

6      what we've already talked about.

7           Q    So in the course of Ms. Green's

8      investigation into Ms. McCart's sexual harassment

9      claim, Mr. Carpitella told her about his concerns

10     about Ms. McCart's performance?

11          A    Yeah.  That was on the record.  That was on

12     the record, you know.  When was that on the record?

13     Just then?  Or before?  I'm not sure if it was before.

14     I just know it was on the record then.

15          Q    Okay.  Understood.  And did Ms. Green tell

16     you anything about what she found after interviewing

17     Mr. Jeff Batson?

18          A    In what sense?  I guess I know I say that

19     but that Jeff felt uneasy around Ms. McCart.  Like

20     stuff like that?  Is that what you want to know?

21          Q    I want to know what Ms. Green told you about

22     her findings from her conversation with Mr. Batson in

23     the course of her investigation into Ms. McCart's

24     complaint.  If you remember everything she told you, I

25     want to know --

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 122

1        A     No.

2        Q     -- everything you remember.  I want -- to

3    the extent that your memory allows you as you sit here

4    today, I want to know as much detail as you can

5    provide about what Ms. Green told you that came

6    from --

7        A     Yeah.  I mean --

8        Q     -- her investigation with Mr. Batson.

9        A     -- she told me part of the reason for lack

10   of merit she thought is because of how many advances

11   Tiar had done to Jeff and some of the behavior that

12   had gone on there.

13            And how she had started following Jeff's

14   girlfriend online.  And making comments on her

15   Instagram.  Maybe Facebook.  I don't know.  One of the

16   socials.  We'll just put it like that.

17            And how Jeff repeatedly felt uneasy, but he

18   didn't want to mention anything 'cause he just said

19   that it's up to him to say to keep somebody away.

20            And that I know she had left crying one time

21   because there was a jokingly fake engagement party

22   that some people played a joke on Jeff, and she

23   thought it was real.  She had an affinity for Jeff

24   which, that's okay.

25        Q     All right.  So Ms. Green told you that

Eddy Perez                                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 123

1      Mr. Batson expressed to her that he felt uncomfortable

2      with comments that Ms. McCart had made to him?

3           A     Seems to be.

4           Q     Okay.  And what did she tell you were the

5      comments that made Mr. Batson feel uncomfortable?

6           A     No.  I'd say ask.  No.  I'd say ask -- Jeff

7      would know all those comments, not me.

8           Q     Okay.  I'm asking you what Ms. Green told

9      you in reporting her findings to you.

10          A     She didn't give me specifics.

11          Q     Okay.  Understood.

12          A     I didn't ask for them either.

13          Q     But she gave you enough specifics to

14     describe for you a party that Ms. McCart left crying

15     at.  Is that correct?

16          A     Yeah.

17          Q     Okay.  So describe for me what information

18     Ms. Green provided to you about this party that she

19     alleged Ms. McCart left crying from.

20          A     Some -- they jokingly -- some people played

21     a joke on Jeff to -- they congratulate him for his

22     engagement, which was coming but not yet.  And she

23     thought Jeff actually had gotten engaged.  And she had

24     an affinity for Jeff.

25          Q     Okay.  So Ms. Green told you that Mr. Batson

Eddy Perez                                   August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 124

1    had expressed to her that after there was a fake party

2    thrown for his engagement --

3         A    Through her investigation.

4         Q    Through her investigation she found that

5    there was a fake party thrown for Mr. Batson as a joke

6    saying he was engaged.  And upon learning of that,

7    Ms. McCart left crying?

8         A    Yeah.  Mm-hmm.

9         Q    Okay.  And did Ms. Green tell you through

10   what information she learned that Ms. McCart left

11   crying from this fake engagement party?

12        A    I mean, I can speculate, but no.

13        Q    Ms. Green didn't tell you how she found that

14   information?

15        A    Nn-mmm.  I remember the party.  I was there.

16   Like, I was in the office that day.

17        Q    Okay.  Do you remember seeing Ms. McCart

18   leaving crying?

19        A    Yes.

20        Q    So is this memory that you're recalling of

21   this information something that was communicated to

22   you by Ms. Green?  Or just something that you recall

23   experiencing?

24        A    Ms. Green communicated it to me, and I

25   recall -- 'cause I didn't understand, you know.

Eddy Perez                                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 125

1    Somebody leaves, you don't know what's going on

2    especially during COVID.  I wasn't going to assume.

3    She validated.  She put A and B together.

4        Q    Okay.  So you saw Ms. McCart leaving that

5    fake party that day, but you didn't realize that

6    according to Ms. Green she was doing so because she

7    was upset about Mr. Batson being engaged?

8        A    Yes.  Correct.

9        Q    Okay.  So who was it that made the

10   connection that Ms. McCart left that party crying

11   because she believed Mr. Batson was engaged?

12       A    Oh.  I don't know.  I don't know who.  Like

13   I said, I don't know everybody that Nyree met with.

14   It could have been from Jeff.  I don't know.

15       Q    Okay.  Understood.  What else did Ms. Green

16   express to you that she learned through her

17   investigation into Ms. McCart's sexual harassment

18   complaint from Mr. Batson?

19       A    Like I said, I'm not sure exactly what Jeff

20   told her.  I didn't ask for specifics.

21       Q    Again, understood.  I am asking what Ms.

22   Green told you as opposed to what Jeff told Ms. Green.

23       A    Well, Ms. Green just relayed that she had

24   talked to Jeff.  And Jeff had had his concerns.  And

25   this is something that went down that was part of the

Eddy Perez                                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 126

1      summary.  Just she went down and gave her thoughts.

2            Q    Okay.  And so what I'm asking you for is

3      what the details were of what you just described.

4      Ms. Green was providing you a summary and she went

5      down and gave her thoughts is what you just said.

6            A    Mm-hmm.

7            Q    What did tell you when she was giving you

8      the summary and giving you her thoughts?

9            A    Well, she said to me, like, look.  You know

10     that -- you know, Tiar was always overly -- I don't

11     know the term to use, but like I said, an affinity

12     towards Jeff.  She's, like, you were aware of that?  I

13     said yes.

14           And she said did you know about this?  I

15     said no, but now this makes sense.  And she just went

16     through every -- every person and just gave we'll say

17     one or two liners.

18           'Cause I was just looking for a general is

19     this have merit?  And I need to investigate further?

20     And I need to take further action one way?  Or this

21     has -- like, I was just looking to see where the facts

22     lied.

23           Q    Okay.  You said she went down every person

24     and gave one or two lines.  Who was the every person

25     that she went down when she was giving you the one or

Page 127

```
 1    two lines about her investigation into Ms. McCart's

 2    sexual harassment claim against Mark Moloughney?

 3        A    She talked about -- she talked about Steve.

 4    And she knew about the performance.  And I know that

 5    Jason had to testify on different job changing, things

 6    of that nature.  You had Jeff.  You had DeAngelo.  Who

 7    else?  I think she talked to Ali, but I'm not sure.

 8    Ali would have made sense.  Some of the other people.

 9            Like I said, I think I think she talked to

10    somewhere around five or ten people.  I don't recall

11    everybody.  I recall those people 'cause they're still

12    here at EPM.  I'm sure there's some people like I'd be

13    speculative if I said some other ones 'cause they're

14    not here anymore if they did or didn't.

15                    MR. WILSON:  I know you don't want to

16    take a break, but I've got to take break.

17                    MS. RAGAN:  Okay.  I'm fine with taking

18    a break now, but I'd like to get to the end of this

19    line of questioning.

20                    MR. WILSON:  That's fine.  I'm just

21    yeah.  That's fine.  But I have to go to the bathroom.

22                    MS. RAGAN:  Understood.

23                    THE WITNESS:  Shit.  When are we

24    getting to eat?

25                    MR. WILSON:  I'm an old man.
```

Eddy Perez                           August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 128

```
 1                    THE REPORTER:  We are off the record --
 2                    MS. RAGAN:  I don't think we agreed to
 3      go off the record.  I thought he was just going to
 4      step out to go to the bathroom.
 5                    MR. WILSON:  Yeah.  We're off the
 6      record.
 7                    MS. RAGAN:  Oh.
 8                    MR. KREINER:  It's twelve.
 9                    MS. RAGAN:  I'm sorry.  I did not
10      realize that we were deciding that we're off the
11      record.
12                    MR. WILSON:  Yeah.  I'm going to
13      take -- yeah.  I'm not going to let you question
14      him --
15                    MS. RAGAN:  We have to agree.
16                    MR. WILSON:  -- question the witness
17      while I'm not here.
18                    MS. RAGAN:  Well, we have to agree
19      we're off the record.
20                    MR. WILSON:  I have to go to the
21      bathroom.  And I'm --
22                    MS. RAGAN:  Okay.
23                    MR. WILSON:  -- not going to sit here
24      and pee.
25                    MS. RAGAN:  That's fine.  That's fine.
```

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 129

1    I haven't agreed to go off the record.  So we're still

2    on the record.

3    BY MS. RAGAN:

4        Q    All right.  So you said that you -- Ali was

5    another person that you mentioned.  Is Ali -- what did

6    Ms. Green tell you about Ali as far as what she

7    learned from her in the course of the investigation?

8        A    I'd like to wait until he gets back.

9        Q    I'm sorry.  You don't have the right to make

10   that call.  We have to agree to go off the record.  He

11   wouldn't allow me to agree.  So I'm continuing to ask

12   the questions.  You've got two other counsel in here

13   that can object to questions if you'd like.

14                  THE WITNESS:  Is that okay?

15                  MS. SMITH:  As long as you're okay with

16   me objecting, then that's --

17                  MS. RAGAN:  Absolutely.  Yeah.  No

18   problem with that whatsoever.

19   BY MS. RAGAN:

20       Q    Okay.  Would you like me to repeat the

21   question?

22       A    Yeah.  Real quick though.  Before we get

23   into that, when are we going to do lunch?  'Cause I do

24   that whole I.F. and I'm starting to starve.

25       Q    We can talk about that and go off to break

Eddy Perez                              August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 130

1      after you answer my question.  I think that's one of

2      the things we understood at the beginning that we're

3      not going to take a break while there's a pending

4      question and there is a pending question.

5          A    Okay.  Fair enough.

6          Q    Would you like me to repeat the question?

7          A    Please.

8          Q    What did Ms. Green tell you about what she

9      learned from Ali in the course of her investigation

10     into Ms. McCart's sexual harassment complaint about

11     Mark Moloughney?

12         A    About Mark?  Or about, you know -- she would

13     talk to Ali just about --

14         Q    Please answer my question.

15         A    No.  She would have talked to Ali about

16     production and that --

17         Q    Okay.  You had indicated that Ali is one of

18     the people that Ms. Green talked to.

19         A    I believe so.

20         Q    She talked to Ms. Ali in the course of

21     investigating Ms. McCart's sexual harassment complaint

22     about production?

23         A    I know she talked to Steve about it.  And I

24     said I would assume that Ali would be another one.

25         Q    Okay.  Understood.  Anything else that Ms.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 131

1      Green shared with you that she was informed by from

2      Ali?

3            A    Not that I'm aware of.

4            Q    All right.  And then the only other one that

5      I think that we haven't talked about is -- well,

6      actually, Mark.  Did Ms. Green tell you what she

7      learned from Mark in the course of her investigation

8      into Ms. McCart's sexual harassment complaint?

9            A    Like I said, I said I don't want any graphic

10     details.  That's not my business.  She did say that

11     she thought that what went between them was

12     consensual.

13           Q    Okay.  Did she tell you why she came to the

14     conclusion that Ms. McCart had consented to the

15     conduct that she complained about being sexual

16     harassment?

17           A    No.  I mean, she explained some of her

18     concerns and an all around picture.  But not

19     specifically just that.

20           Q    Okay.  What were the concerns in the all

21     around picture that Ms. Green expressed to you?

22           A    She thought there was a pattern there.

23           Q    Okay.  What was the pattern?

24           A    We had Jeff.  We had Mark.  Now we also had

25     DeAngelo.  DeAngelo I knew about because DeAngelo came

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 132

1    to me and I told him he had to go to HR.  And then I

2    said leave it at that.  Once again I did that part.

3         Q    Okay.  I am not clear as to what you mean

4    when you say there's a pattern.  You've identified the

5    names of three men in response to me asking you about

6    a pattern.  I don't understand what you mean.  Can you

7    please elaborate on that?  What is the pattern --

8         A    You mean my thoughts?  My thoughts?

9         Q    Well, your testimony was that Ms. Green

10   expressed to you that she found there to be a

11   pattern --

12        A    Mm-hmm.

13        Q    -- that resulted in her concluding that Ms.

14   McCart had consented to the physical contact between

15   her and Mr. Moloughney.

16             I'm asking you to describe what did Ms.

17   Green express to you was the nature of the pattern?

18        A    She thought her behaviors -- to summarize

19   what she would say -- was promiscuous.  And she

20   thought that she was always outwardly putting herself

21   out there.  So when she looked at everything and then

22   she validated it with multiple people, she believed it

23   was consensual.

24        Q    Okay.  So Ms. Green expressed to you that

25   she believed that Ms. McCart was promiscuous and that

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 133

1    she had put herself out there with Mr. Moloughney, Mr.

2    Batson, and DeAngelo?

3        A    Correct.

4        Q    Okay.  Understood.  Did Ms. Green describe

5    for you how she believed that Ms. McCart had put

6    herself out there and been promiscuous with Mr.

7    Moloughney?

8        A    Mr. Moloughney in particular?  Or --

9        Q    Yes, sir.

10       A    No.  She did not in particular.

11       Q    So she didn't give you any particular detail

12   about the individual with whom Ms. -- she was

13   investigating Ms. McCart's complaint?

14       A    She told me that they -- after the football

15   game went with -- 'cause Sarah was there, the head

16   of -- not HR but right underneath her.  That they had

17   gone to one place together.  And then they went with

18   each other to another place.  And that they had been

19   together for quite a few hours together, so.  She

20   thought everything followed accordingly.

21       Q    Okay.  So what you just described is what

22   Ms. Green expressed to you the evidence that

23   Ms. McCart had been promiscuous and putting herself

24   out there with Mr. Moloughney?

25       A    Correct.  And that they -- you know, they

Eddy Perez                                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 134

1     did something.  But I didn't ask.  I just asked.  I

2     did ask was there sex involved?  And they said no.  It

3     was, I guess, what we would say nowadays fooling

4     around or something of that nature.  I left it

5     at -- okay.  We'll leave it at that.

6          Q    Okay.  Are there any other details you can

7     think of as you sit here today that Ms. Green

8     expressed to you formed her opinion that Ms. McCart

9     had consented to the interaction with Mr. Moloughney?

10         A    I mean, she told me that she stayed with

11    Mark all night and didn't leave till the next day if

12    that's what you mean.  But --

13         Q    I'm asking about anything that you can

14    recall.  It's not what I mean.  It's what you can

15    recall.

16         A    Well, I didn't know if that was pertinent.

17    That's why I said that.  Yeah.  She told me that she

18    thought it was consensual because something that's

19    usually not consensual, somebody leaves or does at

20    least something.  And she said that she stayed till

21    the very next day that she found.  So that was part of

22    it.  And like I said over, just some of her prior

23    behaviors.

24         Q    Okay.  Did Ms. Green express to you that she

25    found that Ms. McCart verbally told Mr. Moloughney no?

Eddy Perez                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 135

1    Verbally stopped any physical interaction with him?

2         A    She did not tell me that.

3         Q    Okay.  Did Ms. -- okay.  The other

4    individuals that you described as being part of this

5    pattern were Mr. Batson.  He was one of the other

6    individuals.

7              What did Ms. Green express to you that she

8    learned from Mr. Batson that helped form her belief

9    that there was a pattern of Ms. McCart being

10   promiscuous and putting herself out there with Mr.

11   Batson?

12        A    Well, in the testimony she's found a pattern

13   between DeAngelo, Jeff, and Mark that Ms. Tiar had

14   expressed that she wanted to have kids with them.

15        Q    Okay.  Anything else that Ms. Green

16   expressed to you she found from Mr. Batson that

17   supported her conclusion that there was a pattern of

18   how Ms. McCart acted with the three of those men?

19        A    Well, Jeff's the only one that didn't act on

20   anything.  Probably the best way to put it.  So no.

21   Outside of like I said, the -- the pattern of wanting

22   to have kids with them.  And start a life.

23        Q    Okay.  So Ms. Green informed you that she

24   found in the course of her investigation into

25   Ms. McCart's sexual harassment complaint that

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 136

1    Ms. McCart expressed that she wanted to have kids to

2    Mr. Moloughney, to Mr. Batson, and to DeAngelo --

3         A    No.  She said she found it between all three

4    of them.  DeAngelo, Jeff, and Mark all said it.

5         Q    This is a great example of why you've got to

6    let me get the question on the record --

7         A    I'm sorry.

8         Q    -- 'cause that's exactly what I asked you.

9    And you answered with no, but then repeated my

10   question back to me.  So let's clarify the record.

11        A    Okay.

12        Q    My understanding of your testimony is that

13   one of the things that Ms. Green expressed to you that

14   she found in the course of her sexual harassment

15   investigation into the conduct between Ms. McCart and

16   Mr. Moloughney that led her to believe that there was

17   a pattern of Ms. McCart's conduct was that she had

18   expressed to Mr. Moloughney, Mr. Batson, and to

19   DeAngelo that she wanted to have kids with each of

20   them?

21        A    Yes.

22        Q    Okay.  Understood.  All right.

23        A    Can I make a clarification?

24        Q    Yes.  Please.

25        A    It was from them.  Not from Tiar.  That's

Eddy Perez                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 137

1    what I'm saying.

2         Q    What was from the men I believe is who

3    you're referring to?

4         A    They all three said those are some of the

5    conversations they had with Tiar.

6         Q    Again I was not asking you what Tiar said.

7    I was --

8         A    Oh.  Okay.  Sorry.

9         Q    -- asking you what --

10        A    My confusion.

11        Q    -- Ms. Green told you in the course of her

12   investigation.  What we're talking about right now and

13   what we have been talking about for some time now is

14   what Ms. Green conveyed to you were the results of her

15   investigation.

16             So my understanding is that your testimony

17   is that Ms. Green expressed to you that one of the

18   reasons that she found that Ms. McCart's interaction

19   with Mr. Moloughney was consensual was that Ms. Green

20   determined that Ms. McCart engaged in a pattern of

21   similar behavior with Mr. Moloughney, Mr. Batson, and

22   DeAngelo.  Is that correct?

23        A    Yes.

24        Q    And Ms. Green expressed to you that one of

25   the patterns she found between Ms. McCart and those

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 138

1     three men is that she found in the course of her

2     investigation that Ms. McCart had expressed to Mr.

3     Moloughney, Mr. Batson, and DeAngelo that she wanted

4     to have kids with each of them?

5          A     Yes.

6          Q     Okay.  Understood.  All right.  Is there

7     anything else that you can recall that Ms. Green

8     expressed to you formed the basis of her conclusion

9     that Ms. McCart engaged in a pattern of conduct with

10    Mr. Moloughney, Mr. Batson, and Mr. DeAngelo?

11         A     Not at this time.

12         Q     Okay.  So just the fact that she had

13    expressed to all three of them that she wanted to have

14    kids with them?

15         A     I mean, there was a few thing she expressed,

16    but I'm saying that was the -- the big pattern that

17    she found along with -- you know, she came to a

18    conclusion.

19               She said, you know, how can there be -- part

20    of the reason for her merit -- she came to the

21    conclusion of three men she's wanted to have kids

22    with.  How can there be a sexual harassment claim

23    and -- and things of that nature.  You know.

24               You know, look.  People can change their

25    mind.  I'm not going to say they can't.  But she just

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 139

1    said between that and -- and some of the -- like I

2    said earlier, some of the promiscuous behavior

3    and -- and outlets out there and some of the things

4    that she learned that she felt it was consensual and

5    that there was no merit to the claim.

6         Q    Okay.  So what you're doing is talking in

7    pretty broad generalities about what Ms. Green

8    expressed to you.  Whereas what I am doing is trying

9    to get the detail as to that.

10        So when I asked you a moment ago if there

11   was anything else that you could recall that Ms. Green

12   expressed to you formed the basis of her conclusion

13   that the conduct between Mr. Moloughney and Ms. McCart

14   was consensual, you said that there was nothing else.

15        But then you gave me some very broad

16   examples of some things.  So let's go back to that

17   question and re-visit it.

18        A    Okay.

19        Q    Thus far the only specific detail that

20   you've identified for me that Ms. Green expressed to

21   you was the basis of her conclusion that Ms. McCart

22   had consented to the physical interaction with Mr.

23   Moloughney was that there was a pattern in her conduct

24   between Mr. Moloughney, Mr. Batson, and DeAngelo.

25        And that that pattern resulted from the fact

Page 140

1   that she had expressed to all three of those men that

2   she wanted to have kids with them.  Do I -- am I with

3   you thus far?

4        A    Well, I was giving you a summary just to

5   give you some context.

6        Q    Understood.

7        A    Before --

8        Q    What I just stated, did I understand your

9   testimony correctly?

10       A    I mean, do we also include the -- what she

11  had told me, the sexual relations that she had with

12  DeAngelo?  The -- Jeff didn't act on it, but that.

13  And then with Mark.  Like, I don't -- I

14  don't -- that's what I'm trying to say is she

15  summarized, like I said, for me.  And that's -- she

16  found that to be what she thought was very crucial.

17       Q    Okay.  Understood.  I'm going to ask you to

18  answer my question.  And then I'll be glad to allow

19  you to provide more detail.

20       A    Okay.

21       Q    My question to you was:  Did I understand

22  your testimony correctly that thus far the only facts

23  that you have identified that Ms. Green expressed to

24  you that formed the basis of her conclusion that

25  Ms. McCart consented to the interaction with

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 141

1     Mr. Moloughney was the pattern that she said resulted

2     from Ms. McCart expressing to Mr. Moloughney,

3     Mr. Batson, and DeAngelo that she wanted to have kids

4     with them?

5                    MR. WILSON:  I'm going to object.

6                    But you can answer the question.

7                    THE WITNESS:  Just out of curiosity,

8     what does the objection do?

9                    MR. WILSON:  Just preserves it for the

10    record.

11                   MS. RAGAN:  Answer the question,

12    please.

13                   THE WITNESS:  Yes.

14    BY MS. RAGAN:

15        Q     Okay.  So that's the one example that we

16    have.  Now let's talk about any others that you may

17    have which I believe you referenced in your last

18    response regarding --

19        A     Well, it was part of her --

20        Q     -- DeAngelo.

21        A     -- her summary.

22        Q     Understood.  What else can you identify that

23    Ms. Green expressed to you was the basis of her

24    concluding that Mr. Moloughney and Ms. McCart's

25    interactions were consensual because of a pattern of

Eddy Perez                                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 142

1      Ms. McCart's conduct?

2           A     I mean, with DeAngelo -- so you're just

3      talking about the conversation Nyree had.  So --

4           Q     I'm talking about the conversation that

5      Ms. Green expressed to you --

6           A     Yeah.

7           Q     -- that formed the basis of her conclusion

8      that Ms. McCart engaged in a pattern of conduct with

9      Mr. Moloughney, Mr. Batson, and Mr. DeAngelo.

10                     MR. WILSON:  Before you answer that

11     question, you can answer it again.

12                     I've got 12:40.  And I know that you

13     don't like to be interrupted when you're on a roll.

14     But we're going to have to take a break at some point.

15     So does one o'clock work for you or --

16                     MS. RAGAN:  Assuming that we can get to

17     the end of this line of question, absolutely it works.

18                     MR. WILSON:  All right.

19                     THE WITNESS:  Do what?

20                     MR. KREINER:  Can we go off the record

21     for a second?

22                     MR. WILSON:  No.  She's got a question

23     pending, so.

24                     MR. KREINER:  I didn't realize that.  I

25     apologize.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 143

1              MR. WILSON:  Right.

2              MS. RAGAN:  Yeah.

3              MR. WILSON:  So he's got to answer that

4     question.

5              MS. RAGAN:  And just for the record,

6     when we do go off record, we're not having any

7     conversations in front of the witness.

8              MR. WILSON:  No.  We're not going to

9     have any.

10             MS. RAGAN:  So I'm glad to go off the

11    record, but we'll segregate.

12             MR. WILSON:  Sure.

13    BY MS. RAGAN:

14        Q    My question to you was:  Other than what we

15    have confirmed already, which is your testimony that

16    one of the things Ms. Green expressed formed the basis

17    of her conclusion that Ms. McCart had engaged in a

18    pattern of conduct with Mr. Moloughney, Mr. Batson,

19    and Mr. DeAngelo was that she had expressed to all

20    three of them she wanted to have kids, what else did

21    Ms. Green express to you formed the conclusion that

22    she made that there was a pattern in Ms. McCart's

23    conduct?

24        A    I know that she thought -- so you're talking

25    about all three of them.  Right?  Just to be clear.

Eddy Perez                      August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 144

1          Q     I am talking --

2          A     Are you talking about Ms. Green?  Nyree?  I

3     just call her Nyree 'cause --

4          Q     That's fine.

5          A     -- the -- it's like saying Mr. Batson.  That

6     just sounds weird to me.  I just call him Jeff.

7          Q     Please feel free to refer to them as you

8     like.

9          A     So for Nyree, the conversation she had is

10    that she also felt that -- that possibly these

11    gentlemen had rejected her because these conversations

12    that she had had and then either they didn't take

13    action or they didn't follow up with more.  So she

14    thought that that was part of the pattern that she

15    felt like that.

16          She also thought it was -- part of her

17    thoughts in her summary -- her thoughts -- was that

18    the incident happened and then two months later after

19    she's getting reviewed for her job and it was looking

20    like she wasn't going to keep it, that that allegation

21    showed up.  She thought that that was convenient.  And

22    she thought that everything that she had looked under,

23    just she didn't think there was merit.

24          Q     Okay.

25                MR. WILSON:  All right.  Now

Eddy Perez                                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 145

1    we're -- he's going to sit right here.  And we're

2    going to take a quick break.

3                    MS. RAGAN:  Okay.  Understood.

4                    THE REPORTER:  We are off the record at

5    12:42 p.m.

6                    (Off the record.)

7                    THE REPORTER:  Back on the record at

8    12:48 p.m.

9    BY MS. RAGAN:

10        Q    Okay.  All right.  Mr. Perez, have you at

11   this point identified for me every fact that Ms. Green

12   expressed to you was the basis of her conclusion that

13   Ms. McCart engaged in a pattern with Mr. Moloughney,

14   Mr. Batson, and DeAngelo?

15        A    To the best of my knowledge.  Yes.

16        Q    Okay.  And so your -- one of those -- the

17   last thing that you identified as I understand it is

18   that each of those three men had rejected Ms. McCart.

19   Is that correct?

20        A    It's her speculation.

21        Q    That was Ms. Green's speculation that Mark

22   Moloughney, Jeff Batson, and DeAngelo had all rejected

23   Ms. McCart?

24        A    In her thoughts.

25        Q    Okay.  Understood.  The last one that we

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 146

1     have not talked about in detail is DeAngelo.

2          A     Mm-hmm.

3          Q     What did Ms. Green express to you she found

4     from speaking to DeAngelo in the course of her

5     investigation into Ms. McCart's sexual harassment

6     complaint?

7          A     Well, he had talked about how they had

8     consensual sex.  And a few different times.  And then

9     she had also expressed how Tiar had sat outside his

10    house at, like, three in the morning one night.  And

11    DeAngelo was concerned for himself.  And those were

12    the details that were given.  I didn't ask how many

13    times or anything of that nature.

14         Q     Okay.  And those were the details that was

15    given to you by DeAngelo?  Or by Ms. Green in

16    summarizing her investigation into Ms. McCart's sexual

17    harassment complaint against Mark Moloughney?

18         A     Nyree.

19         Q     Okay.  Given that DeAngelo had come to you,

20    did you express to Ms. Green that she should talk to

21    DeAngelo as a part of her investigation?

22         A     Nn-mmm.

23         Q     Is that a no?

24         A     No.

25         Q     Do you have any knowledge as to how Ms.

Eddy Perez                                   August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 147

1    Green concluded that DeAngelo would have information

2    relevant to her investigation into Mr. Moloughney's

3    conduct with Ms. McCart?

4         A    I mean, I'd have to presume that he went, or

5    she had discovered it talking to other people.  I'm

6    not sure.  I don't -- I can't speculate on how.  I did

7    tell him to go to HR.

8         Q    When did DeAngelo come to you expressing

9    concerns about Ms. McCart?

10        A    I don't know when that went down.  But would

11   you like me to guess?

12        Q    Estimate to the best of your ability would

13   be fine.

14        A    I'd say fall of 2020.

15        Q    Okay.  And what specifically did Mr.

16   DeAngelo express to you when he came to you in the

17   fall of 2020 with concerns about Ms. McCart?

18        A    That -- now so you want what DeAngelo told

19   me?

20        Q    Told you.  Yes, sir.

21        A    Okay.  I was going to say I didn't see this

22   so I'll go off --

23        Q    Understood.

24        A    -- what he told me.

25        Q    Absolutely.

Eddy Perez                                                         August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 148

```
 1        A     He said that she was crying at work.  And he
 2   doesn't have time for this.  And that he had a
 3   girlfriend, and he probably shouldn't have done that.
 4   And he just -- it was stressing him out.
 5              And, you know, he didn't have a ride.  So he
 6   rode with her and I guess they live close to here.
 7   They both live in downtown, I think.  Somewhere around
 8   there back then.  And he didn't want to ride MARTA
 9   anymore.  I mean, he had told me that she had offered
10   to buy him a car.
11              And I just was, like, you got to come to HR.
12   This -- if you're concerned for yourself, you need to
13   go.  That's it.
14        Q     Okay.  And were you concerned that Ms.
15   McCart had violated some policy of Equity Prime
16   Mortgage based on what Mr. DeAngelo expressed to you
17   about her?
18        A     No.
19        Q     Okay.  Did you inform HR about what DeAngelo
20   told you?
21        A     No.
22        Q     Okay.  So the only response that you had to
23   DeAngelo coming to you about these concerns with
24   Ms. McCart was you need to go to HR?
25        A     Yeah.
```

Eddy Perez                                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 149

1      Q    Did you ever follow up with that and him or
2  Ms. Green about whether he did in fact take your
3  suggestion in I believe you said fall of 2020 if I'm
4  not mistaken?
5      A    Yes.
6      Q    And with whom did you follow up?
7      A    Well, I asked DeAngelo one day when I ran
8  into him in the bathroom are you good?  Is everything
9  resolved?  And he said yes.  So I don't know if that
10  was HR or the storm had been weathered.
11      Q    Okay.  Understood.  And just to be clear,
12  you understood what DeAngelo was expressing to you was
13  that it was a consensual relationship between him and
14  Ms. McCart?
15      A    Yeah.  Yes.  Yes.
16      Q    Okay.  So you've used the word promiscuous a
17  few different times to describe, I guess, Ms. Green's
18  findings.  Do I understand that correctly?
19      A    Correct.
20      Q    About Ms. McCart?
21      A    [No audible response.]
22      Q    Is that a yes?
23      A    Yes.  That's a yes.
24      Q    Okay.  What did Ms. Green express to you
25  that she found that resulted in the conclusion that

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 150

1      Ms. McCart was acting promiscuously?

2           A    She just said three guys in a certain amount

3      of months at the same office.  Who's to know what else

4      is going out there in the -- in the world.

5           Q    Okay.  What about those three guys did Ms.

6      Green find to be promiscuous by Ms. McCart?

7           A    She just thought that was a lot of sexual

8      behavior in a short time period.  And you have to

9      understand, Ms. Green is married, of not of that

10     behavior.  Could she have been overestimating?  That's

11     on her.  That's not on me.  I'm just repeating her

12     thoughts.

13          Q    Okay.  And so the three guys that Ms. Green

14     expressed to you she found that resulted in her

15     conclusion that Ms. McCart was promiscuous were

16     DeAngelo, Mr. Batson, and Mr. Moloughney?

17          A    Correct.

18          Q    And what sexual activity was there between

19     Ms. McCart and Mr. Batson that Ms. Green found to

20     contribute to her decision that Ms. McCart was

21     promiscuous?

22          A    She was offering if Jeff wanted to that he

23     could.

24          Q    Okay.  So Ms. Green found that Ms. McCart

25     offered consensual sex to Mr. Batson?

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 151

1          A     Jeff just didn't, like I said, take up

2      any -- he didn't take it up.

3          Q     Okay.  How did Ms. McCart offer sexual --

4          A     I have no idea.

5          Q     Okay.  And Ms. Green also found that Ms.

6      McCart was offering sexual interaction with Mr.

7      Moloughney?

8          A     Correct.

9          Q     Okay.  And do you have any idea what Ms.

10     Green based that finding on?

11         A     No.

12         Q     Did you agree with Ms. Green's findings that

13     Ms. McCart was promiscuous and engaged in a pattern of

14     conduct between DeAngelo and Mr. Batson and

15     Mr. Moloughney?

16         A     I didn't say that.

17         Q     I didn't ask whether you said it.  I asked

18     whether you agreed with it.

19               As you sit here today based on the findings

20     that Ms. Green presented to you from her investigation

21     into Ms. McCart's sexual harassment complaint with Mr.

22     Moloughney, did you determine that Ms. Green was

23     right?  That Ms. McCart was promiscuous and had

24     engaged in a pattern with these three men?

25         A     I don't know if I'd define that as

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 152

1    promiscuous.  Because you're asking me exactly that

2    word.  So --

3         Q    It's a word that you used.  Right?

4         A    I used it because of my conversation with

5    Nyree.

6         Q    Okay.  So that word originated with Ms.

7    Green?

8         A    Yes.

9         Q    Understood.  So did you agree with her

10   assessment that Ms. McCart was promiscuous and

11   engaging in a pattern with the three men that we've

12   identified?

13        A    I would agree with pattern.  I would not

14   agree with promiscuous 'cause that's not for me to

15   decide.

16        Q    Okay.  Understood.  And as a result of Ms.

17   Green's investigation, she recommended to you what

18   should happen at the conclusion of that investigation?

19        A    No.  No.  No.  She just said that her

20   findings had no merit.  And then after that, you

21   know -- that we had been cleared and we had followed

22   protocol.  And we had done everything.

23        Q    Okay.  Did Ms. Green make any recommendation

24   to you as to what should happen with Ms. McCart as a

25   result of her finding that the sexual harassment claim

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 153

1     had no merit?

2          A     No.

3          Q     Okay.  So she left that for you to decide

4     what to do next with Ms. McCart?

5          A     Correct.

6          Q     And what did you decide to do next as a

7     result of Ms. Green's findings that her sexual

8     harassment complaint had no merit?

9          A     The steps I took?  Or exactly what process

10    do you want me to describe?

11         Q     In my mind there's no difference between

12    what you just indicated.  So let me just rephrase my

13    question for you.  I'm asking what did you do --

14         A     Next?

15         Q     -- next after Ms. Green explained to you

16    that her findings were that Ms. McCart's complaint had

17    no merit?

18         A     I called Legal.

19         Q     Okay.  And you called Legal for the purpose

20    of asking about terminating Ms. McCart?  Or sexual

21    harassment?

22         A     Well, I had told --

23         Q     Don't tell me what she had.

24               MR. WILSON:  Objection.

25         Q     I'm asking about the purpose of the advice

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 154

1    you were seeking.

2         A    Well, I let --

3                   MR. WILSON:  Don't talk about the

4    content --

5                   THE WITNESS:  Oh.

6                   MR. WILSON:  -- of any conversation

7    that you had with Legal.

8                   MS. RAGAN:  Right.

9                   THE WITNESS:  I guess I talked to

10   Legal.

11   BY MS. RAGAN:

12        Q    Okay.  And you talked to Legal about either

13   the termination or the sexual harassment complaint?

14   Or both?

15                  THE WITNESS:  Can I answer that?

16                  MR. WILSON:  You can answer that.

17                  MS. RAGAN:  Yeah.

18                  THE WITNESS:  Both.

19   BY MS. RAGAN:

20        Q    Okay.  Understood.

21        A    I don't know what I can answer or not.  I'm

22   not a -- I'm not a pro at this.

23        Q    It's fine.  Okay.  And ultimately after

24   consulting with Legal, after consulting with Ms.

25   Green, did you consult with anyone else before you

Eddy Perez                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 155

1    made your final determination that Ms. McCart should

2    be terminated?

3         A    Yeah.  I talked to Steve Carpitella to see

4    if he still had the same recommendation.

5         Q    And did he in fact have the same

6    recommendation?

7         A    Yeah.  He didn't believe her knowledge

8    would -- would be up to par.

9         Q    Okay.  And so after consulting with Mr.

10   Carpitella, after consulting with Legal, and after

11   consulting with Ms. Green, you made the determination

12   that Ms. McCart's complaint had no merit and therefore

13   you could proceed with terminating her employment?

14        A    I followed Nyree's recommendation that it

15   had no merit.  And yes.  Then I followed with her

16   termination.

17                  MS. RAGAN:  Okay.  I am glad to take a

18   break now.  I appreciate you allowing me to get to the

19   end of that line of questioning which I did not think

20   was a big ask, but apparently it was.  And you know

21   what?  We're a minute --

22                  MR. WILSON:  We're a minute.

23                  MS. RAGAN:  So we can go off the

24   record.

25                  MR. WILSON:  Off the record.

Page 156

1           MS. RAGAN:  And we can take a lunch

2      break.  We just need to know what time to be back.

3           THE REPORTER:  Off the record at 12:59

4      p.m.

5           (Off the record.)

6           THE REPORTER:  And we are back on the

7      record at 2:00 p.m.

8      BY MS. RAGAN:

9      Q    Okay.  Mr. Perez, prior to the break, we

10     talked about your knowledge of Nyree Green's

11     investigation into Ms. McCart's sexual harassment

12     complaint.

13          Aside from the information that you received

14     from Ms. Green about her investigation, did you

15     yourself do any independent investigation into

16     Ms. McCart's sexual harassment claim?

17     A    No.

18     Q    Okay.  Did you speak to anybody directly

19     other than what you've told us about the information

20     you received from Ms. Green in relation to

21     Ms. McCart's sexual harassment claim?

22     A    And I spoke about when I told the execs what

23     was going on.  To keep it here.  And on a few

24     occasions I did the reminder.

25          And if people would ask me, 'cause a lot of

Eddy Perez                                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 157

 1    people asked in December because there was an article
 2    that went out about it through the industry.  I had to
 3    address people, some in the firm; some outside the
 4    firm.  Some of my credit lines called and were
 5    inquiring.
 6            So I had to give statements like that.  But
 7    a lot of it was it's a legal matter.  You need to call
 8    our attorney.  That's who you need to handle it with.
 9    So it was more context is probably what I would say.
10        Q    Okay.  Did you make any written statements
11    related to Ms. McCart's complaints in response to any
12    of the inquiries that you just described receiving?
13        A    Did anybody make me put it in writing?
14    That's a good question.  Shit.  God.  Man.  You make
15    remember that.  I don't know because I'm just not
16    sure.  I -- I don't know.  I don't know.
17        Q    Okay.  It's possible.  You're not certain as
18    you sit here today?
19        A    It's possible that somebody made me after I
20    have a call, give a statement.  Legal put it together
21    or, you know, chief people officer, and I signed it
22    and sent it.  So there's a -- there's a possibility,
23    but I don't recall.
24        Q    Okay.  Do you recall specifically signing a
25    statement that Legal put together?

Eddy Perez                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 158

1       A    I do not recall.

2       Q    Okay.  You're saying it's possible that

3   Legal put together a statement and you signed it?

4       A    What?  To the outside forces?

5       Q    Yes, sir.

6       A    I don't think Legal did.  I would have

7   probably guessed that maybe our chief people officer

8   did.  But I don't -- I don't -- I don't think Legal

9   did.  Or maybe Jim Lyons 'cause he handles a lot of

10  that.  So I don't know.  I just -- I'm not sure.  That

11  was around Christmas, so.

12      Q    Of 2021?

13      A    Yes.  When that article came out and had to

14  address it.

15      Q    Can you recall as you sit here today the

16  names of either the individuals or the entities that

17  reached out to you for comment in relation to that

18  article?

19      A    Some people gave me an e-mail.  And I just

20  said it's with Legal.  I'd have to go back to look.  I

21  don't -- I know a few people called me.  Some people

22  from the industry who are not, were checking up to see

23  if things were okay with just myself dealing with

24  this.  Other business owners.  But I don't -- I don't

25  remember everybody.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 159

1      Q    Okay.  So you think you received some
2   e-mails asking for either comment or just checking in
3   on you regarding the article that was published?  And
4   you think some of them were received via phone call?
5      A    Some were phone calls.  Some were texts.
6   Some were phone.  E-mail.  Excuse me.
7           I know that I reached out proactively to the
8   Mortgage Bankers Association because I'm the -- I am
9   the executive council co-chair.  So I said look.
10  Hopefully this doesn't give you guys any stress.  So I
11  reached out to the CEO and the COO.
12     Q    All right.  Did you reach out to them via
13  e-mail or phone call or through what means?
14     A    I sent them the article so that they would
15  be informed 'cause that's sometimes what the press
16  will ask a lot of questions because I happen to be in
17  the trade association, on the board, and things like
18  that.  And then I also texted them and I spoke to
19  them.
20     Q    Okay.  All right.  Any other communications
21  that you can recall making, whether in writing or
22  verbally, regarding responses that you made to the
23  article that was published about Ms. McCart's claims?
24     A    No, ma'am.
25     Q    Okay.  All right.  So my original question

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 160

```
 1    that got us down that rabbit hole was --

 2         A    Sorry.  I need to just shut up.

 3         Q    No.  No.  Listen, it's not your fault.  That

 4    got us down that rabbit hole was regarding whether you

 5    conducted any independent investigation into

 6    Ms. McCart's complaint about Mr. Moloughney.

 7              Did you have any conversations directly with

 8    Mr. Moloughney about Ms. McCart's claims?

 9         A    Well, I had to ask him about it.  Is this

10    legit?  He said that they did have something that went

11    on.  And I said well, it's a legal matter now.  And we

12    have to investigate it.  And I will tell you upon

13    further notice what the outcome is.

14         Q    Okay.  Was Mr. Moloughney disciplined,

15    suspended, reprimanded, coached or in any way given

16    any negative consequence as a result of Ms. McCart's

17    claims?

18         A    Obviously he reports to me, so that's pretty

19    bad if it gets to me.  And we had a long conversation

20    that I just said look.  This is unbecoming.  This is

21    behavior that shouldn't be done.  And I don't care if

22    it's consensual.

23              Because of that we put in a very strict

24    policy after that that if you're C-level and later

25    down the road you're -- you're -- of anything of that
```

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 161

1     nature we put the policy in 'cause we had to wait till

2     everything was done in I want to say, like,

3     June -- that it's a terminable offense even if it's

4     consensual and everything is good.

5              It just is not C-level behavior as I would

6     say.  Or I didn't think it lived our 4CORE of our

7     culture.

8              And after that he does have a weekly one-

9     hour session with a business coach that all this has

10    to get resolved and everything of that nature.  So he

11    did get coaching.  He did get reprimanded.  And he did

12    acknowledge that.

13       Q    Okay.  Was that coaching or reprimand

14    documented in any way?

15       A    I don't know.  I know it was verbal but I

16    don't know if I put it in -- I didn't -- I didn't put

17    it in writing but I don't know if I told HR and then

18    they put it in writing.

19       Q    Okay.  And the business coaching that he

20    has, do I understand you correctly that that business

21    coaching he receives relates in some way to his

22    conduct towards employees?

23       A    Just overall, you know, level up as a leader

24    because this is stuff that should have mentally hit

25    his head ahead of time.

Eddy Perez                                         August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 162

1       Q    Okay.  And you said he receives that

2   business coaching weekly?

3       A    Yes.

4       Q    And from whom does he receive the coaching?

5       A    The gentleman's name is Michael Allosso.

6   It's independent, and I don't get coached by him.  The

7   executives do.  I keep that separate.

8       Q    When you say the executives, you mean all

9   the executives, not just Mark?

10       A    Correct.  Today.

11       Q    So that business coaching that Mr.

12   Moloughney receives isn't some consequence of

13   Ms. McCart's claims; it's something that all

14   executives receive?

15       A    No.  Not at the time.  Today they do.  Now

16   we've put in a policy that every executive has to get

17   coached by this person.  But at the time that was part

18   of dude, you can't.  You can't.  So back then that

19   was.  Today it's just automatic.

20       Q    Okay.  So the business coaching was a new

21   requirement that was put into place after Ms. McCart's

22   claims were made?

23       A    Some people were already on there.  But yes.

24   Him.  Yes.

25       Q    Okay.  Understood.  I believe you also

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 163

1       mentioned that there was a policy created in June of

2       2021 about no fraternization or relationships between

3       C-level employees and any other employee of the

4       company.  Is that correct?

5            A    Yeah.

6            Q    Did I describe that policy correctly?  That

7       no C-level employee can have any relationship or

8       fraternization or sexual intercourse with any --

9            A    After that date we said look, guys.  We've

10      examined everything.  Anything prior to that, it's a

11      different conversation.  But here's, like, you know,

12      when a new law passes, this is the new -- the new

13      rule.  We had it on our executive call.  And, you

14      know, we made that a very standard.  Everybody voted

15      in full unanimous.  And we left it at that.

16           Q    Okay.  And that policy took effect in

17      approximately June of 2021?

18           A    We'll say summer as I have to summarize

19      'cause I may be off by a month.

20           Q    Okay.  Did Mr. Moloughney receive any

21      coaching, counseling, or discipline as a result of the

22      relationship that he has with an employee named Jamie

23      that's out of Texas with EPM?

24           A    She's no longer with us.  What do you mean?

25      Coaching on that?

Eddy Perez                                      August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 164

1          Q    Yes.  As a result of his relationship with

2     her.

3          A    Well, that happened prior to that June.  And

4     that's where we came to that conclusion.  And then

5     they had disclosed it fully to HR as soon as it

6     happened that it was consensual.

7               And then we just put in the behavior 'cause

8     I just said that that's just not going to be part of

9     our culture anymore.

10              And it was after June at some point only

11    because that was a discussion at our strategic.  That

12    just jogged my memory.

13         Q    Okay.  What was after June at some point?

14         A    That policy that it doesn't matter.  What's

15    done is done.  I understand that.  Both of y'all are

16    going through a divorce.  You're finding yourselves.

17    But after this it doesn't matter.  And he's very well

18    aware of that.

19         Q    Okay.  When was the relationship between

20    Jamie and Mark disclosed to EPM?

21         A    I'm not sure.  I don't -- I don't remember.

22         Q    To whom did Mark disclose his relationship

23    with the other female employee of Equity Prime

24    Mortgage?

25         A    I know he went to HR.  I know they went to

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 165

1    HR.  And they signed forms.

2         Q    Okay.  Can you tell me Jamie's last name?

3         A    Oh, God.  She had two.  I think Rice.  At

4    least that's what's on LinkedIn.  Oh.  Wait.  No.  Or

5    is that LaCorte?  Do you want me to look it up?

6         Q    Sure.

7         A    It's easier that way.  Well, I -- well, I

8    think one is one and then the other is the other.  So

9    I've just got to be clear.

10            Jamie.  Is that how it's spelled?  LaCorte.

11   Rice LaCorte.  I guess I got it all right.

12        Q    You did.  Good job.  Okay.  So your

13   understanding is that Jamie and Mark both went to HR

14   and signed forms disclosing their relationship?

15        A    Yes.

16        Q    Is that correct?  And was that disclosure

17   made before or after this new policy that you've

18   described that prohibits these types of relationships?

19        A    Before.

20        Q    Before.  And you said that Jamie is no

21   longer employed by the company.  What resulted in the

22   end of her employment?

23        A    She got a big offer when the market was

24   still hot to go to Tavant I want to believe.

25        Q    Okay.  So she resigned from the company?

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 166

1        A    She did.

2        Q    Okay.  And do I understand your testimony to

3    be that Mark received no disciplinary action as a

4    result of this relationship with Jamie?  It was

5    accepted because it was disclosed before the policy

6    was created?

7        A    Correct.

8        Q    Okay.  So I want to go back to what we were

9    talking about as it relates to your conversation with

10   Mark about Ms. McCart's complaints.  I believe that

11   you said that in response to you asking him about

12   Ms. McCart's complaints, Mark said that there was

13   something that happened between the two of them.  Is

14   that correct?

15       A    Correct.

16       Q    Can you describe for me what Mark told you

17   happened between him and Ms. McCart?

18       A    I mean, I know it went on at the apartment.

19   And I know that -- what else did he -- I said look.  I

20   just need to know if sex was involved.  If there was

21   anything that was involved, I need to know.  And he

22   once again said no sexual intercourse.

23            So like I said I think they -- from what

24   I've gathered and -- that they fooled around and that

25   was about it.

Eddy Perez                                                      August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 167

1      Q    Okay.  And did Mr. Moloughney describe to

2   you what fooled around meant in the context of his

3   interaction with Ms. McCart?

4      A    I didn't dig deeper.

5      Q    Okay.  Did he indicate to you that that

6   interaction between the two of them was consensual?

7      A    Yes.

8      Q    Did he ever express to you in any way that

9   Ms. McCart had told him no or stop?

10      A    He did not.

11      Q    Did he ever express to you in any way that

12   Ms. McCart said to him this isn't happening?

13      A    Not that I recall.

14      Q    Okay.  Other than that conversation that you

15   described happening with Mark, did you talk to anybody

16   else for the purposes of gathering information about

17   what happened in relation to Ms. McCart's complaints

18   of sexual harassment?

19      A    Not outside of when I explained it to the

20   groups.  To the group of executives and other people

21   I've -- I've let them explain just what's going on.

22   And then I said it's -- it's a legal matter.

23          People are very respectful when you say it's

24   a legal matter.  They -- I don't know if they think

25   they're going to get themselves in trouble.  But if

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 168

1      that's what works, cool.

2           Q    Okay.  So my question -- I do understand

3      what you mean about having notified everyone of the

4      complaint and requested they, you know, not talk about

5      it further.

6                What I'm asking you is other than talking to

7      Mark in the way that you've described, did you talk to

8      anybody for the purposes of gathering information as

9      opposed to providing information?

10          A    The only thing could say and I don't know if

11     this constitutes it.  Jason and I discussed it 'cause

12     he was obviously on the e-mail and everything like

13     that.  And that's who told me.  But not anything like

14     detailed or anything like that.  No.

15          Q    Okay.  When you say that's who told you, you

16     mean Jason is the one that told you about Ms. McCart's

17     complaint?

18          A    Yeah.  He said check my e-mail, like I was

19     earlier.

20          Q    And to the best of your ability describe for

21     me the nature of the conversation between you and Mr.

22     Callan about Ms. McCart's complaint.

23          A    In what sense?  Just that it occurred?  Or

24     his own thoughts?  Or anything like that?

25          Q    Well, you said you spoke with him because he

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 169

1    was the one that told you about it.

2        A     Mm-hmm.

3        Q     So I'm asking what did you speak with him

4    about?

5        A     Well, first of all, he said check your

6    e-mail.  And I was, like, okay.  What is it about?  He

7    said that Tiar had filed a complaint.

8              So then I had to go check my e-mail.  And

9    then look at it all.  And then that's pretty much it.

10   You know, outside of that I said look.  I'm pretty

11   sure HR or somebody is going to get with you.

12             And he was there when I told Jim Minghini

13   'cause we were all together as well as the other

14   execs.

15       Q     Okay.  Was Mr. Callan there when you told

16   Mark Moloughney as well?

17       A     Yeah.  Every exec was.

18       Q     All the execs were there when you told them

19   about --

20       A     'Cause it was our retreat.  It was our

21   retreat.  Yeah.  And if they weren't there, like,

22   right next to us, we were all together and we -- we

23   had it within 30 seconds.

24       Q     Okay.  And when you say all there together,

25   that's what you're talking about in reference to you

Eddy Perez                                    August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 170

1    being at the airport together?

2         A    Yes.  Yes.

3         Q    Okay.  I want to back up to talk to you

4    about Ms. McCart's performance a bit more and your

5    conversations with Mr. Carpitella about that.

6              When we were speaking about that earlier,

7    you mentioned that Mr. Carpitella had, I believe you

8    said, interviewed Ms. McCart a couple of times.  Did I

9    understand that correctly?

10        A    If you want to call it.  I mean, he

11   reinterviewed her I guess is the best way to put it.

12   Or asked her a lot of questions about what she knows

13   about the job.

14        Q    Okay.  When did Mr. Carpitella explain to

15   you that he had had this conversation with Ms. McCart?

16        A    Like I said, it was either late January or

17   early February.

18        Q    Okay.  And what did you understand to be the

19   content of that conversation between Mr. Carpitella

20   and Ms. McCart in late January or early February?

21        A    I mean, the only content was just her -- her

22   performance and her knowledge.  Like, what had been

23   done for the last four months.  And if she understood

24   the role 'cause from what I've been informed, she had

25   a couple different positions prior.  'Cause I believe

Case 1:21-cv-04247-CAP-LTW   Document 86   Filed 03/21/23   Page 171 of 315
Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 171

1   she started there in 2020.

2        Q    Do you know when Ms. McCart took on the

3   processing role?

4        A    I do not.

5        Q    Okay.  Do you know how long she had been in

6   the processing role when Mr. Carpitella had this

7   conversation that you're describing with her?

8        A    I do not.

9        Q    Okay.  Do you know if Mr. Carpitella spoke

10  with Ms. McCart during this conversation that you've

11  described about anything other than just asking her

12  questions related to her knowledge and understanding

13  of her role?

14       A    No.  I'd say that's a Steve Carpitella

15  question.

16       Q    Okay.  Well, I guess I'm asking what he

17  expressed to you about this conversation that you've

18  described.

19       A    That was the gist of what we spoke about.

20       Q    Okay.  Did Mr. Carpitella indicate to you

21  that he advised Ms. McCart that he had concerns about

22  her performance?

23       A    I can make an assumption, but I won't.

24  I -- I would -- I can't recall.

25       Q    Okay.  You can't -- just to clarify that

Page 172

```
 1    answer.  You cannot recall whether or not
 2    Mr. Carpitella ever told you that he told Ms. McCart
 3    about the concerns about her performance?
 4         A    Yeah.  I don't know if he had that
 5    conversation with her.  I mean, I would guess, but
 6    we're not in a guessing game.
 7         Q    Okay.  Did he tell you that he told Ms.
 8    McCart he had concerns about her performance?
 9         A    Like I said, I can't say with 100 percent
10    accuracy.  If I had to -- if I had to bet money, I
11    would say yes.  But this is about not just betting
12    money.
13         Q    Okay.  That's fair.  Okay.  So aside from
14    this conversation that we've described between
15    Mr. Carpitella and Ms. McCart where we're calling it,
16    sort of, a quasi reinterviewing of her.  Is that fair
17    to say?
18         A    Yeah.  Sure.  Yes.
19         Q    Did Mr. Carpitella ever inform you of any
20    other conversations that he had directly with
21    Ms. McCart about either her productivity or her
22    performance?
23         A    I know they had multiple talks.  It wasn't
24    just one, done.
25         Q    Okay.  How do you know that?
```

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 173

1        A    He told me that they had -- I mean, I would

2    say at least two, but I know Steve.  It had to be

3    more.  But I -- I can at least tell you two, but once

4    again like I said, if I had to put money on it, I'd

5    say it was more.

6        Q    Okay.  When was the second one that you know

7    for certain happened?  The conversation between

8    Mr. Carpitella and Ms. McCart?

9        A    I know it went -- it either went -- it

10   either went Ali, Steve, Ali, Steve.  Or it went Steve,

11   Ali.  Like, there was -- by the time I talked to him,

12   you know, I know that he had talked to Ali at least

13   once.  I'm not sure if it was twice.  But I know that

14   him and Ali had spoken with her.

15       Q    Okay.  Meaning, the two of them together had

16   a conversation with Ms. McCart?

17       A    Separate.  Separate.

18       Q    So I'm not sure I follow your response so

19   let me ask you --

20       A    Okay.  Sorry.  Apologies.

21       Q    -- just to -- it's not your fault.  It's

22   probably mine, frankly.

23            Your understanding is that there was at

24   least one conversation for certain between

25   Mr. Carpitella and Ms. McCart wherein he talked with

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 174

1    her about her knowledge of the role and her

2    performance?

3         A    No.  I'd say there's -- I know there was at

4    least two 'cause I know he talked to two.  And I know

5    that those were the subject matters.  I just don't

6    know if he had talked to Ali twice about it or once.

7    He had talked to me.

8         Q    I see.  Okay.  So my question for the moment

9    is only about conversations between Mr. Carpitella and

10   Ms. McCart --

11        A    Okay.

12        Q    -- that he explained to you that occurred.

13   So let's remove Ali from the equation --

14        A    Okay.

15        Q    -- for the moment.  So I believe you have

16   testified that the first conversation Mr. Carpitella

17   informed you he had with Ms. McCart was in late

18   January or early February.  Is that correct?

19        A    That's correct.  Yes.

20        Q    Do you have any understanding of when the

21   second conversation Mr. Carpitella told you that he

22   had with Ms. McCart about her role and her performance

23   was?

24        A    I mean, I would say shortly after.  A week.

25   A week and a half if I had to --

Eddy Perez                                                       August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 175

1          Q     Early to mid-February?

2          A     Yeah.  Towards the -- you know, February is

3     almost, like, you know -- mid-February is almost the

4     end of February just 'cause it's a short month.  So,

5     like, in that second to third week of the month I

6     would say.  I know that -- okay.  Yeah.  I won't talk

7     about Ali.

8          Q     Okay.  We will get to Ali.  I promise.

9                What did Mr. Carpitella tell you was the

10    nature or topic of that second conversation he had

11    with Ms. McCart?

12         A     With her?

13         Q     Yes.

14         A     That's why I said is I don't recall myself

15    100 percent, but if I had to speculate I'm -- Steve's

16    not somebody that doesn't embrace conflict and really

17    in a very professional way.  He's just very matter of

18    fact 'cause he's a former accountant.  I'm sure he

19    laid out his thoughts.

20               I just don't recall what thoughts.  What

21    part of it.  If it was just the performance or I know

22    that he had talked to her about knowledge.  Ali

23    had -- so I'm just not sure exactly the parameters is

24    probably the best way to put it.

25         Q     Okay.  Why was Mr. Carpitella having these

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 176

```
 1    conversations with Ms. McCart in late January, early
 2    to mid-February of 2021?
 3        A    He had taken over as chief retail officer.
 4    And she was processing, which was moving under all of
 5    that.  Parts of it were already there ahead of time.
 6    But she was transitioning fully.
 7            And he was -- we were dividing up what is
 8    over ops.  We removed processing out of it 'cause we
 9    viewed it more as a sales function 'cause it's sales
10    support.  So it is an ops job per se by technique, but
11    we viewed it as more of a sales support 'cause they're
12    very vital to the consumer.
13        Q    Okay.  At the time that Mr. Carpitella had
14    these conversations that you've described with Ms.
15    McCart in late January, early February of 2021, was he
16    supervising her role?
17        A    I'm pretty sure it was Ali that was
18    supervising it.  And she -- and I mean, he's the
19    responsible 'cause he's the -- he's the leader and
20    then there's Ali and then the employee.
21        Q    Okay.  So he was not her direct supervisor
22    at the time that he would have been having these
23    conversations with her?
24        A    He's over the whole channel, so I guess it's
25    like -- I guess to use an analogy, everybody says that
```

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 177

1    almost 500 employees, I'm their boss.  I keep telling

2    them I'm not because I don't have time for that.

3              So I would say that it was his

4    responsibility because that was.  And it was his

5    system that he had created as well.

6         Q    Okay.  So what I understood your testimony

7    just now to be was that at the time that these changes

8    were occurring, Ali would have been Ms. McCart's

9    direct supervisor and Ali would have reported to Mr.

10   Carpitella.  Did I misunderstand that?

11        A    No.  That's correct.

12        Q    Okay.  So then in response to my question

13   about who Ms. McCart's direct supervisor is, it would

14   not have been Mr. Carpitella?

15        A    No.  It would have been Ali.

16        Q    Okay.  Understood.  When did Ali become Ms.

17   McCart's direct supervisor?

18        A    The same time Steve would have taken over

19   that channel because she was already in that role.

20   She's been with us a long a time in that senior vice

21   president role.

22        Q    Okay.  And I was just about to ask you.  So

23   Ali's position was a senior vice president?

24        A    Mm-hmm.

25        Q    Is that a yes?

Eddy Perez                                August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 178

1          A    Yes.  Yes.  Sorry.

2          Q    No problem.  Okay.  So when you say in that

3     same time, you're talking late January, early

4     February, mid-February time frame?

5          A    Well, we had made the announcement that

6     Steve was taking over all of retail as the chief

7     retail officer and we had listed out the new roles.

8     And then they were putting it all together.

9          Q    Who was putting what together?

10         A    Steve and Ali 'cause they were moving.  And

11    Jason.  'Cause they were moving some things off Jason

12    under that realm.  Because of the past it was just

13    regional.  And we were making it national.  Like,

14    company-wide.

15         Q    Okay.  Do you know when Ms. McCart was

16    officially moved out of Jason Callan's supervision

17    into Ali's?

18         A    I mean, I know they had an introductory

19    call, but I don't know the exact dates.  But I would

20    say it was probably obviously before Steve and Ali

21    reinterviewed her.  So if I had to guess, I'd say

22    probably -- God.  When the hell was EPMX?  The second

23    week of February?  I mean, January.  Third.

24              Mid-month or so.  Mid to third week I would

25    guess.

Eddy Perez                                     August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 179

1        Q    Of what month?

2        A    January.

3        Q    Of 2021?

4        A    Correct.

5        Q    Okay.  So by mid-January of 2021, Jason

6   Callan would have had no more responsibilities to

7   supervise or manage Ms. McCart?

8        A    Or -- or by the end of that month.  Yes.

9   Somewhere in that time point.

10       Q    Somewhere --

11       A    I don't know exactly know exactly when that

12   handoff was.  I don't know the exact date.

13       Q    Somewhere in the month of January, Jason

14   Callan would have had no more involvement in Ms.

15   McCart's, you know, management or supervision?

16       A    Unless she went to him to ask a question.

17   But not on paper and not on what we were doing

18   anywhere transitioning.  I know that she sat right

19   outside his office.  So I don't know if he said hello

20   or something.

21       Q    Right.  I guess what I'm talking about is

22   not just their ability to communicate with each other.

23   I'm talking about his -- as it being part of his

24   job --

25       A    He left in January at some point.

Eddy Perez                                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 180

1        Q    Okay.  So as of some point in January of
2    2021, Jason Callan had no further supervision or
3    responsibilities or obligations over Tiar McCart?
4        A    Correct.  And any processor.
5        Q    And any processor.  And he would not have
6    been making any decisions related to her employment
7    whatsoever after that time period?
8        A    Correct.
9        Q    He wouldn't have had the authority to make
10   decisions related to her employment after January of
11   2021?
12       A    He could have recommended, but not to your
13   point.  It's not his -- his call.
14       Q    Okay.  Did Mr. Callan ever recommend that
15   Ms. McCart should be terminated?
16       A    Good question.  Did he?  I don't -- I don't
17   recall.  I don't know.
18       Q    Did he ever express to you that he had
19   concerns about her employment?
20       A    When?  Then?
21       Q    At any time.  Did Mr. Callan ever come to
22   you and say I have concerns about Ms. McCart's ability
23   to perform her job?
24       A    I don't -- I'm not sure.  I don't know.  I
25   don't know if he did or didn't.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 181

1       Q    Okay.  The other thing that you mentioned is

2    that during this same time in early January -- excuse

3    me.  Late January, early to mid-February, Ali was also

4    meeting with Ms. McCart.  Is that correct?

5       A    Yes.

6       Q    And did Ali talk to you about the meetings

7    that she had with Ms. McCart?

8       A    No.

9       Q    Okay.  How did you know she was having those

10   meetings?

11      A    Steve told me.

12      Q    Okay.  So Ali communicated with Steve about

13   her meetings with Ms. McCart.  And then Steve passed

14   along that information to you?

15      A    Correct.

16      Q    Okay.  Given that chain of information, how

17   many times were you informed that Ali met with Ms.

18   McCart?

19      A    I mean, at least I'd say a handful.  I'm not

20   sure if it was -- how many, but she met with her.  I

21   know that.  More than -- more than once.

22      Q    More than once.  Okay.  Did Steve explain to

23   you what the purpose of Ali meeting with Ms. McCart

24   more than once was?

25      A    Well, they were evaluating everybody.  And

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 182

1    they wanted to see if it was a -- a fit for what they

2    expected out of the -- the job and to their standards.

3         Q    Okay.  So Ali was not just meeting with

4    Ms. McCart, and Steve was not just meeting with

5    Ms. McCart.  The two of them were also meeting with

6    every other person in the processing role?

7         A    Well, that they weren't -- they were already

8    over a portion of processing.  So the final pieces.

9    The integration.  Whoever was part of that

10   integration.

11        Q    Okay.  Who was a part of that integration

12   that they would have -- that Steve and Ali would have

13   been meeting with in early -- excuse me -- late

14   January or early February of 2021?

15        A    I know Jayza [ph] was one.  I know that

16   Delsi [ph] was one.  I know that he met with Felix in

17   Orlando.  And a lot of the processing to get them on

18   the processing system.  But they report up there.  But

19   they handle theirs.

20             So I think, you know, he talked to a lot of

21   people.  I know he talked to Sam Patel's team.  So he

22   talked to a lot of the processing teams.  'Cause at

23   one point in time you had Steve's system that was the

24   largest before he got promoted because he was a

25   regional.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 183

1              And then that system is what became the
2       norm.  So it was that integration of all the other
3       ones.  I guess the saying is burning down the silos to
4       go under one.
5              Q    Okay.  So do I understand correctly that as
6       a result of this burning down the silos to make one,
7       sort of, line of reporting, Steve was meeting with
8       these processors at these different locations for the
9       purposes of evaluating their strengths and weaknesses
10      in their role?
11             A    Yes.
12             Q    Okay.  And in doing that, he was reporting
13      back to you what he found after those meetings with
14      each of the individuals that he interviewed?
15             A    Correct.
16             Q    Okay.  Now we talked about this for a moment
17      earlier, and I want to make sure I understand.
18             After all of -- Steve had conducted all of
19      those meetings and was reporting back to you what he
20      found, do I understand correctly that the only two
21      individuals he expressed any concerns about to you
22      were Ms. McCart and Delsi [ph] Padilla?
23             A    Yes.
24             Q    Okay.  There was no one else that he felt
25      concerned could not perform the role?

Eddy Perez                         August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 184

```
 1        A    Well, he was concerned with Jayza [ph] but
 2    he thought that he -- she had demonstrated certain
 3    actions and he thinks he could -- he could get her
 4    there.
 5        Q    Okay.  So he only had concerns about three
 6    individuals who were three women in the Atlanta
 7    office.  But of those three --
 8        A    He had concerns with Felix in Orlando
 9    and -- God.  What's his -- his last name is Holt.
10    Travis.  I know he had some concerns with -- oh, my
11    gosh.  Of course I don't remember his name.  A short
12    guy.  He had concerns with a few of the people, but
13    his -- Steve's a guy that likes to give people a lot
14    of chances.  He thought he could work with them and
15    get them up to speed.
16        Q    So you said there was a processor named
17    Felix in the Orlando office that he had concerns with?
18        A    Well, he was the one running processing in
19    there.  And he had some concerns with the system
20    there.
21        Q    When you say running processing, you mean he
22    was in the processing manager role as opposed to a
23    processor?
24        A    Correct.  Yes.
25        Q    Okay.  Felix was a processing manager?
```

Eddy Perez                                                August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 185

1        A    Yes.  Or VP of ops.  However you want to

2    call it.

3        Q    Understood.  What about you said there was

4    someone named Holt?

5        A    Travis I believe is his -- yeah.  I'm pretty

6    sure it's Travis.

7        Q    And where was Travis located?

8        A    He's in Orlando as well.

9        Q    Okay.  And was he in a processing role?  Or

10   a processing manager role?

11       A    He's like in an assistant role, but then he

12   still processes 20 files a month, 25.  So he's one of

13   those, you know, like, team leads that do a little bit

14   of both.

15       Q    Okay.  But nonetheless, Steve had concerns

16   about Mr. Holt's performance?

17       A    Yeah.  As well as -- one person's -- and

18   then I forget his name.  Oh, my gosh.  Of course I'd

19   forget his name.

20       Q    So there was a third person that you're

21   trying to think of the name of right now?

22       A    And then he had a concern with somebody else

23   somewhere, but I don't -- I don't remember where.  I

24   don't remember who.  Probably a better way to put it.

25       Q    So there were -- to your recollection, the

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 186

1    individuals that Steve expressed to you that he had

2    concerns about their performance following these

3    getting to know them meetings or interviews, were

4    Ms. McCart, Ms. Padilla, Ms. Iola -- Jayza [ph].  I'm

5    sure I'm butchering her name.

6          A     No.  She goes by Jayza [ph].

7          Q     Felix, Travis Holt, and one other person

8    that you can't recall his name.

9          A     Yeah.  I don't remember his name.

10         Q     Okay.  And did Mr. Carpitella recommend the

11   termination of anyone other than Ms. McCart?

12         A     No.  He said that he thought he could work

13   with Delsi [ph].  And he thought he could work with

14   Jayza [ph].

15               I know that he did get Jayza [ph] up faster.

16   And then she wound up getting a very lucrative offer

17   to get a senior processing role at another company and

18   is still there.  So she gave him a lot of credit for

19   getting her to those levels.

20         Q     Okay.  So Jayza [ph] ultimately voluntarily

21   left, but other than her voluntary resignation and

22   Ms. McCart's termination, Mr. Carpitella didn't

23   terminate anyone else that he had expressed concerns

24   with their performance?

25         A     And yeah.  And just for the record, he

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 187

1    didn't -- you know, he expressed it, but I'm -- he did

2    not terminate Tiar himself.  I did.

3         Q    Thank you for clarifying that.  So let me

4    rephrase the question given your clarification.

5              Other than expressing or recommending that

6    Ms. McCart's employment be terminated, he did not

7    recommend to you that any other of the individuals

8    about whom he had concerns for their performance

9    should be terminated?

10        A    Not at that time.  Later he did on

11   Delsi [ph].

12        Q    Okay.  At what point did he recommend to you

13   that Ms. Padilla should be terminated because of her

14   performance?

15        A    There was a lot of the knowledge too.  So I

16   think he said that -- God.  That's a good question

17   'cause I'm having to now think how many months later.

18   It was a handful of months later.  He just didn't

19   believe she can keep up.  And there was a lot of

20   volume industry-wide coming in.  So it really exposed

21   cracks on people if you can -- if you had been

22   performing at a high level or not, so.

23        Q    Other than Ms. McCart who he recommended the

24   termination of very quickly after talking with her.

25   Is that fair to say?

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 188

1        A    Yeah.  He -- he made that recommendation by

2    middle of February.  Around that time.

3        Q    Okay.  And Ms. Padilla who he recommended be

4    terminated several months after meeting with her for

5    the first time.  Is that correct?

6        A    Mm-hmm.

7        Q    There were no other processors or people

8    that were moving under his line of reporting that he

9    recommended should be terminated?

10       A    No.  In his opinion, he felt like they had

11   leveled up.

12       Q    Okay.  When we talked earlier about the

13   concerns that Mr. Carpitella expressed to you about

14   Ms. McCart you testified that there was a policy that

15   if employees didn't have enough work they were

16   obligated to raise their hand and say I need some more

17   work.  Is that fair to say?

18       A    Honor code.  Yeah.  Sure.

19       Q    Okay.  How is that policy documented?

20       A    Good question.  I don't know.  I'm not sure.

21       Q    How is it communicated to employees that the

22   expectation of EPM is that individuals should raise

23   their hand and come and say I need more work?

24       A    That's part of the culture.  That's part of

25   the culture training that we put out.  That's part of

Page 189

```
 1    our daily affirmations of do the right thing.  Step it
 2    up.  No.  That's -- that's all constantly communicated
 3    and communicated and communicated.  And for the most
 4    part it's overwhelmingly been a huge success on the
 5    honor code.
 6        Q    Okay.  You said daily affirmations.  What
 7    are those?
 8        A    Oh.  I send out daily affirmations to the
 9    organization that are tied to our 4CORE values.  And
10    then behaviors to back them up and things like that.
11        Q    Okay.  What are the 4CORE values?
12        A    Show the way.  Unify through collaboration.
13    Struggle well.  Own unique.
14        Q    Okay.  And those values are communicated or
15    publicized to the employees in some fashion?
16        A    Trained and everything.  Yes.  And
17    constantly discussed over and over and over.
18        Q    Okay.  What training did the employees
19    receive on these core values in the -- one of which
20    being the obligation that they should raise their hand
21    and reach out for more work if they're --
22        A    So I don't know them all, but there's 23
23    behaviors.  'Cause, you know, a lot of organizations
24    will have a core value, but then it would be, like,
25    integrity.  Well, okay.  How do you live that?  I
```

Eddy Perez                                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 190

1    don't know.

2            So we actually have the behaviors 'cause

3    that's what really motivates any habit.  So each of

4    them have assigned behaviors, and in there is where we

5    give examples, you know.

6            We give people Kazoo points as you can call

7    it.  What is Kazoo?  Where there's recognition

8    throughout the organization where they for -- anything

9    that people do.  And I guess the next question for me

10   is -- to you is, do you want to talk about then or

11   now?

12       Q    Well, I want to talk about during the period

13   of time that Ms. McCart was employed --

14       A    Got you.

15       Q    -- and if there's a change we can talk about

16   that later.  But for right now, you're talking about

17   behaviors that are assigned.  And I believe you said

18   the employees receive training as it relates to these

19   behaviors, the core values, and the obligation to

20   raise your hand to --

21       A    Yeah.  We have a -- oh.  That's a good

22   question.  What the heck is his title?  We'll just say

23   we have somebody who's in -- he's under the chief

24   people officer, but he is over culture.  All

25   communication.  All outward notifications.  Everything

Eddy Perez                                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 191

1      like that.  He leads the trainings.  That's part of

2      the new hire training that gets put in.

3          Q    Okay.  And can you identify the name of this

4      employee?

5          A    Yes.  His name is Blaine.

6          Q    Last name?

7          A    Oh, God.  I think it's like Paul McCartney

8      or something like that.  Or McCarty.  Or -- you'd

9      think I know it.  I -- I know people's first names

10     very well.

11         Q    That's fine.  I'm sure his name is recorded

12     somewhere.  We can find it.  Let's refer to him as

13     Blaine right now just since we're --

14         A    Please.  Please.

15         Q    -- a little confused about his last name.

16         A    'Cause I mess up last names.

17         Q    So Blaine is the employee that is

18     responsible for providing this training on the core

19     values in which employees would be informed hey,

20     there's a policy based on our honor code that if you

21     need more work, you've got to raise your hand and say

22     it?

23         A    Was he then?  No.  That's the question.

24     That's the good question.  I may have talked about

25     now.  Back then, would it have been Eric?

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 192

```
 1              I mean, I could say today, yes.  Today.
 2       Back then, I don't recall who was doing it.
 3              Q    Okay.  Let me put the question to you this
 4       way then:  Can you identify for me some training, some
 5       literature, some meeting, or any measurable
 6       communication --
 7              A    Mm-hmm.
 8              Q    -- in which Ms. McCart would have been
 9       informed that it was an expectation that if she was
10       not processing a requisite number of loans per month
11       or closing a requisite number of loans per month, that
12       it was her obligation to raise her hand and say she
13       needed more?
14              A    That would have been Eric Skates then 'cause
15       that was part of marketing at that point before he was
16       promoted to chief people officer.
17              So I know that there was always things going
18       out about the culture and how to do the right thing.
19       'Cause that's -- out of the behaviors, that's number
20       one, because that's under show the way.  Be
21       resourceful.  God.  Is that under struggle well?
22              I -- I don't know all 23.  That's too many.
23       That's what we realized too.  That you have to put
24       them in categories 'cause of what they represent.
25              Q    Okay.  So you believe there would have been
```

Eddy Perez                                    August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 193

1      some communication from Eric Skates to Ms. McCart, and

2      other employees, expressing to them that this policy

3      that you're referring to --

4           A    Yeah.  They would have calls on -- during

5      COVID in 2020 on Fridays.  They would bring education

6      pieces to the table.

7                You know, at one point in time we had a

8      mental health expert talk to the organization on a

9      Zoom in 2020 about the challenges with COVID, and what

10     this is doing for stress, which is the real word for

11     anxiety.

12               So there's a lot of that cultural stuff that

13     we're leaning on.  I'm not sure at that time if we had

14     the text message system up.  So I'm not sure exactly

15     when the dates of what that went up.  I know it went

16     up in 2021.  I just don't know if it was Q1 or Q2 or

17     Q3.

18          Q    Okay.  Understood.  So there should be some

19     documentation somewhere from 2021, notwithstanding

20     what quarter, where Eric Skates or some other employee

21     communicated to all employees here's our core values.

22     Here's these 23 behaviors that you're assigned to

23     engage in.  And here's this policy that we expect that

24     you're raising your hand if you're not -- you don't

25     have enough work to do?

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 194

1      A    Yes.

2      Q    Okay.  And that would have been documented

3   in what form to your knowledge?

4      A    I know they had, you know, Zoom calls about

5   it.  I know they -- I know there's stuff in writing

6   'cause, Good Lord, they send me too much stuff to

7   approve.  I'm just not artistic.

8           I know there's e-mails that go out 'cause I

9   know I send a daily e-mail every day and I have for

10  four years.  And in there I put a core value.

11  Sometimes I even put behaviors to live and -- and how

12  to live them.  But it's all off of BrainyQuote.

13     Q    Okay.  What's BrainyQuote?

14     A    It's an app that you can look up any topic

15  or author and, you know, inspirational type

16  affirmation quotes.

17     Q    Okay.  Other than the e-mails you've

18  described and the Zoom calls I think you've described,

19  can you identify for me how this raise your hand

20  policy would have been communicated to employees

21  including Ms. McCart?

22     A    Well, we were begging people to work.  So

23  outside of the constant begging and the stress on

24  operations, which was daily conversations 'cause our

25  turn times fell backwards, and everybody knew it.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 195

1        And that was providing a stress on the
2    company and I mean, outside of sheer begging and
3    e-mail communications and conversations and Zoom calls
4    and hey, please anybody.  How do we promote from
5    within?  How do we grow?  What can you do?
6        I'd say that they communicated it pretty
7    effectively.  Just they screamed from the mountaintops
8    'cause it was -- it was a very stressful time.
9        Q    So I guess my question is:  Given what
10   you're saying about the communication, I'm asking how
11   was it documented?  How can I -- how can you prove to
12   me that that communication went out?  Is it in writing
13   somewhere?  Is it in a handbook somewhere?  Is it an
14   e-mail somewhere?  All of the above?
15       A    I -- well, I don't know if it's in the
16   handbook.  I can speculate there, but I could
17   definitely tell you 'cause I know I send out daily
18   e-mails.  I know Teams messages go out.  So I know
19   text messages go out.
20       I know that we have happy hours that go out.
21   We have -- we had the empower hour that was every
22   Friday.  I know there was a lot of speakers that have
23   been on there.
24       There's -- I'm sure there's a lot of
25   electronic proof is what I would tell you.

Eddy Perez                                          August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 196

```
 1        Q    Okay.  Understood.  If Ms. McCart's

 2   testimony in this matter is that no one from Equity

 3   Prime Mortgage ever indicated to her that there was

 4   any concern about her performance that she needed to

 5   amend or change or do better, and if she didn't she

 6   would lose her job, is she lying?

 7        A    That if -- wait.  What part of the lie?

 8   Like --

 9        Q    I'll be glad to restate it.  If Ms. McCart's

10   testimony is that no one at Equity Prime Mortgage ever

11   communicated to her that there were any concerns about

12   her performance such that if she did not change or

13   improve those concerns, that she would be terminated,

14   is she lying?

15        A    Yes.  She's lying.

16        Q    So my question to you then is:  What

17   documents, writings, text messages, e-mails, policies,

18   handbooks, et cetera, can you direct me to that prove

19   that someone told Tiar McCart, we have a concern about

20   your performance that you need to improve, and if you

21   don't, you're going to be fired?

22        A    I would say from a text standpoint.  So Mark

23   who's the chief technology officer is in charge of

24   security.  So I'm fairly certain -- not fairly.  I

25   know.  He can pull the e-mails.
```

Eddy Perez                               August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 197

```
 1           I'm sure Eric Skates can also provide a lot
 2      of information 'cause he's over people which includes
 3      culture, communication.
 4           Blaine can provide a lot of information.
 5           Lexie wasn't on board back then yet.  I -- I
 6      would say that those three -- did Adair?
 7           Adair, she may have been -- I know she was
 8      on marketing but she did a lot on social.  So there's
 9      communication that goes out there and internally.
10      Videos that go out that are recorded.
11           I'd say those three to four at least.
12      Q    Okay.  I want to go back and re-ask my
13      question because I'm not sure that you're answering
14      it.  Okay?
15      A    Okay.
16      Q    I just want to take another pass --
17      A    Okay.
18      Q    -- so we can be sure.  My question to you
19      is:  What documentation or evidence exists that proves
20      that someone at EPM -- any person at Equity Prime
21      Mortgage -- at any point said to Tiar McCart something
22      to the effect of you're not performing to expectation.
23      We have concerns about your performance.  If you don't
24      improve, you can be terminated.
25           So do I understand your testimony to be that
```

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 198

1     I should be able to go and talk to Mark Moloughney, I

2     should be able to talk to Eric Skates, and I should be

3     able to talk to Blaine, and they're going to be able

4     to provide me documentation that someone communicated

5     to Ms. McCart that there were concerns about her

6     performance?

7         A    I guess that's where I got confused 'cause I

8     said culturally they talked about do the right thing.

9     Everything like that.

10        Q    Right.

11        A    And we have e-mails, so I said that they can

12    probably document how much we talk about culture and

13    the 4CORE and all that.

14             I know that Steve told her in the

15    reinterview process his concerns to her.  I'm

16    fairly -- like I said, I said it earlier.  I'm not

17    sure if he exactly, implicitly, told her but I'd wager

18    a lot if you spoke to him, he did.

19        Q    Okay.  So to make sure that we're clear on

20    this point, there is no documentation that you can

21    point to?  No e-mail, no counseling form, no letter,

22    no text messages, no Teams messages, nothing of any

23    documentary form that would prove that someone at

24    Equity Prime Mortgage told Tiar McCart that there were

25    concerns about her performance that would lead to her

Eddy Perez                                         August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 199

1    termination if they weren't corrected?

2         A    I don't know if they did.

3         Q    Okay.  So the only thing that you believe is

4    that during a conversation, that there's no

5    documentation of, Steve Carpitella informed Ms. McCart

6    that there were concerns about her performance that

7    could lead to her termination if she didn't correct

8    them?

9         A    Yes.

10        Q    Okay.  So other than that conversation that

11   was not documented, you cannot identify any other

12   evidence to me that suggests that Ms. McCart was in

13   fact informed there were problems with your

14   performance.  You need to improve or you'll be fired.

15        A    I don't know if they did.  Could they have?

16   Absolutely.  But I -- I can't say yes.  I know that in

17   e-mail, anything that went out.  But yes.  Cultural

18   beliefs and who we are and how to live your virtues,

19   that was communicated over and over and over.

20        Q    Okay.  So for the record, I am not talking

21   to you in this moment about cultural beliefs or

22   cultural standards for the company.

23             I'm talking to you specifically about

24   informing Ms. McCart that her performance was

25   problematic in some way and that she needed to

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 200

1    improve.  And I will be talking to you about

2    specifically that topic for the next couple of

3    questions.  And I'll let you know once we move off of

4    it.  Okay?

5         A    Okay.

6         Q    All right.

7                   THE WITNESS:  Can I get ice?

8                   MS. RAGAN:  Absolutely.  We can go off

9    the record.  We'll take a break for a minute.

10                   THE WITNESS:  Okay.

11                   THE REPORTER:  We are off the record at

12   2:53 p.m.

13                   (Off the record.)

14                   THE REPORTER:  We are back on the

15   record at 2:55 p.m.

16   BY MS. RAGAN:

17        Q    Okay.  So we've talked about the fact that

18   you are the one that made the ultimate decision to

19   terminate Ms. McCart's employment.  Is that correct?

20        A    Yes.

21        Q    So did it matter to you at all whether or

22   not someone had actually communicated to Ms. McCart

23   that there was an expectation that she wasn't meeting

24   as far as it was her performance goes?

25        A    Well, it was Steve -- recommended to me that

Eddy Perez                                                      August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 201

1    he didn't think she had the knowledge base,

2    performance, and she lacked the ability to raise her

3    hand.  So you got cultural in line.  Yes.  I -- I

4    thought that that all merited her not to be part of

5    the culture anymore.

6        Q    Okay.  And you made that decision based on a

7    conversation with Steve as opposed to doing any

8    independent investigation yourself into whether or not

9    Ms. McCart was actually underperforming?  Whether or

10   not she had been informed of some standard she was

11   supposed to meet?  And whether or not she had been

12   given an opportunity to actually meet the standard she

13   was informed she was required to meet?

14       A    He gave me the numbers.  He gave me past

15   performance.  He gave me past behavior.

16            And, you know, I -- I trust my leaders,

17   especially Steve Carpitella.  We've been together at

18   that time late 2010.  So that would put it at ten and

19   a half years and there's been a lot of growth where he

20   started off as one little office and built this very

21   good, professional, takes care of the consumers very

22   well style that I agree upon.

23            So I -- and he's not somebody who -- I can

24   see your point if it was somebody who's a -- well,

25   everybody -- get fired.  But he's not a -- he doesn't

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 202

1    make a recommendation that he doesn't believe somebody

2    can make it.

3              Because he's very precise and calculated in

4    the sense of likes to give people chances which has

5    worked out well.  He likes to -- he's not -- he's

6    not -- I take his recommendations higher because he's

7    not emotional.  You know, he's not going to be fired

8    up.  He'll just say look.  I think I can get them

9    there.  Or no.  I can't.  And I respect that.

10        Q    Okay.  So the answer to my question then is

11   no.  I, Eddy Perez, did not take any action whatsoever

12   to verify whether or not what Mr. Carpitella told you

13   about Ms. McCart's performance was accurate?

14        A    Yes.  Correct.

15        Q    Did you ever talk to Tiar yourself?  Did you

16   ever go to her and say hey, Tiar.  This man that

17   you've just met for the first time is telling me that

18   you're not performing up to snuff.  What's going on?

19        A    I'm not sure that was the first time she

20   ever met him.  Steve's around a good amount.

21        Q    Okay.  Let's rephrase the question.

22        A    He wasn't a stranger.  I'll say that much.

23        Q    I guess that's not really what I'm getting

24   at.  And I thought that might have been implied in my

25   question.  But I'll be glad to rephrase to clarify for

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 203

1    you.

2              The first time that she had talked to him in

3    the capacity of her -- as what you have talked about

4    moving into a role that was now going to be within his

5    line of reporting --

6         A    Correct.

7         Q    -- did you ever after that reach out to her

8    and say hey, Steve is telling me there's a problem

9    with your performance.  What's going on with you?  Why

10   aren't you performing?  Why aren't you asking for more

11   work if you don't have enough work?

12        A    No.

13        Q    But nonetheless you would have seen her on

14   every day that you were both in the office.

15        A    No.  I would have said hello.  You asked did

16   I talk to her about her performance.  I talked to her

17   about how she's doing.  But no.  That's, you know.

18        Q    So you -- my point is that you had the

19   opportunity to talk to her about her performance

20   because you both worked in the same office, and you

21   would have routinely when you were in the office

22   together have exchanged pleasantries with her.

23        A    No.  I -- only the people that I -- report

24   to me do I have those conversations.  Because if not,

25   I'll neuter them as leaders.  No.  I will not destroy

Eddy Perez                                            August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 204

1    somebody's empowerment.

2         Q    Okay.  But you're the person that made the

3    decision to terminate Ms. McCart.  Right?

4         A    Mm-hmm.

5         Q    So I'm asking you, given that you made that

6    decision, why didn't you take the moment to say here

7    to this woman who you see in the office routinely, who

8    you exchanged pleasantries with routinely before

9    leaping to a termination, say to her hey, I'm being

10   told that you're not working.  Hey, I'm being told

11   you're just sitting here collecting a paycheck?

12        A    Not my place.

13        Q    Okay.  In the course of you working in the

14   same office as Ms. McCart, did you ever witness or

15   overhear anyone making comments to Ms. McCart about

16   her appearance?

17        A    No.

18        Q    You never witnessed or overheard anyone

19   describing Ms. McCart's body or the features of her

20   body or the way that she looked?

21        A    No.  I don't recall.

22        Q    You don't recall?  Or no; it didn't happen?

23        A    I mean, to me I'd say no.  But I don't -- I

24   don't recall anybody or anything ever happening like

25   that.

Eddy Perez                                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 205

1      Q     Okay.  Is it possible that you did in fact

2   witness or see people making comments to Ms. McCart

3   about her appearance, and you just don't remember them

4   at this moment?

5      A     I'd say no.

6      Q     Okay.  Did you ever witness anyone having

7   decorated Ms. McCart's desk with either penis or

8   sperm-shaped confetti?

9      A     No.

10     Q     Okay.  Were you aware that that occurred?

11     A     No.

12     Q     To this day as you sit here today, you have

13   no knowledge of the fact that Ken Hartman has admitted

14   that he decorated Ms. McCart's desk with what he

15   described as sperm-shaped confetti?

16     A     I think maybe Seth told me.  But no.

17   Never -- but that was in the Complaint, I believe.

18   Something was described, but I don't -- I don't know

19   details.  I didn't ask.

20     Q     Okay.  To your knowledge has anyone at any

21   time -- whether it be at the time that Ms. McCart was

22   still employed or even now that you're learning new

23   information through her Complaint -- taken any action

24   as it relates to the fact that Ken Hartman decorated

25   Ms. McCart's desk with sperm-shaped confetti according

Eddy Perez                                      August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 206

1      to his testimony?

2          A    I don't think anybody was aware.  I don't

3      think HR was aware or anybody like that.  I don't

4      think -- I mean, I'd have to speculate here.  But I

5      don't think Ms. McCart went and told HR, or there

6      would have been obviously something done.  But I

7      don't -- I ...

8          Q    You yourself said that you learned through

9      her Complaint that she made that allegation.  Correct?

10         A    Yeah.  Or my conversation.

11         Q    So you as the CEO and president of the

12     company know that an employee who is still currently

13     employed by the company decorated a woman's desk with

14     confetti shaped like sperm, according to him?

15         A    I had just found out by you it was him.  I

16     had heard but they said it was a legal matter.  And I

17     left it at that with the professionals.

18         Q    Okay.  So you did not take any action to

19     either delegate to someone or you yourself to

20     investigate whether or not that allegation that you

21     heard about through the Complaint was in fact true or

22     if there was any employee that was willing to admit

23     that they had in fact decorated her desk with sperm-

24     shaped confetti?

25         A    I don't know if HR had inquired.  But I

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 207

1    wasn't made aware.  If I'd made aware, it would have

2    been a, you know, different conversation.  But you

3    just made me aware, so.

4        Q    Well, you testified a moment ago that you

5    saw the allegation in Ms. McCart's complaint that was

6    filed --

7        A    I heard about it.

8        Q    -- several months ago.

9        A    I didn't read it.

10       Q    Okay.  You were told by Seth?

11       A    Yes.

12       Q    Okay.  So you were told by Seth about that

13   allegation at some time in relation to the Complaint

14   Ms. McCart made?  The lawsuit.

15       A    Not about the penises on desks.  Stuff like

16   that.  I just knew that there was, as I'll call them,

17   shenanigans.  And I just said okay.  We got to figure

18   out if it's legit or not.  And you just told me about

19   Ken.  So I just -- I don't know.

20       Q    So at the time that Seth told you, what

21   action did you take to discover whether or not any of

22   the allegations of Ms. McCart's lawsuit did actually

23   occur, including but not limited to the sperm-shaped

24   confetti on her desk?

25       A    I was going to let the legal proceedings

Eddy Perez                                     August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 208

1    handle it all.

2         Q    Okay.  So the response to my question is:

3    You did not take any action after learning through

4    counsel that Ms. McCart had alleged that an employee

5    decorated her desk with sperm or penis-shaped confetti

6    to determine if that actually did happen?  You were

7    just allowing the legal proceedings to play out?

8         A    Correct.  Yes.

9         Q    Okay.  Were you ever aware or did you ever

10   witness employees wearing T-shirts with a picture of

11   Ken Hartman's face and the word dickman underneath

12   him?

13        A    No.

14        Q    Okay.  As you sit here today have you ever

15   heard anything about employees of Equity Prime

16   Mortgage making T-shirts that have a picture of Ken

17   Hartman's face on them and the word dickman on it?

18        A    No.

19        Q    Okay.  So me saying this to you right now is

20   the first time you've ever had any indication that

21   such T-shirts were made and worn by employees of

22   Equity Prime Mortgage?

23                  MR. WILSON:  Objection.

24                  But you can answer.

25                  THE WITNESS:  Yes.  This is the first

Eddy Perez                                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 209

1    I'm aware of it.

2    BY MS. RAGAN:

3        Q    Okay.  Were you ever made aware or did you

4    ever witness any employee of Equity Prime Mortgage

5    having a bumper sticker on their car that had the word

6    dickman on it?

7        A    No.

8        Q    Were you ever aware or did you ever witness

9    any employee of Equity Prime Mortgage referring to Ken

10   Hartman as dickman?

11       A    No.

12       Q    Were you ever aware or did you ever witness

13   or did you ever participate in referencing or pointing

14   to a ruler or yardstick for the purpose of indicating

15   the size of Ken Hartman's penis?

16       A    No.

17       Q    Were you ever at any time prior to your

18   testimony here today made aware that Ken Hartman sent

19   an e-mail to C-level executives of Equity Prime

20   Mortgage with a picture that he took from Ms. McCart's

21   Facebook page with the title Ass, A-S-S, a Nine, as in

22   the number nine, making a reference to her body?

23       A    Nn-mmm.  No executives.  Nothing.

24       Q    Okay.  So as you sit here today, the first

25   you've ever heard about the reference to that e-mail

Eddy Perez                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 210

1     was me just telling you that Ken Hartman sent that

2     e-mail?

3          A     Yes.

4          Q     Okay.  Is that a violation of the company's

5     sexual harassment policy?

6          A     I don't know everything that's in the sexual

7     harassment policy.  You know, so I can't speculate on

8     that.  However, finding out this information

9     definitely shines a different light.

10         Q     So I just want to clarify something.  You're

11    the CEO and the president of Equity Prime Mortgage.

12    And as you sit here today, you cannot tell me if an

13    employee sending an e-mail where he's taken a picture

14    from a female's internet page and made a reference to

15    her ass being a nine, is a violation of your company's

16    sexual harassment policy?

17         A     I haven't read the whole thing backwards and

18    forwards.  Do I -- can I speculate?  I'm sure it is.

19    But I -- you're asking me for 100 percent.  I could

20    probably give you 95 percent.

21         Q     You're right.  I am asking you for 100

22    percent certain.  If you're a CEO and a president of a

23    company, I would expect that you'd be able to tell me

24    whether a picture of a female's rear end in a bathing

25    suit being referenced as ass-a-nine is a violation of

Eddy Perez                                     August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 211

1     the sexual harassment policy or not.  So --

2          A    I don't know what's in the policy.

3          Q    -- what I'm understanding you --

4                    MR. WILSON:  Let her finish.

5                    THE WITNESS:  Oh.  Sorry.

6     BY MS. RAGAN:

7          Q    My understanding your response to that

8     question is that you can't answer that for certain.

9     Is that right?

10         A    Well, I can't answer if it's in the -- it's

11    in the book.  I mean, if you're asking me personally

12    that's a different conversation.

13         Q    You are the CEO and president of Equity

14    Prime Mortgage.  I'm not asking you in your personal

15    capacity.  You are the head of the company.  You're at

16    the top of the food chain.

17              I am asking you:  Does it violate your

18    company's sexual harassment policy for an employee to

19    send an e-mail making a reference to a female

20    employee's body parts as being ass-a-nine?

21         A    I don't know.  I can assume, but I don't

22    know.

23         Q    As the CEO and president of Equity Prime

24    Mortgage, is it a violation of your company's sexual

25    harassment policy for another employee to decorate a

Eddy Perez                                      August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 212

1    woman's desk with confetti shaped like sperm or

2    penises?

3         A    Like I said, I haven't read the thing.  I

4    would like to read it first before I would go on.  You

5    know, like I said you're telling me not to assume so

6    that's why I say I don't know.  It could be a yes.  It

7    could be a no.

8         Q    I haven't told you not to assume.  I'm

9    asking you a very straight question.  You're the CEO

10   and the president of Equity Prime Mortgage.

11             Can you as you sit here today tell me

12   whether or not your company prohibits conduct

13   including decorating a woman's desk with either penis

14   or sperm-shaped confetti in the terms of your sexual

15   harassment policy?

16        A    I mean, I'd just have to assume yes.

17        Q    But again, you're assuming.  You don't know

18   for certain?

19        A    I haven't read it.  I mean, I've gone over

20   it all, but I haven't read the fine print.  And but

21   what I assume, yes.  And this is, like I say, first

22   time I'm hearing about it.  First time -- HR would

23   have brought it.  Oh yeah.  HR would have brought that

24   to me.  These are all things that I didn't -- I'm

25   unaware of right now, so.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 213

1          Q    These were all things that were in Ms.

2     McCart's Complaint that's been filed for months now.

3     And you're -- but you haven't looked into them, and as

4     far as you know HR hasn't looked into them.  And as

5     far as you know, you can't tell me for 100 percent

6     certain as you sit here whether or not these would

7     violate the sexual harassment policy of EPM?

8          A    I let Legal handle everything.

9          Q    So the answer to my question is yes.  You're

10    correct?

11         A    Yes.

12         Q    Okay.  Have you ever overheard, participated

13    in, or witnessed in any way any employee of Equity

14    Prime Mortgage asking Ms. Tiar about her sex life?

15         A    Nn-mmm.

16         Q    Is that a no?

17         A    Yeah.  That's a no.

18         Q    Okay.  Have you ever overheard, participated

19    in, or witnessed any employee of Equity Prime Mortgage

20    asking Ms. McCart or talking to Ms. McCart about her

21    relationship status?

22         A    So this is just me with Ms. McCart?  Or

23    who's this with exactly?  Like, 'cause I'm -- I'm

24    confused 'cause I know that DeAngelo came to me, so.

25    And then I sent him to HR, so.  And HR then also spoke

Eddy Perez                                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 214

1      in the Complaint and all that.  So I'm not sure if you

2      can maybe rephrase it a little bit differently.

3              Q    Yeah.  I'll be glad to repeat the question.

4                   Have you ever witnessed, participated in, or

5      overheard any employee asking Ms. McCart about her

6      relationship status?

7              A    No.

8              Q    Okay.  All right.  I'm going to hand you

9      what's been previously marked for identification as

10     plaintiff's Exhibit 32.

11                       (Plaintiff Exhibit 32 was previously

12                       marked for identification.)

13                  Have you seen that e-mail in Exhibit 32

14     before I handed it to you today?

15             A    Nope.

16             Q    This is the first time you're seeing the

17     document in front of you that's labeled as Exhibit 32?

18             A    Correct.

19             Q    Okay.  Set that down. You're welcome to look

20     at it, but I'm not going to ask you any more questions

21     about it.

22             A    No.  I don't.

23             Q    Have you ever participated in -- well, let's

24     classify this question.

25                  Other than what you have described your

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 215

1    conversation with DeAngelo being about Ms. McCart,

2    have you ever asked any employee of Equity Prime

3    Mortgage whether or not they had sex with Ms. McCart?

4         A    I mean, I asked Mark when the Complaint came

5    out.

6         Q    Okay.  Other than DeAngelo and Mark, have

7    you ever asked any employee whether they had any type

8    of sexual interaction with Ms. McCart?

9         A    I asked when -- when -- when Jeff came to me

10   concerned, and I sent him to HR.  I asked, did you do

11   anything.  I didn't -- I wouldn't say it was sex.  I

12   was just saying in general.

13            So I'd say outside of those three that I

14   talked about earlier, no.  I have not.

15        Q    Did you ever ask Alex Rodriguez whether or

16   not he had had sex with Ms. McCart?

17        A    Alex Rodriguez?

18        Q    Yes.

19        A    The baseball player?

20        Q    Not the baseball player.

21        A    I don't know an Alex Rodriguez outside of

22   what was formerly one of my favorite baseball players

23   till ...

24        Q    Well, I may be mispronouncing his last name

25   or misstating his last name, I should say.  Give me

Eddy Perez                                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 216

1      just a moment.

2          A    Are you talking about Alex Restrepo?

3          Q    Yes.  Thank you.  Yes.  You're right.  Thank

4      you for clarifying.

5              Have you ever had a conversation with Alex

6      Restrepo about whether or not he had had any type of

7      sexual relationship with Ms. McCart?

8          A    No.

9          Q    You never asked him whether he had had sex

10     with Ms. McCart?

11         A    No.

12         Q    You never spoke to Alex Restrepo and said to

13     him did you hit that in reference to Ms. McCart?

14         A    No.

15         Q    If Alex says otherwise, is he lying?

16         A    Yes.

17         Q    Okay.  As a part of Ms. McCart's Complaint

18     she's referenced an event that Equity Prime Mortgage

19     held at an Atlanta Falcons game on --

20         A    Mm-hmm.

21         Q    -- December 20th.  Are you familiar with

22     that event?

23         A    I am.

24         Q    Were you present for that event?

25         A    I was.

Eddy Perez                           August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 217

```
 1        Q    Okay.  Can you tell me generally where that
 2   event was?
 3        A    The Mercedes-Benz in one of the suites.
 4        Q    Okay.  And what was the purpose of that
 5   event?
 6        A    Employee appreciation.
 7        Q    Okay.  And were you present for that event?
 8        A    I was.
 9        Q    Okay.  Approximately how many employees were
10   present?
11        A    Not everybody was an employee.  My son was
12   there.  My hairdresser and her son were there.  I'm
13   pretty sure the rest were employees.  Wait.  Did we
14   have a guest or a referral partner?  We may have had a
15   guest or a referral -- I would say if I had to -- I'd
16   say at least if I had to give an estimation, 12 to 15
17   were employees.
18        Q    Okay.  Twelve to 15 employees were there.
19   How many people total were there --
20        A    I think -- oh, God.  Did that one hold 20 or
21   22 or -- they're suites because we didn't have a suite
22   then there.  So I had to call and rent it.  And we
23   were upper level.  I'm not sure if that one held 18 or
24   20.  I'm not sure of the full and I'm also not
25   familiar with were there certain caps because of
```

Eddy Perez                                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 218

 1    COVID.  So I can't recall exactly the number.

 2         Q    Okay.  But approximately 20 is your

 3    estimation?

 4         A    Yeah.  It's a good number.

 5         Q    So of the 20, 12 to 15 were employees of

 6    Equity Prime, and the others were people you had

 7    invited?

 8         A    My son and stuff like that.  Yeah.

 9         Q    Okay.  Can you tell me generally what

10    happened in the suite during that game on December

11    20th?

12         A    I'm pretty sure the Falcons got their butt

13    kicked.  Yeah.  Tom Brady went ballistic on them.  I'm

14    not a Falcons fan so I can say that.

15              I know some people celebrated.  They drank.

16    A lot of people talked to my son 'cause he's -- he's

17    kind of fun and outgoing.  A lot of people talked to

18    my hairdresser and her son.  I -- I'd say general

19    camaraderie building.

20         Q    Okay.  So there -- was there food there?

21         A    Yes.

22         Q    There was food.  There were drinks --

23         A    Yes.

24         Q    -- and there was conversation amongst the 20

25    approximately people that were there?

Eddy Perez                                      August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 219

```
 1        A     Yes.

 2        Q     And maybe some people watched part of the

 3   game.  It sounds like it was a terrible one.

 4                 MR. WILSON:  For the Falcons.

 5                 THE WITNESS:  Yeah.  I mean, a lot of

 6   people wanted to see Brady.

 7                 MS. RAGAN:  Okay.  Understood.  Okay.

 8                 THE WITNESS:  They watched that.  I'll

 9   tell you that.  They watched Tampa on offense.  We'll

10   put it like that.

11   BY MS. RAGAN:

12        Q     Got it.  All right.  Anything that happened

13   at that event other than what we've just described?

14        A     What do you mean exactly like?

15        Q     Was there any other activities that

16   individuals participated in other than just generally

17   having conversation, watching the game, eating, and

18   drinking?

19        A     No.

20        Q     Okay.  How did you get to the event?

21        A     I drove.

22        Q     And who rode with you to the game?

23        A     First from the house was me and my son.  And

24   then I picked up Sarah Rodriguez and Mark Moloughney.

25        Q     Okay.  That's where I got the Rodriguez
```

Eddy Perez                                                      August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 220

1    from.  Thank you for clarifying.

2            So you, your son, Sarah Rodriguez, and Mark

3    Moloughney rode to the game together?

4        A    Correct.

5        Q    All right.  And when you left the game, who

6    was in your vehicle?

7        A    Those four and then Tiar as well.

8        Q    Okay.  And where did you take those five

9    individuals total including Ms. McCart?

10       A    I dropped them off right at Hammond over

11   there by the corporate apartment area.  I didn't pull

12   into the complex, so.  On the side over there, there's

13   like a Starbucks, a Schwab, and a building.  I dropped

14   them off there.

15       Q    Okay.  All right.  And where did you go

16   after you dropped those -- I'm assuming your son

17   stayed with you.  Is that fair to say?

18       A    He's in the front seat.

19       Q    Okay.  So your understanding is that you

20   were driving, your son was in the front passenger

21   seat, and Mr. Moloughney, Ms. Rodriguez, and

22   Ms. McCart were in the back seat?

23       A    Correct.

24       Q    Okay.  And after you dropped Ms. McCart,

25   Ms. Rodriguez, and Mr. Moloughney off where did you

Eddy Perez                                  August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 221

1    and your son go?

2         A    Home.

3         Q    Okay.  Were -- what -- let me rephrase this

4    question.

5              When you were driving to drop off

6    Mr. Moloughney, Ms. McCart, and Ms. Rodriguez, were

7    there conversations about any plans for the remaining

8    of the evening?

9         A    Well, a lot of people had mentioned in the

10   suite let's go out.  Let's, you know -- it's a Friday.

11   I mean, not Friday.  Sunday afternoon.  And, you know,

12   they -- people like to do Sunday Fun Day.

13             And I -- I know that they had a

14   conversation.  And Sarah was parked there 'cause

15   that's where Sarah had met 'cause Sarah didn't know

16   the whole area.  So they had talked about going out

17   further which I found out they did.

18        Q    Okay.  Do you know who all went out after

19   you dropped the three individuals off?

20        A    I know those three went out.  I know that.

21        Q    Do you know of anyone else that went out

22   with them that would have been employed by Equity

23   Prime Mortgage?

24        A    I don't know if anybody joined later or

25   anything.  I don't -- I don't -- as CEO and president,

Eddy Perez                                    August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 222

1    I have to keep a distance for legality reasons.  And I

2    have to -- I like people a lot, but I just -- I got to

3    separate at a certain point.

4         Q    Okay.  How did you know that those three

5    went out after you dropped them off?

6         A    'Cause I dropped them off and they -- they

7    said they were going out.  I don't know if they all

8    did, but then they -- Sarah said they went out.

9         Q    Okay.  When did you talk to Sarah about that

10   night?

11        A    She just thanked me the next day and just

12   said that they -- they went out.  And I said oh, cool.

13   I mean, I figured.  I just assumed.

14        Q    Did Sarah tell you where they went?

15        A    No.

16        Q    Okay.  Did you ever talk to either

17   Ms. McCart or Mr. Moloughney about where the three of

18   them went out after you dropped them off?

19        A    No.

20        Q    Okay.  Other than what someone may have told

21   you or you may have learned through the investigation,

22   do you have any other knowledge about anything else

23   that happened on the evening of December 20th and the

24   morning of December 21st after you dropped off

25   Ms. Rodriguez, Mr. Moloughney, and Ms. McCart?

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 223

1          A    Outside of, you know, Tiar and Mark's time

2     together that we talked about earlier, no.  I don't

3     know what happened in between.

4          Q    Okay.  And the only way that you have the

5     knowledge about what happened in the course of the

6     interactions between Ms. McCart and Mr. Moloughney is

7     through what Mr. Moloughney told you and what Ms.

8     Green told you about her investigation?

9          A    Sarah, like I said earlier, told me that

10    they went out, so.

11         Q    Again, I'm asking about the interactions

12    between Ms. McCart and Mr. Moloughney that were --

13         A    Yeah.  Only when I asked him about

14    the -- the e-mail that went out.

15         Q    My point is that you were not present.  You

16    have not seen any video that shows it.  The only

17    information that you have about the interactions

18    between Ms. McCart and Mr. Moloughney is based on what

19    someone else has told you?

20         A    Yeah.  I mean, Mark.  But, you know, no.

21    No.  I don't have video or any evidence like that or

22    anything.

23         Q    Okay.  The apartment that you dropped

24    Ms. McCart and Mr. Moloughney and Ms. Rodriguez off at

25    is owned by Equity Prime Mortgage.  Correct?

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 224

```
 1        A    Well, we don't own the -- the apartment
 2   building.  But we -- we lease -- I don't know if we
 3   leased two at that point, but we leased at least one.
 4        Q    Okay.  And why does Equity Prime Mortgage
 5   lease that apartment?
 6        A    In the virtual world when executives are
 7   coming in, a lot of people didn't like the Westin that
 8   was next to us.  They wanted a little bit of more of
 9   a -- a feel.
10             We also used it to shoot videos from time to
11   time with Ric Flair of all people in marketing.  True
12   story.  I mean, you're asking me.  I have to tell you.
13             It was very convenient when I had COVID.
14   Nobody was around and I went there 'cause my wife was
15   panicked even though nobody got sick but me, and I
16   didn't get sick, so.
17             So they wanted a little bit of a
18   refrigerator, a kitchen, an area to chill.  They
19   hated, you know -- I mean, this room is way more
20   glorified than your average hotel room.  So they
21   didn't want a bed, a couch, and -- not even a couch.
22   A bed, TV, and shower.
23        Q    Okay.  It was -- the apartment is leased for
24   the convenience of the executives that made use of it
25   from time to time?
```

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 225

1        A     It's also not even -- you know, sometimes we

2     would let other people, if they're senior leadership.

3     We've allowed -- I know that in the second one we got

4     it because sometimes some of the sales folks would

5     come into town and they were going to be here extended

6     periods of time.  Like, extended meaning like a week.

7              Unfortunately, the extended stays by our

8     office are a little bit risque I'll say.  So the

9     apartment was a lot safer.  I'm just going to

10    say -- I'm just being honest.  The one behind the

11    Publix is, like, in such a nice area.  I don't know

12    how that one went sideways, but it did.

13             So we thought it was safer and better.  And

14    if somebody is going to be staying a week or so and

15    back and forth, some people keep clothes there.  So

16    we -- we thought it was a better environment.

17       Q     Okay.  I'm going to hand you what's been

18    previously marked as plaintiff's Exhibit 34.

19                    (Plaintiff Exhibit 34 was previously

20                    marked for identification.)

21             Do you recognize the picture that you see on

22    the first page of Exhibit 34?

23       A     Do I recognize it?

24       Q     Yes, sir.

25       A     I mean, I could guess.

Eddy Perez                                     August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 226

1      Q    Well, have you seen it before today?  Let me
2    ask you that way.
3      A    No.  I haven't seen it.
4      Q    Okay.  So what is your guess as to what this
5    document is depicting?
6      A    I know that the -- what the heck is her
7    name?  The Falcon staff told us to take whatever we
8    wanted home.
9      Q    Okay.  So you -- do I understand you to be
10   testifying that what's depicted in this picture are
11   employees of Equity Prime Mortgage taking --
12     A    If I had to guess.
13     Q    -- home things that the Falcon staff had
14   told them they were free to take?
15     A    Yeah.
16     Q    Okay.  And can you identify who are the
17   people in the picture?
18     A    Only person I recognize is in the middle.
19   Well, that's -- is that Ashley Thomas?  'Cause I know
20   she wanted some to go home.  That's -- that's the only
21   person I recognize right off the top is Ashley Thomas.
22     Q    Who is Ashley Thomas?
23     A    I believe that's her name.  I'm pretty sure
24   it is.  She works -- worked for us.  I don't know if
25   she still does, but she did.

Eddy Perez                                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 227

1      Q    Okay.  She's one of the employees that was

2   at the Falcons event?

3      A    Yeah.  She's in Atlanta.  You know, like I

4   said.

5      Q    Take a look at the second page of Exhibit

6   34.  Do you recognize who that is in the picture?

7      A    I believe that's Tiar without a mask.  The

8   mask mandate thingy throws me off at times.  But that

9   looks like Tiar.

10      Q    Do you have any idea who took these pictures

11   at the Falcons event?

12      A    Nn-mmm.

13      Q    Okay.  Have you seen them before --

14           MR. WILSON:  Is that a no?

15           THE WITNESS:  No.  I do not.

16   BY MS. RAGAN:

17      Q    Have you seen those pictures before today?

18      A    No.  Are we done here?

19      Q    Yes.  With that one.  Thank you so much.

20      A    Okay.  Sorry.  I know there was more

21   pictures, so I didn't know.

22      Q    Yeah.  That's okay.  That's the only ones I

23   wanted to ask you about.  All right.

24           I'm going to hand you what I'm marking for

25   identification as plaintiff's Exhibit 55.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 228

1              (Plaintiff Exhibit 55 was marked for
2              identification.)
3          If you will just take a look at that
4    document and then let me know once you've had a chance
5    to review it.
6      A    Like, read the whole thing?
7      Q    Well, in as much detail as you want.  I'm
8    going to ask you some questions about it.  So if you'd
9    like to familiarize yourself with it, you're free to.
10   If you want me to jump right into the questions, I'll
11   be glad to.
12     A    Yeah.  You can jump in 'cause then
13   I'll -- if I've got to read or reference, I will.
14     Q    Sure.  Do you recognize Exhibit 55?
15     A    I do not.
16     Q    Okay.  It appears to me that Exhibit 55 is
17   an e-mail chain that starts with an e-mail that you
18   sent.  Can you verify whether that's accurate or not?
19     A    See, here it looks like Eric sent it.
20     Q    Okay.  I did see that.  But the end of that
21   e-mail chain is the signature -- is your signature
22   block.  Do you see that?
23     A    I do.
24     Q    Can you explain to me why your signature
25   block would have been on an e-mail that Eric sent?

Eddy Perez                                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 229

1        A    Yeah.   'Cause Wine Wednesday was something

2    that was brought upon for the culture from EPM.   So I

3    just wanted people to know that I -- I support this

4    type of cultural interaction.

5             And it's good for the organization 'cause if

6    I didn't put my e-mail on it, they may think it's just

7    Eric doing it.   And then some people may not want to

8    participate.   I've learned that more people

9    participate in the culture if I'm involved.

10       Q    Okay.  So is it fair for me to understand

11   then that the e-mail was sent by Eric but at your

12   direction?

13       A    Yeah.   An overall part of his empowerment of

14   his job duties.

15       Q    Okay.  Understood.  So the original e-mail

16   on this chain, my understanding is that it's a request

17   that employees can win a bottle of wine if they go

18   onto websites and specifically Indeed.com and leave a

19   favorable review of Equity Prime Mortgage.  Is that

20   correct?

21       A    I'm not sure of all the parameters, but I

22   know that we have Wine Wednesday.  And I know that

23   they play games and try to have fun.

24       Q    Okay.  So the basis of my question was

25   interpreted from the information that's in the e-mail.

Page 230

1     So if you need to review the e-mail to be able to

2     answer my question, then please feel free to do so.

3          A     Okay.

4          Q     But the question essentially is: Do I

5     understand correctly that the purpose of this e-mail

6     that was sent by Eric at your direction was to

7     incentivize employees to go online and provide a

8     review favorable to Equity Prime Mortgage in exchange

9     for winning a bottle of wine?

10         A     The EPM way of keep things fun. We want to

11     offer a challenge to win a bottle of vino. First 24

12     employees to complete an Indeed review in a minimum of

13     three sentences will be rewarded a bottle of vino.

14     Once you receive the submission.

15          I mean, it ties reading it backwards that

16     for this week it was to put a -- a review on Indeed.

17         Q     So did I interpret the e-mail correctly

18     then?

19         A     For this week. Yes.

20         Q     Okay. Your point is that Wine Wednesday is

21     something that was done every week and --

22         A     Still is.

23         Q     -- and this challenge is something that was

24     just particular to the week that this e-mail was sent

25     in Exhibit 55?

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 231

```
 1        A    Yeah.  And the wine -- you know, not that it
 2   matters, but it all comes from Gary Vaynerchuk 'cause
 3   that's part of our -- one of the speakers that has
 4   spoken, and we think he's a good person about empathy
 5   and things like that.
 6             So it's, kind of -- they're all, kind of,
 7   tied together.  That's why it's part of the culture
 8   and all that stuff.  Yeah.
 9        Q    Okay.  And so the second e-mail in this
10   chain is Tiar responding to Eric as is part of the
11   steps in the competition to win the wine showing that
12   she has in fact provided a review that is more than
13   the minimum of three sentences, and claiming one of
14   the bottles of wine?
15        A    Yes.
16        Q    Okay.  Why did -- let me rephrase this
17   question.
18             What was the purpose of requesting the
19   employees to go online to provide the reviews of
20   Equity Prime Mortgage?
21        A    I am not a marketing expert, so I will start
22   with that.  That was based off Eric, who is more in
23   that line.  I think from what I gather from my
24   conversations and one-on-ones with him, that
25   unfortunately usually online reviews, it's not
```

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 232

1      the -- the happy people.

2              So we needed to want -- to try to raise the

3      spirits.  Because at times unfortunately it's the

4      unhappy people and you have to have a -- you know,

5      online presence and reputation matters a whole lot

6      more today and even last year than it did in 2015.

7          Q    So do I understand you to be saying that

8      this competition was Eric's idea?

9          A    Wine Wednesday was mine just as an idea

10     to -- to bring people together.  Now the individual

11     parameters, I don't -- I don't touch that.

12         Q    Okay.  Then do I understand you to be saying

13     that the purpose behind this particular Wine Wednesday

14     was to generate positive reviews to counteract some of

15     the negative ones that had been posted online?

16         A    Just in general.  Most people just -- the

17     happiest people in the world just never tell anybody.

18     So we want to get them there.  It just -- it's similar

19     to surveys.

20             You know, we try to get engagement in 80 or

21     90 so you can leverage data better.  But there's still

22     10 or 20 people -- even if they're happy as can

23     be -- will not do anything.

24         Q    Right.

25         A    So it was motivate them.

Page 233

1          Q    The answer to my question is yes; the

2     purpose of this particular Wine Wednesday that's

3     reflected in Exhibit 55 is to motivate people to put

4     positive reviews online so that you can counteract the

5     negative ones?

6          A    Yes.  I'll go with that.

7          Q    Okay.  I'm going to mark for identification

8     plaintiff's Exhibit 56.

9                    (Plaintiff Exhibit 56 was marked for

10                    identification.)

11              And again I'm going to ask you a few

12    questions about the e-mail.  However, please feel free

13    to review it in as little or as much detail as you'd

14    like.

15         A    Mm-hmm.

16         Q    This e-mail is one that is sent from your

17    e-mail address.  Is that correct?

18         A    Yes.  From my e-mail address.  Yes.

19    Correct.

20         Q    And it was sent on July 29th of 2020.

21         A    Yes.

22         Q    And it was sent directly from you to Ms.

23    McCart.  Right?

24         A    That would have been a bcc throughout the

25    whole company 'cause I can tell when they use my

Eddy Perez                                           August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 234

1    e-mail how this is set up.

2         Q    I see.

3         A    'Cause I don't know how to set these up.

4         Q    Okay.  So this went to --

5         A    Oh.  Yeah.  And if you look at the e-mail

6    address, you can tell 'cause look at the top where it

7    says Eddy Perez.  But if you look in parentheses, it's

8    Mick Donahue at Equity Prime.  That's not me.

9              So that's how I know they name it from the

10   marketing people, the other name because they're in

11   charge of that.  They just put my name 'cause it's

12   better interaction.

13        Q    Right.  That's a different e-mail though.

14   That's --

15        A    No.  Right there.

16        Q    -- the second e-mail in the chain.

17        A    Right there.

18        Q    Okay.  And that's a second e-mail though.

19   There's one e-mail that is yours and then there's

20   another e-mail that is M. Donahue.

21        A    No.  That's it.  That's the original one.

22   It says Eddy Perez, CMB.  Parentheses or whatever.

23   It's not parentheses.  M. Donahue.

24        Q    I see.

25        A    So that's M. Donahue.  That's not me.

Page 235

1        Q     CMB is your certification?

2        A     Yeah.  Certified mortgage banker.  Excuse

3    me.  Sorry about that.

4        Q     No.  No.  I appreciate the clarification.

5    Okay.  So you're saying this wasn't an e-mail only to

6    Ms. McCart.  This was an e-mail to the whole company.

7        A     So you know how they do those bcc's?  'Cause

8    I've learned that.  That then it shows To, like it's

9    individual to everybody, not just blanketed.

10       Q     Okay.  So this is an e-mail where -- did you

11   send this e-mail out or somebody created it on your

12   behalf?

13       A     Well, it has my name, the account.  But

14   that's not me because it shows who it is, being Mick.

15   He's over marketing.  He's in marketing.  So that

16   would make sense since Eric reports to me, and that's

17   one of the people that report to him.

18       Q     All right.  So this is Mick using your

19   account to send this e-mail to the company?

20       A     That's like the marketing account.  That's

21   not my eperez@epm.net.  Or at that point at

22   equityprime.com.

23       Q     Okay.  But do I understand how this e-mail

24   went out correctly?  Mick Donahue sent the e-mail out.

25   And although it uses your name, it's not your specific

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 236

1    e-mail?  It just reflects as though it's coming from

2    you?

3         A    To try to get more engagement.  Yes.

4         Q    Okay.  And the purpose of it reflecting that

5    it's coming from you is to get the employee's

6    attention to say hey, this is a message from the CEO?

7         A    It's what they requested once.  I would

8    rather have different people at the table.  I'm not an

9    egomaniac.  I -- I'd rather have executives take that.

10   But they say that that gets better engagement, so I

11   have to listen to people.

12        Q    What you're saying is using your name gets

13   better engagement?

14        A    Yes.

15        Q    And again this is another example of where

16   the company is incentivizing employees to go and leave

17   a review on a video for the purpose of --

18        A    YouTube?

19        Q    -- receiving positive --

20        A    If I had to guess.  Hold on.  Is that what I

21   saw?  I would guess is this is YouTube.  I try

22   to -- yeah.  It's to build our YouTube following.

23        Q    Okay.  And it's a marketing effort to

24   encourage positive --

25        A    Yeah.  Convey the --

Eddy Perez                                           August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 237

1      Q      -- commenting and viewing of the --

2      A      We don't make anybody do it.  And people

3    that are happy, they put their own videos together if

4    they want to do it.  And talk about.  And then put it

5    out there.

6      Q      Okay.  And in exchange for doing this, again

7    the employee is getting a bottle of wine?

8      A      Yeah.  This is a Wine Wednesday one.  I had

9    to look at the subject.

10     Q      All right.  And then the second e-mail in

11   this chain is Ms. McCart responding to Mr. Donahue

12   showing where she has in fact followed the procedure

13   that was intended to get the positive comments on this

14   YouTube video?

15     A      Yes.

16     Q      Okay.

17     A      Do we need this thing?

18     Q      Oh.  We can put it right here.

19     A      Okay.

20     Q      Thank you, sir.

21     A      Yep.  You're welcome.

22     Q      All right.  I'm going to hand you what's

23   been previously marked for identification as

24   plaintiff's Exhibit 35.

25   //

Eddy Perez                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 238

1                    (Plaintiff Exhibit 35 was previously

2                    marked for identification.)

3              Have you seen these documents in Exhibit 35

4     before?

5         A    I have not.

6         Q    Okay.  Is it fair to say that these are

7     examples of a couple of the less-than-favorable

8     comments that we discussed were made online about

9     Equity Prime Mortgage?

10        A    Now that you're showing me, I'd say yes.

11        Q    This is what you were referring to when you

12    said that it's the unhappy people that are making the

13    comments online?

14        A    Just in general you want as much engagement

15    as you can.

16        Q    So my question is:  This is an example of

17    what you said about people who were the unhappy people

18    making the comments online?

19        A    Yes.

20        Q    Okay.  But you hadn't seen these comments

21    that are reflected in Exhibit 35 prior to me handing

22    them to you?

23        A    No.  I've never -- I don't know how to work

24    Indeed.  I know Glassdoor.  So that's -- I specialize

25    on that one.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 239

1        Q    Okay.  Even though you had not seen these

2    particular comments in Exhibit 35, you were aware that

3    there were negative comments out there that the

4    marketing campaigns we just talked about were intended

5    to counteract.  Right?

6        A    Yes.  Eric had told me.

7        Q    Okay.

8        A    Still need this?

9        Q    You can set it right there.

10       A    Okay.

11       Q    Thank you, sir.

12       A    Yeah.  No, no.

13       Q    Okay.  I'm going to hand you what I'm

14   marking for identification as plaintiff's Exhibit 57.

15            (Plaintiff Exhibit 57 was marked for

16             identification.)

17            Do you recognize Exhibit 57?

18       A    After you watch this video, you'll see

19   through the EPM way.  Exhibiting the many fashions

20   that were -- the most important part is to celebrate

21   someone that has overcome a huge obstacle.  It shows

22   the character.  Say you want a better life and embrace

23   the internal conflict to seek along with accomplished

24   personal growth.

25            I'm not sure exactly what's before this.  I

Eddy Perez                                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 240

1      don't know what the video is.

2            Yes.  I understand it because Jeff has

3      overcome dependency issues.

4            Q    Okay.  When you say dependency, you mean

5      substance or alcohol dependency?

6            A    Should I divulge?  I mean, I know.  He's

7      part of AA and I believe he went to NA as well.

8            Q    Okay.  And so this video has some reference

9      in it to Mr. Batson's dependency issues?

10           A    I don't know if it does.  I don't -- I'd

11     have to see it.  I just know that he's overcome a lot

12     and done very well.  And he went from an employee that

13     was performing enough and then -- and then started

14     excelling.

15           Q    Okay.  And so this video was a way of you

16     showing support for Mr. Batson in his --

17           A    Yeah.  I think mental health is one of the

18     biggest travesties in this world that nobody's willing

19     to talk about and face.  Unfortunately, I've dealt

20     with it personally.  Not myself, but with my mother

21     and other people in my family.

22           So I'm a big proponent.  I've talked about

23     it online.  I've done it for veterans.  So I'm pretty

24     sure if I see the video I could comment even deeper to

25     you.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 241

1          But that's where I'm always pushing people

2     to talk about their challenges.  Face them.  There are

3     no saints in the room.  And just try to get a little

4     bit better every day.  But you know, not to be -- it's

5     okay to fall.  You've just got to get better.

6          Q    Okay.  And so this e-mail that you were

7     sending out was for the purpose of showing support for

8     Mr. Batson in dealing with his challenges with

9     dependency.

10         A    He must have done something.  I'm

11    only -- once again, we're extremely proud of you.

12    Your accomplished personal growth.  I'm not sure if

13    there was a promotion at that point or something.  I

14    don't know the whole -- I would need what was before

15    that to be able to comment exactly.

16         But yes.  It's something reaffirming and

17    something positive.  I can say that.

18         Q    Okay.  So I guess I'm struggling to

19    understand why it is that you need to see the video.

20    What I am asking about is the e-mail as it appears, as

21    opposed to the video.

22         So your e-mail that you sent from your

23    e-mail address, eperez@epm.net, on January 24th has

24    language in it wherein you say Jeff Batson, we are

25    extremely proud of you.

Eddy Perez                                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 242

1        A     Mm-hmm.

2        Q     Do you use that?

3        A     Yeah.  Yeah.

4        Q     Did I read that correctly?

5        A     You did.

6        Q     Okay.  So is it safe for me to assume in

7    reading that e-mail that you're sending this e-mail

8    for the purpose of showing support for Mr. Batson and

9    encouraging him in his challenges with addiction?

10       A     And everybody in general.  But yes.  Just

11   overall mental wellbeing.

12       Q     Okay.  And you sent that e-mail showing your

13   support for Mr. Batson to the entire Equity Prime

14   company?

15       A     Yeah.  'Cause I see it's just from me.  So

16   it's one of those bcc's.

17       Q     Okay.

18       A     Are we done with that one?

19       Q     We are done with that one.  Thank you, sir.

20       A     Okay.  Yep.  You're welcome.

21       Q     At any time after Ms. McCart's employment

22   ended, did you have any conversations with any

23   industry personnel discouraging them from employing

24   her?

25       A     Nope.

Eddy Perez                                          August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 243

1        Q    Did you ever have any conversation with

2   Charles Dixon with American Safe Lending suggesting

3   that Ms. McCart is not someone that he or his company

4   should consider for employment?

5        A    I don't even recall who Charles Dixon is.

6        Q    Okay.  So is it safe for me to assume that

7   you did not have a conversation with him wherein you

8   discouraged him or his company from employing

9   Ms. McCart?

10       A    Like I says, I don't know what conversation

11  I had with him if I did.  I have -- I don't

12  even -- Charles Dixon.  What's the name of the

13  company?

14       Q    American Safe Lending.

15       A    American Safe.  I don't even recall the

16  company name.

17       Q    Do you recall having any conversation with

18  Sy Kingsada in which you would have discouraged him

19  from employing Ms. McCart?

20       A    I have no idea who Sy Kingsada is.

21       Q    He's also with American Safe Lending.

22       A    I'd have to see pictures to see their face

23  to know.  Or I'd have to -- I don't know.

24       Q    So if you don't know these individuals, is

25  it safe for me to assume that you did not have

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 244

1      conversations with either one of them discouraging

2      them from employing Ms. McCart?

3          A    I didn't -- I do not recall if I know these

4      individuals.  The names don't stick out.  So -- but I

5      do not remember having any conversations of

6      discouraging any employment with anybody with

7      Ms. McCart.  So I'm not sure exactly who these

8      gentlemen are.

9          Q    Do you recall having any conversations with

10     any individual wherein you expressed to them -- let me

11     make that even more specific.

12              Do you recall having any conversations with

13     any individual in the mortgage industry expressing to

14     them that they should not hire Ms. McCart because she

15     simply jumps from job to job until she can find

16     someone to make a frivolous claim against for the

17     purposes of earning money?

18         A    Not to my knowledge.

19         Q    To your knowledge, you have never spoken to

20     anyone within the mortgage industry discouraging them

21     from employing Ms. McCart or suggesting that she makes

22     frivolous employment claims?

23         A    Not to my knowledge.

24         Q    Okay.  What about Mike Kortas?  Do you know

25     Mike Kortas?

Eddy Perez                                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 245

1      A    I do know Mike.

2      Q    And do you know what company he's with?

3      A    Yes.

4      Q    What company is he with?

5      A    NEXA.

6      Q    Okay.  Do you recall having any

7   conversations with Mr. Kortas about Ms. McCart of any

8   nature?

9      A    God.  I talk to him all the time.  You would

10  think I would remember that if I did.  I don't -- I

11  don't recall anything.

12          I know that -- what did Frank tell me?  She

13  showed up to some event that we were sponsoring, and

14  NEXA was sponsoring together.  But I don't remember.

15  And she wasn't employed by NEXA.  So to my knowledge,

16  I don't -- I don't remember having any conversations

17  with Mike Kortas.

18     Q    Okay.  About Ms. McCart at all?

19     A    I didn't know about that till Frank told me

20  'cause I was supposed to go to that event.  And then I

21  had a family -- I had to go pick up my son or do

22  something.  Or no.  I had to get my oldest daughter

23  from Cirque du Soleil.

24     Q    Again I'm not asking about the event.  I'm

25  asking you don't recall having any conversations with

Eddy Perez                                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 246

1      Mike Kortas about Ms. McCart at all?

2           A    I do not recall.

3           Q    To your knowledge, did Frank Ferrans at this

4      event have any conversation with Mike Kortas about Ms.

5      McCart?

6           A    I don't -- I don't believe Mike was there.

7           Q    So the answer to my question is no; to your

8      knowledge you have no information that suggests that

9      Mr. Ferrans had a conversation --

10          A    No.

11          Q    -- with Mr. Kortas?

12          A    I can't -- I mean, I can't speculate for

13     him.  But I don't -- I don't believe so.

14          Q    Did you have any conversation with Mr.

15     Ferrans wherein he expressed to you, I talked to Mike

16     Kortas about Ms. McCart?

17          A    No.

18          Q    Okay.  What about Dave Kushner?  David

19     Kushner?

20          A    Oh.  I know him.  I used to work for him.

21          Q    Okay.  Have you had any conversations with

22     David regarding Ms. McCart?

23          A    No.

24          Q    Okay.  Have you had any conversations with

25     David wherein you discouraged him from employing Ms.

Eddy Perez                                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 247

1     McCart?

2          A    That's where she came from 'cause she told

3     me.  She's like hey, I used to work before you with

4     Dave Kushner.  I said oh, man.  Me and him have a long

5     history.  So I don't know how I could discourage if he

6     had already employed her, so.

7          Q    I'm talking specifically about after her

8     employment with EPM.  Did you have any conversation

9     with Dave Kushner about Ms. McCart?

10         A    No.  I haven't talked to Dave in years.

11         Q    Okay.  Did you have any conversation with

12    anyone in American Home Mortgage discouraging them

13    from employing Ms. McCart after she was terminated

14    from EPM?

15         A    I don't recall talking to anybody there.

16    And I don't know.  I can't even recall the name of

17    that company.  I don't even know where they're

18    located.

19              I mean, you could give me the biggest bucket

20    of money in the world and I couldn't answer anything

21    about them.

22         Q    Okay.  Moral of the story that I should

23    understand from your testimony is that you are

24    testifying under oath that you have had no

25    conversations with any individual for the purpose of

Page 248

1    discouraging them from hiring Ms. McCart or for the

2    purpose of suggesting to them that Ms. McCart's M.O.

3    is to jump from job to job until she can make a

4    frivolous employment claim?

5         A    Not to my knowledge.  I do not recall.

6         Q    If you had had that conversation, would you

7    remember it?

8         A    It's a good question.

9         Q    I thought so.

10        A    I have a pretty good memory, but if I told

11   you I remember everything I've ever talked about, I

12   have always deviated on this one to tote the line and

13   say it's with Legal when people ask me.  So I don't

14   know if they made an assumption that I said something

15   to them based off oh, it's with Legal.  That's code.

16   So I can't talk on their behalf.

17             But I mean, I'm not going to sit here and

18   say that I didn't tell them that it's a legal matter.

19   And I can't comment.  I -- I wouldn't be shocked if I

20   said something like that, but I don't -- I don't

21   discourage -- you know, I still have good

22   relationships with people that it didn't work out

23   with.  I don't -- I don't begrudge them.

24        Q    Do you have good relationships with people

25   that sue you or your company?

Eddy Perez                                     August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 249

1        A     Yeah, dude.  Mike sued me once.  Me and him

2    are buddies.

3        Q     Okay.  Mike Kortas?

4        A     Yeah.  He sued me.  Yeah.  No.  I have good

5    people relations with people that sued me.

6        Q     Okay.  Do you have a good relationship with

7    Ms. McCart?

8        A     I don't think it's bad.  We've never spoken.

9    She doesn't have my cellphone.

10       Q     You mean you've not spoken to her since her

11   employment was terminated?

12       A     Correct.

13       Q     You did speak to her while she was employed?

14       A     Yeah.  And I thought it was a pretty

15   cordial, good relationship.

16       Q     Okay.  So do I understand your testimony

17   correctly that as you sit here today, you can't recall

18   making any specific comments that would have

19   discouraged any mortgage industry professional from

20   employing Ms. McCart, but you may have talked to them

21   about the existence of a legal matter and leaving it

22   at that?

23       A     Yeah.  I don't -- I don't recall.  That's

24   ...

25                  MS. RAGAN:  Okay.  I think that we can

Eddy Perez                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 250

1      wrap up then.  I have no further questions for you.  I

2      appreciate your time.  We're right on the mark, I

3      think.

4                  MR. KREINER:  Yes.  Thank you for that.

5                  THE WITNESS:  Thank you.

6                  MR. WILSON:  No questions.

7                  THE REPORTER:  All right.  So State

8      Rules require that the witness shall be afforded the

9      opportunity to review the transcript.

10                 MR. WILSON:  Yep.  He wants to read

11     and sign.

12                 THE REPORTER:  Thank you.  And would

13     counsel like to order a copy of the transcript?

14                 MR. WILSON:  Yes.

15                 THE WITNESS:  Oh.  Shit.  Sorry.  Are

16     we off the record?

17                 THE REPORTER:  No.  I'm on the record.

18                 THE WITNESS:  Oh.  Oh.  Thank God.

19     We're off the record?

20                 MS. RAGAN:  We're not off the record.

21                 MR. WILSON:  Well, you've said shit and

22     fuck on the record anyway.

23                 MS. RAGAN:  Multiple times.

24                 We have a standing order with you guys.

25     So yes.  Please.

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 251

1                    THE WITNESS:  I try not to.  I got to

2    work on it.

3                    MS. RAGAN:  My paralegal will kill me

4    if I order the wrong thing.

5                    MR. KREINER:  He'll forward me a copy.

6                    THE REPORTER:  Perfect.  All right.  So

7    we are off the record at 3:52 p.m.

8                    (Signature reserved.)

9                    (Whereupon, at 3:52 p.m., the

10                   proceeding was concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eddy Perez                              August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 252

1           CERTIFICATE OF DEPOSITION OFFICER

2           I, ARIEL DALLAS, the officer before whom the

3    foregoing proceedings were taken, do hereby certify

4    that any witness(es) in the foregoing proceedings,

5    prior to testifying, were duly sworn; that the

6    proceedings were recorded by me and thereafter reduced

7    to typewriting by a qualified transcriptionist; that

8    said digital audio recording of said proceedings are a

9    true and accurate record to the best of my knowledge,

10   skills, and ability; that I am neither counsel for,

11   related to, nor employed by any of the parties to the

12   action in which this was taken; and, further, that I

13   am not a relative or employee of any counsel or

14   attorney employed by the parties hereto, nor

15   financially or otherwise interested in the outcome of

16   this action.

17                            ARIEL DALLAS

18                    Notary Public in and for the

19                            State of Georgia

20

21   [X] Review of the transcript was requested.

22

23

24

25

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 253

1                    CERTIFICATE OF TRANSCRIBER

2            I, JULIE WHEELAND, do hereby certify that

3    this transcript was prepared from the digital audio

4    recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13

14

15                                    JULIE WHEELAND

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
800.808.4958                                     770.343.9696

Page 254

1    Brent Wilson

2    bwilson@elarbeethompson.com

3                          August 29, 2022

4    RE:    Mccart, Tiar v. Equity Prime Mortgage, LLC, Et Al.

5         8/15/2022, Eddy Perez (#5316895)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-southeast@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

```
                                              Page 255

 1     Mccart, Tiar v. Equity Prime Mortgage, LLC, Et Al.

 2     Eddy Perez (#5316895)

 3                 E R R A T A   S H E E T

 4     PAGE_____ LINE_____ CHANGE_____

 5     _____

 6     REASON_____

 7     PAGE_____ LINE_____ CHANGE_____

 8     _____

 9     REASON_____

10     PAGE_____ LINE_____ CHANGE_____

11     _____

12     REASON_____

13     PAGE_____ LINE_____ CHANGE_____

14     _____

15     REASON_____

16     PAGE_____ LINE_____ CHANGE_____

17     _____

18     REASON_____

19     PAGE_____ LINE_____ CHANGE_____

20     _____

21     REASON_____

22

23     _____    _____

24     Eddy Perez                              Date

25
```

Eddy Perez                                   August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 256

1    Mccart, Tiar v. Equity Prime Mortgage, LLC, Et Al.

2    Eddy Perez (#5316895)

3                  ACKNOWLEDGEMENT OF DEPONENT

4        I, Eddy Perez, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Eddy Perez                         Date

13   *If notary is required

14                     SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                     _____ DAY OF _____, 20____.

16

17

18                     _____

19                     NOTARY PUBLIC

20

21

22

23

24

25

Eddy Perez
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

August 15, 2022

[& - 5316895]

Page 1

| & | 2 | | 29th 233:20 |
|---|---|---|---|

**&**   1:17 2:4,13,20
7:15

**0**

**04247**   1:8

**1**

**10**   232:22
**100**   65:23 101:17
120:23 172:9
175:15 210:19
210:21 213:5
**10:05**   1:16 5:5
**10:57**   55:6
**11:04**   55:9
**11:21**   71:5
**11:26**   71:8
**12**   13:10 80:13
107:15 217:16
218:5
**125**   2:5
**12:40**   142:12
**12:42**   145:5
**12:48**   145:8
**13**   107:15
**15**   1:15 5:9 6:15
6:23 20:11
217:16,18 218:5
**15,000,000**   16:18
**150**   12:11
**16**   107:11
**17**   108:19
**18**   17:1 217:23
**19**   24:24 80:5
**1999**   12:5
**1:21**   1:8

**2**   37:6
**20**   17:18 24:24
28:3 49:5 70:6
87:16 185:12
217:20,24 218:2
218:5,24 232:22
256:15
**2008**   14:2 36:18
36:19 37:8
**20080**   252:16
**2010**   201:18
**2015**   18:10 20:9
20:17 232:6
**2018**   17:8
**2019**   16:19,24
24:20,20 25:2
27:14 29:6,7,23
30:3 40:19 41:4
44:8
**2020**   13:22 16:6
16:14,24 21:2
25:2 27:19,22,23
28:12 30:8,10
31:13,17 41:22
42:3,16 43:15,22
44:11,13,19,25
45:2,5,9,10,17
46:4,14,14,24
81:3 82:1
147:14,17 149:3
171:1 193:5,9
233:20
**2021**   5:9 6:15
15:2 16:4 20:10
20:20,22 21:8
28:14 29:6
32:18,21 46:4

61:7 62:15,23
64:7 65:16 81:3
82:2 100:17
158:12 163:2,17
176:2,15 179:3,5
180:2,11 182:14
193:16,19
**2022**   1:15 6:23
28:20 29:2
254:3
**20th**   216:21
218:11 222:23
**21**   15:13 20:1,4
28:3 45:20
99:24,24,24,24
**214**   4:15
**21st**   222:24
**22**   217:21
**225**   4:16
**228**   4:8
**229**   1:19 2:14,21
5:9
**23**   189:22 192:22
193:22
**233**   4:9
**238**   4:18
**239**   4:10
**24**   230:11
**24th**   241:23
**25**   70:4 100:17
185:12
**25th**   100:1
101:20 102:4,23
103:13 106:16
108:24 109:22
**26830**   253:14
**29**   254:3

**2:00**   156:7
**2:53**   200:12
**2:55**   200:15

**3**

**30**   70:4,6 87:16
169:23 254:17
**300,000**   16:21
**3001**   3:6
**30030**   2:6
**30303**   1:20 2:15
2:22 5:10
**30a**   107:6
**32**   4:15 214:10
214:11,13,17
**33487**   3:7
**34**   4:16 225:18
225:19,22 227:6
**35**   4:17 237:24
238:1,3,21 239:2
**380**   2:5
**3:52**   251:7,9

**4**

**404**   2:17,23
**470**   2:8
**4core**   161:6
189:9,11 198:13

**5**

**50**   14:17,18
87:19
**50,000,000**   16:12
**500**   14:22 42:19
177:1
**5316895**   1:22
254:5 255:2
256:2

Eddy Perez

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

August 15, 2022

**[54 - agreed]**

Page 2

**54** 4:23
**55** 4:7 227:25
  228:1,14,16
  230:25 233:3
**56** 4:9 233:8,9
**561** 3:8
**57** 4:10 239:14
  239:15,17
**582-8419** 2:23
**582-8427** 2:17

**7**

**70** 65:24

**8**

**8** 4:3,23
**8/15/2022** 254:5
**80** 232:20
**800** 1:18
**823-4000** 2:8

**9**

**90** 232:21
**901-8400** 3:8
**95** 210:20
**950** 3:6

**a**

**a.m.** 1:16 5:5
  55:6,9 71:5,8
**aa** 240:7
**aaragan** 2:7
**ability** 16:8,23
  30:25 70:8,16
  71:19 147:12
  168:20 179:22
  180:22 201:2
  252:10 253:7
**able** 37:18 71:17
  99:20 198:1,2,3

198:3 210:23
  230:1 241:15
**absent** 5:13
**absolutely** 99:18
  129:17 142:17
  147:25 199:16
  200:8
**acceptable** 73:16
  74:13 76:9,17
  77:13
**accepted** 166:5
**accepting** 120:15
**access** 68:9
**accomplished**
  239:23 241:12
**accord** 91:13
**account** 235:13
  235:19,20
**accountant**
  175:18
**accredited** 12:12
**accuracy** 172:10
  254:9
**accurate** 19:21
  20:13,14 43:1
  202:13 228:18
  252:9 253:5
**accurately** 70:25
**achilles** 47:8
**acknowledge**
  161:12
**acknowledge...**
  256:3
**acknowledgm...**
  254:12
**acknowledgm...**
  5:12

**acronym** 11:8
**act** 13:5 95:18
  95:25 135:19
  140:12
**acted** 135:18
**acting** 150:1
**action** 1:7 50:18
  94:4,10 110:13
  126:20 144:13
  166:3 202:11
  205:23 206:18
  207:21 208:3
  252:12,16 253:8
  253:12
**actions** 60:1
  114:2 184:3
**activities** 219:15
**activity** 119:24
  150:18
**actual** 65:19
**adair** 197:6,7
**add** 37:15 103:1
  103:2
**added** 43:12,13
  43:22 44:11
**addiction** 242:9
**additions** 256:6
**address** 157:3
  158:14 233:17
  233:18 234:6
  241:23
**addressed** 33:24
**administer** 5:12
**administered**
  24:22
**administration**
  12:1

**admit** 206:22
**admitted** 205:13
**advanced** 24:6
**advances** 122:10
**advice** 97:2 98:8
  98:23 99:8,12
  111:9 153:25
**advised** 171:21
**affiliate** 14:12
**affinity** 122:23
  123:24 126:11
**affirmation**
  194:16
**affirmations**
  189:1,6,8
**afforded** 250:8
**afternoon**
  221:11
**agency** 34:3,24
  35:5
**ago** 13:10,11
  17:16,19 23:9
  26:17 28:6 49:5
  66:17 74:20
  75:18 76:3
  105:5 139:10
  207:4,8
**agree** 5:15 7:3,4
  71:4 75:1 79:7
  79:12 128:15,18
  129:10,11
  151:12 152:9,13
  152:14 201:22
**agreed** 47:13
  55:11 107:15
  128:2 129:1
  151:18

Eddy Perez                                      August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

[ahead - approximately]                                      Page 3

**ahead** 100:13
161:25 176:5
**airport** 103:19
104:23 105:13
105:15 170:1
**al** 254:4 255:1
256:1
**alcohol** 240:5
**alex** 215:15,17
215:21 216:2,5
216:12,15
**ali** 61:1 67:8,9
67:11,13 72:23
74:17 79:22
82:10,14,24 83:4
83:16,18 91:16
92:6,7 102:25
104:16 127:7,8
129:4,5,6 130:9
130:13,15,17,20
130:24 131:2
173:10,10,11,12
173:14 174:6,13
175:7,8,22
176:17,20 177:8
177:9,15,16
178:10,20 181:3
181:6,12,17,23
182:3,12
**ali's** 87:8 177:23
178:17
**allegation**
144:20 206:9,20
207:5,13
**allegations**
207:22
**allege** 91:18

**alleged** 123:19
208:4
**alleging** 99:14
**allosso** 162:5
**allotted** 254:20
**allow** 10:2,16
71:13,23 129:11
140:18
**allowed** 12:22
225:3
**allowing** 155:18
208:7
**allows** 122:3
**altogether** 51:13
**amelia** 2:3 7:22
8:15
**amend** 196:5
**american** 243:2
243:14,15,21
247:12
**amicably** 96:4
**amount** 15:1,4
51:17 58:15,15
150:2 202:20
**analogy** 176:25
**analysis** 60:20
60:23 61:9
**announcement**
63:9 64:9,19
108:2 178:5
**announcing** 65:5
65:8
**annual** 61:11,14
61:21 62:2
**annually** 23:13
31:22 35:1
50:14

**anomaly** 31:5
**answer** 4:21
9:20 10:17
11:17 18:24
26:4 28:8 30:21
31:10 32:1
36:16 45:25
54:9 56:4 58:14
71:13 73:18,23
75:5 76:22,24
77:18 81:6 82:7
91:25 93:6
114:12 130:1,14
140:18 141:6,11
142:10,11 143:3
154:15,16,21
172:1 202:10
208:24 211:8,10
213:9 230:2
233:1 246:7
247:20
**answered** 9:22
136:9
**answering**
197:13
**anti** 38:6,15
**anticipate** 9:8
10:12
**anticipated**
12:13
**anxiety** 193:11
**anybody** 11:1
51:18 56:24
67:18 156:18
157:13 167:15
168:8 195:4
204:24 206:2,3
221:24 232:17

237:2 244:6
247:15
**anymore** 127:14
148:9 164:9
201:5
**anyway** 250:22
**apartment**
166:18 220:11
223:23 224:1,5
224:23 225:9
**apologies** 8:24
173:20
**apologize** 109:17
142:25
**app** 194:14
**apparently**
155:20
**appearance**
204:16 205:3
**appears** 84:8
228:16 241:20
**appended** 256:7
**applicable** 5:19
254:8
**appreciate** 18:22
20:5 21:20
34:21 93:7
111:19 155:18
235:4 250:2
**appreciation**
217:6
**approve** 194:7
**approved** 35:13
**approximately**
14:20 20:9,9,17
21:7 23:9 25:1
69:13 81:2,25
82:3,4,5 109:22

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[approximately - back]**

Page 4

163:17 217:9
218:2,25
**april** 99:25
**area** 56:12 58:23
88:11 107:8
220:11 221:16
224:18 225:11
**areas** 62:1 79:17
**argument** 33:3
**ariel** 1:21 5:3
252:2,17
**armed** 53:22
**arrested** 50:10
**article** 157:1
158:13,18 159:3
159:14,23
**artistic** 194:7
**ashley** 226:19,21
226:22
**aside** 156:13
172:13
**asked** 10:4 56:6
73:24 79:19,20
80:12,17 82:23
97:21 106:6
114:8 115:11
134:1 136:8
139:10 149:7
151:17 157:1
170:12 203:15
215:2,4,7,9,10
216:9 223:13
**asking** 6:3,7 8:18
10:13 13:21
19:3 26:13,24
38:2,8 42:18
59:18 67:18
73:22 74:8,18

88:21 89:11
98:7 109:13
118:14 123:8
125:21 126:2
132:5,16 134:13
137:6,9 152:1
153:13,20,25
159:2 166:11
168:6 169:3
171:11,16
195:10 203:10
204:5 210:19,21
211:11,14,17
212:9 213:14,20
214:5 223:11
224:12 241:20
245:24,25
**asks** 45:24
**ass** 39:4 209:21
210:15,25
211:20
**assessment**
47:14 152:10
**asset** 15:18
**assigned** 5:4
70:11,12 73:7
190:4,17 193:22
**assistant** 185:11
**association**
159:8,17
**assume** 9:21
39:3 69:9
116:14 125:2
130:24 211:21
212:5,8,16,21
242:6 243:6,25
**assumed** 222:13

**assuming** 142:16
212:17 220:16
**assumption** 39:4
112:6 171:23
248:14
**assure** 119:10
**assured** 119:15
**atlanta** 1:3,20
2:15,22 5:10
55:23 56:14,15
56:19,19,21,25
57:9,15,25 62:17
62:21 184:6
216:19 227:3
**attached** 254:11
**attack** 16:25
17:8 28:5
**attained** 12:7
**attention** 66:23
236:6
**attorney** 103:7
157:8 252:14
253:10 254:13
**attwood** 2:4
**audible** 8:20
11:16 19:6
23:19 42:7 84:1
94:19 149:21
**audio** 252:8
253:3
**august** 1:15 5:9
6:15,23 21:2
45:9,9,10 254:3
**author** 194:15
**authority** 180:9
**authorized** 5:11
**automatic**
162:19

**available** 254:6
**avenue** 2:5
**average** 58:9
59:17 69:22
70:3,4 224:20
**averaged** 60:17
**averaging** 80:4
**avoid** 59:7
**awards** 62:5,6
**aware** 7:1 18:1
48:2 50:4
126:12 131:3
164:18 205:10
206:2,3 207:1,1
207:3 208:9
209:1,3,8,12,18
239:2
**awareness** 105:2
**awfully** 53:23

**b**

**b** 4:5,13 125:3
**bachelor's** 12:1
**back** 19:22
20:15 26:16
29:5 36:21 37:2
41:5,14 55:8
63:1,6 64:4,11
65:24 66:5,6
69:11 71:7
84:17 85:7
106:24 129:8
136:10 139:16
145:7 148:8
156:2,6 158:20
162:18 166:8
170:3 183:13,19
189:10 191:25

Eddy Perez                                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[back - bit]**                                                  Page 5

192:2 197:5,12
200:14 220:22
225:15
**backcheck**  68:24
69:1
**background**
11:22 48:22
49:1,2,23 115:21
115:22
**backgrounds**
50:19
**backtrack**  42:15
**backwards**  69:6
91:3 194:25
210:17 230:15
**bad**  54:2 160:19
249:8
**bai**  24:7,14
25:13
**ballistic**  218:13
**ballpark**  16:11
**bank**  49:16
**banker**  12:9,15
235:2
**bankers**  159:8
**base**  73:2 86:23
87:3,25 89:25
121:5 201:1
**baseball**  215:19
215:20,22
**based**  74:10 75:9
78:19 79:23
80:1 102:2
148:16 151:10
151:19 191:20
201:6 223:18
231:22 248:15

**basically**  46:3
67:17
**basis**  58:9 72:13
116:2 138:8
139:12,21
140:24 141:23
142:7 143:16
145:12 229:24
**bathing**  210:24
**bathroom**  10:8
127:21 128:4,21
149:8
**batson**  4:10
111:17,17 112:3
112:19 121:17
121:22 122:8
123:1,5,25 124:5
125:7,11,18
133:2 135:5,8,11
135:16 136:2,18
137:21 138:3,10
139:24 141:3
142:9 143:18
144:5 145:14,22
150:16,19,25
151:14 240:16
241:8,24 242:8
242:13
**batson's**  240:9
**bau**  25:6
**bcc**  95:15 233:24
**bcc'ed**  95:12
**bcc's**  235:7
242:16
**beach**  99:23
107:4
**bed**  107:13
224:21,22

**beds**  107:12
**begging**  194:22
194:23 195:2
**beginning**  14:4
130:2
**begrudge**  248:23
**behalf**  2:2,10 3:2
35:4 70:1
235:12 248:16
**behavior**  117:25
122:11 137:21
139:2 150:8,10
160:21 161:5
164:7 201:15
**behaviors**  53:15
118:19 132:18
134:23 189:10
189:23 190:2,4
190:17,19
192:19 193:22
194:11
**belief**  135:8
**beliefs**  199:18,21
**believe**  24:7,23
30:21 36:11
41:15 49:1 50:9
50:14,14 52:24
54:6 64:25 66:3
73:4 76:4 102:1
102:3,12,13,22
110:24 112:1
116:1 120:15,24
130:19 136:16
137:2 141:17
149:3 155:7
162:25 165:24
166:10 170:7,25
174:15 185:5

187:19 190:17
192:25 199:3
202:1 205:17
226:23 227:7
240:7 246:6,13
**believed**  116:12
125:11 132:22
132:25 133:5
**believes**  117:11
**benz**  217:3
**best**  16:8,22
30:25 88:12,13
105:19 116:8
118:13 135:20
145:15 147:12
168:20 170:11
175:24 252:9
253:6
**bet**  172:10
**better**  34:10
113:15 185:24
196:5 225:13,16
232:21 234:12
236:10,13
239:22 241:4,5
**betting**  172:11
**big**  37:1 49:4
138:16 155:20
165:23 240:22
**bigger**  106:25
**biggest**  240:18
247:19
**bit**  8:25 45:24
50:4 97:9
112:16 170:4
185:13 214:2
224:8,17 225:8
241:4

Eddy Perez
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

August 15, 2022

**[blaine - carpitella]**

Page 6

**blaine** 191:5,13
191:17 197:4
198:3
**blanketed** 235:9
**block** 228:22,25
**board** 159:17
197:5
**boca** 3:7
**body** 34:3
204:19,20
209:22 211:20
**bomb** 53:22
**book** 211:11
**bookends** 20:6
**books** 15:21
**boss** 177:1
**bottle** 229:17
230:9,11,13
237:7
**bottles** 231:14
**bounce** 88:10
**brady** 218:13
219:6
**brain** 40:24
48:25
**brainyquote**
194:12,13
**break** 9:25 10:2
10:7 100:10,12
127:16,16,18
129:25 130:3
142:14 145:2
155:18 156:2,9
200:9
**breaks** 10:8
**brent** 2:12 7:15
254:1

**bring** 62:4,4
193:5 232:10
**bringing** 47:3
59:5
**brink** 59:10
**broad** 51:5
118:14 139:7,15
**broke** 13:2
**broker** 14:8
**broker's** 36:22
**brought** 27:5
46:5 66:23
212:23,23 229:2
**bubble** 59:7
**bucket** 247:19
**buckhead** 58:2
**buddies** 249:2
**build** 236:22
**building** 218:19
220:13 224:2
**built** 201:20
**bumper** 209:5
**burning** 183:3,6
**burns** 3:5 7:20
**bus** 95:15
**business** 12:1
14:15 16:25
17:7 23:3 28:5
41:10,17 44:15
46:3 59:21
62:13 67:19,19
131:10 158:24
161:9,19,20
162:2,11,20
**busy** 113:24
**butchering**
186:5

**butt** 218:12
**button** 50:3
**buy** 148:10
**bwilson** 2:16
254:2

**c**

**c** 2:1 3:1 5:1
41:10 42:6,10,16
44:5,8 56:25
57:4 107:18
160:24 161:5
163:3,7 209:19
**c's** 40:8
**calculated** 15:8
202:3
**calendar** 84:9,18
85:1
**call** 31:8 48:5
62:12 75:20
76:4,14 77:11
92:1,25 93:11,17
96:1,8,16,18
112:13 129:10
144:3,6 157:7,20
159:4,13 163:13
170:10 178:19
180:13 185:2
190:6 207:16
217:22
**callan** 70:14,23
71:14 72:10,16
73:14 74:10,21
74:24 75:12,14
75:19 76:3,14
77:10 78:13
101:1 104:5
112:7,20 120:19

168:22 169:15
179:6,14 180:2
180:14,21
**callan's** 178:16
**called** 8:5 43:4
47:22 96:1,5,13
97:22 153:18,19
157:4 158:21
**calling** 96:6
172:15
**calls** 75:13 93:1
159:5 193:4
194:4,18 195:3
**camaraderie**
218:19
**campaigns** 239:4
**cap** 1:9
**capacity** 1:10
5:9 203:3
211:15
**capital** 16:10
**caps** 217:25
**car** 28:1 148:10
209:5
**care** 53:23
106:11 160:21
201:21
**carpitella** 60:20
60:22 61:9,18
63:7 65:1,6
66:25 68:2 69:5
75:23 78:7
79:19,20 80:1
81:13,24 85:3,9
86:18 87:24
88:7,18 89:24
90:3,9,20 91:15
91:18,22 93:11

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

[carpitella - changing]                                                    Page 7

94:5,15 95:19
99:5 102:25
104:7,14 112:20
121:1,9 155:3,10
170:5,7,14,19
171:6,9,14,20
172:2,15,19
173:8,25 174:9
174:16,21 175:9
175:25 176:13
177:10,14
186:10,22
188:13 199:5
201:17 202:12
**carpitella's**
98:24
**case**  54:20 96:4
**cases**  39:5
**catch**  9:4
**categories**
192:24
**caught**  8:24 9:1
**cause**  15:6 16:16
17:2 26:9 27:24
30:17 33:15
35:23 36:16
42:19,20 47:11
49:21 58:22
60:25 61:3,10
65:23 67:11,12
67:14 68:10
77:1 79:15
82:10 85:23
86:6 88:2 92:14
92:25 96:1,3
97:17 99:22
101:11,12 102:8
105:2,16 108:17

110:25 111:14
111:17 112:21
115:21 116:21
119:1,2 122:18
124:25 126:18
127:11,13
129:23 133:15
136:8 144:3
152:14 156:25
158:9 159:15
161:1 163:19
164:7 168:11
169:13,20
170:24,25 174:4
175:4,18 176:8,9
176:11,19
178:10,11
182:22 187:17
189:23 190:2
191:16 192:14
192:19,24 194:6
194:8,24 195:8
195:17 197:2
198:7 213:23,24
218:16 221:14
221:15 222:6
224:14 226:19
228:12 229:1,5
231:2 233:25
234:3,6,11 235:7
242:15 245:20
247:2
**caution**  109:4
**cc'ed**  95:11
**ce**  13:1 33:2
**celebrate**  239:20
**celebrated**
218:15

**cell**  7:2
**cellphone**  249:9
**center**  58:23
**ceo**  13:17,21,23
38:3 39:14
40:22 41:22
46:15 92:21
159:11 206:11
210:11,22
211:13,23 212:9
221:25 236:6
**ceremony**  62:6
**certain**  18:25
19:3 31:18 32:3
32:7,8,11,13,14
50:21 62:1
93:20,23 100:18
102:11,13,18
112:18 113:10
120:21,23 150:2
157:17 173:7,24
184:2 196:24
210:22 211:8
212:18 213:6
217:25 222:3
**certificate**  252:1
253:1
**certification**
12:8,15 33:22
235:1
**certifications**
12:14 33:23
35:12
**certified**  5:15
12:9,15 235:2
**certify**  252:3
253:2

**ces**  23:22 31:23
33:5,14,17 34:25
**cetera**  51:3
72:13 196:18
**cfo**  41:12,18
42:25,25 45:22
57:9,13
**chain**  70:19
181:16 211:16
228:17,21
229:16 231:10
234:16 237:11
**chair**  159:9
**chairman**  59:11
**challenge**  107:14
230:11,23
**challenges**  26:12
49:7 51:7
106:25 193:9
241:2,8 242:9
**chance**  228:4
**chances**  184:14
202:4
**change**  33:14
37:15 40:16
44:11 49:8
138:24 190:15
196:5,12 255:4,7
255:10,13,16,19
**changed**  12:20
19:20 25:11
41:21 42:2 44:5
44:17
**changes**  177:7
254:10 256:6
**changing**  45:12
127:5

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[channel - comments]**

Page 8

channel 176:24
  177:19
character
  239:22
characterize
  25:22 39:22
charge 63:22,23
  196:23 234:11
charles 243:2,5
  243:12
chat 120:11
chatted 120:9
check 47:22
  48:22 49:1,2,23
  49:25 50:21
  67:18 68:16
  69:10 78:9,17
  100:21 168:18
  169:5,8
checked 69:2,11
checking 50:23
  50:24 158:22
  159:2
checks 49:3,24
  50:5
chief 18:5,7,8
  19:25 20:7
  26:11 38:21
  41:12,18 42:22
  43:2,3,5,9,23,23
  43:24,24,25 44:9
  44:10,23 45:4,11
  45:13,16 47:16
  52:20 157:21
  158:7 176:3
  178:6 190:23
  192:16 196:23

chill 224:18
choose 56:7
christmas 61:22
  61:23 158:11
cio 41:18 42:24
  43:1 47:4
circumstances
  21:21
circumstantial
  72:8
cirque 245:23
civil 1:7
claim 97:3,15
  116:13,15 121:9
  127:2 138:22
  139:5 152:25
  156:16,21
  244:16 248:4
claiming 231:13
claims 8:16,19
  51:20,21 159:23
  160:8,17 162:13
  162:22 244:22
clairemont 2:5
clarification
  40:18 136:23
  187:4 235:4
clarifications
  9:6
clarify 6:22
  20:25 21:13
  32:1 97:7,10
  98:4 136:10
  171:25 202:25
  210:10
clarifying 18:8
  18:22 29:18
  93:7 187:3

216:4 220:1
clarity 10:15
class 26:2 37:3
classes 13:1 33:2
  33:5,17
classify 214:24
classroom 24:18
  27:6
clean 92:19
clear 9:20 28:8
  31:11 95:11
  119:13 132:3
  143:25 149:11
  165:9 198:19
cleared 87:16
  152:21
click 6:1
close 76:17
  77:12 79:5,8
  88:22 89:12
  95:22 97:23
  108:23 148:6
closed 70:17
  73:15 79:9 87:4
closing 70:6,18
  70:22 74:12
  76:6 88:1 89:18
  192:11
closings 71:19
  72:11
clothes 225:15
cmb 33:21
  234:22 235:1
coach 161:9
coached 160:15
  162:6,17
coaching 161:11
  161:13,19,21

162:2,4,11,20
  163:21,25
code 78:3 188:18
  189:5 191:20
  248:15
coincidental
  95:22
coincidentally
  98:17 106:21
collaboration
  189:12
collect 15:18,24
  15:25
collecting 78:9
  78:17 204:11
come 39:6 60:19
  66:5,6 88:21
  111:8,8,18
  146:19 147:8
  148:11 180:21
  188:23 225:5
comes 16:1
  49:13 231:2
comfortable
  15:11
coming 123:22
  148:23 187:20
  224:7 236:1,5
comment 52:7
  72:16 74:16
  158:17 159:2
  240:24 241:15
  248:19
commenting
  237:1
comments 54:4,7
  54:7 111:13
  122:14 123:2,5,7

Case 1:21-cv-04247-CAP-LTW  Document 86  Filed 03/21/23  Page 265 of 315

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

[comments - conduct]

Page 9

204:15 205:2
237:13 238:8,13
238:18,20 239:2
239:3 249:18

**communicate**
115:8 179:22

**communicated**
67:22 124:21,24
181:12 188:21
189:2,3,3,14
193:21 194:20
195:6 196:11
198:4 199:19
200:22

**communicating**
83:20 109:15

**communication**
63:23 65:4
83:23 97:17
109:14 110:1
190:25 192:6
193:1 195:10,12
197:3,9

**communications**
159:20 195:3

**company**  14:4,7
14:10,21,25 15:1
17:14,23 24:10
27:5 32:24
33:16 38:4,13
47:3 48:3,9
60:21 64:19,25
65:10 108:11
110:23 163:4
165:21,25
178:14 186:17
195:2 199:22
206:12,13

210:23 211:15
212:12 233:25
235:6,19 236:16
242:14 243:3,8
243:13,16 245:2
245:4 247:17
248:25

**company's**  210:4
210:15 211:18
211:24

**competition**
231:11 232:8

**compile**  113:17
113:19

**complained**
131:15

**complaining**
106:22

**complaint**  11:13
11:15 94:18,23
96:7,14 97:24
98:11 99:13
100:17 103:10
103:11,13
104:25 105:14
105:21,23 106:3
106:10 108:5,10
109:23 110:5,6
110:15,19 111:4
111:25 117:5,6
118:18 120:6,12
121:24 125:18
130:10,21 131:8
133:13 135:25
146:6,17 151:21
153:8,16 154:13
155:12 156:12
160:6 168:4,17

168:22 169:7
205:17,23 206:9
206:21 207:5,13
213:2 214:1
215:4 216:17

**complaints**
157:11 166:10
166:12 167:17

**complete**  10:14
10:16,19 35:1
110:15 230:12
256:8

**completed**  98:12
114:24 254:17

**completely**  10:5

**complex**  63:3
220:12

**compliance**
17:25 18:6,7,9
20:7 29:16
34:17,20 41:8
43:9 44:24
52:20 104:20

**complicated**
109:17

**complying**  34:3

**compound**  76:20
77:3

**concern**  85:18
89:20 185:22
196:4,19

**concerned**
146:11 148:12
148:14 183:25
184:1 215:10

**concerns**  66:12
67:22 85:10,17
85:20 86:17,18

86:21 87:2,24
89:23 90:4,10,21
91:18,23 93:12
94:1 111:18,20
116:20 121:9
125:24 131:18
131:20 147:9,17
148:23 171:21
172:3,8 180:19
180:22 183:21
184:5,8,10,12,17
184:19 185:15
186:2,23 187:8
188:13 196:11
196:13 197:23
198:5,15,25
199:6

**concluded**  98:1
147:1 251:10

**concluding**
132:13 141:24

**conclusion**  68:15
78:20 89:6
131:14 135:17
138:8,18,21
139:12,21
140:24 142:7
143:17,21
145:12 149:25
150:15 152:18
164:4

**conclusions**  68:7

**conduct**  51:21
78:3 131:15
136:15,17 138:9
139:13,23 142:1
142:8 143:18,23
147:3 151:14

Eddy Perez
August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

[conduct - correct]

Page 10

161:22 212:12
**conducted** 26:20
  160:5 183:18
**conference**
  61:12,15,17 62:2
  62:14,18,19,21
**conferences**
  33:18
**confetti** 205:8,15
  205:25 206:14
  206:24 207:24
  208:5 212:1,14
**confidential**
  106:6
**confirm** 34:24
**confirmed** 77:10
  88:20 89:10
  143:15
**confirming** 35:5
  50:25
**conflict** 175:16
  239:23
**confuse** 114:14
**confused** 38:1
  77:23 119:1
  191:15 198:7
  213:24
**confusing** 9:18
  77:20 82:9
**confusion** 9:21
  137:10
**congratulate**
  123:21
**conjuncture**
  33:9
**connection**
  125:10

**consensual**
  116:1,3 117:12
  117:21 118:6
  119:20,23
  131:12 132:23
  134:18,19
  137:19 139:4,14
  141:25 146:8
  149:13 150:25
  160:22 161:4
  164:6 167:6
**consented**
  131:14 132:14
  134:9 139:22
  140:25
**consequence**
  160:16 162:12
**consider** 12:10
  26:6 243:4
**considering**
  51:19
**constant** 194:23
**constantly** 189:2
  189:17
**constitute** 5:23
**constitutes**
  168:11
**consult** 154:25
**consulting**
  154:24,24 155:9
  155:10,11
**consumer**
  176:12
**consumers**
  201:21
**cont'd** 3:1
**contact** 132:14

**contacted** 97:1
  97:12 98:8 99:8
  99:11
**content** 154:4
  170:19,21
**context** 140:5
  157:9 167:2
**continue** 5:25
**continuing**
  129:11
**contribute**
  150:20
**control** 70:9,16
  71:17,19 72:1,14
**controlled** 70:21
**convenience**
  224:24
**convenient**
  144:21 224:13
**conversation**
  103:18 104:25
  105:7,12 109:5
  121:22 142:3,4
  144:9 152:4
  154:6 160:19
  163:11 166:9
  167:14 168:21
  170:15,19 171:7
  171:10,17 172:5
  172:14 173:7,16
  173:24 174:16
  174:21 175:10
  199:4,10 201:7
  206:10 207:2
  211:12 215:1
  216:5 218:24
  219:17 221:14
  243:1,7,10,17

246:4,9,14 247:8
  247:11 248:6
**conversations**
  113:10,11 137:5
  143:7 144:11
  160:7 170:5
  172:20 174:9
  176:1,14,23
  194:24 195:3
  203:24 221:7
  231:24 242:22
  244:1,5,9,12
  245:7,16,25
  246:21,24
  247:25
**convey** 236:25
**conveyed** 137:14
**coo** 41:6 42:24
  43:10 44:11
  159:11
**cool** 168:1
  222:12
**cop** 53:8
**copied** 95:2,8,10
  99:14 101:15,20
**copies** 254:14
**copy** 250:13
  251:5
**cordial** 249:15
**core** 189:19,24
  190:19 191:18
  193:21 194:10
**corporate** 3:6
  220:11
**correct** 6:16
  20:14 23:25
  32:17 41:19,20
  43:10 44:18,20

Eddy Perez
August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

[correct - date]
Page 11

45:14 46:11,12
46:16 48:10,12
48:13 55:20
56:23 57:21
58:1 63:8 65:11
65:17 66:22
69:8 70:7 74:14
75:14 76:19
77:14 80:9 81:4
81:10 84:25
85:5 89:22
94:21 96:16
98:25 99:10
100:5 102:21
104:10 105:1
106:4,14,17
110:16 123:15
125:8 133:3,25
137:22 145:19
149:19 150:17
151:8 153:5
162:10 163:4
165:16 166:7,14
166:15 174:18
174:19 177:11
179:4 180:4,8
181:4,15 183:15
184:24 188:5
199:7 200:19
202:14 203:6
206:9 208:8
213:10 214:18
220:4,23 223:25
229:20 233:17
233:19 249:12
256:8
**corrected**  199:1

**correcting**  9:4
**corrections**
  256:6
**correctly**  13:13
  19:5 23:8 34:22
  55:22 66:10
  76:2 93:9
  115:13 140:9,22
  149:18 161:20
  163:6 170:9
  183:5,20 230:5
  230:17 235:24
  242:4 249:17
**couch**  107:11
  224:21,21
**couching**  102:2
**council**  159:9
**counsel**  4:11,19
  7:20,22 11:2
  47:5,19 55:11
  97:13 129:12
  208:4 250:13
  252:10,13 253:7
  253:10 254:14
**counseling**
  163:21 198:21
**counteract**
  232:14 233:4
  239:5
**counterintuitive**
  28:6
**couple**  9:11
  11:21 170:8,25
  200:2 238:7
**course**  26:3
  29:22 108:16
  110:18 111:24
  117:3 121:7,23

129:7 130:9,20
131:7 135:24
136:14 137:11
138:1 146:4
184:11 185:18
204:13 223:5
**courses**  25:14
**court**  1:1
**courtesy**  10:18
**covid**  27:23
  40:24 59:5,9
  125:2 193:5,9
  218:1 224:13
**coworkers**  11:4
**cracks**  187:21
**crazy**  36:21 62:7
**create**  106:7,11
**created**  20:7
  45:6,7 163:1
  166:6 177:5
  235:11
**credit**  50:5 157:4
  186:18
**criminal**  50:19
**criteria**  49:17
**crowd**  61:19
  65:18,19,22 66:3
**crucial**  140:16
**crying**  122:20
  123:14,19 124:7
  124:11,18
  125:10 148:1
**cs**  254:15
**cultural**  193:12
  199:17,21,22
  201:3 229:4
**culturally**  198:8

**culture**  161:7
  164:9 188:24,25
  190:24 192:18
  197:3 198:12
  201:5 229:2,9
  231:7
**curiosity**  141:7
**current**  51:7
  75:9
**currently**  13:14
  55:25 206:12
**cut**  78:11
**cv**  1:8

**d**

**d**  4:1,13 5:1
**d.c.**  14:19
**daily**  58:20
  189:1,6,8 194:9
  194:24 195:17
**dallas**  1:21 5:3
  252:2,17
**dang**  48:24
**data**  60:21 80:2
  80:3,6,11,15,19
  80:24 81:12,14
  81:19 82:14,24
  82:24 83:8,11,18
  83:21 85:3
  232:21
**date**  1:15 13:22
  19:16 20:13
  27:3 35:18
  99:21 100:3,18
  100:18 106:17
  163:9 179:12
  255:24 256:12

**[dates - describing]**

**dates** 18:17,23
19:2,19 27:1
40:15 46:2
52:21 95:21
178:19 193:15
**daughter** 245:22
**dave** 246:18
247:4,9,10
**david** 246:18,22
246:25
**day** 11:7 17:1,1
36:23 37:3,3
59:17,17,19,19
61:23 62:18
63:11 93:1
105:16 106:16
106:20 124:16
125:5 134:11,21
149:7 194:9
203:14 205:12
221:12 222:11
241:4 256:15
**days** 57:18
254:17
**de** 12:16
**dead** 19:21
58:22
**deal** 10:22 13:12
44:7 53:19
120:4
**dealing** 158:23
241:8
**dealt** 240:19
**deangelo** 111:8,8
112:1,19,22
116:19 117:2
118:9,20 119:8
119:16 127:6

131:25,25,25
133:2 135:13
136:2,4,19
137:22 138:3,10
139:24 140:12
141:3,20 142:2,9
143:19 145:14
145:22 146:1,4
146:11,15,19,21
147:1,8,16,18
148:16,19,23
149:7,12 150:16
151:14 213:24
215:1,6
**death** 53:22
**decatur** 2:6
**december** 157:1
216:21 218:10
222:23,24
**decide** 152:15
153:3,6
**decided** 103:1
**deciding** 128:10
**decision** 74:11
92:2 108:6,12
110:13 150:20
200:18 201:6
204:3,6
**decisions** 72:19
73:14 92:18,20
180:6,10
**declare** 256:4
**decorate** 211:25
**decorated** 205:7
205:14,24
206:13,23 208:5
**decorating**
212:13

**deemed** 27:25
256:6
**deeper** 51:6
167:4 240:24
**defendants** 1:11
2:10 3:2 7:15
**defer** 15:19,20
15:21 16:3,4,9
**deferred** 15:7,14
15:16 16:11,15
16:21
**define** 15:3
25:21 151:25
**defined** 73:23
**defines** 37:2
**definitely** 43:4
195:17 210:9
**definition** 15:12
71:22,24
**degree** 11:24,25
12:4,6,8
**delegate** 206:19
**delicate** 35:24
**delsi** 86:14,19
182:16 183:22
186:13 187:11
**delsi's** 90:24
**demonstrated**
184:2
**department** 47:6
64:3 72:17
**depend** 39:17
**dependency**
240:3,4,5,9
241:9
**depending** 18:17
31:7 33:3,15

**depends** 26:5
39:16 72:4
87:21 114:1
**depicted** 226:10
**depicting** 226:5
**deponent** 254:13
256:3
**deposed** 8:19
**deposing** 254:13
**deposition** 1:13
5:6,21 9:9,10
252:1
**describe** 14:15
15:10,16 16:23
24:2,21 38:16
46:25 116:8,16
117:7 118:3
123:14,17
132:16 133:4
149:17 153:10
163:6 166:16
167:1 168:20
**described** 34:4
35:7 45:12
49:24 54:5
63:21 65:21
68:4,7 103:18
104:1 108:3
126:3 133:21
135:4 157:12
165:18 167:15
168:7 171:11,18
172:14 176:14
194:18,18
205:15,18
214:25 219:13
**describing** 171:7
204:19

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

[description - drafting]

Page 13

description 4:6
4:14
desk 205:7,14,25
206:13,23
207:24 208:5
212:1,13
desks 207:15
destroy 203:25
detail 18:2
116:10 117:13
117:21 120:5
122:4 133:11
139:9,19 140:19
146:1 228:7
233:13
detailed 168:14
details 109:2
111:10 112:22
113:15 115:20
116:6,19,20,24
118:2 119:7
120:1 126:3
131:10 134:6
146:12,14
205:19
determination
98:25 99:1,7
155:1,11
determine 99:20
151:22 208:6
determined 48:8
70:18 117:19
137:20
determining
48:19 75:16
development
41:11,17

deviated 248:12
dickman 208:11
208:17 209:6,10
difference 16:24
153:11
different 13:20
14:19 18:25
19:1 24:12 26:4
26:9 31:5 37:13
51:9 97:9 127:5
146:8 149:17
163:11 170:25
183:8 207:2
210:9 211:12
234:13 236:8
differently 214:2
dig 167:4
digital 252:8
253:3
digitally 89:4
digs 51:6
direct 54:8,13
60:3 176:21
177:9,13,17
196:18
directing 60:1
105:8
direction 116:23
229:12 230:6
directly 46:10
95:3 156:18
160:7 172:20
233:22
director 21:1,16
21:23 34:19
disabled 53:18
disagree 38:11

disciplinary
166:3
discipline
163:21
disciplined
160:14
disclose 119:1,3
164:22
disclosed 164:5
164:20 166:5
disclosing
165:14
disclosure
165:16
discourage
247:5 248:21
discouraged
243:8,18 246:25
249:19
discouraging
242:23 244:1,6
244:20 247:12
248:1
discover 207:21
discovered 147:5
discrimination
39:1
discussed 168:11
189:17 238:8
discussion
164:11
discussions
92:13
distance 222:1
district 1:1,2
dive 106:25
dividing 176:7

division 1:3 20:8
divorce 164:16
divulge 240:6
dixon 243:2,5,12
doctor 66:1
document
198:12 214:17
226:5 228:4
documentary
198:23
documentation
193:19 197:19
198:4,20 199:5
documented
161:14 188:19
194:2 195:11
199:11
documents
11:11,14 196:17
238:3
doing 18:23 62:2
74:16 79:21
84:21,22 89:5
93:8 109:19
125:6 139:6,8
179:17 183:12
192:2 193:10
201:7 203:17
229:7 237:6
donahue 234:8
234:20,23,25
235:24 237:11
door 53:14 63:2
doubt 6:5
downtown 148:7
drafted 18:21
drafting 18:13

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[drank - employee]**

Page 14

**drank** 10:8
218:15
**dressed** 62:7,12
**dresses** 62:8
**drinking** 219:18
**drinks** 218:22
**drive** 28:1
**driver** 66:2
**driving** 220:20
221:5
**drop** 221:5
**dropped** 220:10
220:13,16,24
221:19 222:5,6
222:18,24
223:23
**drove** 219:21
**du** 245:23
**dude** 100:24
162:18 249:1
**duly** 8:5 252:5
**duties** 229:14
**duty** 60:6

**e**

**e** 2:1,1 3:1,1 4:1
4:5,7,9,10,13,13
4:13,15 5:1,1
52:24 63:15,21
64:2 65:5,7,11
65:14 67:23
94:13,24 95:2,8
98:17 99:13
100:3,16,21,23
101:3,14,16,20
102:4,10,19,23
103:13 108:24
108:25 109:23

116:6 158:19
159:2,6,13
168:12,18 169:6
169:8 194:8,9,17
195:3,14,18
196:17,25
198:11,21
199:17 209:19
209:25 210:2,13
211:19 214:13
223:14 228:17
228:17,21,25
229:6,11,15,25
230:1,5,17,24
231:9 233:12,16
233:17,18 234:1
234:5,13,16,18
234:19,20 235:5
235:6,10,11,19
235:23,24 236:1
237:10 241:6,20
241:22,23 242:7
242:7,12 255:3,3
255:3
**earlier** 37:16
72:23 87:15
139:2 168:19
170:6 183:17
188:12 198:16
215:14 223:2,9
**early** 20:10 21:9
21:11 33:24
67:2,5 68:3 69:5
69:10 81:3 82:2
83:24 84:18
85:2,9,16 92:8
92:22 93:9,20
94:15 170:17,20

174:18 175:1
176:1,15 178:3
181:2,3 182:13
182:14
**earned** 15:1
**earner** 34:18
**earning** 244:17
**easier** 11:10
13:10 41:3
87:21 109:17
165:7
**easiest** 39:23
**easy** 40:11 42:20
**eat** 127:24
**eating** 219:17
**eddy** 1:14 3:3
5:6 7:12 8:4
202:11 234:7,22
254:5 255:2,24
256:2,4,12
**eduardo** 7:11
**education** 11:23
193:5
**eerily** 95:22
**effect** 163:16
197:22
**effective** 24:7
**effectively** 195:7
**effort** 236:23
**egomaniac** 236:9
**eight** 12:18
51:13
**eighteen** 16:5
**either** 18:10
20:24 26:19
27:6,20 28:16,22
32:5 38:25
50:16 67:2,5

72:13 73:7
79:22 84:24
95:9 101:20
108:4,10 123:12
144:12 154:12
158:16 159:2
170:16 172:21
173:9,10 205:7
206:19 212:13
222:16 244:1
**elaborate** 132:7
**elarbee** 1:17
2:13,20 7:15,18
**elarbeethomps...**
2:16 254:2
**electronic**
195:25
**electronically**
35:14
**eleven** 107:15
**embrace** 175:16
239:22
**emotional** 202:7
**empathy** 231:4
**employed** 13:14
36:4 50:17
63:25 64:7
66:13 165:21
190:13 205:22
206:13 221:22
245:15 247:6
249:13 252:11
252:14 253:8,11
**employee** 31:22
53:17 64:6
70:19 71:15
163:3,7,22
164:23 176:20

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[employee - esquire]**

Page 15

| | | | |
|---|---|---|---|
| 191:4,17 193:20 | 52:3,9 93:14 | **engaging** 58:13 | 30:9 31:2,12 |
| 206:12,22 208:4 | 95:19,25 108:6 | 152:11 | 32:19 37:17,19 |
| 209:4,9 210:13 | 108:13 110:14 | **entire** 27:3 | 37:23 38:18,23 |
| 211:18,25 | 155:13 165:22 | 242:13 | 38:24 50:17 |
| 213:13,19 214:5 | 180:6,10,19 | **entities** 158:16 | 148:15 164:23 |
| 215:2,7 217:6,11 | 187:6 200:19 | **environment** | 196:2,10 197:20 |
| 237:7 240:12 | 242:21 243:4 | 225:16 | 198:24 208:15 |
| 252:13 253:10 | 244:6,22 247:8 | **eperez** 235:21 | 208:22 209:4,9 |
| **employee's** | 248:4 249:11 | 241:23 | 209:19 210:11 |
| 211:20 236:5 | **empower** 26:11 | **epm** 11:8 26:22 | 211:13,23 |
| **employees** 11:5 | 195:21 | 26:23 31:4,18 | 212:10 213:13 |
| 14:20 25:3 31:3 | **empowerment** | 32:5,9,15 33:4,5 | 213:19 215:2 |
| 31:22 38:25 | 204:1 229:13 | 36:4 42:11 | 216:18 218:6 |
| 39:15 40:19 | **encompass** | 48:20 63:5 70:5 | 221:22 223:25 |
| 54:3,7 57:4 59:6 | 68:23 83:5 | 88:20 89:10 | 224:4 226:11 |
| 61:22 63:19,24 | **encounter** | 102:15 127:12 | 229:19 230:8 |
| 65:10 70:15 | 116:25 | 163:23 164:20 | 231:20 234:8 |
| 88:20 90:2 | **encounters** | 188:22 197:20 | 238:9 242:13 |
| 107:18 161:22 | 117:1 | 213:7 229:2 | 254:4 255:1 |
| 163:3 177:1 | **encourage** | 230:10 239:19 | 256:1 |
| 188:15,21 | 236:24 | 247:8,14 | **equityprime.c...** |
| 189:15,18 | **encouraging** | **epm's** 29:23 | 235:22 |
| 190:18 191:19 | 242:9 | 31:14 32:4 33:7 | **eric** 19:25 64:10 |
| 193:2,21 194:20 | **ended** 38:8 | 110:18 | 191:25 192:14 |
| 208:10,15,21 | 242:22 | **epm.net** 241:23 | 193:1,20 197:1 |
| 217:9,13,17,18 | **engage** 193:23 | **epm.net.** 235:21 | 198:2 228:19,25 |
| 218:5 226:11 | **engaged** 123:23 | **epmx** 178:22 | 229:7,11 230:6 |
| 227:1 229:17 | 124:6 125:7,11 | **equation** 88:16 | 231:10,22 |
| 230:7,12 231:19 | 137:20 138:9 | 174:13 | 235:16 239:6 |
| 236:16 | 142:8 143:17 | **equity** 1:8 2:10 | **eric's** 232:8 |
| **employer** 51:7 | 145:13 151:13 | 3:2 4:17 5:7 | **errata** 254:11,13 |
| **employing** | 151:24 | 7:20 8:16 11:5,8 | 254:17 |
| 242:23 243:8,19 | **engagement** | 13:14 14:11,15 | **es** 252:4 |
| 244:2,21 246:25 | 47:6 122:21 | 17:22 22:14,17 | **especially** 53:16 |
| 247:13 249:20 | 123:22 124:2,11 | 23:7,25 24:13 | 59:4 88:9 125:2 |
| **employment** | 232:20 236:3,10 | 25:2,18 26:25 | 201:17 |
| 13:13 50:19,23 | 236:13 238:14 | 27:4,15,21 28:11 | **esquire** 2:3,12 |
| 51:1,2,3,19 52:1 | | 28:17,21 29:8 | 2:19 3:4 |

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[essential - explained]**

Page 16

**essential**  27:25
**essentially**  34:16
  106:2 230:4
**establish**  99:4
**established**
  26:15
**estimate**  14:25
  16:13 107:8
  147:12
**estimating**  102:1
**estimation**  16:8
  18:12 20:5
  21:20 34:21
  40:25 102:2,3
  217:16 218:3
**et**  51:3 72:13
  196:18 254:4
  255:1 256:1
**ethics**  30:18
**evaluating**
  181:25 183:9
**evening**  221:8
  222:23
**event**  216:18,22
  216:24 217:2,5,7
  219:13,20 227:2
  227:11 245:13
  245:20,24 246:4
**everybody**  40:4
  41:3 53:23
  58:12,23 59:13
  61:24 84:7
  85:14 87:14
  88:9 95:1 102:7
  106:22 125:13
  127:11 158:25
  163:14 176:25
  181:25 194:25

  201:25 217:11
  235:9 242:10
**everyday**  71:24
**evidence**  133:22
  197:19 199:12
  223:21
**evidentiary**  5:20
**evolved**  42:23
**exact**  14:22
  21:18 95:21
  99:20 117:25
  178:19 179:12
**exactly**  18:21
  25:11 39:11
  60:24 66:14
  105:25 125:19
  136:8 152:1
  153:9 175:23
  179:11,11
  193:14 198:17
  213:23 218:1
  219:14 239:25
  241:15 244:7
**exaggerating**
  17:18
**examination**  4:2
  8:11
**examined**  8:7
  163:10
**example**  136:5
  141:15 236:15
  238:16
**examples**  139:16
  190:5 238:7
**excelling**  240:14
**exception**  57:3
**exchange**  230:8
  237:6

**exchanged**
  203:22 204:8
**excuse**  11:25
  13:3 19:16
  21:11 64:22
  93:25 94:5,9
  100:7 112:12
  120:17 159:6
  181:2 182:13
  235:2
**exec**  104:2,3
  169:17
**execs**  156:22
  169:14,18
**executive**  42:4
  43:13,22 104:17
  107:20,20 159:9
  162:16 163:13
**executives**  56:18
  56:18 98:18
  105:16,21
  106:13 107:9,13
  108:3 162:7,8,9
  162:14 167:20
  209:19,23 224:6
  224:24 236:9
**exhibit**  4:7,9,10
  4:15,16,17
  214:10,11,13,17
  225:18,19,22
  227:5,25 228:1
  228:14,16
  230:25 233:3,8,9
  237:24 238:1,3
  238:21 239:2,14
  239:15,17
**exhibiting**
  239:19

**exhibits**  4:11,19
**exist**  44:24 45:5
  45:17
**existed**  43:8
  44:16 45:1
  114:17
**existence**  249:21
**existing**  109:1
**exists**  197:19
**expect**  87:13
  193:23 210:23
**expectation**
  188:22 192:9
  197:22 200:23
**expectations**
  69:19,20,23
**expected**  69:24
  72:12 182:2
**expenses**  15:5
**experience**  26:14
  26:18 39:2
**experiences**  52:5
**experiencing**
  124:23
**expert**  26:10
  29:15 120:10
  193:8 231:21
**experts**  27:16
**explain**  41:4
  68:6,13 87:11
  105:20 167:21
  170:14 181:22
  228:24
**explained**  67:7
  68:3 90:3,5
  116:4,9 131:17
  153:15 167:19
  174:12

**explosion** 46:5
**exposed** 187:20
**express** 51:19
85:20 86:21
125:16 132:17
134:24 135:7
143:21 146:3,20
147:16 149:24
167:8,11 180:18
**expressed** 85:16
86:17,18 87:3,24
88:19 89:7,9,24
94:1 100:16
106:12,15
114:23 115:20
123:1 124:1
131:21 132:10
132:24 133:22
134:8 135:14,16
136:1,13,18
137:17,24 138:2
138:8,13,15
139:8,12,20
140:1,23 141:23
142:5 143:16,19
145:12 146:9
148:16 150:14
171:17 183:21
186:1,23 187:1
188:13 244:10
246:15
**expressing** 90:20
93:12 141:2
147:8 149:12
187:5 193:2
244:13
**extend** 10:18

**extended** 225:5
225:6,7
**extensively**
33:20
**extent** 13:20
18:23 39:2,21
122:3
**extremely**
241:11,25

**f**

**f** 52:24 105:3
**face** 208:11,17
240:19 241:2
243:22
**facebook** 122:15
209:21
**fact** 34:14 38:11
72:14 79:24
99:20 109:13
115:7 138:12
139:25 145:11
149:2 155:5
175:18 199:13
200:17 205:1,13
205:24 206:21
206:23 231:12
237:12
**factors** 72:5
**facts** 126:21
140:22
**fail** 23:15
**fails** 254:19
**fair** 22:7,8 52:1
52:6 77:5
105:17 130:5
172:13,16
187:25 188:17

220:17 229:10
238:6
**fairly** 196:24,24
198:16
**fake** 122:21
124:1,5,11 125:5
**falcon** 226:7,13
**falcons** 216:19
218:12,14 219:4
227:2,11
**fall** 21:11 147:14
147:17 149:3
241:5
**familiar** 17:22
22:6 216:21
217:25
**familiarize**
228:9
**family** 240:21
245:21
**famous** 53:1,3,5
**fan** 218:14
**far** 129:6 139:19
140:3,22 200:24
213:4,5
**fashion** 189:15
**fashions** 239:19
**faster** 186:15
**fault** 160:3
173:21
**favorable**
229:19 230:8
238:7
**favorite** 215:22
**fear** 59:8,15
**features** 204:19
**february** 14:2
67:3,5 68:3 69:5

69:10 81:3 82:2
83:25 84:18
85:2,9,16 92:8
92:22 93:10,21
94:15 100:1,17
101:16,19 102:4
102:23 103:13
106:16 108:24
109:22 170:17
170:20 174:18
175:1,2,3,4
176:2,15 178:4,4
178:23 181:3
182:14 188:2
**feel** 15:11 19:1
123:5 144:7
224:9 230:2
233:12
**felix** 182:16
184:8,17,25
186:7
**fell** 194:25
**felonies** 49:4,24
**felony** 49:5,11
49:14 50:3
**felt** 54:2 121:19
122:17 123:1
139:4 144:10,15
183:24 188:10
**female** 53:17
54:7 107:13
164:23 211:19
**female's** 210:14
210:24
**ferrans** 246:3,9
246:15
**festivities** 66:7

Eddy Perez

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

August 15, 2022

**[figure - frankly]**

Page 18

**figure** 207:17
**figured** 222:13
**filed** 169:7 207:6
  213:2
**files** 68:16,17,20
  70:11,12,16,17
  70:21 72:2 78:4
  78:6,23,24 79:5
  80:13,17,18,20
  89:5,11 185:12
**final** 155:1 182:8
**finance** 11:24
  12:1 44:9
**financially**
  252:15 253:11
**find** 30:15 150:6
  191:12 244:15
**finding** 151:10
  152:25 164:16
  210:8
**findings** 113:2,6
  113:21 115:12
  116:10 117:5
  118:17,22
  119:18 120:2,14
  120:16 121:22
  123:9 149:18
  151:12,19
  152:20 153:7,16
**fine** 10:10 18:23
  19:4,9 20:5
  21:20 40:23
  48:13 50:13
  109:19 127:17
  127:20,21
  128:25,25 144:4
  147:13 154:23
  191:11 212:20

**finish** 100:10
  117:17 211:4
**fired** 99:2,6
  196:21 199:14
  201:25 202:7
**firm** 157:3,4
**first** 8:5 9:13
  13:25 17:11
  22:14,19,23
  23:10 37:22
  45:8 62:25
  67:10 91:1
  94:22 97:12,17
  97:21 98:7,10,21
  110:4 112:1
  169:5 174:16
  188:5 191:9
  202:17,19 203:2
  208:20,25
  209:24 212:4,21
  212:22 214:16
  219:23 225:22
  230:11
**fit** 48:9 182:1
**fits** 107:11
**five** 23:1,9 26:16
  127:10 220:8
**fl** 3:7
**flair** 224:11
**floor** 27:16
  58:11 63:1,6
  66:4
**florida** 23:5
  30:19 36:12,13
  36:16,23 56:11
  96:25 98:16
  107:6

**flying** 100:21
  103:20
**focusing** 23:6
**folks** 225:4
**follow** 49:16,16
  144:13 149:1,6
  173:18
**followed** 41:16
  133:20 152:21
  155:14,15
  237:12
**following** 122:13
  186:2 236:22
**follows** 8:7
**food** 211:16
  218:20,22
**fooled** 166:24
  167:2
**fooling** 134:3
**foolish** 49:6
**football** 133:14
**forces** 158:4
**foregoing** 252:3
  252:4 253:4
  256:5
**forget** 33:14
  185:18,19
**forgot** 63:23
**form** 73:17
  135:8 194:3
  198:21,23
**formation** 14:6
**formed** 134:8
  138:8 139:12
  140:24 142:7
  143:16,21
**former** 175:18

**formerly** 215:22
**forms** 165:1,14
**formulate**
  115:23
**fort** 56:10
**forth** 66:5
  225:15
**forty** 12:19
**forward** 47:14
  115:25 251:5
**forwards** 210:18
**found** 50:10 54:5
  116:17 117:8
  118:3,5,8 119:22
  121:16 124:4,13
  132:10 134:21
  134:25 135:12
  135:16,24 136:3
  136:14 137:18
  137:25 138:1,17
  140:16 146:3
  149:25 150:14
  150:19,24 151:5
  183:13,20
  206:15 221:17
**founding** 14:2,3
**four** 28:5 57:18
  60:16 68:23,25
  69:3,6 77:1
  78:21,25 93:1
  170:23 194:10
  197:11 220:7
**fox** 53:21
**frame** 178:4
**frank** 245:12,19
  246:3
**frankly** 173:22

Eddy Perez                                                      August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

[fraternization - going]                                                Page 19

**fraternization**
163:2,8
**free** 19:1 144:7
226:14 228:9
230:2 233:12
**friday** 195:22
221:10,11
**fridays** 193:5
**frivolous** 244:16
244:22 248:4
**front** 26:1 143:7
214:17 220:18
220:20
**fuck** 109:20
250:22
**fucked** 54:10
**full** 37:3 61:24
163:15 217:24
**fully** 164:5 176:6
**fun** 92:21 96:22
218:17 221:12
229:23 230:10
**function** 176:9
**funded** 80:21
81:1 82:4
**fundings** 80:18
**further** 55:13
126:19,20
160:13 168:5
180:2 221:17
250:1 252:12
253:9

**g**

**g** 5:1 7:11
**ga** 1:20 2:6,15,22
**gains** 16:10

**gal** 52:22
**gala** 62:6 63:1
**game** 133:15
172:6 216:19
218:10 219:3,17
219:22 220:3,5
**games** 229:23
**gary** 231:2
**gather** 231:23
**gathered** 166:24
**gathering** 36:2
167:16 168:8
**gcic** 48:25
**general** 22:13
26:22 32:24
47:4 102:17,19
108:8,9 126:18
215:12 218:18
232:16 238:14
242:10
**generalities**
139:7
**generally** 14:14
47:1 59:15
217:1 218:9
219:16
**generate** 232:14
**gentleman** 111:7
**gentleman's**
112:1 162:5
**gentlemen**
144:11 244:8
**georgia** 1:2 5:10
5:12 12:2 36:8
48:22 49:11,12
50:11 252:19
**getting** 78:4
88:17 127:24

144:19 186:3,16
186:19 202:23
237:7
**girlfriend**
122:14 148:3
**gist** 171:19
**give** 8:24,25
18:18 45:24
58:17 62:5 81:5
116:24 120:18
123:10 133:11
140:5 157:6,20
159:10 184:13
190:5,6 202:4
210:20 215:25
217:16 247:19
**given** 74:21
76:12 77:9
115:5 146:12,15
146:19 160:15
181:16 187:4
195:9 201:12
204:5 256:9
**giving** 126:7,8
126:25 140:4
**glad** 9:19 10:1
74:1 93:5
140:18 143:10
155:17 196:9
202:25 214:3
228:11
**glassdoor**
238:24
**global** 14:12
**glorified** 224:20
**go** 7:4,12 9:9
10:1,6 24:3 29:5
29:22 37:5 39:7

40:3 49:15,20
55:1,2 63:10
65:8,9 67:19
88:14 100:13
107:3 111:15
127:21 128:3,4
128:20 129:1,10
129:25 132:1
139:16 142:20
143:6,10 147:7
147:22 148:13
148:24 155:23
158:20 165:24
166:8 169:8
183:4 194:8
195:18,19,20
197:10,12 198:1
200:8 202:16
212:4 220:15
221:1,10 226:20
229:17 230:7
231:19 233:6
236:16 245:20
245:21
**god** 21:15 22:19
40:24 41:2,11
45:8 48:24 60:2
86:10 157:14
165:3 178:22
184:9 187:16
191:7 192:21
217:20 245:9
250:18
**goes** 64:16 186:6
197:9 200:24
**going** 6:3 8:17
10:13,13,14
11:21 19:19

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[going - hairdresser]**

Page 20

21:15 26:16
38:10 39:24
40:7 45:10
47:10 53:19
54:8,13 59:4,10
59:13,14 67:12
69:11 70:24
71:12 72:6,7
96:10,10 98:18
99:4 100:10,11
100:19,24 101:4
101:13 109:3,4
119:10 125:1,2
128:3,12,13,23
129:23 130:3
138:25 140:17
141:5 142:14
143:8 144:20
145:1,2 147:21
150:4 156:23
164:8,16 167:21
167:25 169:11
192:17 196:21
198:3 202:7,18
203:4,9 207:25
214:8,20 221:16
222:7 225:5,9,14
225:17 227:24
228:8 233:7,11
237:22 239:13
248:17
**good** 5:2 7:19
8:13,14 9:24
10:22 13:12
17:5 18:20 34:5
36:15 40:18
44:7 48:9,12
50:2 58:15,15

91:20 106:24
107:10 120:4
149:8 157:14
161:4 165:12
180:16 187:16
188:20 190:21
191:24 194:6
201:21 202:20
218:4 229:5
231:4 248:8,10
248:21,24 249:4
249:6,15
**gosh** 184:11
185:18
**gossip** 106:7,12
**gotten** 49:21
123:23
**grace** 9:1
**graduated** 11:24
11:25
**graphic** 116:21
116:22 119:7
131:9
**great** 11:11 18:1
41:12 42:18
57:9 70:13
136:5
**green** 19:14
20:16,16,23 21:1
21:22 101:23
102:5,13 113:17
115:12 116:9,23
117:14,19 118:3
118:16,22
119:17,22 120:1
120:7,18,25
121:15,21 122:5
122:25 123:8,18

123:25 124:9,13
124:22,24 125:6
125:15,22,22,23
126:4 129:6
130:8,18 131:1,6
131:21 132:9,17
132:24 133:4,22
134:7,24 135:7
135:15,23
136:13 137:11
137:14,17,19,24
138:7 139:7,11
139:20 140:23
141:23 142:5
143:16,21 144:2
145:11 146:3,15
146:20 147:1
149:2,24 150:6,9
150:13,19,24
151:5,10,20,22
152:7,23 153:15
154:25 155:11
156:14,20 223:8
**green's** 111:24
117:3 121:7
145:21 149:17
151:12 152:17
153:7 156:10
**grew** 41:9
**group** 88:15
167:20
**groups** 167:20
**grow** 195:5
**grown** 42:19
**growth** 17:4
43:14,23 201:19
239:24 241:12

**guards** 53:22
**guess** 12:12 20:1
25:20 36:15
47:2 48:6 58:17
91:2 101:22
115:7 118:13,25
121:18 134:3
147:11 148:6
149:17 154:9
165:11 170:11
171:16 172:5
176:24,25
178:21,25
179:21 183:3
190:9 195:9
198:7 202:23
225:25 226:4,12
236:20,21
241:18
**guessed** 158:7
**guessing** 172:6
**guest** 217:14,15
**guilty** 50:10
**guy** 111:14
184:12,13
**guys** 34:13
111:14,19
113:23 114:3,4
150:2,5,13
159:10 163:9
250:24

**h**

**h** 4:5,13 255:3
**habit** 190:3
**hairdresser**
217:12 218:18

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[half - history]**

Page 21

| | | | |
|---|---|---|---|
| **half** 62:25 | 166:13,17 | 210:16 211:1,18 | 217:23 |
| 174:25 201:19 | 167:17 173:7 | 211:25 212:15 | **hell** 178:22 |
| **hammond** | 218:10 219:12 | 213:7 | **hello** 58:12,21 |
| 220:10 | 222:23 223:3,5 | **hard** 17:2 | 58:23 179:19 |
| **hand** 8:2 18:13 | **happening** | **hartman** 205:13 | 203:15 |
| 78:10 79:16,25 | 111:23 167:12 | 205:24 209:10 | **help** 9:11 34:9 |
| 80:7,17 87:5 | 167:15 204:24 | 209:18 210:1 | 45:23 87:6 |
| 88:2,3,8 188:16 | **happens** 15:24 | **hartman's** | 92:17 |
| 188:23 189:20 | 65:13 | 208:11,17 | **helped** 49:8 |
| 190:20 191:21 | **happiest** 232:17 | 209:15 | 135:8 |
| 192:12 193:24 | **happy** 195:20 | **hate** 24:11 40:3 | **hereto** 252:14 |
| 194:19 201:3 | 232:1,22 237:3 | **hated** 224:19 | 253:11 256:7 |
| 214:8 225:17 | **harassment** | **he'll** 35:12 202:8 | **hey** 100:21,24 |
| 227:24 237:22 | 17:23 22:7,12,17 | 251:5 | 101:6 110:9 |
| 239:13 | 25:3,19 27:7,14 | **head** 17:25,25 | 191:19 195:4 |
| **handbook** | 27:22 28:12,17 | 18:4,5 19:5,11 | 202:16 203:8 |
| 195:13,16 | 28:22 29:9,23 | 20:21,23 21:16 | 204:9,10 236:6 |
| **handbooks** | 30:10 31:13,17 | 21:17 47:9 | 247:3 |
| 196:18 | 32:4,20 33:11 | 52:17 55:18 | **hi** 7:11,19 |
| **handed** 214:14 | 34:2 35:6,11 | 61:11,18 65:1 | **high** 59:4 87:9 |
| **handful** 181:19 | 36:3,9 37:2,18 | 133:15 161:25 | 187:22 |
| 187:18 | 39:1 51:21 | 211:15 | **higher** 34:18 |
| **handing** 238:21 | 54:22 94:18,23 | **heading** 20:8 | 202:6 |
| **handle** 34:5 36:2 | 96:7,14 97:3,15 | **health** 193:8 | **highest** 11:23 |
| 55:12 106:8 | 99:14 100:17 | 240:17 | 12:6 |
| 157:8 182:19 | 105:24 108:11 | **hear** 6:17 | **hire** 46:23 47:14 |
| 208:1 213:8 | 108:25 110:5,15 | **heard** 6:14 26:9 | 49:9 191:2 |
| **handled** 34:6 | 110:19 111:25 | 206:16,21 207:7 | 244:14 |
| 88:17 | 116:13,15 117:4 | 208:15 209:25 | **hired** 48:4,20 |
| **handles** 35:22 | 121:8 125:17 | **hearing** 7:25 | 55:19,23 |
| 158:9 | 127:2 130:10,21 | 212:22 | **hiring** 39:15 |
| **handoff** 179:12 | 131:8,16 135:25 | **heart** 16:25 17:8 | 46:10,17,21 |
| **happen** 152:18 | 136:14 138:22 | 28:5 | 55:16 248:1 |
| 152:24 159:16 | 146:5,17 151:21 | **heck** 38:1 105:5 | **history** 27:4 |
| 204:22 208:6 | 152:25 153:8,21 | 190:22 226:6 | 50:19,24 51:20 |
| **happened** 59:10 | 154:13 156:11 | **heel** 47:8 | 52:1,3,9 68:24 |
| 83:23 110:18 | 156:16,21 | **held** 62:15,16,25 | 69:1 247:5 |
| 144:18 164:3,6 | 167:18 210:5,7 | 63:5 216:19 | |

Eddy Perez
August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

[hit - individual]

Page 22

**hit** 161:24
216:13
**hits** 102:16
**hmm** 16:7 22:1
41:23,25 43:16
52:24 66:19,21
74:4,6 75:11
78:18 95:24
101:24 103:14
104:4,6,9 105:4
105:9 109:24
115:1,14 124:8
126:6 132:12
146:2 169:2
177:24 188:6
192:7 204:4
216:20 233:15
242:1
**hodgepodge**
24:11
**hold** 12:14,16,16
12:17,23 84:5
217:20 236:20
**hole** 160:1,4
**holt** 184:9 185:4
186:7
**holt's** 185:16
**home** 56:9,13,17
56:20,25 57:5
221:2 226:8,13
226:20 247:12
**honest** 21:19
109:20 113:8
225:10
**honor** 188:18
189:5 191:20
**hope** 10:3

**hopefully** 119:15
159:10
**horrible** 47:7
**hot** 50:3 165:24
**hotel** 224:20
**hour** 161:9
195:21
**hours** 12:11
33:23 133:19
195:20
**house** 99:23
107:4 146:10
219:23
**hr** 14:23 18:1,4,5
18:15,15 19:5,11
19:24 20:8,24
21:1,16,16,17,23
39:7 48:23 51:6
51:15,25 52:7,8
52:12,17 55:18
91:20 95:6,9
101:6,7,11,22
102:15,17,19
104:20 106:5,11
108:16 110:20
111:2,3,11,14,15
111:19,21 132:1
133:16 147:7
148:11,19,24
149:10 161:17
164:5,25 165:1
165:13 169:11
206:3,5,25
212:22,23 213:4
213:25,25
215:10
**huge** 33:22
52:13 189:4

239:21
**human** 9:2

**i**

**i.f.** 129:24
**ice** 200:7
**idea** 79:2 103:8
151:4,9 227:10
232:8,9 243:20
**ideas** 88:10
**identification**
214:9,12 225:20
227:25 228:2
233:7,10 237:23
238:2 239:14,16
**identified** 103:6
132:4 139:20
140:23 145:11
145:17 152:12
**identify** 64:6
141:22 191:3
192:4 194:19
199:11 226:16
**imagine** 30:1
**immediately**
95:18
**implicated** 54:19
**implicitly** 198:17
**implied** 202:24
**important** 19:19
25:8 49:20
119:9 239:20
**improve** 196:13
196:20 197:24
199:14 200:1
**inappropriate**
51:21

**inbox** 100:23
**incentive** 4:8,9
**incentivize** 230:7
**incentivizing**
236:16
**incident** 144:18
**include** 104:5
140:10
**included** 102:4
107:17
**includes** 197:2
**including** 14:17
14:18 42:14,17
71:16 194:21
207:23 212:13
220:9
**inclusion** 62:1
**income** 15:7,19
16:1,17
**incorrect** 70:23
**indeed.com** 4:7
229:18
**independent**
156:15 160:5
162:6 201:8
**indicate** 167:5
171:20
**indicated** 130:17
153:12 196:3
**indicating** 9:21
209:14
**indication**
208:20
**individual** 1:10
5:9 13:7,8 30:14
31:8,9 36:4 40:6
58:18 133:12
232:10 235:9

Eddy Perez
August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[individual - investigation]**
Page 23

244:10,13
247:25
**individually**
39:23
**individuals**
90:19 135:4,6
158:16 183:14
183:21 184:6
186:1 187:7
188:22 219:16
220:9 221:19
243:24 244:4
**industry** 12:9,10
17:3 27:25
31:19 32:5,10,16
33:11 49:7,8
59:4,9,11,14,19
69:21 70:3
157:2 158:22
187:20 242:23
244:13,20
249:19
**industry's** 31:14
**influence** 110:25
**inform** 148:19
172:19
**information**
18:18 49:3
54:24 59:12,16
78:19 80:11
83:12,14 96:11
120:18 121:1
123:17 124:10
124:14,21 147:1
156:13,19
167:16 168:8,9
181:14,16 197:2
197:4 205:23

210:8 223:17
229:25 246:8
**informed** 101:3
118:22 131:1
135:23 159:15
170:24 174:17
181:17 191:19
192:9 199:5,13
201:10,13
**informing**
104:25 199:24
**inheriting** 92:16
**initial** 93:24 97:8
**inputs** 35:21
**inquired** 206:25
**inquiries** 88:9,19
88:23 89:10,14
157:12
**inquiring** 157:5
**inspirational**
194:15
**instagram**
122:15
**instructed** 4:21
**instructing** 77:2
**instructor** 26:8
**instructs** 38:25
**integration**
182:9,10,11
183:2
**integrity** 189:25
**intended** 5:18
237:13 239:4
**intense** 12:11
**intentionally**
118:14
**interact** 58:12
59:20

**interacted** 47:2
58:19,25 113:9
**interacting** 58:8
58:9
**interaction**
117:15,20 118:7
118:11,13
119:14,22 134:9
135:1 137:18
139:22 140:25
151:6 167:3,6
215:8 229:4
234:12
**interactions**
48:16 117:22
118:4 141:25
223:6,11,17
**intercourse**
118:1,6 119:23
163:8 166:22
**interested**
252:15 253:12
**internal** 65:7
97:4 98:1,12
239:23
**internally** 65:4
197:9
**international**
1:18
**internet** 210:14
**interpret** 230:17
**interpreted**
229:25
**interrupt** 71:10
**interrupted**
142:13
**interview** 48:5

**interviewed**
47:13 48:2,3,6,8
92:6,7 112:15,16
112:18,19
120:19,21 121:2
170:8 183:14
**interviewing**
48:17,17 121:16
**interviews** 92:8
186:3
**introduce** 7:6
**introduced**
61:11,18 63:7
**introducing** 65:1
**introduction**
67:11
**introductory**
178:18
**investigate**
50:18 101:7
126:19 160:12
206:20
**investigated**
52:9
**investigating**
111:4 130:21
133:13
**investigation**
51:25 52:3
94:13 96:12
97:4 98:1,12
101:12 105:8
106:1 108:5,20
110:14,18
111:24 114:24
117:4 118:17,23
119:18 120:2,6
121:8,23 122:8

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

[investigation - kind]

Page 24

124:3,4 125:17
127:1 129:7
130:9 131:7
135:24 136:15
137:12,15 138:2
146:5,16,21
147:2 151:20
152:17,18
156:11,14,15
160:5 201:8
222:21 223:8
**investment**
41:13,18 44:10
47:16
**invite** 62:3
**invited** 218:7
**involved** 17:14
52:15 82:10,14
82:24 83:17,18
83:20 112:12
113:3 134:2
166:20,21 229:9
**involvement**
39:14 46:9,17,20
108:4 113:4
179:14
**involving** 117:6
**iola** 186:4
**ish** 20:2,4 59:7
**island** 57:2,5,6
**issue** 75:1 87:6
**issues** 51:2 54:13
240:3,9
**iterations** 24:5
24:11 51:3

**j**

**j** 17:12
**jamie** 163:22
164:20 165:10
165:13,20 166:4
**jamie's** 165:2
**janine** 66:2
**janitor** 49:10
**january** 45:20
61:5,12 62:15
63:12 64:7
65:15 67:2,5
68:2 69:4,5,9
81:3 82:1 83:24
84:18 85:2,8,16
170:16,20
174:18 176:1,15
178:3,23 179:2,5
179:13,25 180:1
180:10 181:2,3
182:14 241:23
**jason** 70:14 73:8
73:9 77:24
101:1 112:20
127:5 168:11,16
178:11,11,16
179:5,13 180:2
**jayza** 86:8,9,10
86:25 182:15
184:1 186:4,6,14
186:15,20
**jeans** 62:11
**jeff** 4:10 111:17
111:17 112:3,22
121:17,19
122:11,17,22,23
123:6,21,23,24
125:14,19,22,24

125:24 126:12
127:6 131:24
135:13 136:4
140:12 144:6
145:22 150:22
151:1 215:9
240:2 241:24
**jeff's** 116:20
122:13 135:19
**jersey** 36:14
55:24 56:1
88:11
**jim** 17:24 26:11
34:6,7 38:20
53:18 101:5
112:12 114:6
158:9 169:12
**job** 1:22 18:20
18:23 60:8 73:2
79:20 111:2
127:5 144:19
165:12 170:13
176:10 179:24
180:23 182:2
196:6 229:14
244:15,15 248:3
248:3
**jobs** 73:20
**jogged** 164:12
**joined** 221:24
**joke** 122:22
123:21 124:5
**joking** 96:22
**jokingly** 122:21
123:20
**jr** 7:12
**julie** 253:2,15

**july** 20:1 21:2
45:10 233:20
**jump** 10:22
228:10,12 248:3
**jumps** 244:15
**june** 18:10 20:1
161:3 163:1,17
164:3,10,13

**k**

**k** 4:13 17:12
**karess** 61:1
**kazoo** 190:6,7
**keep** 15:21 30:18
33:23 42:19
59:6 61:3 106:6
122:19 144:20
156:23 162:7
177:1 187:19
222:1 225:15
230:10
**ken** 205:13,24
207:19 208:11
208:16 209:9,15
209:18 210:1
**kept** 29:25
**kicked** 218:13
**kid** 49:6 53:9
**kids** 135:14,22
136:1,19 138:4
138:14,21 140:2
141:3 143:20
**kill** 251:3
**killed** 53:8
**kind** 25:10 33:8
58:11,22 107:13
218:17 231:6,6

Case 1:21-cv-04247-CAP-LTW   Document 86   Filed 03/21/23   Page 281 of 315

Eddy Perez
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

August 15, 2022

[kindly - knowledge]

Page 25

**kindly** 53:13
**kingsada** 243:18
  243:20
**kitchen** 224:18
**knew** 47:11,21
  51:16 53:19
  61:10 114:17
  127:4 131:25
  194:25 207:16
**knickknack**
  65:12
**know** 6:14 9:19
  10:1,11,13 14:22
  17:24 18:1,16,19
  18:20 20:11,12
  21:1,16,18 23:1
  23:3 24:15 25:6
  25:16,17 26:9
  27:23,24 29:3,3
  30:2,12 31:4,16
  31:21,23,23,25
  32:9 33:2 34:10
  34:16,19,19
  36:15 37:12,13
  37:14 38:15
  39:3,5,8,9,9 41:1
  41:2 43:2 50:2,5
  50:6 51:8,9,14
  51:15,16 54:23
  58:5,14,14 59:5
  59:23,24 60:2,16
  60:19 61:16,19
  62:8,14 64:11,19
  64:20 65:4,12,14
  66:18 71:22
  72:22 73:5 74:6
  75:7 76:10
  77:22 78:3,8

79:6,18,21 83:16
84:21,22 85:22
86:9 87:7 88:7
88:14,23 89:2,3
89:7 91:3,4,8,22
92:15 95:1,6,14
95:21 96:9
99:22 102:6,8,25
103:2,7,8 105:3
105:15,16,18,25
106:6 107:6,8
108:3,15 109:1
110:6,9,9 111:3
111:5,6,7,12,13
111:16,17 112:4
112:4,5,6,7,10
112:11,14,16,17
112:18 113:11
113:12,13,15,22
113:25 114:7
115:4,7,9 117:24
118:15 119:1,3,6
121:12,14,18,20
121:21,25 122:4
122:15,20 123:7
124:25 125:1,12
125:12,13,14
126:9,10,11,14
127:4,15 130:12
130:23 133:25
134:16 138:17
138:19,23,24
142:12 143:24
147:10 148:5
149:9 150:3
151:25 152:21
154:21 155:20
156:2 157:15,16

157:16,21
158:10,21 159:7
161:15,15,16,17
161:23 163:11
163:14 164:25
164:25 166:18
166:19,20,21
167:24 168:4,10
169:10 171:2,5,9
172:4,23,25
173:2,6,9,12,12
173:13 174:3,4,4
174:6 175:2,3,6
175:21 178:15
178:18,19
179:11,11,12,15
179:18,19
180:17,24,25
181:9,21 182:15
182:15,16,20,21
184:10 185:13
186:3,15 187:1
188:20 189:22
189:23 190:1,5
191:9,9 192:17
192:22 193:7,15
193:16 194:4,4,5
194:5,8,9,15
195:15,17,18,18
195:20,22
196:25 197:7
198:14 199:2,15
199:16 200:3
201:16 202:7
203:17 205:18
206:12,25 207:2
207:19 210:6,7
211:2,21,22

212:5,6,17 213:4
213:5,24 215:21
218:15 221:10
221:11,13,15,18
221:20,20,21,24
222:4,7 223:1,3
223:20 224:2,19
225:1,3,11 226:6
226:19,24 227:3
227:20,21 228:4
229:3,22,22
231:1 232:4,20
234:3,9 235:7
238:23,24 240:1
240:6,10,11
241:4,14 243:10
243:23,23,24
244:3,24 245:1,2
245:12,19
246:20 247:5,16
247:17 248:14
248:21
**knowledge** 22:5
26:3 27:12
37:17,22 38:3,13
38:18,24 49:3
50:1,16 60:8
66:9,11 71:24
73:2 79:3,21,23
79:24 86:23
87:3,4,13,23,25
89:25 101:25
121:5 145:15
146:25 155:7
156:10 170:22
171:12 174:1
175:22 187:15
194:3 201:1

Case 1:21-cv-04247-CAP-LTW  Document 86  Filed 03/21/23  Page 282 of 315
Eddy Perez                        August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

[knowledge - licensed]                                         Page 26

205:13,20
222:22 223:5
244:18,19,23
245:15 246:3,8
248:5 252:9
253:6
**known**  36:22
47:5
**knows**  66:7
170:12
**kortas**  244:24,25
245:7,17 246:1,4
246:11,16 249:3
**kreiner**  3:4,5
7:19,20,20 47:20
98:22 99:8,11
108:21,25 109:6
110:1 128:8
142:20,24 250:4
251:5
**kreinerlawfirm...**
3:9
**kunjan**  17:9
**kushner**  246:18
246:19 247:4,9

**l**

**l**  2:12,19 4:13
7:15 52:24
**labeled**  214:17
**lack**  122:9
**lacked**  201:2
**lacorte**  165:5,10
165:11
**lady**  85:23,24
86:3
**laid**  175:19

**language**  54:11
76:5 241:24
**largest**  182:24
**lastly**  38:22
**late**  16:25 21:7
61:5 67:2,5 68:2
69:4,9 81:3 82:1
83:24 84:18
85:2,8,15 170:16
170:20 174:17
176:1,15 178:3
181:3 182:13
201:18
**latina**  85:24 86:3
**law**  2:7 12:21
49:22 77:20
163:12
**laws**  5:20
**lawsuit**  70:14
71:15 207:14,22
**lead**  27:6 29:16
198:25 199:7
**leader**  161:23
176:19
**leaders**  201:16
203:25
**leadership**  17:2
67:12 104:18
225:2
**leading**  29:20
35:23 46:3
106:24
**leads**  68:11
185:13 191:1
**leaning**  193:13
**leaping**  204:9
**learned**  121:1
124:10 125:16

129:7 130:9
131:7 135:8
139:4 206:8
222:21 229:8
235:8
**learning**  124:6
205:22 208:3
**lease**  224:2,5
**leased**  224:3,3
224:23
**leave**  40:14
53:13 104:24
132:2 134:5,11
229:18 236:16
**leaves**  125:1
134:19
**leaving**  21:22
98:16 103:25
106:20 124:18
125:4 249:21
**led**  17:4 26:20
29:8,10,11,19
49:6 115:23
136:16
**left**  7:7 91:12
103:19 116:7
122:20 123:14
123:19 124:7,10
125:10 134:4
153:3 163:15
179:25 186:21
206:17 220:5
**legal**  7:8 10:25
47:19 96:1,2,5,8
96:13 97:2,12
153:18,19 154:7
154:10,12,24
155:10 157:7,20

157:25 158:3,6,8
158:20 160:11
167:22,24
206:16 207:25
208:7 213:8
248:13,15,18
249:21 254:23
**legality**  222:1
**legare**  2:4
**legit**  160:10
207:18
**lender**  14:8,16
**lender's**  36:20
**lending**  43:5
45:13 243:2,14
243:21
**letter**  198:21
**letters**  50:12
**letting**  108:3
**level**  11:23 41:10
42:6,10,16 44:5
44:8 57:4 59:4
59:19 67:16
107:18 160:24
161:5,23 163:3,7
187:22 209:19
217:23
**leveled**  188:11
**levels**  186:19
**leverage**  232:21
**lexie**  197:5
**liability**  15:15
**license**  13:3,5
35:1 36:20,22
57:2
**licensed**  14:17
30:19 33:6

Eddy Perez                                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[licenses - lot]**                                                    Page 27

**licenses** 12:17 14:19 23:22 29:4,25 30:12,14 30:18 32:12 35:17
**licensing** 13:9 23:4 25:8,9 34:2 34:16,23 35:5,15 57:10
**licensure** 31:20 33:13 36:5
**lie** 196:7
**lied** 126:22
**life** 135:22 213:14 239:22
**light** 210:9
**likes** 96:21 184:13 202:4,5
**limit** 119:13
**limited** 207:23
**line** 4:22 95:12 100:11 101:20 127:19 142:17 155:19 183:7 188:8 201:3 203:5 231:23 248:12 255:4,7 255:10,13,16,19
**lined** 53:14
**liners** 126:17
**lines** 126:24 127:1 157:4
**link** 84:11,19 85:1
**linkedin** 165:4
**list** 39:22 40:2
**listed** 178:7

**listen** 160:3 236:11
**literally** 9:2
**literature** 192:5
**litigation** 54:9
**little** 8:25 14:22 50:4 78:5 118:25 185:13 191:15 201:20 214:2 224:8,17 225:8 233:13 241:3
**live** 56:19 148:6 148:7 189:25 194:11,12 199:18
**lived** 55:24 161:6
**lives** 96:25
**llc** 1:8 2:4,10 3:2 5:8 254:4 255:1 256:1
**llc.com** 2:7
**llp** 1:17 2:13,20
**loan** 68:22 70:19 70:20 83:5
**loans** 49:11 60:17 70:4,6,9 71:17 72:15 73:15 74:12 76:6,16 77:12 78:21 79:8 80:4 82:3,4,5 87:16 87:21,21 88:1,21 89:17 192:10,11
**located** 185:7 247:18

**location** 1:17 55:23 56:1,8 63:6
**locations** 56:22 91:6 183:8
**log** 29:21
**logged** 29:12
**logistical** 9:11
**long** 13:18 18:3 18:4,8,15 20:12 21:4 24:13 47:5 53:23 65:11 74:6,8 129:15 160:19 171:5 177:20 247:4
**longer** 163:24 165:21
**look** 39:24 40:2 43:6 64:5 81:20 81:22 92:14 99:17 100:24 101:4,6,7 126:9 138:24 158:20 159:9 160:20 163:9 165:5 166:19 169:9,10 194:14 202:8 214:19 227:5 228:3 234:5,6,7 237:9
**looked** 69:5 73:1 73:1 80:6,25 81:18 84:17 132:21 144:22 204:20 213:3,4
**looking** 40:5,9 43:20 85:13 99:21 126:18,21

**144:19**
**looks** 227:9 228:19
**lord** 34:9 42:18 107:15 194:6
**los** 68:22
**lose** 23:21 30:14 32:12 196:6
**lot** 10:9 13:1,9 15:7,8 16:2 19:20 22:22 24:6 28:3,3,4,4,6 34:17 35:23 41:3,13 46:2,4 53:25 57:22 58:5,12 59:8,12 59:13,14,15 65:25 66:5 72:4 72:7 77:25 86:9 87:14 88:11,11 88:14 89:4 109:17 112:8 113:15 150:7 156:25 157:7 158:9 159:16 170:12 182:17 182:20,22 184:13 186:18 187:15,19 189:23 193:12 195:22,24 197:1 197:4,8 198:18 201:19 218:16 218:17 219:5 221:9 222:2 224:7 225:9 232:5 240:11

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

[low - mccart]

Page 28

| | | | |
|---|---|---|---|
| **low** 15:14 17:4 | 229:6,11,15,25 | **management** | 233:9 237:23 |
| 78:22 80:23 | 230:1,5,17,24 | 179:15 | 238:2 239:15 |
| **ltw** 1:9 | 231:9 233:12,16 | **manager** 184:22 | **market** 165:23 |
| **lucrative** 186:16 | 233:17,18 234:1 | 184:25 185:10 | **marketing** 41:8 |
| **lunch** 129:23 | 234:5,13,16,18 | **mancuso** 47:18 | 41:10,17 63:14 |
| 156:1 | 234:19,20 235:5 | 48:6,7 | 63:17,25 64:7 |
| **lunches** 59:5 | 235:6,10,11,19 | **mandate** 227:8 | 192:15 197:8 |
| **lying** 196:6,14 | 235:23,24 236:1 | **manner** 5:21 | 224:11 231:21 |
| 196:15 216:15 | 237:10 241:6,20 | **march** 13:22 | 234:10 235:15 |
| **lyons** 34:6,8,22 | 241:22,23 242:7 | 41:21 42:2,16,24 | 235:15,20 |
| 35:4,9 53:18 | 242:7,12 | 43:15,22 44:11 | 236:23 239:4 |
| 158:9 | **mails** 159:2 | 44:13,17,25 45:2 | **marking** 227:24 |
| | 194:8,17 195:18 | 45:5 46:14,14 | 239:14 |
| **m** | 196:17,25 | **mark** 1:9 2:11 | **married** 150:9 |
| **m** 4:13 234:20 | 198:11 | 5:8 8:17 46:21 | **marta** 148:8 |
| 234:23,25 | **maintain** 33:13 | 46:23 47:11 | **mask** 227:7,8 |
| **m.o.** 248:2 | 35:1 36:5 | 101:12,15 | **matter** 5:7 39:7 |
| **ma'am** 159:24 | **major** 11:25 | 103:10 104:25 | 49:5,14 72:10 |
| **mail** 4:7,9,10,15 | **majority** 10:12 | 105:23 112:5 | 111:21 157:7 |
| 63:15,21 64:2 | 16:15 | 115:22 116:5 | 160:11 164:14 |
| 65:5,7,11,14 | **making** 9:5 54:5 | 118:9,20 127:2 | 164:17 167:22 |
| 67:23 94:13,24 | 63:9 73:14 | 130:11,12 131:6 | 167:24 175:17 |
| 95:2,8 98:17 | 77:11 86:11 | 131:7,24 134:11 | 196:2 200:21 |
| 99:13 100:3,16 | 97:18 122:14 | 135:13 136:4 | 206:16 248:18 |
| 100:21,23 101:3 | 159:21 178:13 | 140:13 145:21 | 249:21 |
| 101:14,16,20 | 180:6 204:15 | 146:17 162:9 | **matters** 174:5 |
| 102:4,10,19,23 | 205:2 208:16 | 164:20,22 | 231:2 232:5 |
| 103:13 108:24 | 209:22 211:19 | 165:13 166:3,10 | **mba** 12:10 |
| 108:25 109:23 | 238:12,18 | 166:12,16 | **mccart** 1:5 2:2 |
| 116:6 158:19 | 249:18 | 167:15 168:7 | 5:7 7:23 8:16 |
| 159:6,13 168:12 | **man** 40:24 77:19 | 169:16 196:22 | 46:18 57:20 |
| 168:18 169:6,8 | 107:10 109:16 | 198:1 215:4,6 | 58:9 59:20 60:8 |
| 194:9 195:3,14 | 109:17,20 | 219:24 220:2 | 61:14 66:20 |
| 198:21 199:17 | 114:14 127:25 | 223:20 233:7 | 67:1,5 69:6,18 |
| 209:19,25 210:2 | 157:14 202:16 | 250:2 | 69:24 71:16 |
| 210:13 211:19 | 247:4 | **mark's** 223:1 | 72:11,25 73:4,12 |
| 214:13 223:14 | **manage** 179:7 | **marked** 214:9,12 | 74:3 75:15 |
| 228:17,17,21,25 | | 225:18,20 228:1 | 78:16,24 79:25 |

Eddy Perez
August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

| | | | |
|---|---|---|---|
| 80:7,12,16,20,25 | 173:16,25 | 105:21 108:5,25 | 56:17 58:11,15 |
| 82:2 85:21 | 174:10,17,22 | 109:23 110:19 | 58:21 62:11 |
| 86:17 90:21 | 175:11 176:1,15 | 111:24 117:4 | 63:11 64:9 |
| 91:17,23 94:5,6 | 178:15 179:7 | 118:17 120:6,12 | 66:14 69:1 |
| 94:16,17 95:3,9 | 180:3,15 181:4,7 | 121:8,10,23 | 71:21 83:4 |
| 97:13 98:9,23 | 181:13,18,23 | 125:17 127:1 | 91:11 97:5 |
| 99:6,12 100:4 | 182:4,5 183:22 | 130:10,21 131:8 | 101:10,21 |
| 103:1 106:3,10 | 186:4,11 187:23 | 133:13 135:25 | 102:24 107:21 |
| 110:2,13 116:18 | 188:14 190:13 | 136:17 137:18 | 109:1 110:20 |
| 116:25 117:2,6,8 | 192:8 193:1 | 141:24 142:1 | 112:7 113:19 |
| 117:20,22 118:5 | 194:21 196:19 | 143:22 146:5,16 | 116:12 120:9 |
| 118:11,23 | 197:21 198:5,24 | 151:21 153:16 | 121:3 122:7 |
| 119:14,19,24 | 199:5,12,24 | 155:12 156:11 | 124:12 131:17 |
| 121:19 123:2,14 | 200:22 201:9 | 156:16,21 | 132:3,6,8 134:10 |
| 123:19 124:7,10 | 204:3,14,15 | 157:11 159:23 | 134:12,14 |
| 124:17 125:4,10 | 205:2,21 206:5 | 160:6,8,16 | 138:15 140:10 |
| 131:14 132:14 | 207:14 208:4 | 162:13,21 | 142:2 147:4 |
| 132:25 133:5,23 | 213:20,20,22 | 166:10,12 | 148:9 162:8 |
| 134:8,25 135:9 | 214:5 215:1,3,8 | 167:17 168:16 | 163:24 166:18 |
| 135:18 136:1,15 | 215:16 216:7,10 | 168:22 170:4 | 168:3,16 170:10 |
| 137:20,25 138:2 | 216:13 220:9,22 | 177:8,13,17 | 170:21 172:5 |
| 138:9 139:13,21 | 220:24 221:6 | 179:15 180:22 | 173:1 174:24 |
| 140:25 141:2 | 222:17,25 223:6 | 186:22 187:6 | 176:18 178:18 |
| 142:8 143:17 | 223:12,18,24 | 196:1,9 200:19 | 178:23 181:19 |
| 145:13,18,23 | 233:23 235:6 | 202:13 204:19 | 184:21 192:1 |
| 147:3,9,17 | 237:11 243:3,9 | 205:7,14,25 | 195:2 204:23 |
| 148:15,24 | 243:19 244:2,7 | 207:5,22 209:20 | 206:4 211:11 |
| 149:14,20 150:1 | 244:14,21 245:7 | 213:2 216:17 | 212:16,19 215:4 |
| 150:6,15,19,20 | 245:18 246:1,5 | 242:21 248:2 | 219:5,14 221:11 |
| 150:24 151:3,6 | 246:16,22 247:1 | **mccartney** 191:7 | 222:13 223:20 |
| 151:13,23 | 247:9,13 248:1 | **mccarty** 191:8 | 224:12,19 |
| 152:10,24 153:4 | 249:7,20 254:4 | **mean** 14:3 23:1 | 225:25 230:15 |
| 153:20 155:1 | 255:1 256:1 | 23:3 29:11,13,19 | 240:4,6 246:12 |
| 166:17 167:3,9 | **mccart's** 11:15 | 33:21 34:15,17 | 247:19 248:17 |
| 167:12 170:8,15 | 66:10 68:4 | 41:1,3 44:4 48:5 | 249:10 |
| 170:20 171:2,10 | 93:13 94:2,23 | 48:21 50:3,7,7 | **meaning** 72:18 |
| 171:21 172:2,8 | 95:18 97:24 | 50:20,22,23 | 173:15 225:6 |
| 172:15,21 173:8 | 100:16 105:13 | 51:12 54:15 | |

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[means - mmm]**

Page 30

| | | | |
|---|---|---|---|
| **means** 5:22 159:13 | **mental** 193:8 240:17 242:11 | **microphone** 6:1 6:8,10 | **minor** 12:2 |
| **meant** 167:2 | **mentally** 161:24 | **microphones** 7:1 | **minute** 155:21 155:22 200:9 |
| **measurable** 72:12 76:15 77:16,25 192:5 | **mention** 122:18 | **microsoft** 40:3 | **minutes** 17:16 17:18 |
| **measurables** 75:2,16,22,23 78:13 | **mentioned** 44:8 45:16 91:3,5,5 103:10,10 129:5 163:1 170:7 181:1 221:9 | **mid** 20:17,20 61:4 63:12 92:8 92:22 93:10,21 94:15 175:1,3 176:2 178:4,24 178:24 179:5 181:3 | **misdemeanor** 50:8 |
| **meet** 67:8 69:24 72:12 201:11,12 201:13 | **mercedes** 217:3 | **middle** 188:2 226:18 | **mispronouncing** 215:24 |
| **meeting** 63:5 65:20 68:1,11,12 69:18 83:15,24 84:19,20 85:8,15 86:16 92:23,23 93:10,18,18,24 93:24 96:19,19 96:24 181:4,23 182:3,4,5,13 183:7 188:4 192:5 200:23 | **merit** 113:25 114:1 115:24,24 116:2,11,13,14 120:15 122:10 126:19 138:20 139:5 144:23 152:20 153:1,8 153:17 155:12 155:15 | **mike** 244:24,25 245:1,17 246:1,4 246:6,15 249:1,3 | **missed** 23:17 |
| **meetings** 81:16 84:5,12 181:6,10 181:13 183:13 183:19 186:3 | **merited** 201:4 | **milking** 67:18 | **misstating** 215:25 |
| **melissa** 52:22 55:18 | **mess** 92:19 191:16 | **million** 16:5,10 | **mistaken** 71:20 71:21,23,25 72:7 72:15 75:7 149:4 |
| **memory** 40:13 122:3 124:20 164:12 248:10 | **message** 193:14 236:6 | **mind** 7:5 17:10 112:23 138:25 153:11 | **misunderstand** 177:10 |
| **men** 132:5 135:18 137:2 138:1,21 140:1 145:18 151:24 152:11 | **messages** 195:18 195:19 196:17 198:22,22 | **mine** 36:15 92:20 173:22 232:9 | **mlk** 61:23 |
| | **met** 33:17 67:9 72:25 85:3 111:6,7,16 125:13 181:17 181:20 182:16 202:17,20 221:15 | **minghini** 17:25 18:3,4 20:7 34:7 38:21 52:15,19 52:20 101:9 103:11 104:19 105:8 112:11 113:3 115:4,12 115:18 120:5,11 169:12 | **mm** 16:7 22:1 41:23,25 43:16 52:24 66:19,21 74:4,6 75:11 78:18 95:24 101:24 103:14 104:4,6,9 105:4 105:9 109:24 115:1,14 124:8 126:6 132:12 146:2 169:2 177:24 188:6 192:7 204:4 216:20 233:15 242:1 |
| | **metric** 72:11 | **minghini's** 19:24 | |
| | **michael** 162:5 | **minimal** 15:15 | **mmm** 44:2,4 48:21 108:22 120:20 124:15 146:22 209:23 |
| | **mick** 234:8 235:14,18,24 | **minimum** 230:12 231:13 | |

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[mmm - name]**

Page 31

213:15 227:12
**moloughney** 1:9
2:11 5:8 8:17
46:21,23 47:2,17
48:2,4,8,16,17
48:18,19 51:19
55:19,22,25
57:12 102:5,12
102:20 106:4,11
112:19 116:17
116:25 117:7,9
117:21,23 118:4
118:11,18,24
119:14,19,25
120:7,13 127:2
130:11 132:15
133:1,7,8,24
134:9,25 136:2
136:16,18
137:19,21 138:3
138:10 139:13
139:23,24 141:1
141:2,24 142:9
143:18 145:13
145:22 146:17
150:16 151:7,15
151:22 160:6,8
160:14 162:12
163:20 167:1
169:16 198:1
219:24 220:3,21
220:25 221:6
222:17,25 223:6
223:7,12,18,24
**moloughney's**
50:18 52:1,3,9
55:16 147:2

**moment** 66:17
71:2 74:20
75:18 119:12
139:10 174:8,15
183:16 199:21
204:6 205:4
207:4 216:1
**moments** 76:3
**monday** 1:15
**money** 15:4
172:10,12 173:4
244:17 247:20
**monitoring** 60:4
**month** 60:17
68:18,21,23,25
70:4,6,10,17
71:20 73:16
74:13 76:17
77:13 78:21,25
79:1,5,9,10 80:5
80:13 81:1 82:4
82:5 87:17 88:1
89:18 99:16
106:21,23
163:19 175:4,5
178:24 179:1,8
179:13 185:12
192:10,11
**monthly** 15:25
66:15 72:13
**months** 22:25
60:16 69:3,6
78:21 105:5
144:18 150:3
170:23 187:17
187:18 188:4
207:8 213:2

**moons** 51:12
**moral** 247:22
**morning** 5:2
7:19 8:13,14
100:2 146:10
222:24
**morpac** 59:11
**mortgage** 1:8
2:10 3:2 4:18
5:8 8:17 11:5,8
12:9,15 13:14
14:8,8,11,13,15
14:16 17:22
23:7,25 24:14
25:2,18 26:25
27:4 31:2 32:20
35:15 36:20,22
37:23 38:18,24
50:17 109:18
148:16 159:8
164:24 196:3,10
197:21 198:24
208:16,22 209:4
209:9,20 210:11
211:14,24
212:10 213:14
213:19 215:3
216:18 221:23
223:25 224:4
226:11 229:19
230:8 231:20
235:2 238:9
244:13,20
247:12 249:19
254:4 255:1
256:1
**mortgage's**
27:22 28:12,17

28:22 29:9
30:10 31:13
**mother** 240:20
**motivate** 232:25
233:3
**motivates** 190:3
**mountaintops**
195:7
**move** 10:19
55:13 95:15
200:3
**moved** 24:6
47:14 72:25
73:5 75:8 78:7
178:16
**moving** 46:6
89:5 176:4
178:10,11 188:8
203:4
**multi** 62:18
**multiple** 22:20
77:4 102:16
111:6 132:22
172:23 250:23
**myers** 56:10

**n**

**n** 2:1 3:1 4:1 5:1
17:12,12
**nailed** 100:1
**name** 5:3 7:8
8:15 14:9 17:11
52:22 63:24
86:1,2,6,8,10,12
90:23,24 91:1
105:22,22 112:1
112:2,13 162:5
165:2 184:9,11

Case 1:21-cv-04247-CAP-LTW   Document 86   Filed 03/21/23   Page 288 of 315

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[name - obligated]**                                              Page 32

185:18,19,21
186:5,8,9 191:3
191:5,6,11,15
215:24,25 226:7
226:23 234:9,10
234:11 235:13
235:25 236:12
243:12,16
247:16
**named** 68:23
163:22 184:16
185:4
**names** 85:22
90:7 91:7
115:19 132:5
158:16 191:9,16
244:4
**naples** 56:12
**national** 35:15
178:13
**nature** 9:2 35:19
96:20 127:6
132:17 134:4
138:23 146:13
161:1,10 168:21
175:10 245:8
**necessarily** 31:4
72:22 73:3
**necessary** 256:6
**need** 9:25 10:3,8
10:10 34:25
106:25 108:15
111:20 113:25
119:3 126:19,20
148:12,24 156:2
157:7,8 160:2
166:20,21
188:16,23

191:21 196:20
199:14 230:1
237:17 239:8
241:14,19
**needed** 31:20
98:14 192:13
196:4 199:25
232:2
**negative** 160:16
232:15 233:5
239:3
**negotiation**
33:15
**neither** 252:10
253:7
**neuter** 203:25
**never** 26:12
59:24 77:20
79:25 80:12,16
81:18 92:21
96:21 109:2
204:18 205:17
216:9,12 232:17
238:23 244:19
249:8
**new** 30:16 36:14
44:13 56:1 65:1
67:12 101:11
162:20 163:12
163:12,12
165:17 178:7
191:2 205:22
**news** 53:21
**nexa** 245:5,14,15
**nice** 225:11
**night** 134:11
146:10 222:10

**nine** 209:21,22
210:15,25
211:20
**nitpicky** 9:5
**nmls** 35:15
**nn** 44:2,4 48:21
108:22 120:20
124:15 146:22
209:23 213:15
227:12
**nobody's** 240:18
**noises** 7:2
**non** 118:6
119:23
**nope** 79:11,13
214:15 242:25
**norm** 183:2
**northeast** 1:19
5:10
**northern** 1:2
**notary** 1:21 5:11
252:18 256:13
256:19
**note** 9:4 254:10
**noted** 36:11
256:7
**notes** 112:9
**notice** 94:22
106:2 160:13
**notifications**
190:25
**notified** 168:3
**noting** 9:4
**notwithstanding**
193:19
**nowadays** 134:3
**nuance** 46:4

**number** 47:8
70:9,16,17,21
71:17,19 72:11
72:14 73:15
74:12 75:22
76:5,16,19 77:12
78:22 87:25
89:21 192:10,11
192:19 209:22
218:1,4
**numbers** 62:5
68:12 81:17
121:3 201:14
**nyree** 19:14
52:14,21 101:11
111:5 114:6
120:10 125:13
142:3 144:2,3,9
146:18 152:5
156:10
**nyree's** 155:14

**o**

**o** 4:13 5:1 52:24
**o'clock** 142:15
**oath** 247:24
**oaths** 5:12
**object** 70:24
129:13 141:5
**objecting** 129:16
**objection** 5:13
7:25 73:17
76:20 77:17
82:6 87:18
114:11 141:8
153:24 208:23
**obligated** 188:16

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[obligation - okay]**

Page 33

**obligation**
189:20 190:19
192:12
**obligations**
180:3
**obstacle**  239:21
**obviously**  16:2
58:16 98:19
107:12 112:5
113:12 160:18
168:12 178:20
206:6
**occasion**  98:8,10
98:21 109:21
110:4
**occasions**  156:24
**occur**  207:23
**occurred**  27:10
116:17 117:8
118:23 119:18
168:23 174:12
205:10
**occurring**  177:8
**october**  69:11,13
81:2 82:1
**offense**  54:6
161:3 219:9
**offer**  151:3
165:23 186:16
230:11
**offered**  26:25
27:15 31:2,19,21
148:9 150:25
**offering**  25:18
150:22 151:6
**offers**  22:17
23:25 48:24

**office**  14:12 56:9
56:13,17,20,25
57:1,5,15,17,20
57:24,25 124:16
150:3 179:19
184:7,17 201:20
203:14,20,21
204:7,14 225:8
**officer**  18:6,7,9
19:25 20:8
26:11 38:21
41:13,19 42:23
43:3,3,5,9,23,24
43:24,25 44:9,10
44:24 45:4,12,13
45:16 47:16
70:19,20 157:21
158:7 176:3
178:7 190:24
192:16 196:23
252:1,2
**offices**  63:5
**officially**  178:16
**oh**  6:11 10:11
11:18 17:17
19:8,16 20:23
21:15 22:19
29:14 34:9
40:24 41:2,11
42:18 52:11
54:10 60:2
62:22 64:22
73:19 82:18
93:4 99:22
104:11 107:15
109:7 114:6
117:18 125:12
128:7 137:8

154:5 165:3,4
184:10 185:18
189:8 190:21
191:7 211:5
212:23 217:20
222:12 234:5
237:18 246:20
247:4 248:15
250:15,18,18
**okay**  6:6,11 7:11
8:21 9:23,25
10:7,20 11:1,4,7
11:11,14 12:3,6
12:13 13:18,23
13:25 14:9,14,20
14:24 15:16,20
16:4,6,13,22
17:5,14,17,20
18:3,22 19:13
20:3,13,15,22,25
21:4,13,21,25
22:4,9,23 23:6
23:12,24 24:13
24:16,20 25:13
25:17 26:13
27:3,9,12,17
28:8,14,20 29:1
29:5 30:2,5,8,21
31:1,10,16 32:1
32:8,13 33:10
34:1,12,21 35:3
35:9,20 36:1,8
36:11,14 37:9,16
38:22 39:13,17
39:19 40:5,11,18
41:15,21,24 42:6
42:10 43:19,21
44:16,21,23 45:4

45:11,15,19,21
45:22 46:8,13,17
46:20,23,25
47:15,19,24 48:1
48:7,14,15 49:2
49:23 50:8,16
51:18,24 52:15
52:19 53:25
55:3,4,11,15,21
55:25 56:2,7,13
56:16,20,24 57:4
57:14,19,24 58:4
58:19,25 59:17
59:25 60:22
61:8,14,20 62:9
62:14 63:4,10,17
63:24 64:12,17
65:7 66:8,8,25
67:4,21 68:1,19
69:17 71:1 72:9
73:11 74:5 76:1
76:9,25 77:19
78:2,16,23 79:3
79:7,14,18 80:3
80:15,24 81:14
81:17,24 82:8,13
82:19 83:3,14
84:8,14,17,24
85:6,15 86:16,21
87:15 88:3,5,25
89:9,14 90:2,8
91:10,14,21 92:2
92:9,22 93:2,16
93:20 94:4,11,14
94:22 95:2,8,17
95:24 96:13,18
96:24 97:11,20
98:7,21 99:1,4

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[okay - online]**

Page 34

| | | | |
|---|---|---|---|
| 99:16 100:6,13 | 146:14,19 | 188:3,12,19 | 238:20 239:1,7 |
| 100:15,22 101:2 | 147:15,21 | 189:6,11,14,18 | 239:10,13 240:4 |
| 101:9,15,18,23 | 148:14,19,22 | 189:25 191:3 | 240:8,15 241:5,6 |
| 101:25 102:11 | 149:11,16,24 | 192:3,25 193:18 | 241:18 242:6,12 |
| 102:18,22 103:4 | 150:5,13,24 | 194:2,13,17 | 242:17,20 243:6 |
| 103:9,20,23 | 151:3,5,9 152:6 | 196:1 197:12,14 | 244:24 245:6,18 |
| 104:3,23 105:4,7 | 152:16,23 153:3 | 197:15,17 | 246:18,21,24 |
| 105:12,19 106:2 | 153:19 154:12 | 198:19 199:3,10 | 247:11,22 249:3 |
| 106:15,19 107:2 | 154:20,23 155:9 | 199:20 200:4,5 | 249:6,16,25 |
| 107:5,17,23 | 155:17 156:9,18 | 200:10,17 201:6 | **old**  37:5 80:13 |
| 108:2,21,23 | 157:10,17,24 | 202:10,21 204:2 | 127:25 |
| 109:11 110:12 | 158:2,23 159:1 | 204:13 205:1,6 | **oldest**  245:22 |
| 110:17 111:3 | 159:20,25 | 205:10,20 | **once**  41:4 95:19 |
| 112:17,24 113:6 | 160:14 161:13 | 206:18 207:10 | 132:2 166:22 |
| 114:3,7,23 115:4 | 161:19 162:1,20 | 207:12,17 208:2 | 173:3,13 174:6 |
| 116:3,8,16,23 | 162:25 163:16 | 208:9,14,19 | 181:21,22,24 |
| 117:3,13 118:2 | 163:20 164:13 | 209:3,24 210:4 | 200:3 228:4 |
| 118:10,21 | 164:19 165:2,12 | 213:12,18 214:8 | 230:14 236:7 |
| 119:21 120:4,11 | 165:25 166:2,8 | 214:19 215:6 | 241:11 249:1 |
| 120:17,21,25 | 167:1,5,14 168:2 | 216:17 217:1,4,7 | **ones**  41:15 58:3 |
| 121:15 122:24 | 168:15 169:6,15 | 217:9,18 218:2,9 | 67:24 80:22 |
| 123:4,8,11,17,25 | 169:24 170:3,14 | 218:20 219:7,7 | 84:6 127:13 |
| 124:9,17 125:4,9 | 170:18 171:5,9 | 219:20,25 220:8 | 183:3 227:22 |
| 125:15 126:2,23 | 171:16,20,25 | 220:15,19,24 | 231:24 232:15 |
| 127:17 128:22 | 172:7,13,13,25 | 221:3,18 222:4,9 | 233:5 |
| 129:14,15,20 | 173:6,15,20 | 222:16,20 223:4 | **ongoing**  66:14 |
| 130:5,17,25 | 174:8,11,14 | 223:23 224:4,23 | **online**  4:17 |
| 131:13,20,23 | 175:6,8,25 | 225:17 226:4,9 | 24:16,23 25:4,14 |
| 132:3,24 133:4 | 176:13,21 177:6 | 226:16 227:1,13 | 28:24 29:1,8,12 |
| 133:21 134:5,6 | 177:12,16,22 | 227:20,22 | 29:21,22 30:3,5 |
| 134:24 135:3,3 | 178:2,15 179:5 | 228:16,20 | 30:9,22 31:1,12 |
| 135:15,23 | 180:1,14 181:1,9 | 229:10,15,24 | 31:17 32:3,20 |
| 136:11,22 137:8 | 181:12,16,22 | 230:3,20 231:9 | 35:21 64:9,25 |
| 138:6,12 139:6 | 182:3,11 183:5 | 231:16 232:12 | 89:4 122:14 |
| 139:18 140:17 | 183:12,16,24 | 233:7 234:4,18 | 230:7 231:19,25 |
| 140:20 141:15 | 184:5,25 185:9 | 235:5,10,23 | 232:5,15 233:4 |
| 144:24 145:3,10 | 185:15 186:10 | 236:4,23 237:6 | 238:8,13,18 |
| 145:16,25 | 186:20 187:12 | 237:16,19 238:6 | 240:23 |

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[open - partner]**

Page 35

**open** 27:25 38:8
66:4
**operations** 59:19
82:16 194:24
**opinion** 134:8
188:10
**opportunity**
21:24 201:12
203:19 250:9
**opposed** 29:19
40:6 50:19 59:1
59:18 65:20
96:19 109:14
111:23 125:22
168:9 184:22
201:7 241:21
**ops** 61:2 72:24
176:8,10 185:1
**order** 33:12 37:9
68:14 69:24
73:16 74:13
76:7,17 77:13
250:13,24 251:4
**organization**
13:6,8 17:3
30:15 35:22
36:2 43:14 62:3
63:9 90:6 189:9
190:8 193:8
229:5
**organizations**
189:23
**original** 159:25
229:15 234:21
**originated** 152:6
**origination**
68:22 83:5

**originations**
72:3,3
**originator** 13:6
**originators** 25:9
72:2
**orlando** 91:5
182:17 184:8,17
185:8
**outcome** 160:13
252:15 253:12
**outgoing** 218:17
**outlets** 139:3
**outside** 53:14
135:21 146:9
157:3 158:4
167:19 169:10
179:19 194:23
195:2 215:13,21
223:1
**outward** 190:25
**outwardly**
132:20
**overall** 59:19
161:23 229:13
242:11
**overcome**
239:21 240:3,11
**overestimating**
150:10
**overflowing**
78:4,24
**overhear** 204:15
**overheard**
204:18 213:12
213:18 214:5
**overly** 126:10
**overruled** 77:21

**overseeing** 60:25
91:4
**oversees** 18:19
**overwhelmingly**
189:4
**owned** 223:25
**owners** 158:24
**owning** 36:25

**p**

**p** 2:1,1 3:1,1
4:13 5:1
**p.m.** 145:5,8
156:4,7 200:12
200:15 251:7,9
**pace** 42:20
**padilla** 86:13,14
86:19,22 87:3,25
88:21 89:11,17
90:22,25 183:22
186:4 187:13
188:3
**padilla's** 89:24
**page** 4:2,6,14,22
209:21 210:14
225:22 227:5
255:4,7,10,13,16
255:19
**paid** 15:5 53:13
**panicked** 224:15
**paper** 179:17
**par** 155:8
**paralegal** 251:3
**parameters**
175:23 229:21
232:11
**pardon** 54:11

**parentheses**
234:7,22,23
**parked** 221:14
**part** 23:22 30:17
33:22 35:3
36:22 48:23
49:9 63:5 66:7
88:15 111:9
116:22 118:12
122:9 125:25
132:2 134:21
135:4 138:19
141:19 144:14
144:16 146:21
162:17 164:8
175:21 179:23
182:9,11 188:24
188:24,25 189:4
191:1 192:15
196:7 201:4
216:17 219:2
229:13 231:3,7
231:10 239:20
240:7
**participate**
209:13 229:8,9
**participated**
213:12,18 214:4
214:23 219:16
**particular** 133:8
133:10,11
230:24 232:13
233:2 239:2
**parties** 5:14 7:4
55:11 252:11,14
253:8,11
**partner** 16:25
17:7 44:15 46:3

Eddy Perez
August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[partner - period]** Page 36

217:14
**partner's** 28:5
**parts** 46:6 77:1,4
176:5 211:20
**party** 61:16,20
61:22 62:6
65:20 122:21
123:14,18 124:1
124:5,11,15
125:5,10
**pass** 36:21 37:4
37:7 48:21
197:16
**passed** 12:22
181:13
**passenger**
220:20
**passes** 163:12
**passing** 13:9
**patel** 17:9,12
**patel's** 182:21
**pattern** 131:22
131:23 132:4,6,7
132:11,17 135:5
135:9,12,17,21
136:17 137:20
138:9,16 139:23
139:25 141:1,25
142:8 143:18,22
144:14 145:13
151:13,24
152:11,13
**patterns** 137:25
**paul** 191:7
**pause** 45:24
**paused** 110:11
**pay** 16:2,10,16

**paycheck** 204:11
**pays** 33:5
**peachtree** 1:19
2:14,21 5:10
**pee** 128:24
**pencil** 37:6
**pending** 48:24
100:8 130:3,4
142:23
**peninsula** 3:6
**penis** 205:7
208:5 209:15
212:13
**penises** 207:15
212:2
**people** 19:25
25:16 26:11
35:23 36:24
38:21 39:5 41:6
43:24 47:7,9
49:21 53:14
58:16,24 59:15
62:3,11 65:24
66:4,5 68:11,16
81:22 84:15
88:10,11,14 89:2
89:5 90:5,9,11
91:4,5,8,10,12
91:14 94:25
95:14,15 97:19
102:6,16 108:18
108:19 111:6
112:4,8,14,16
113:15 122:22
123:20 127:8,10
127:11,12
130:18 132:22
138:24 147:5

156:25 157:1,3
157:21 158:7,19
158:21,21
162:23 167:20
167:23 182:21
184:12,13
187:21 188:7
190:6,9,24
192:16 194:22
197:2 202:4
203:23 205:2
217:19 218:6,15
218:16,17,25
219:2,6 221:9,12
222:2 224:7,11
225:2,15 226:17
229:3,7,8 232:1
232:4,10,16,17
232:22 233:3
234:10 235:17
236:8,11 237:2
238:12,17,17
240:21 241:1
248:13,22,24
249:5,5
**people's** 191:9
**percent** 42:19
65:23 101:17
120:23 172:9
175:15 210:19
210:20,22 213:5
**perez** 1:14 3:3
5:7 6:2,14,18,21
6:24 7:8,11,12
7:21 8:1,4,13,19
55:13 145:10
156:9 202:11
234:7,22 254:5

255:2,24 256:2,4
256:12
**perfect** 7:24
17:20 251:6
**perform** 67:16
180:23 183:25
**performance**
60:5 66:10,12
68:4 69:2 72:20
73:1,16 74:13
76:9,18 77:13
85:10 89:25
90:21 91:19,23
93:13 94:2
121:4,10 127:4
170:4,22 171:22
172:3,8,22 174:2
174:22 175:21
185:16 186:2,24
187:8,14 196:4
196:12,20
197:23 198:6,25
199:6,14,24
200:24 201:2,15
202:13 203:9,16
203:19
**performed** 60:8
**performing**
67:17 69:7,19,24
187:22 197:22
202:18 203:10
240:13
**period** 18:25
20:17 73:11
74:2,9 78:25
81:2,25 150:8
180:7 190:12

Eddy Perez                                                       August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[periods - policy]**                                                Page 37

**periods** 225:6
**permitted** 5:18
**person** 24:17
  25:19,21,23 26:7
  26:19 27:4,5,6
  27:13,20 28:10
  28:15,21 30:4
  34:23 35:25
  47:16 50:13
  52:12 58:10
  67:23 70:4
  72:18 73:14
  74:11,24,25 75:2
  75:13,19 76:4,13
  77:11 91:22
  96:24 101:11
  104:20 126:16
  126:23,24 129:5
  162:17 182:6
  185:20 186:7
  197:20 204:2
  226:18,21 231:4
**person's** 185:17
**personal** 211:14
  239:24 241:12
**personally**
  211:11 240:20
**personnel**
  242:23
**persons** 40:6
**perspective**
  25:23
**pertinent** 134:16
**ph** 61:1 86:8,9
  86:10,14,19,25
  90:24 182:15,16
  183:22 184:1
  186:4,6,13,14,15

186:20 187:11
**phil** 47:18,25
  48:6,15,17 51:16
  52:4
**phone** 7:2 39:25
  40:2,10 43:6
  67:23 92:25
  93:11 99:17,21
  159:4,5,6,13
**photographs**
  4:16
**phrase** 25:23
**phrasing** 74:19
**physical** 116:24
  117:1,14,20
  132:14 135:1
  139:22
**physically** 76:10
  81:18
**pick** 245:21
**picked** 9:13 77:6
  219:24
**picks** 77:3
**picture** 131:18
  131:21 208:10
  208:16 209:20
  210:13,24
  225:21 226:10
  226:17 227:6
**pictures** 227:10
  227:17,21
  243:22
**pieces** 182:8
  193:6
**place** 61:25
  107:11 133:17
  133:18 162:21
  204:12

**places** 50:21
**plaintiff** 1:6 2:2
  7:23 214:11
  225:19 228:1
  233:9 238:1
  239:15
**plaintiff's**
  214:10 225:18
  227:25 233:8
  237:24 239:14
**plane** 103:21
**planes** 103:22
**planned** 106:22
**plans** 221:7
**platform** 29:12
  29:21
**play** 208:7
  229:23
**played** 122:22
  123:20
**player** 215:19,20
**players** 215:22
**pleasantries**
  59:2 203:22
  204:8
**please** 8:1,9 9:3
  9:4,19 10:1
  11:10 17:11
  19:1 73:23 75:5
  90:12 113:24
  117:17 130:7,14
  132:7 136:24
  141:12 144:7
  191:14,14 195:4
  230:2 233:12
  250:25
**plenty** 67:19

**plus** 29:15
**pmps** 31:21
**point** 17:15
  19:23 20:15
  24:9 25:6 26:23
  35:25 42:5
  51:18 69:4 73:5
  85:2 88:20
  110:12 142:14
  145:11 164:10
  164:13 179:9,25
  180:1,13 182:23
  187:12 192:15
  193:7 197:21
  198:20,21
  201:24 203:18
  222:3 223:15
  224:3 230:20
  235:21 241:13
**pointing** 209:13
**points** 190:6
**policies** 17:22
  18:13 22:5
  38:23 196:17
**policy** 17:23
  22:7,10,11,12,18
  25:3,19 27:7,14
  27:22 28:12,17
  28:22 29:9,23
  30:10 31:13
  32:5,20 33:11
  36:9 37:18,19,23
  38:4,14,18,24
  39:11 79:15
  148:15 160:24
  161:1 162:16
  163:1,6,16
  164:14 165:17

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[policy - proceeding]**

Page 38

166:5 188:14,19
191:20 193:2,23
194:20 210:5,7
210:16 211:1,2
211:18,25
212:15 213:7
**portion** 182:8
**position** 13:16
34:8 41:18,18
42:6 44:13,16,24
45:5,7,12,17,19
70:20 71:16,17
72:19 177:23
**positions** 39:19
40:5,7 42:2,10
42:17 43:13,21
43:22 44:8 46:9
46:10 63:20
170:25
**positive** 232:14
233:4 236:19,24
237:13 241:17
**possibility**
157:22
**possible** 9:12
58:13 157:17,19
158:2 205:1
**possibly** 69:12
69:14 102:5,19
102:19 144:10
**post** 46:14
**posted** 232:15
**potato** 31:9,9
43:5,5
**potentially** 51:5
93:11
**pre** 46:14

**precise** 202:3
**predominantly**
56:10
**prepare** 10:24
**prepared** 253:3
**preparing** 11:2
11:12
**presence** 232:5
**present** 18:17
24:21 42:16
103:23 113:20
216:24 217:7,10
223:15
**presented** 70:18
72:15 113:1
151:20
**preserves** 141:9
**president** 13:17
13:21,23,24 14:1
14:5 38:3 39:14
40:21,22 41:22
61:2 72:24
82:15 177:21,23
206:11 210:11
210:22 211:13
211:23 212:10
221:25
**press** 64:8,12,17
64:24 159:15
**presume** 147:4
**pretty** 12:11
38:11 53:1,3
65:17,18,22
100:2 139:7
160:18 169:9,10
176:17 185:5
195:6 217:13
218:12 226:23

240:23 248:10
249:14
**previous** 24:9
47:6
**previously** 13:24
96:10 214:9,11
225:18,19
237:23 238:1
**prime** 1:8 2:10
3:2 4:17 5:8
7:20 8:17 11:5,8
13:14 14:11,15
17:22 22:14,17
23:7,25 24:13
25:2,18 26:25
27:4,15,21 28:12
28:17,21 29:9
30:9 31:2,12
32:19 37:23
38:18,24 50:17
148:15 164:23
196:3,10 197:20
198:24 208:15
208:22 209:4,9
209:19 210:11
211:14,23
212:10 213:14
213:19 215:2
216:18 218:6
221:23 223:25
224:4 226:11
229:19 230:8
231:20 234:8
238:9 242:13
254:4 255:1
256:1
**prime's** 37:17,19
38:23

**principal** 31:6
**print** 212:20
**prior** 9:9 14:10
44:24 45:5,17
52:12,14 60:16
69:3 134:22
156:9 163:10
164:3 170:25
209:17 238:21
252:5
**pro** 38:7,14
154:22
**proactively**
159:7
**probably** 16:11
19:2 39:8 45:10
59:23 80:14
86:6 135:20
148:3 157:9
158:7 173:22
175:24 178:20
178:22 185:24
198:12 210:20
**problem** 40:9
52:13 129:18
178:2 203:8
**problematic**
199:25
**problems** 199:13
**procedural** 5:19
**procedure** 39:12
64:16 237:12
**procedures** 51:9
**proceed** 9:11
99:7 155:13
**proceeding** 5:5
5:17 251:10
253:4

Eddy Perez                                             August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[proceedings - quarter]**                                        Page 39

**proceedings**
207:25 208:7
252:3,4,6,8
253:6
**process** 24:3
39:9 47:1 48:19
70:9 96:3 153:9
198:15
**processes** 185:12
**processing** 70:5
70:15 71:16
72:20 73:12,22
74:3,9 75:3,4,17
85:11,17 90:3
171:3,6 176:4,8
182:6,8,17,18,22
184:18,21,22,25
185:9,10 186:17
192:10
**processor** 66:22
69:25 70:5,8,22
76:6,16 77:12,16
87:17 180:4,5
184:16,23
**processors** 75:16
183:8 188:7
**produced** 5:16
**produces** 88:11
**production**
130:16,22
**productivity**
172:21
**professional**
62:13 175:17
201:21 249:19
**professionals**
206:17

**profit** 15:12
**profits** 15:1,3,15
16:13,20
**prohibits** 165:18
212:12
**promiscuous**
132:19,25 133:6
133:23 135:10
139:2 149:16
150:6,15,21
151:13,23 152:1
152:10,14
**promiscuously**
150:1
**promise** 175:8
**promote** 195:4
**promoted**
182:24 192:16
**promotion** 65:5
65:8 88:16
241:13
**proof** 195:25
**properly** 28:25
**proponent**
240:22
**proposal** 112:10
112:25,25
113:18
**pros** 87:11 106:8
**protocol** 152:22
**proud** 241:11,25
**prove** 195:11
196:18 198:23
**proves** 197:19
**provide** 22:21
59:16 81:14
120:5,25 122:5
140:19 197:1,4

198:4 230:7
231:19
**provided** 29:22
32:15,19 82:2
115:18 120:1,7
120:19 123:18
231:12
**provider** 33:10
**provides** 31:5
33:5
**providing** 126:4
168:9 191:18
195:1
**proximity** 97:23
**public** 1:21
252:18 256:19
**publicized**
189:15
**published** 159:3
159:23
**publix** 225:11
**puerto** 14:18
**pull** 68:10
196:25 220:11
**pulled** 28:2
57:10 68:14
83:1,3,5 102:9
**pulling** 68:19
83:18
**purpose** 74:2
97:1 98:22
153:19,25
181:23 209:14
217:4 230:5
231:18 232:13
233:2 236:4,17
241:7 242:8
247:25 248:2

**purposes** 34:3
47:2 59:1
167:16 168:8
183:9 244:17
**pushing** 241:1
**put** 6:13 35:13
53:13 60:21
72:2 112:10
113:22 114:7
116:6 118:13
122:16 125:3
133:1,5 135:20
157:13,20,25
158:3 160:23
161:1,16,16,18
162:16,21 164:7
170:11 173:4
175:24 185:24
188:25 191:2
192:3,23 194:10
194:11 201:18
219:10 229:6
230:16 233:3
234:11 237:3,4
237:18
**putting** 132:20
133:23 135:10
178:8,9

|  q  |
| --- |

**q1** 193:16
**q2** 193:16
**q3** 193:17
**qualified** 252:7
**qualifying** 31:8
38:15
**quarter** 193:20

Case 1:21-cv-04247-CAP-LTW   Document 86   Filed 03/21/23   Page 296 of 315
Eddy Perez
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

August 15, 2022

**quarterly** 99:23
**quasi** 172:16
**question** 4:21
  9:18,21,22 10:5
  10:6,14,16,20
  12:14 16:6
  18:24 19:23
  28:9,14 30:8
  32:18 34:5
  37:22 38:1,8,12
  38:17,20 40:15
  41:12 44:21,23
  45:25 50:2 51:5
  54:18 56:4,7
  57:9 60:12
  64:21 67:21
  70:13 71:13
  73:23,24 74:2,19
  75:5,8,9,24
  76:21,23 77:9
  80:15 82:13,17
  82:22,23 88:25
  90:12,16 91:20
  91:25 93:3,7
  97:9,21 100:8
  107:10 117:17
  118:15 119:4,12
  119:17 128:13
  128:16 129:21
  130:1,4,4,6,14
  136:6,10 139:17
  140:18,21 141:6
  141:11 142:11
  142:17,22 143:4
  143:14 153:13
  157:14 159:25
  168:2 171:15
  174:8 177:12

179:16 180:16
  187:4,16 188:20
  190:9,22 191:23
  191:24 192:3
  195:9 196:16
  197:13,18
  202:10,21,25
  208:2 211:8
  212:9 213:9
  214:3,24 221:4
  229:24 230:2,4
  231:17 233:1
  238:16 246:7
  248:8
**questioning**
  55:13 100:11
  127:19 155:19
**questions** 6:4,7
  8:18 9:15 10:12
  11:21 29:6
  42:18 54:19
  55:12 59:3,18
  129:12,13
  159:16 170:12
  171:12 200:3
  214:20 228:8,10
  233:12 250:1,6
**quick** 129:22
  145:2
**quickly** 187:24
**quite** 85:18
  112:16 133:19
**quote** 21:15
  101:14
**quoted** 81:17
**quotes** 194:16

**r**

**r** 2:1 3:1 4:13,13
  5:1 52:24 255:3
  255:3
**rabbit** 160:1,4
**rack** 86:11
**racking** 48:25
**ragan** 2:3 4:3
  6:11 7:22,22
  8:10,12,15 11:19
  11:20 12:24
  17:13 46:7 53:4
  53:24 54:17,23
  55:1,3,10 71:1,4
  71:9,11 73:21
  76:22 77:2,8
  78:1,15 81:8,11
  82:12 83:10
  90:18 100:9,14
  104:13 109:10
  109:12 114:15
  127:17,22 128:2
  128:7,9,15,18,22
  128:25 129:3,17
  129:19 141:11
  141:14 142:16
  143:2,5,10,13
  145:3,9 154:8,11
  154:17,19
  155:17,23 156:1
  156:8 200:8,16
  209:2 211:6
  219:7,11 227:16
  249:25 250:20
  250:23 251:3
**raise** 8:1 78:10
  79:16 80:7 88:3
  188:16,22

189:20 190:20
  191:21 192:12
  194:19 201:2
  232:2
**raised** 79:25
  80:17 87:5 88:2
  88:8
**raising** 193:24
**ran** 149:7
**range** 23:2
**raton** 3:7
**reach** 68:14
  78:19 108:24
  159:12 189:21
  203:7
**reached** 68:6
  98:22 158:17
  159:7,11
**reaching** 88:12
**read** 113:23
  114:9,16,21
  207:9 210:17
  212:3,4,19,20
  228:6,13 242:4
  250:10 254:9
  256:5
**reading** 230:15
  242:7
**reaffirming**
  241:16
**real** 122:23
  129:22 193:10
**realignments**
  61:13
**realize** 125:5
  128:10 142:24
**realized** 78:11
  103:12 192:23

Eddy Perez
August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

[really - referring]

Page 41

**really** 48:25
49:14 54:2
72:16 98:19
103:3 116:6
119:9 175:16
187:20 190:3
202:23
**realm** 35:24 78:6
178:12
**rear** 210:24
**reason** 15:6
54:18 74:18
76:14 77:14
88:15 122:9
138:20 254:11
255:6,9,12,15,18
255:21
**reasoning** 16:22
**reasons** 51:1
137:18 222:1
**recall** 22:23
25:18 27:9
28:15,25 29:7
30:9 31:24
32:19 85:22
90:1,9,20 102:7
105:19 115:9
118:15,21 120:3
124:22,25
127:10,11
134:14,15 138:7
139:11 157:23
157:24 158:1,15
159:21 167:13
171:24 172:1
175:14,20
180:17 186:8
192:2 204:21,22

204:24 218:1
243:5,15,17
244:3,9,12 245:6
245:11,25 246:2
247:15,16 248:5
249:17,23
**recalling** 124:20
**receipt** 254:18
**receive** 12:3
27:21 31:12
79:8 94:22
99:12 162:4,14
163:20 189:19
190:18 230:14
**received** 15:4
28:10,15,21
30:22 31:17
32:3 34:2,24
35:6,10 79:4
82:14,24,25
94:17 98:11,24
100:3,15 101:19
102:4 103:12
109:23 117:14
156:13,20 159:1
159:4 166:3
**receives** 161:21
162:1,12
**receiving** 29:7
30:9 32:19
96:13,15 97:2,23
98:23 101:16
108:23 157:12
236:19
**recognition**
190:7
**recognize** 225:21
225:23 226:18

226:21 227:6
228:14 239:17
**recollection**
27:19 116:9
185:25
**recommend**
49:18 180:14
186:10 187:7,12
**recommendation**
92:3,4,10 94:17
96:15 97:14
98:14,24 152:23
155:4,6,14 188:1
202:1
**recommendati...**
92:15 202:6
**recommended**
47:4,11,17,20,21
47:25 93:25
94:6,15 95:19
99:5,8 152:17
180:12 187:23
188:3,9 200:25
**recommending**
93:13 187:5
**record** 5:4,5,13
7:3,4,6 9:6,7
10:2,6,15,16
26:15 31:11
32:2 34:11
37:10 55:1,2,5,7
55:9 64:21
70:25 71:1,3,6,7
75:25 82:17
90:13 93:5
109:4 121:11,12
121:12,14 128:1
128:3,6,11,19

129:1,2,10 136:6
136:10 141:10
142:20 143:5,6
143:11 145:4,6,7
155:24,25 156:3
156:5,7 186:25
199:20 200:9,11
200:13,15
250:16,17,19,20
250:22 251:7
252:9 253:5
**recorded** 5:21
191:11 197:10
252:6
**recording** 5:16
252:8 253:4
**records** 35:10
36:3 68:19
112:9
**reduced** 252:6
**refer** 11:8 144:7
191:12
**reference** 169:25
209:22,25
210:14 211:19
216:13 228:13
240:8
**referenced**
141:17 210:25
216:18 254:6
**referencing** 4:10
209:13
**referral** 217:14
217:15
**referred** 18:14
**referring** 13:4
19:17 33:12
57:11,13 61:20

Eddy Perez
August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[referring - represent]**
Page 42

62:10 74:25
91:15 101:16
137:3 193:3
209:9 238:11
**refined** 17:3
**reflected** 233:3
238:21
**reflecting** 236:4
**reflects** 70:25
236:1
**refreshers** 24:10
**refrigerator**
224:18
**regarding** 55:12
100:16 110:13
141:18 159:3,22
160:4 246:22
**regional** 178:13
182:25
**regulations**
15:19
**regulator** 37:14
**reins** 17:1
**reinterview**
198:15
**reinterviewed**
82:11 92:6
170:11 178:21
**reinterviewing**
85:13 172:16
**rejected** 144:11
145:18,22
**related** 8:18
37:23 38:19
97:2,13 98:8,23
99:9,12 108:10
110:1,5 120:12
157:11 171:12

180:6,10 252:11
253:7
**relates** 38:23
76:16 108:4
161:21 166:9
190:18 205:24
**relating** 38:5
**relation** 108:23
156:20 158:17
167:17 207:13
**relations** 140:11
249:5
**relationship**
149:13 163:7,22
164:1,19,22
165:14 166:4
213:21 214:6
216:7 249:6,15
**relationships**
163:2 165:18
248:22,24
**relative** 252:13
253:10
**relayed** 125:23
**release** 64:8,13
64:17,24
**releases** 97:19
**relevant** 147:2
**rely** 40:11 76:18
**remaining** 221:7
**remember** 12:20
37:6 40:8 43:8
65:23 75:6 86:1
86:2,4,5 90:6,23
91:7 99:15
100:2 106:17,19
112:2 121:24
122:2 124:15,17

157:15 158:25
164:21 184:11
185:23,24 186:9
205:3 244:5
245:10,14,16
248:7,11
**remembered**
90:25
**remind** 9:10
90:24 108:18
**reminder** 156:24
**remote** 57:22
**remotely** 56:21
58:5,6
**remove** 25:12
92:1 174:13
**removed** 88:17
91:8,10,14,18,22
176:8
**rent** 217:22
**repeat** 37:21
71:12 76:25
129:20 130:6
214:3
**repeated** 136:9
**repeatedly**
119:13 122:17
**repeating** 150:11
**rephrase** 9:19
71:12 73:25
153:12 187:4
202:21,25 214:2
221:3 231:16
**report** 34:1
38:25 39:18,19
41:7,8,9 44:14
46:10 48:25
49:2 50:13

66:25 67:4,13
81:23 83:8
113:20,22 114:8
114:10,17,17,20
114:24 115:5
182:18 203:23
235:17
**reported** 1:21
18:16 19:11
40:20 41:1 42:2
42:4 44:9,15
112:12 113:5,6
118:16 177:9
**reporter** 5:2,3
6:6,12,16,19,22
7:10,13,24 8:8
17:10 45:23
55:5,8 71:3,5,7
128:1 145:4,7
156:3,6 200:11
200:14 250:7,12
250:17 251:6
**reporting** 35:3
36:3 42:24,25
43:9 44:17 45:2
68:10 117:5
123:9 183:7,12
183:19 188:8
203:5
**reports** 34:23
40:4 66:24
68:14 73:10
76:8 81:20,22
84:7 160:18
235:16
**represent** 8:16
192:24

Eddy Perez                                    August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[representative - right]**                          Page 43

representative
  104:20
representing
  7:14 54:15
reprimand
  161:13
reprimanded
  160:15 161:11
reputation  232:5
request  229:16
requested  168:4
  236:7 252:21
requesting
  231:18
require  14:19
  36:7,8,12 250:8
required  23:4
  25:9 29:21 35:7
  36:6 49:1
  201:13 256:13
requirement
  34:4 162:21
requires  13:9
requisite  192:10
  192:11
reserved  251:8
residential  14:16
resignation
  186:21
resigned  21:25
  91:13 165:25
resolved  149:9
  161:10
resourceful
  192:21
respect  54:12
  202:9

respectful
  167:23
respectfully
  54:13
respond  9:14
  10:5 54:14
  101:9 119:16
responding
  231:10 237:11
response  8:20
  10:19 11:16
  19:6 23:19 42:7
  52:2 84:1 94:19
  96:14 97:8,22
  108:11 114:3
  132:5 141:18
  148:22 149:21
  157:11 166:11
  173:18 177:12
  208:2 211:7
responses
  159:22
responsibilities
  179:6 180:3
responsibility
  177:4
responsible  13:7
  13:8 30:13 31:8
  64:1 176:19
  191:18
responsive  119:4
  119:6
rest  64:11
  217:13
restate  196:9
restrepo  216:2,6
  216:12

result  72:14
  97:14 118:16
  152:16,25 153:7
  160:16 163:21
  164:1 166:4
  183:6
resulted  21:22
  132:13 139:25
  141:1 149:25
  150:14 165:21
results  137:14
resume  50:21,25
retail  41:2,17
  43:2 45:16 61:3
  61:4,11,18 65:2
  75:17 88:10
  176:3 178:6,7
retained  4:11,19
retaliate  37:25
  38:1
retaliation  37:19
  37:24 38:5,7,14
  38:14,15,19 39:1
retreat  45:8
  99:23 100:19
  103:25 104:24
  106:13,23 107:1
  107:3 108:21
  169:20,21
return  254:13,17
review  4:7,9
  11:11 228:5
  229:19 230:1,8
  230:12,16
  231:12 233:13
  236:17 250:9
  252:21 254:7

reviewed  83:11
  115:5 144:19
reviews  4:17
  231:19,25
  232:14 233:4
rewarded
  230:13
rhode  57:2,5,6
ric  224:11
rice  165:3,11
rico  14:18
rid  61:22
ride  148:5,8
right  8:1 10:22
  10:23 13:12
  14:14 16:6
  17:19,21 22:4,16
  25:1 29:18
  32:18 34:1 35:9
  37:9,21 38:22
  39:13 42:1,21
  44:7 45:15 48:1
  51:11 54:4
  57:14 60:15
  64:23 66:8
  68:25 69:17
  75:24 81:8 85:6
  85:20 86:24
  87:2,23 89:23
  90:2 92:12 94:4
  94:24 95:17
  98:13 99:19
  100:8,10,15
  104:23 119:12
  120:4 122:25
  129:4,9 131:4
  133:16 136:22
  137:12 138:6

**[right - see]**

142:18 143:1,25
144:25 145:1,10
151:23 152:3
154:8 159:12,20
159:25 165:11
169:22 179:18
179:21 185:21
189:1 190:16
191:13 192:18
198:8,10 200:6
204:3 208:19
210:21 211:9
212:25 214:8
216:3 219:12
220:5,10,15
226:21 227:23
228:10 232:24
233:23 234:13
234:15,17
235:18 237:10
237:18,22 239:5
239:9 250:2,7
251:6
**risque** 225:8
**road** 160:25
**rode** 148:6
219:22 220:3
**rodriguez**
215:15,17,21
219:24,25 220:2
220:21,25 221:6
222:25 223:24
**role** 13:18 14:5
19:24 20:8 21:1
21:5,22 38:3
39:13 46:15
59:23 69:25
70:4,5,15 72:20

73:4,12,12,22
74:3,10 75:3,21
77:16 85:11,17
90:3 170:24
171:3,6,13 174:1
174:22 176:16
177:19,21 182:6
183:10,25
184:22 185:9,10
185:11 186:17
203:4
**roles** 13:21
63:25 73:6
178:7
**rolfe** 52:22,23
54:5,16 55:12,15
55:18
**roll** 142:13
**room** 25:24
27:13,20 28:11
28:16,23 224:19
224:20 241:3
**routinely** 203:21
204:7,8
**row** 78:21
**rule** 13:2 163:13
**ruler** 209:14
**rules** 5:20 9:11
48:23 250:8
**run** 28:3,4,4,6,19
50:14 92:14
108:16
**running** 27:1
184:18,21

**s**

**s** 2:1 3:1 4:5,13
4:13 5:1 209:21

209:21 255:3
**sadly** 49:15
**safe** 13:5 242:6
243:2,6,14,15,21
243:25
**safer** 225:9,13
**saints** 241:3
**sales** 41:1,10,17
43:2 176:9,9,11
225:4
**sam** 182:21
**sapp** 1:17 2:13
2:20 7:15
**sarah** 133:15
219:24 220:2
221:14,15,15
222:8,9,14 223:9
**sat** 26:19 27:4
59:11 146:9
179:18
**saw** 80:16 81:18
81:18 83:12
125:4 207:5
236:21
**saying** 23:8
31:16 32:2
55:17 63:4
64:12,23 80:5,22
95:24 114:16
116:12 117:19
119:5,22 124:6
137:1 138:16
144:5 158:2
183:3 195:10
208:19 215:12
232:7,12 235:5
236:12

**says** 68:17
176:25 216:15
234:7,22 243:10
**scantron** 37:6
**scenario** 16:14
**school** 37:5
**schwab** 220:13
**screamed** 195:7
**se** 176:10
**seat** 220:18,21
220:22
**second** 109:21
109:25 142:21
173:6 174:21
175:5,10 178:22
225:3 227:5
231:9 234:16,18
237:10
**seconds** 169:23
**security** 196:24
**see** 10:11 13:2
45:21 68:20
69:2,6,11 70:1
72:1 77:2 89:4
92:4 98:14
114:18,20
115:24 120:17
126:21 147:21
155:3 158:22
174:8 182:1
201:24 204:7
205:2 219:6
225:21 228:19
228:20,22 234:2
234:24 239:18
240:11,24
241:19 242:15
243:22,22

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[seeing - showed]**

Page 45

**seeing** 124:17
  214:16
**seek** 239:23
**seeking** 154:1
**seen** 100:22
  203:13 214:13
  223:16 226:1,3
  227:13,17 238:3
  238:20 239:1
**segregate** 143:11
**self** 29:8,19
**send** 25:15 63:13
  63:14 189:8
  194:6,9 195:17
  211:19 235:11
  235:19
**sending** 64:1
  210:13 241:7
  242:7
**sends** 77:24
**senior** 61:2
  72:23 82:15
  104:17 177:20
  177:23 186:17
  225:2
**sense** 108:7
  121:18 126:15
  127:8 168:23
  202:4 235:16
**sensitive** 7:1
**sensitivity** 50:3
**sent** 63:8,20 64:8
  64:13,24 78:24
  89:12 94:12,24
  95:3,9 157:22
  159:14 209:18
  210:1 213:25
  215:10 228:18

  228:19,25
  229:11 230:6,24
  233:16,20,22
  235:24 241:22
  242:12 254:14
**sentences** 230:13
  231:13
**sentiment** 106:9
  106:12
**separate** 61:3
  92:12,23 93:10
  93:24 162:7
  173:17,17 222:3
**separated** 30:12
**separation** 29:17
**september** 45:9
  69:14,15 81:2
  82:1
**serious** 49:6
**servicer** 14:17
  15:25
**servicing** 16:1
**session** 161:9
**set** 84:4 214:19
  234:1,3 239:9
**seth** 3:4,9 7:19
  12:18 34:9
  48:15 51:16
  52:4 96:21 97:1
  97:18 205:16
  207:10,12,20
**setting** 75:2
**seven** 16:10
**severance** 98:15
**sex** 134:2 146:8
  150:25 166:20
  213:14 215:3,11
  215:16 216:9

**sexual** 17:23
  22:7,12,17 25:3
  25:19 27:7,14,22
  28:12,17,22 29:9
  29:23 30:10
  31:13,17 32:4,4
  32:20 33:11
  34:2 35:6,11
  36:3,9 37:2,17
  39:1 51:20
  54:22 94:18,23
  96:7,14 97:2,15
  99:14 100:17
  105:24 108:11
  108:25 110:5,15
  110:19 111:25
  116:13,14 117:4
  117:25 118:1,6
  119:23,24 121:8
  125:17 127:2
  130:10,21 131:8
  131:15 135:25
  136:14 138:22
  140:11 146:5,16
  150:7,18 151:3,6
  151:21 152:25
  153:7,20 154:13
  156:11,16,21
  163:8 166:22
  167:18 210:5,6
  210:16 211:1,18
  211:24 212:14
  213:7 215:8
  216:7
**shaking** 20:21
**shannon** 2:19
  7:17

**shaped** 205:8,15
  205:25 206:14
  206:24 207:23
  208:5 212:1,14
**share** 107:12,13
**shared** 83:11,14
  85:3 131:1
**shareholder**
  31:6
**shareholders**
  36:24
**shares** 37:1
**sharing** 59:12
**sheer** 195:2
**sheet** 254:11
**shenanigans**
  207:17
**shifts** 60:25
**shines** 210:9
**shirts** 208:10,16
  208:21
**shit** 42:20,25
  53:19 127:23
  157:14 250:15
  250:21
**shocked** 248:19
**shoot** 224:10
**short** 150:8
  175:4 184:11
**shortly** 97:22
  98:10 174:24
**show** 35:18 80:3
  80:10,19 189:12
  192:20
**showed** 80:2,6
  80:11,16,25
  81:12 144:21
  245:13

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[shower - specifically]**

Page 46

**shower**   224:22

**showing**   231:11
   237:12 238:10
   240:16 241:7
   242:8,12

**shows**   35:10
   49:15 50:10
   223:16 235:8,14
   239:21

**shut**   160:2

**sic**   5:9 25:6
   98:11

**sick**   224:15,16

**side**   59:24 61:3
   88:10 220:12

**sideways**   47:10
   225:12

**sign**   97:19
   250:11 254:12

**signature**   228:21
   228:21,24 251:8
   252:16 253:14

**signed**   17:1
   157:21 158:3
   165:1,14 254:20

**significant**   16:23

**signing**   157:24

**silos**   183:3,6

**similar**   118:20
   137:21 232:18

**similarities**
   118:8

**similarly**   9:9

**simply**   38:2,17
   244:15

**sir**   7:13 8:8 9:8
   26:23 32:23
   42:13 43:11

59:22 60:10
62:24 71:22
75:5 133:9
147:20 158:5
225:24 237:20
239:11 242:19

**sister**   86:11,12

**sit**   27:20 28:9
   32:2 60:7 66:17
   75:10 79:4 90:8
   90:19 91:21
   93:16 101:19
   111:22 112:18
   119:25 122:3
   128:23 134:7
   145:1 151:19
   157:18 158:15
   205:12 208:14
   209:24 210:12
   212:11 213:6
   248:17 249:17

**sitting**   24:17
   25:24 78:9,16
   204:11

**situation**   108:15
   115:23

**sixteen**   16:18

**size**   64:4 209:15

**skates**   64:10
   192:14 193:1,20
   197:1 198:2

**skills**   252:10
   253:6

**sleep**   107:11

**smaller**   16:2
   41:14

**smith**   2:19 7:17
   7:17 129:15

**smoothly**   9:12

**snuff**   202:18

**social**   197:8

**socials**   122:16

**sociology**   12:2

**software**   68:22

**soleil**   245:23

**solutions**   254:23

**somebody**   33:3
   36:25 74:17
   76:8 78:8
   100:20 122:19
   125:1 134:19
   157:19 169:11
   175:16 185:22
   190:23 201:23
   201:24 202:1
   225:14 235:11

**somebody's**
   204:1

**son**   53:7 217:11
   217:12 218:8,16
   218:18 219:23
   220:2,16,20
   221:1 245:21

**son's**   53:8

**soon**   164:5

**sorry**   8:22 11:18
   19:8 23:21
   41:25 42:9
   43:18 44:22
   48:10 64:22
   69:8 71:10 81:7
   81:21 82:18
   90:15,17 93:4
   96:22 104:11,12
   105:11 107:24
   115:3,16 117:18

117:18,18 128:9
129:9 136:7
137:8 160:2
173:20 178:1
211:5 227:20
235:3 250:15

**sort**   9:13 20:6
   44:5 108:3
   172:16 183:7

**sounds**   9:24
   36:21 144:6
   219:3

**southeast**   254:15

**spanish**   85:23
   86:5

**speak**   11:1,4
   74:20,21,25
   75:12 156:18
   169:3 249:13

**speaker**   66:6

**speakers**   62:4
   66:2 195:22
   231:3

**speaking**   52:4
   146:4 170:6

**specialize**
   238:24

**specific**   50:11
   116:24 139:19
   235:25 244:11
   249:18

**specifically**
   72:10 80:11
   81:24 93:13
   131:19 147:15
   157:24 199:23
   200:2 229:18
   247:7

Eddy Perez
August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

[specifics - strengths]

Page 47

| | | | |
|---|---|---|---|
| **specifics** 22:6 | **spot** 51:14 | 36:12,14 48:22 | 83:4,4,16,20 |
| 123:10,13 | **spreads** 59:7 | 49:10 250:7 | 84:4 98:13 |
| 125:20 | **spring** 20:3 21:9 | 252:19 | 102:24 112:6,20 |
| **speculate** 91:2 | 21:10 | **state's** 31:7 | 127:3 130:23 |
| 101:21 103:3 | **staff** 43:23 226:7 | **stated** 22:6 | 155:3 171:14 |
| 115:10 124:12 | 226:13 | 28:18 41:16 | 173:2,10,10,10 |
| 147:6 175:15 | **stand** 76:14 | 140:8 | 177:18 178:6,10 |
| 195:16 206:4 | **standard** 31:19 | **statement** 79:24 | 178:20 181:11 |
| 210:7,18 246:12 | 32:6,16 68:12 | 108:17 157:20 | 181:12,13,22 |
| **speculating** | 69:17 77:16 | 157:25 158:3 | 182:4,12 183:7 |
| 87:20 | 87:8,8,9,10,16 | **statements** 157:6 | 183:18 185:15 |
| **speculation** | 87:20 163:14 | 157:10 | 186:1 198:14 |
| 69:21 115:10 | 201:10,12 | **states** 1:1 14:17 | 199:5 200:25 |
| 145:20,21 | **standards** 31:15 | 14:18 30:19 | 201:7,17 203:8 |
| **speculative** | 37:12 72:20 | 36:6,7 37:13 | **steve's** 87:8 |
| 58:18 127:13 | 76:15 182:2 | **status** 50:25 | 175:15 182:23 |
| **speculatively** | 199:22 | 213:21 214:6 | 184:13 202:20 |
| 30:7 102:24 | **standing** 26:1 | **stay** 7:3 21:4 | **stick** 112:23 |
| **speculatory** | 84:11 250:24 | 27:24 108:16 | 244:4 |
| 112:15 | **standpoint** | **stayed** 110:22 | **sticker** 209:5 |
| **speed** 184:15 | 196:22 | 134:10,20 | **stipulation** 5:23 |
| **spell** 17:10 | **stands** 77:14 | 220:17 | **stop** 167:9 |
| **spelled** 165:10 | **starbucks** | **staying** 225:14 | **stopped** 98:19 |
| **sperm** 205:8,15 | 220:13 | **stays** 225:7 | 135:1 |
| 205:25 206:14 | **start** 42:24 60:13 | **steering** 111:1 | **storm** 149:10 |
| 206:23 207:23 | 101:11 105:8 | **stenographic** | **story** 37:7 118:9 |
| 208:5 212:1,14 | 135:22 231:21 | 5:22 | 224:12 247:22 |
| **spirits** 232:3 | **started** 20:11 | **step** 39:9,9 128:4 | **straight** 212:9 |
| **spoke** 86:25 | 25:2 42:25 43:9 | 189:1 | **straightforward** |
| 111:25 156:22 | 45:2 62:2 | **steps** 48:18 | 38:12 |
| 159:18 168:25 | 122:13 171:1 | 108:9 110:21 | **stranger** 202:22 |
| 171:9,19 198:18 | 201:20 240:13 | 111:3 153:9 | **strategic** 164:11 |
| 213:25 216:12 | **starting** 7:6 | 231:11 | **strategy** 42:23 |
| **spoken** 173:14 | 106:1 129:24 | **steve** 60:20 65:5 | 43:25 |
| 231:4 244:19 | **starts** 228:17 | 66:23 67:13 | **street** 1:19 2:14 |
| 249:8,10 | **starve** 129:24 | 70:2 75:23 78:7 | 2:21 5:10 |
| **sponsoring** | **state** 12:2,17,21 | 79:19,20 80:1 | **strengths** 183:9 |
| 245:13,14 | 23:5 30:18 36:8 | 81:13,14 83:1,3 | |

Eddy Perez
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

August 15, 2022

**[stress - take]**

Page 48

| | | | |
|---|---|---|---|
| **stress** 17:2 | **sued** 49:21 249:1 | **support** 176:10 | 175:23 176:17 |
| 159:10 193:10 | 249:4,5 | 176:11 229:3 | 180:24 181:20 |
| 194:23 195:1 | **suggesting** 243:2 | 240:16 241:7 | 183:17 185:6 |
| **stressful** 195:8 | 244:21 248:2 | 242:8,13 | 186:5 188:18,20 |
| **stressing** 148:4 | **suggestion** 149:3 | **supported** | 191:11 193:13 |
| **stretches** 6:12 | **suggests** 79:4 | 135:17 | 193:14 195:24 |
| **strict** 48:23 | 199:12 246:8 | **supposed** 201:11 | 197:1,13,18 |
| 97:18 160:23 | **suit** 210:25 | 245:20 | 198:17,19 |
| **stringent** 49:12 | **suite** 2:5 3:6 | **sure** 9:15 18:19 | 202:19 210:18 |
| **structure** 44:17 | 217:21 218:10 | 19:21 22:20 | 214:1 217:13,23 |
| **struggle** 189:13 | 221:10 | 24:24,25 25:6,11 | 217:24 218:12 |
| 192:21 | **suites** 217:3,21 | 26:8 27:2,17,24 | 226:23 228:14 |
| **struggling** | **summarize** | 28:2,7,9,13,18 | 229:21 239:25 |
| 241:18 | 113:24 114:4,9 | 31:10 33:1,7 | 240:24 241:12 |
| **studied** 77:20 | 115:12 117:11 | 36:10 37:11 | 244:7 |
| **stuff** 29:15 62:8 | 132:18 163:18 | 38:6,9,20 39:11 | **surveys** 232:19 |
| 62:9 65:12 | **summarized** | 41:16 43:7 50:6 | **suspended** |
| 67:25 111:14 | 140:15 | 50:6 51:4,6,7,8 | 160:15 |
| 121:20 161:24 | **summarizing** | 51:24 54:1 57:7 | **sustained** 77:21 |
| 193:12 194:5,6 | 120:2 146:16 | 57:8,22 58:3 | **swear** 7:25 |
| 207:15 218:8 | **summary** 115:17 | 60:24 63:22 | **sworn** 5:14 8:5 |
| 231:8 | 126:1,4,8 140:4 | 64:15 65:3,17,18 | 252:5 256:14 |
| **stuff's** 109:16 | 141:21 144:17 | 65:22,23 67:9,10 | **sy** 243:18,20 |
| **style** 201:22 | **summer** 20:2,3,4 | 67:15,25 68:11 | **system** 35:16 |
| **subject** 33:19,24 | 20:10 21:7 | 69:20,23 70:2,13 | 63:16 68:23 |
| 174:5 237:9 | 163:18 | 70:25 73:5,6 | 83:5 87:12 |
| **subjects** 37:1 | **sunday** 221:11 | 74:15 75:6 88:4 | 177:5 182:18,23 |
| **submission** | 221:12 | 89:6 93:17 | 183:1 184:19 |
| 230:14 | **supervise** 179:7 | 97:18 100:2 | 193:14 |
| **submitted** 99:13 | **supervising** | 101:17 102:25 | |
| **subscribed** | 20:16 176:16,18 | 113:8,14 119:5 | **t** |
| 256:14 | **supervision** | 121:13 125:19 | **t** 4:5,13 208:10 |
| **substance** 240:5 | 178:16 179:15 | 127:7,12 143:12 | 208:16,21 255:3 |
| **substantial** | 180:2 | 147:6 157:16 | 255:3 |
| 51:17 | **supervisor** 75:15 | 158:10 164:21 | **table** 193:6 |
| **success** 189:4 | 115:6 176:21 | 165:6 169:11 | 236:8 |
| **sue** 248:25 | 177:9,13,17 | 172:18 173:13 | **take** 5:4,11 10:2 |
| | | 173:18 175:18 | 12:21 13:1 |

Eddy Perez
August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[take - tell]**

Page 49

| | | | |
|---|---|---|---|
| 22:16 23:12,23 | 141:16 146:20 | **talking** 10:17 | **technical** 56:2,5 |
| 24:2 26:12 | 154:3 167:15 | 11:9 13:3 22:4 | **technically** |
| 31:23 33:3,12,15 | 168:4,7 170:3 | 22:25,25 23:24 | 56:25 |
| 36:17 37:5 | 175:6 181:6 | 48:15 51:10 | **technique** |
| 50:18 53:23 | 190:10,12,15 | 55:16 62:22 | 176:10 |
| 94:4,10 100:11 | 193:8 198:1,2,3 | 66:9 70:1 73:13 | **technology** |
| 110:13 111:11 | 198:12 202:15 | 74:1 137:12,13 | 43:24 196:23 |
| 111:13,20 | 203:16,19 222:9 | 139:6 142:3,4 | **telegraphing** |
| 126:20 127:16 | 222:16 237:4 | 143:24 144:1,2 | 19:23 |
| 127:16 128:13 | 240:19 241:2 | 147:5 166:9 | **telephone** 93:17 |
| 130:3 142:14 | 245:9 248:16 | 168:6 169:25 | 96:18 |
| 144:12 145:2 | **talked** 10:25 | 178:3 179:21,23 | **tell** 8:6 10:23 |
| 149:2 151:1,2 | 33:18,19,21 | 187:24 190:16 | 11:22 14:9 |
| 155:17 156:1 | 37:16 39:10 | 199:20,23 200:1 | 21:13 26:18 |
| 197:16 200:9 | 44:7,10 45:21 | 213:20 216:2 | 30:20 33:10 |
| 202:6,11 204:6 | 67:10 83:2 | 247:7,15 | 37:18 40:4,15 |
| 206:18 207:21 | 85:12,18 89:2 | **talks** 88:9 | 42:1,20 43:21 |
| 208:3 220:8 | 97:5,6 98:5,13 | 172:23 | 54:4 60:15 |
| 226:7,14 227:5 | 108:14 110:10 | **tampa** 219:9 | 69:21 77:20 |
| 228:3 236:9 | 112:4,6,7,7 | **tavant** 165:24 | 79:14 86:6 |
| **taken** 5:7 22:20 | 121:3,4,4,6 | **tax** 15:14 | 87:15 88:6 |
| 22:22 26:15 | 125:24 127:3,3,7 | **taxes** 16:2,10,17 | 89:14,17 95:13 |
| 29:1 48:18 | 127:9 130:15,18 | **teach** 27:7 | 113:14 119:17 |
| 176:3 177:18 | 130:20,23 131:5 | **teacher** 26:21 | 121:15 123:4 |
| 205:23 210:13 | 146:1,7 154:9,12 | 27:20 28:16,23 | 124:9,13 126:7 |
| 252:3,12 253:9 | 155:3 156:10 | **teaching** 26:2 | 129:6 130:8 |
| **takes** 33:16 | 173:11,12,25 | 29:20 | 131:6,13 135:2 |
| 201:21 | 174:4,6,7 175:22 | **team** 63:14,17 | 147:7 153:23 |
| **talk** 13:12 14:24 | 182:20,21,22 | 64:7,11 91:9,11 | 160:12 165:2 |
| 17:21 18:17 | 183:16 188:12 | 182:21 185:13 | 172:7 173:3 |
| 22:14 34:13 | 191:24 198:8 | **teams** 40:3 84:13 | 175:9 195:17,25 |
| 40:19 58:24 | 200:17 203:2,3 | 84:14,19,21 | 210:12,23 |
| 62:4 85:9,23 | 203:16 215:14 | 84:24 92:23 | 212:11 213:5 |
| 86:5,9 88:10 | 218:16,17 | 93:17 96:19 | 217:1 218:9 |
| 89:7 93:1 | 221:16 223:2 | 182:22 195:18 | 219:9 222:14 |
| 111:19 112:5 | 239:4 240:22 | 198:22 | 224:12 232:17 |
| 119:9,10,16 | 246:15 247:10 | **tech** 41:5,6 47:6 | 233:25 234:6 |
| 129:25 130:13 | 248:11 249:20 | 47:10 | 245:12 248:18 |

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[telling - thought]**

Page 50

**telling** 31:11
177:1 202:17
203:8 210:1
212:5
**temporal** 97:23
**ten** 17:16 23:1,9
26:16 51:14
127:10 201:18
**term** 38:16
117:25 126:11
**terminable** 54:6
161:3
**terminate** 95:18
95:25 108:6,12
186:23 187:2
200:19 204:3
**terminated**
53:20 93:14
94:7,16 95:20
97:14 155:2
180:15 187:6,9
187:13 188:4,9
196:13 197:24
247:13 249:11
**terminating**
153:20 155:13
**termination**
60:17 91:12
96:6,15,17 99:9
99:12 154:13
155:16 186:11
186:22 187:24
199:1,7 204:9
**terms** 15:10
212:14
**terrible** 219:3
**test** 36:17,19
37:5 40:13

**testified** 8:7
70:14 71:15
72:10 74:20
75:18 76:3
77:15 97:25
119:21 174:16
188:14 207:4
**testifies** 76:15
77:15
**testify** 11:12
109:5 127:5
**testifying** 226:10
247:24 252:5
**testimony** 10:24
11:2 66:17
73:13 74:11
75:9 76:13,18
77:10 88:18
117:10 132:9
135:12 136:12
137:16 140:9,22
143:15 166:2
177:6 196:2,10
197:25 206:1
209:18 247:23
249:16 254:9,18
256:8
**tests** 13:9
**texas** 163:23
**text** 193:14
195:19 196:17
196:22 198:22
**texted** 159:18
**texts** 159:5
**thank** 6:23 7:13
8:8,10,23 9:25
11:19 17:6 18:7
18:12 29:18

52:25 71:9
107:25 115:17
187:3 216:3,3
220:1 227:19
237:20 239:11
242:19 250:4,5
250:12,18
**thanked** 222:11
**theirs** 87:19
182:19
**thing** 28:1 64:10
138:15 145:17
168:10 181:1
189:1 192:18
198:8 199:3
210:17 212:3
228:6 237:17
251:4
**things** 19:3,20
28:6 40:16
65:25 66:1 72:7
89:5 96:3 106:6
111:10 113:9
119:8 121:5
127:5 130:2
136:13 138:23
139:3,16 143:16
158:23 159:17
178:11 189:10
192:17 212:24
213:1 226:13
230:10 231:5
**thingy** 227:8
**think** 21:24 25:5
26:14 28:24
38:11 44:4 46:1
47:15 50:10
51:13 57:22

58:4 64:10
65:19 71:22
101:13,15,17,18
102:8 103:4
107:14 113:25
119:25 127:7,9,9
128:2 130:1
131:5 134:7
144:23 148:7
155:19 158:6,8
159:1,4 161:6
165:3,8 166:23
167:24 182:20
185:21 187:16
187:17 191:7,9
194:18 201:1
202:8 205:16
206:2,3,4,5
217:20 229:6
231:4,23 240:17
245:10 249:8,25
250:3
**thinks** 184:3
**third** 175:5
178:23,24
185:20
**thirteen** 13:10
**thirty** 12:18
**thomas** 226:19
226:21,22
**thompson** 1:17
2:13,20 7:15,18
**thorough** 67:14
111:6 115:21
**thought** 6:15,18
29:14 82:20
105:17 116:1,3
122:10,23

Eddy Perez
August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[thought - told]**                                                Page 51

| | | | |
|---|---|---|---|
| 123:23 128:3 | **throw**  95:15 | 60:11 66:12 | **timing**  17:20 |
| 131:11,22 | **thrown**  124:2,5 | 73:10,11 74:2,9 | **tiny**  64:3 |
| 132:18,20 | **throws**  227:8 | 81:2 94:25 | **title**  21:14,18 |
| 133:20 134:18 | **thursday**  99:15 | 95:25 96:16 | 56:25 190:22 |
| 140:16 143:24 | 99:16 | 97:5,12,20 98:6 | 209:21 |
| 144:14,16,21,22 | **tiar**  1:5 2:2 5:7 | 122:20 137:13 | **titles**  43:8,12 |
| 150:7 184:2,14 | 7:23 8:16 46:18 | 138:11 148:2 | 44:4 |
| 186:12,13 201:4 | 83:2 91:23 | 150:8 156:2 | **today**  6:4,23 |
| 202:24 225:13 | 111:9 115:22 | 161:25 162:15 | 8:18 10:4,13,24 |
| 225:16 248:9 | 122:11 126:10 | 162:17 173:11 | 11:7,12 13:10 |
| 249:14 | 135:13 136:25 | 176:5,13,22 | 18:16 25:21 |
| **thoughts**  96:2,6 | 137:5,6 146:9 | 177:2,7,18,20 | 28:9 32:2 40:16 |
| 113:25 114:19 | 169:7 180:3 | 178:3,4 179:9 | 41:3 42:12,20 |
| 126:1,5,8 132:8 | 187:2 196:19 | 180:7,21 181:2 | 51:9,10 60:7,9 |
| 132:8 144:17,17 | 197:21 198:24 | 182:23 187:10 | 60:12 62:13 |
| 145:24 150:12 | 202:15,16 | 188:2,5 190:13 | 63:18 64:4 |
| 168:24 175:19 | 213:14 220:7 | 193:7,13 195:8 | 66:17 75:10 |
| 175:20 | 223:1 227:7,9 | 201:18 202:17 | 77:10 79:4 |
| **thousand**  50:13 | 231:10 254:4 | 202:19 203:2 | 84:22 90:8,19 |
| **threats**  53:22,22 | 255:1 256:1 | 205:21,21 | 91:21 93:16 |
| **three**  14:7 36:23 | **tied**  25:7,10 56:9 | 207:13,20 | 101:19 111:22 |
| 37:3 41:6 47:7 | 56:16,19 57:8,23 | 208:20 209:17 | 119:25 122:4 |
| 78:22 80:23 | 189:9 231:7 | 212:22,22 | 134:7 151:19 |
| 81:1,1 82:3,4,5 | **ties**  230:15 | 214:16 223:1 | 157:18 158:15 |
| 93:1 132:5 | **tight**  58:11 | 224:10,11,25,25 | 162:10,15,19 |
| 135:18 136:3 | **till**  108:20 | 225:6 242:21 | 192:1,1 205:12 |
| 137:4 138:1,13 | 134:11,20 161:1 | 245:9 250:2 | 208:14 209:18 |
| 138:21 140:1 | 215:23 245:19 | 254:19 | 209:24 210:12 |
| 143:20,25 | **time**  1:16 7:5 | **timeframe**  254:8 | 212:11 214:14 |
| 145:18 146:10 | 9:17 10:1,4 13:2 | **timeline**  99:5 | 226:1 227:17 |
| 150:2,5,13 | 18:15,25 19:14 | **times**  15:8 22:20 | 232:6 249:17 |
| 151:24 152:11 | 20:17,24 22:19 | 25:15 73:7 80:5 | **today's**  9:8 |
| 184:5,6,7 197:6 | 22:23 23:6,10 | 93:1 97:17 | **told**  39:6 53:14 |
| 197:11 215:13 | 24:10 25:6,17 | 108:17,18,19 | 73:6 80:1 81:25 |
| 221:19,20 222:4 | 26:19 47:5 | 146:8,13 149:17 | 88:24 89:1 90:9 |
| 222:17 230:13 | 49:24 52:18 | 170:8 181:17 | 100:20,25 |
| 231:13 | 53:23 55:19,23 | 194:25 227:8 | 101:12 102:9 |
| | 58:16 59:8,10 | 232:3 250:23 | 105:16,20 |

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[told - ultimately]**

Page 52

111:11,18
115:25 118:8,10
119:7 121:9,21
121:24 122:5,9
122:25 123:8,25
125:20,22,22
132:1 133:14
134:10,17,25
137:11 140:11
147:18,20,24
148:9,20 153:22
156:19,22
161:17 166:16
167:9 168:13,15
168:16 169:1,12
169:15,18 172:2
172:2,7 173:1
174:21 181:11
196:19 198:14
198:17,24
202:12 204:10
204:10 205:16
206:5 207:10,12
207:18,20 212:8
222:20 223:7,8,9
223:19 226:7,14
239:6 245:19
247:2 248:10
**tolerate** 53:16
**tolerating** 53:18
**tom** 218:13
**top** 211:16
226:21 234:6
**topic** 175:10
194:14 200:2
**total** 217:19
220:9

**totally** 19:9
**tote** 248:12
**touch** 7:2 106:5
232:11
**touched** 49:11
**tough** 31:24
42:19 92:18,20
**tower** 1:18
**town** 225:5
**track** 89:4
**tracked** 32:15
68:14
**tracking** 68:9,20
**tracks** 98:19
**trade** 159:17
**trained** 189:16
**trainer** 26:21
**training** 22:9,15
22:16 23:3,7,10
23:12,18,25 24:2
24:4,14,16,16,17
24:22 25:2,4,14
25:19,23 26:3,7
26:14,20,24,24
27:5,7,13,21
28:11,16,21 29:2
29:8,22,23 30:3
30:6,9,24 31:1
31:12,17,20 32:4
32:6,16,19 34:2
35:6,10 36:3,23
188:25 189:18
190:18 191:2,18
192:4
**trainingpro** 25:7
25:13
**trainings** 191:1

**transcriber**
253:1
**transcript** 5:16
250:9,13 252:21
253:3,5 254:6,20
256:5,8
**transcriptionist**
252:7
**transferred** 14:7
**transitioning**
14:10 176:6
179:18
**transparency**
105:17
**travesties**
240:18
**travis** 184:10
185:5,6,7 186:7
**tried** 47:9
**trip** 106:20
**troops** 106:24
**trouble** 30:15
167:25
**true** 37:6 43:1,1
46:13 206:21
224:11 252:9
253:5 256:8
**trust** 81:22
201:16
**trusted** 114:18
**truth** 8:6,6,7
**try** 58:12,13
95:14 96:3
229:23 232:2,20
236:3,21 241:3
251:1
**trying** 46:1,2
59:6,16 75:6

76:11 115:23,23
139:8 140:14
185:21
**turn** 194:25
**turned** 30:11
**tuxes** 62:7
**tv** 77:22 224:22
**twelve** 128:8
217:18
**twice** 173:13
174:6
**two** 41:6 60:17
68:17 78:21,25
79:5,8,9 80:4,13
80:22,22,24,25
81:1 82:3,4,5
90:8 103:22
105:5 113:13
126:17,24 127:1
129:12 144:18
165:3 166:13
167:6 173:2,3,15
174:4,4 182:5
183:20 224:3
**type** 87:21
194:15 215:7
216:6 229:4
**types** 165:18
**typewriting**
252:7
**typical** 111:14

**u**

**u** 4:13 17:12
**ultimate** 200:18
**ultimately**
154:23 186:20

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[unanimous - video]**

Page 53

| | | | |
|---|---|---|---|
| **unanimous** | **understanding** | **unfortunate** | **value** 189:24 |
| 163:15 | 20:6 46:8 51:24 | 108:15 | 194:10 |
| **unaware** 27:18 | 66:16 94:14 | **unfortunately** | **values** 189:9,11 |
| 112:22 116:5 | 97:8,21 110:17 | 225:7 231:25 | 189:14,19 |
| 212:25 | 111:22 136:12 | 232:3 240:19 | 190:19 191:19 |
| **unbecoming** | 137:16 165:13 | **unhappy** 232:4 | 193:21 |
| 160:20 | 171:12 173:23 | 238:12,17 | **vast** 10:12 |
| **unclear** 9:18 | 174:20 211:3,7 | **unify** 189:12 | **vastly** 50:4 60:18 |
| **uncomfortable** | 220:19 229:16 | **unique** 189:13 | **vaynerchuk** |
| 113:12 123:1,5 | **understood** 9:22 | **united** 1:1 | 231:2 |
| **underneath** | 14:24 37:16 | **universally** | **vehicle** 220:6 |
| 133:16 208:11 | 39:13 45:15 | 25:10 | **vendor** 24:9 |
| **underperformi...** | 46:8 47:24 48:1 | **university** 12:2 | **vendors** 24:8 |
| 60:18 66:20 | 52:8 55:21 | 12:12 | **venture** 78:8 |
| 67:1,6 68:8 | 56:16,24 57:14 | **unpack** 53:25 | **verbal** 11:17 |
| 201:9 | 59:25 76:12 | **upgraded** 44:5 | 81:5,16 161:15 |
| **understand** 5:15 | 101:10 103:9 | 91:8,11 | **verbalized** 39:10 |
| 10:21 11:9 | 104:19 106:9 | **upper** 217:23 | **verbally** 83:12 |
| 13:13 19:5 | 107:23 110:8 | **upset** 125:7 | 83:15 85:4 |
| 21:21 22:5 23:8 | 112:24 113:17 | **use** 25:22 71:23 | 134:25 135:1 |
| 34:22 52:2 | 115:11 121:15 | 126:11 176:25 | 159:22 |
| 55:17,21 66:10 | 123:11 125:15 | 224:24 233:25 | **verify** 202:12 |
| 75:14 76:2 | 125:21 127:22 | 242:2 | 228:18 254:9 |
| 84:15 93:9 | 130:2,25 133:4 | **users** 65:9 | **veritext** 5:4 |
| 102:1 115:13 | 136:22 138:6 | **uses** 5:18 235:25 | 254:14,23 |
| 124:25 132:6 | 140:6,17 141:22 | **usually** 49:18 | **veritext.com** |
| 140:8,21 145:17 | 145:3,25 147:23 | 64:15 134:19 | 254:15 |
| 149:18 150:9 | 149:11,12 152:9 | 231:25 | **versus** 61:4 |
| 161:20 164:15 | 152:16 154:20 | | **veterans** 240:23 |
| 166:2 168:2 | 162:25 170:23 | **v** | **vetted** 67:14 |
| 170:9,18 183:5 | 177:6,16 185:3 | **v** 1:7 4:13 254:4 | **vice** 61:2 72:24 |
| 183:17,20 | 193:18 196:1 | 255:1 256:1 | 82:15 177:20,23 |
| 197:25 226:9 | 219:7 229:15 | **vagueness** | **video** 63:8,10,13 |
| 229:10 230:5 | **underwriting** | 116:20 | 63:20 64:2,13,17 |
| 232:7,12 235:23 | 12:17 | **validated** 125:3 | 64:24 96:21 |
| 240:2 241:19 | **uneasy** 121:19 | 132:22 | 223:16,21 |
| 247:23 249:16 | 122:17 | **valuation** 14:25 | 236:17 237:14 |
| | | | 239:18 240:1,8 |

Eddy Perez
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

August 15, 2022

**[video - weird]**

Page 54

240:15,24
241:19,21
**videos** 64:9
197:10 224:10
237:3
**viewed** 176:9,11
**viewing** 237:1
**vino** 230:11,13
**violate** 211:17
213:7
**violated** 35:18
148:15
**violation** 210:4
210:15,25
211:24
**virtual** 26:7,8
84:20 224:6
**virtually** 26:19
27:6,14,21 28:11
28:16,22
**virtuals** 26:6
**virtues** 199:18
**visit** 139:17
**vital** 36:16
176:12
**vocalize** 9:15
**volition** 29:12
**volume** 46:5
187:20
**voluntarily**
21:25 186:20
**voluntary**
186:21
**voted** 61:22
163:14
**vouched** 51:12
**vp** 185:1

**vs** 5:7

**w**

**wager** 198:17
**wait** 19:16 20:23
45:9 62:22
90:14 129:8
161:1 165:4
196:7 217:13
**waited** 108:20
**waiting** 77:21
**walk** 58:23
**want** 9:14 14:24
15:13 17:21
18:10 31:10
34:15 39:20
40:10 56:2,4
58:14 61:4
62:12 69:21
86:12 97:7
110:25 111:1
116:22 118:15
121:20,21,25
122:2,4,18
127:15 131:9
147:18 148:8
153:10 161:2
165:5,24 166:8
170:3,10 183:17
185:1 190:10,12
197:12,16
210:10 224:21
228:7,10 229:7
230:10 232:2,18
237:4 238:14
239:22
**wanted** 25:12
61:24 66:4

67:16 103:1,2
114:18 135:14
136:1,19 138:3
138:13,21 140:2
141:3 143:20
150:22 182:1
219:6 224:8,17
226:8,20 227:23
229:3
**wanting** 58:16
135:21
**wants** 111:13
250:10
**washington**
49:10
**watch** 239:18
**watched** 77:22
219:2,8,9
**watching** 219:17
**water** 10:9
**watersound**
107:6
**way** 9:18 18:19
18:24,25 24:6,21
31:24 38:7
40:11 60:1,5
74:19 92:18
100:21 108:10
111:2 113:7
118:13 126:20
135:20 160:15
161:14,21 165:7
167:8,11 168:7
170:11 175:17
175:24 185:24
189:12 192:4,20
199:25 204:20
213:13 223:4

224:19 226:2
230:10 239:19
240:15
**ways** 24:12 26:9
89:4
**wazoo** 78:5
**we've** 24:5,6,19
26:14 42:19
43:12,13 49:8,20
49:21 75:8
95:16 121:6
152:11 162:16
163:9 172:14
200:17 201:17
219:13 225:3
249:8
**weaknesses**
183:9
**wear** 6:8
**wearing** 6:25
62:10 208:10
**weathered**
149:10
**websites** 229:18
**wednesday**
229:1,22 230:20
232:9,13 233:2
237:8
**week** 57:18 84:6
84:9 174:24,25
175:5 178:23,24
225:6,14 230:16
230:19,21,24
**weekend** 103:24
**weekly** 72:13
161:8 162:2
**weird** 144:6

Veritext Legal Solutions

Eddy Perez

August 15, 2022

Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[welcome - works]**

Page 55

| | | | |
|---|---|---|---|
| **welcome** 214:19 | **wheeland** 253:2 | **wine** 229:1,17,22 | **wondering** 72:1 |
| 237:21 242:20 | 253:15 | 230:9,20 231:1 | **word** 71:23,24 |
| **wellbeing** | **whichever** 6:6 | 231:11,14 232:9 | 149:16 152:2,3,6 |
| 242:11 | **whispering** 7:2 | 232:13 233:2 | 193:10 208:11 |
| **wellness** 65:25 | **wholesale** 41:2 | 237:7,8 | 208:17 209:5 |
| **wendy's** 53:11 | 43:3 45:4,11 | **winning** 230:9 | **words** 92:17 |
| 53:12 | 61:4 | **witness** 3:3 5:14 | **work** 33:8 34:17 |
| **went** 47:12 | **wide** 24:10 64:25 | 5:15 7:25 8:5 | 49:15 56:1,8,21 |
| 51:15 58:2 | 178:14 187:20 | 9:3 11:18 12:18 | 57:5,14,17 59:1 |
| 64:19 65:5,14 | **wife** 224:14 | 17:12 46:1 53:3 | 66:6 68:16 78:4 |
| 67:20 83:4 | **willing** 206:22 | 53:7,10,12 54:10 | 79:16,17,25 80:8 |
| 84:17 92:7 | 240:18 | 73:19 76:25 | 80:12 88:14 |
| 98:17 99:22 | **wilson** 1:17 2:12 | 77:3,6,19 81:7,9 | 96:12 142:15 |
| 101:6 109:2 | 2:13,20 6:5 7:14 | 82:8 90:15,17 | 148:1 184:14 |
| 112:11 117:12 | 7:15,16 11:17 | 104:11 109:7,11 | 186:12,13 |
| 125:25 126:1,4 | 53:2,6,8,11 54:8 | 114:13 127:23 | 188:15,17,23 |
| 126:15,23,25 | 54:12,21,25 55:2 | 128:16 129:14 | 189:21 191:21 |
| 131:11 133:15 | 55:4 70:24 | 141:7,13 142:19 | 193:25 194:22 |
| 133:17 147:4,10 | 73:17 76:20,24 | 143:7 154:5,9,15 | 203:11,11 |
| 157:2 160:10 | 77:5,17 81:5 | 154:18 200:7,10 | 238:23 246:20 |
| 164:25,25 | 82:6 83:9 87:18 | 204:14 205:2,6 | 247:3 248:22 |
| 165:13 166:18 | 90:14,16 100:7 | 208:10,25 209:4 | 251:2 |
| 173:9,9,10,10 | 100:13 104:9 | 209:8,12 211:5 | **worked** 50:20 |
| 179:16 193:15 | 109:3,8 114:11 | 219:5,8 227:15 | 57:20,22,24 58:4 |
| 193:15 195:12 | 127:15,20,25 | 250:5,8,15,18 | 58:5 80:18 |
| 199:17 206:5 | 128:5,12,16,20 | 251:1 252:4 | 86:11 202:5 |
| 218:13 221:18 | 128:23 141:5,9 | 254:8,10,12,19 | 203:20 226:24 |
| 221:20,21 222:5 | 142:10,18,22 | **witnessed** | **working** 55:22 |
| 222:8,12,14,18 | 143:1,3,8,12 | 204:18 213:13 | 68:17,20 78:10 |
| 223:10,14 | 144:25 153:24 | 213:19 214:4 | 80:20,25 82:3 |
| 224:14 225:12 | 154:3,6,16 | **wolfe** 2:4 | 204:10,13 |
| 234:4 235:24 | 155:22,25 | **woman** 54:19 | **workplace** 37:24 |
| 240:7,12 | 208:23 211:4 | 204:7 | 38:5,19 39:2 |
| **westin** 63:2 | 219:4 227:14 | **woman's** 206:13 | 51:22 |
| 224:7 | 250:6,10,14,21 | 212:1,13 | **works** 31:25 |
| **whatsoever** | 254:1 | **women** 51:22 | 56:9 77:3 |
| 39:15 129:18 | **win** 229:17 | 184:6 | 142:17 168:1 |
| 180:7 202:11 | 230:11 231:11 | | 226:24 |

Eddy Perez
August 15, 2022
Mccart, Tiar v. Equity Prime Mortgage, LLC, et al.

**[workshops - zooms]**

Page 56

**workshops**
33:18
**world**  105:6
150:4 224:6
232:17 240:18
247:20
**worn**  208:21
**worry**  9:3
**wound**  186:16
**wrap**  250:1
**writing**  67:25
157:13 159:21
161:17,18 194:5
195:12
**writings**  196:17
**written**  5:23
99:13 113:20
114:8,17,20,24
115:5 157:10
**wrong**  6:15 86:7
251:4

**x**

**x**  4:1,5,13 252:21

**y**

**y**  4:13
**y'all**  7:5 77:19
77:22,22 82:8
114:14 164:15
**yardstick**  209:14
**yeah**  14:6 22:22
23:21 27:8,18
28:13 35:2
39:21 46:4
49:19 51:14
52:11 57:23
62:11,16,16,16
65:22 68:5

69:16 88:25
93:22 94:21
100:10,25
101:17 102:21
105:2 106:5
107:22,22,22
110:3,16 112:2
112:21 121:11
122:7 123:16
124:8 127:21
128:5,12,13
129:17,22
134:17 142:6
143:2 148:25
149:15 154:17
155:3,7 163:5
168:18 169:17
169:21 172:4,18
175:2,6 185:5,17
186:9,25 188:1
188:18 190:21
193:4 206:10
212:23 213:17
214:3 218:4,8,13
219:5 223:13,20
226:15 227:3,22
228:12 229:1,13
231:1,8 234:5
235:2 236:22,25
237:8 239:12
240:17 242:3,3
242:15 249:1,4,4
249:14,23
**year**  12:3 15:23
16:20 21:6,7
23:17 26:16
27:10,23 28:15
28:20,24 29:2,4

29:7 33:23 61:6
80:13 99:24
232:6
**yearn**  88:14
**years**  13:10,10
14:7 22:25 23:1
23:9 24:5,19
26:17 27:10
28:4,4,6,18
35:11 49:5
51:14,17 194:10
201:19 247:10
**yep**  92:3 96:1
237:21 242:20
250:10
**yield**  27:16
**youtube**  4:9
236:18,21,22
237:14

**z**

**zoom**  68:2 83:15
83:23 84:4,11,23
84:24 92:23
93:10,18 96:19
193:9 194:4,18
195:3
**zooms**  67:24
84:15

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons
given for the refusal to sign require rejection of
the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.