Case 1:21-cv-04247-CAP-LTW   Document 143   Filed 07/08/24   Page 1 of 34

Eddy Perez                                    June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 257

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF GEORGIA

3                   ATLANTA DIVISION

4

5    TIAR MCCART,                    )

6                   Plaintiff,       )

7              vs.                   )CIVIL ACTION

8    EQUITY PRIME MORTGAGE,          )FILE NO.

9    LLC, AND MARK MOLOUGHNEY        )1:21-CV-04247-CAP-LTW

10   in his Individualy             )JURY TRIAL DEMANDED

11   Capacity,                       )

12                  Defendants.      )

13   ~~~~~~~~~~~~~~~~~~~~~~~~~~

14

15

16           VIDEOCONFERENCE DEPOSITION OF

17                   EDDY PEREZ

18                    VOLUME II

19                  12:00 p.m.

20                 June 25, 2024

21              Decatur, Georgia

22              Atlanta, Georgia

23            Boca Raton, Florida

24

25           Terri B. Howell, CCR-B-1018

Eddy Perez                                    June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 258

1               A P P E A R A N C E S   O F   C O U N S E L

2

3    On behalf of the Plaintiff:

4    AMELIA A. RAGAN, Esq.

5    Legare, Attwood & Wolfe, LLC

6         125 Clairemont Avenue, Suite 380

7         Decatur, Georgia  30030

8         aarangan@law-llc.com

9

10   On behalf of the Defendants Equity Prime

11   Mortgage, LLC and Mark Moloughney:

12   BRENT L. WILSON, Esq.

13   Elarbee, Thompson, Sapp & Wilson, LLP

14        229 Peachtree Street

15        Atlanta, Georgia  30303

16        bwilson@elarbeethompson.com

17

18   SHANNON L. SMITH, esq.

19   Elarbee, Thompson, Sapp & Wilson, LLP

20        229 Peachtree Street

21        Atlanta, Georgia  30303

22        ssmith@elarbeethompson.com

23

24

25

Page 259

1          APPEARANCES OF COUNSEL (Continued)

2

3  On behalf of the Defendants Equity Prime

4  Mortgage, LLC and Eddy Perez:

5  SETH KREINER, Esq.

6  Kreiner Burns

7         950 Peninsula Corporate, Suite 3001

8         Boca Raton, Florida  33487

9         seth@kreinerlawfirm.com

10

11

12                       -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:21-cv-04247-CAP-LTW Document 143 Filed 07/08/24 Page 4 of 34
Eddy Perez                                    June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 260

1                  DEPOSITION OF EDDY PEREZ

2                     June 25, 2024

3

4          (Reporter disclosure made pursuant

5      to Article 8.B. of the Rules and

6      Regulations of the Board of Court

7      Reporting of the Judicial Council of

8      Georgia.)

9      EDDY PEREZ, having been first duly

10 sworn, was examined and testified as follows:

11     CONTINUED EXAMINATION

12     BY MS. RAGAN:

13     Q.  Good afternoon, Mr. Perez.  We met

14 previously.  My name is Amelia Ragan.  I'm sure

15 you recall I represent Tiar McCart in her claims

16 against Equity Prime Mortgage and Mark

17 Moloughney.  I'm going to apologize to you.  I

18 have a bit of a raspy lost voice today.  So if

19 you have any difficulty hearing me at any

20 point -- same goes for you, Terri -- just let me

21 know.  I'll do my best to speak up.

22     A.  I understand.  My eyes are itching like

23 crazy from allergies so I --

24     Q.  So you're in the same boat.  I

25 anticipate our deposition is going to go very

Case 1:21-cv-04247-CAP-LTW   Document 143   Filed 07/08/24   Page 5 of 34
Eddy Perez                                    June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 261

 1   similarly to the last time, albeit much shorter.

 2   I'm going to go over just a couple of logistical

 3   rules as a reminder.

 4         Because Ms. Howell is taking down

 5   everything that everyone in this Zoom meeting

 6   says, if you can do your best to let me complete

 7   my question into the record before you begin

 8   your answer so we're not talking over each

 9   other, I will do my best to offer the same

10   courtesy back to you.

11         But in the event that I do

12   inadvertently cut you off before you've

13   completed your response, please just let me know

14   and I'll be glad to allow you to complete your

15   response.  Okay?

16         A.  Cool.

17         Q.  If you need a break at any time during

18   the deposition, let me know.  We'll be glad to

19   go off the record and allow you to take whatever

20   break that you need.  The only exception to that

21   rule is if I have a question pending on the

22   table, I will request that you complete that

23   answer.  And if your break is not emergent, I

24   may ask that you allow me to complete a line of

25   questioning before we take the break.  Okay?

Eddy Perez                                June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 262

1          A.   Cool.

2          Q.   If I ask you any questions that are in

3     any way confusing or unclear to you, please let

4     me know.  I'll be glad to rephrase or restate

5     the question until it is clear to you.  But if

6     you respond to my question without having

7     indicated any misunderstanding or confusion,

8     I'll assume you did understand the question when

9     you responded.  Okay?

10         A.   Sounds fair.

11         Q.   And lastly, if you want to answer any

12    of my questions with either a yes or a no today,

13    please just vocalize yes or no as opposed to

14    uh-huh or huh-uh or merely shaking or nodding

15    your head simply for clarity in the record.

16         A.   Okay.  And please gently remind me if I

17    do that.

18         Q.   I will.  I will.  No problem.  It's a

19    common habit of most people so no worries.    So

20    I want to talk to you briefly today about your

21    communications with Seth Kreiner.

22              My understanding is that Mr. Kreiner

23    provided general counsel services to Equity

24    Prime Mortgage and you as the CEO of Equity

25    Prime Mortgage; is that correct?

Eddy Perez                                    June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 263

1      A.   Yes.

2      Q.   And my understanding also is that you

3   sought specific advice from Mr. Kreiner related

4   to Tiar McCart related to her as an employee of

5   Equity Prime Mortgage, correct?

6      A.   In what sense?

7      Q.   In the general sense, in the way I've

8   asked the question.

9      A.   Just in general, any communication I

10   had with them or what -- in anything?

11      Q.   My question is you sought advice from

12   Seth Kreiner as counsel for Equity Prime

13   Mortgage related to Tiar McCart, correct?

14      A.   Yes.

15      Q.   And we'll talk in more detail about the

16   specifics of that advice.  Did you seek legal

17   advice prior to the termination of Tiar McCart

18   about Ms. McCart from anyone other than Seth

19   Kreiner?

20      A.   I mean I gave what was sent to me over

21   to HR.  That was it.  So I mean they were

22   obviously in the know.

23      Q.   Okay.  Any other legal representative

24   that you sought advice from prior to Ms.

25   McCart's termination?

Eddy Perez                                June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 264

1      A.   Not that I recall.

2      Q.   Okay.  So I want to talk with you

3  specifically now about the advice that you

4  sought from Mr. Kreiner.  Do I understand

5  correctly that at least one aspect of the advice

6  that you sought from Mr. Kreiner was related to

7  a sexual harassment complaint that Ms. McCart

8  made?

9      A.   I turned them over the e-mail.

10      Q.   So is the answer to my question, yes,

11  one of the areas of advice you sought from Mr.

12  Kreiner was related to Ms. McCart's sexual

13  harassment complaint?

14      A.   Is turning over the e-mail considered

15  that?  I'm not an attorney so I don't know what

16  the ins and outs of what legalities are.

17      Q.   Understanding that you turned an e-mail

18  over to Mr. Kreiner, did you also seek advice

19  from him related to that e-mail and related to

20  Ms. McCart's complaint?

21      A.   Before termination or --

22      Q.   At any time.

23      A.   Yes.

24      Q.   Okay.  Other than the e-mail that you

25  described providing to Mr. Kreiner, did you give

Eddy Perez                                    June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 265

1   him any other information or documents in

2   connection with the advice you sought related to

3   Ms. McCart's complaint of sexual harassment?

4        A.   Not that I recall.

5        Q.   Okay.  To be specific, the e-mail that

6   you're referring to that you provided to Mr.

7   Kreiner, can you describe that for me?

8        A.   Well, I don't know what was in it.  I

9   just know that Tiar sent it to us.  I was on it

10  with quite a few other people.  Then I sent it

11  to HR, and I let Seth know about it.

12       Q.   Okay.  If you'll give me a moment, I'm

13  going to upload a document for your review.

14  Okay.  I've moved into the marked exhibit folder

15  what you should see has been previously marked

16  as Plaintiff's Exhibit 71.  If you'll just let

17  me know once you can see that document.

18       A.   Okay.

19       Q.   Have you had an opportunity to review

20  Exhibit 71?

21       A.   Yeah.

22       Q.   I'm sorry.  Was that a yes?

23       A.   Yes.

24       Q.   Okay.  Excuse me.  I want you to take a

25  look at the first e-mail in the chain which is

Eddy Perez                      June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 266

1   the last e-mail that appears in this document,

2   and it starts on Page 2 of Exhibit 61 -- excuse

3   me -- 71.  It's an e-mail from Tiar McCart to

4   Jason Callan.  Do you see that e-mail?

5       A.   Uh-huh.

6       Q.   Is that a yes?

7       A.   Yes.

8       Q.   Is this the e-mail that you were

9   referring to that you received and forwarded to

10  Mr. Kreiner?

11      A.   Yeah, this is the e-mail.

12      Q.   You testified that you were on the

13  e-mail along with several other people, but you

14  don't appear in this chain even though this

15  chain does forward the e-mail over to Mr.

16  Kreiner.  Can you explain that?

17      A.   I know Jason's the one that informed me

18  of it so...

19      Q.   Okay.  Can you please --

20      A.   I don't look in my e-mails so...

21      Q.   Okay, understood.  Do you have any

22  explanation as to why it is that your

23  recollection is that you would have been copied

24  on this e-mail but you aren't?

25      A.   So we were all flying that day

Eddy Perez                                        June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 267

1    somewhere together.  Jason showed it to me on
2    the e-mail, said I was on it.  I may have
3    assumed that I was on it.  Didn't think much of
4    it.
5         Q.  Okay, understood.  And did you instruct
6    Mr. Callan to forward the e-mail over to Seth
7    Kreiner?
8         A.  Yeah.
9         Q.  Okay.  So within Exhibit 71 where we
10   see Mr. Callan having forwarded the e-mail to
11   both Seth Kreiner and Mark Moloughney, that was
12   at your instruction?
13        A.  Correct.
14        Q.  Did you also instruct him to include
15   Mr. Moloughney on the forwarded e-mail?
16        A.  No.  I just said send it to Seth.
17        Q.  So other than Exhibit 71, to your
18   knowledge, did you or someone at your
19   instruction provide any other information to Mr.
20   Kreiner in connection with you seeking advice
21   about Ms. McCart's sexual harassment complaint?
22        A.  Not that I recall.
23        Q.  Okay.  What advice did you seek from
24   Mr. Kreiner in relation to Ms. McCart's sexual
25   harassment complaint?

Eddy Perez                              June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 268

1      A.   I waited until after HR was done with

2  their investigation.  When they gave me their

3  findings, I just asked him what the process to

4  move forward, what it looked like.

5      Q.   So you did not speak to Mr. Kreiner at

6  all related to Ms. McCart's sexual harassment

7  complaint until after human resources had

8  completed its investigation?

9      A.   Not that I recall.

10     Q.   Okay.  Who instructed human resources

11  to investigate Ms. McCart's complaint?

12     A.   It's on the e-mail.  I mean it was at

13  my direction.

14     Q.   Okay.  So you instructed Ms. Green --

15  Ms. Valerie Green to begin an investigation in

16  response to Ms. McCart's complaint?

17     A.   Yeah.  Yes, that's HR's job.

18     Q.   I apologize.  I didn't hear that last

19  part.

20     A.   I said that's HR's job.

21     Q.   Okay.  And you did not communicate with

22  Mr. Kreiner about Ms. McCart's sexual harassment

23  claim prior to giving Ms. Green that

24  instruction?

25     A.   Correct.

Eddy Perez                                    June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 269

1      Q.   Okay.  What information did you seek or

2   communicate with Mr. Kreiner about after Ms.

3   Green had completed the investigation?

4      A.   I just asked him what the protocol was

5   now that HR had given us the determination that

6   nothing had happened, it was consensual.  And

7   beforehand, a week before that, we had decided

8   already with Ali who was with us to terminate

9   her, and then that came up before we could.  So

10  once that was done, I just asked Seth for what

11  are the circumstances, like how does that look

12  like.

13     Q.   Okay.  When you say protocol or

14  circumstances, what specifically are you asking

15  Mr. Kreiner to advise you on?

16     A.   What are the risks.

17     Q.   Risks of what?

18     A.   There's always employment risks.

19  There's risks everywhere.  So I have to ask

20  legal for risks.

21     Q.   Understood.  Risks of what?

22     A.   Anything and everything.  We obviously

23  had followed procedure.  Is it okay to move

24  forward with the termination.

25     Q.   Okay.  My question to you was about

Eddy Perez                                    June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 270

1   what advice you sought from Mr. Kreiner related

2   to the sexual harassment complaint.  Do I

3   understand you to be saying the only advice you

4   actually sought from him was related to what

5   risks would be associated with moving forward

6   with termination?

7        A.  Yeah.  Because HR had already told us

8   that they didn't believe there was a sexual

9   harassment.

10       Q.  Okay.  So did you have any other

11  communications with Mr. Kreiner seeking advice

12  from him related to Ms. McCart and her complaint

13  of sexual harassment other than asking him what

14  risks were associated with proceeding to

15  terminate her?

16       A.  Not that I recall.

17       Q.  Okay.  What, if any, information did

18  you provide to Mr. Kreiner in connection with

19  discussing the risks of proceeding to terminate

20  Ms. McCart?

21       A.  What risks did I share with him?

22       Q.  What information did you share with

23  him?

24       A.  I explained to him what our findings

25  were after I got the news from HR, and he just

Page 271

1    said that, you know, you always run risks when

2    you do that.

3        Q.   Okay.  When you said you explained the

4    findings to him, you mean the findings of Ms.

5    Green's investigation into the sexual harassment

6    complaint?

7        A.   Well, he knew about that.  And also I'd

8    informed him about what Ali had discovered a

9    week or two prior to Tiar's e-mail about the

10   lawsuit and everything, about what Ali had

11   concluded about her employment.

12       Q.   Okay.  And what information

13   specifically did you provide to Mr. Kreiner in

14   connection with what Ali discovered or

15   concluded?

16       A.   Just said that Ali, after her review,

17   did not believe that she was fit for our

18   organization and respected Ali in her decision.

19       Q.   Okay.  So what you told Mr. Kreiner in

20   connection with seeking his advice was that Ali

21   Kreiner determined Ms. McCart wasn't fit for the

22   organization?

23       A.   I shared with him that was her advice

24   and that the decision was on me, and that's why

25   I asked him for the risks.

Eddy Perez                                    June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 272

1          Q.   What advice from Ms. Ali are you
2     referring to?
3          A.   They had started reviewing Tiar a few
4     weeks prior to this if she was a fit for the
5     organization.
6          Q.   Okay.  And so what was her advice that
7     you're referring to?
8          A.   Ali did not believe she was a fit for
9     the organization.
10         Q.   Understanding that was an opinion she
11    shared about Ms. McCart, what advice are you
12    referring to that Ali provided?
13         A.   She just said that when she reviewed
14    her file and her case work, she didn't believe
15    that she was working, and she didn't believe
16    that she deserved to have a job here.
17         Q.   So are you suggesting that Ali advised
18    you that Ms. McCart should be terminated?
19         A.   She had given the advice two or three
20    weeks prior of the allegation from Ms. McCart.
21         Q.   Okay.  And my question was specifically
22    did she give you that advice that Ms. McCart
23    should be terminated?
24         A.   She gave me her findings, yes.
25         Q.   And were her findings -- again, I need

Page 273

1    you to respond to my question.  You're welcome

2    to elaborate and give me more information, but I

3    do need a direct response to what I'm asking.

4              And what that is is, to repeat, do I

5    understand your testimony correctly to be that

6    Ali advised you that she believed Ms. McCart

7    should be terminated?

8         A.   Yes.

9         Q.   Okay.  Thank you, sir.  And you shared

10   the advice that Ali provided to you with Mr.

11   Kreiner?

12        A.   Yeah.  After HR, yes.

13        Q.   When you say after HR, you're meaning

14   after the HR investigation --

15        A.   Correct.

16        Q.   -- into the sexual harassment

17   complaint?

18        A.   Correct.

19        Q.   Okay.  Thank you, sir.  So other than

20   providing to Mr. Kreiner the results of Ms.

21   Green's investigation and providing to Mr.

22   Kreiner the advice that you described Ali

23   provided you about Ms. McCart needed to be

24   terminated, was there any other information that

25   you provided to Mr. Kreiner in connection with

Eddy Perez                                    June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 274

1    seeking his advice about the risks of

2    terminating Ms. McCart?

3         A.   Not that I recall.

4         Q.   Okay.  What advice ultimately did Mr.

5    Kreiner give you in response to your request

6    about what were the risks of terminating Ms.

7    McCart?

8         A.   He just said that any time you

9    terminate an employee, there's always risks that

10   you take doing that.

11        Q.   Okay.  Did he give you any specific

12   examples of the risks that he advised you about

13   in relation to Ms. McCart's termination?

14        A.   Nothing in specific that I recall.

15        Q.   Okay.  So your recollection is he said

16   only very generally there are always risks in

17   terminating an employee?

18        A.   Correct.

19        Q.   Okay.  At any time do you recall Mr.

20   Kreiner advising you that you should not proceed

21   with terminating Ms. McCart?

22        A.   Not that I recall.

23        Q.   Is there anything else that you can

24   recall about Mr. Kreiner's advice to you other

25   than that he said there are always risks

Case 1:21-cv-04247-CAP-LTW   Document 143   Filed 07/08/24   Page 19 of 34
Eddy Perez                                           June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 275

1    associated with terminating an employee?

2         A.   Not that I recall.

3         Q.   Did Mr. Kreiner ever give you specific

4    advice about risks associated with terminating

5    an employee immediately after that employee had

6    made a complaint of sexual harassment?

7         A.   Like I said, that was a long time ago

8    so I don't recall a lot.

9         Q.   Okay.  So the only thing you recall is

10   much more general advice from him about there

11   are always risks?

12        A.   Uh-huh.

13        Q.   Is that a yes?

14        A.   Sorry, sorry.  Yes.

15        Q.   Okay.  To confirm, that was a yes?

16        A.   Yes.

17        Q.   Thank you, sir.  Do you believe that

18   you followed the advice that Mr. Kreiner gave

19   you in connection with the steps that you took

20   after consulting with him?

21        A.   What do you mean?

22        Q.   Well, you said that he gave you advice

23   about risks and you sought advice about

24   terminating Ms. McCart.  Do you believe that you

25   followed the advice that he gave you?

Page 276

1        A.   He didn't give me advice, I mean, in

2   the sense of -- he just said there were risks so

3   I took the risk.  I wouldn't say that was on

4   him.  I would say that was on me.

5        Q.   Okay.  Meaning that he advised you that

6   you were -- excuse me.  Start that over.  He

7   advised you that risks existed, and you made an

8   informed decision to take the risk?

9        A.   Correct, yes.

10       Q.   Okay.  Did Mr. Kreiner give you any

11  advice about the status of the law related to

12  sexual harassment complaints and claims of

13  retaliation?

14       A.   I don't recall.

15       Q.   Okay.  You don't recall him giving you

16  any specific advice about the nature of Title 7

17  and/or the specific laws that exist prohibiting

18  sexual harassment and retaliation in the

19  workplace?

20       A.   I don't recall.

21       Q.   Okay.  As you sit here today, do you

22  have any knowledge or understanding of the Title

23  7 laws that prohibit sexual harassment and

24  retaliation in the workplace?

25       A.   I mean I didn't know it was called

Eddy Perez                                    June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 277

 1  Title 7 but, no, not that I'm aware of.

 2       Q.  And so at the time that you made the

 3  decision to take the risk or not avoid the risk

 4  that Mr. Kreiner advised you existed, you

 5  weren't familiar with or were relying upon any

 6  understanding of Title 7 or any other laws about

 7  prohibiting sexual harassment and retaliation?

 8       A.  And I'd heard it in general in my life.

 9  But once HR came back with their conclusion, I

10  didn't think we were at risk of violating.

11       Q.  So my question is at the time that you

12  decided to proceed with Ms. McCart's

13  termination, you weren't relying upon or basing

14  your decision to terminate her on having a

15  knowledge and understanding of the laws of Title

16  7 and other laws prohibiting sexual harassment

17  and retaliation in the workplace?

18       A.  Like I said, I knew generalities about

19  it.  I didn't know Title 7 or explicitly every

20  detail in it.  Obviously, I was aware that --

21  what the risks were implied so I understood

22  them.

23       Q.  Okay.  I appreciate the explanation of

24  your knowledge.  I'm still not certain that

25  you're answering my question which is about what

Case 1:21-cv-04247-CAP-LTW   Document 143   Filed 07/08/24   Page 22 of 34
Eddy Perez                                   June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 278

1    understanding you had and what you were relying

2    upon when you made the decision to terminate Ms.

3    McCart.  So let me attempt to clarify it.

4           Do I understand you to be stating that

5    even though you had some, you know, general

6    understanding of anti-discrimination,

7    anti-sexual harassment, anti-retaliation laws,

8    you were not relying on specific understandings

9    of those laws when you made the decision to take

10   the risk and terminate Ms. McCart?

11        A.   Correct.

12        Q.   Okay.  You said a moment ago that there

13   were risks that were implied.  What did you

14   understand to be the implied risks of

15   terminating Ms. McCart shortly after she made a

16   complaint of sexual harassment?

17        A.   You can always get sued.

18        Q.   Okay.  And did you understand that to

19   be a risk in Ms. McCart's case when you made the

20   decision to terminate her?

21        A.   That's a risk any time you get rid of

22   any employee.

23        Q.   Including Ms. McCart?

24        A.   Everybody.

25        Q.   Including Ms. McCart?

Eddy Perez                                    June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 279

1        A.   Yes, everybody.

2        Q.   And that was part of the specific

3   advice and discussion that you had with Mr.

4   Kreiner leading up to the decision to terminate

5   her?

6        A.   Yes.

7        Q.   And so Mr. Kreiner explaining to you

8   the existence of those risks did not in any way

9   dissuade you from proceeding with Ms. McCart's

10  termination?

11       A.   Right.  It did not.

12       Q.   Okay.  Who made the decision to offer

13  Ms. McCart a severance agreement that offered

14  her compensation in exchange for releasing her

15  claims against Equity Prime Mortgage?

16       A.   I can't answer that with certainty.  I

17  don't recall who did.

18       Q.   Okay.  Can you tell me for certain

19  whether it was or was not you that made the

20  decision to offer that severance?

21       A.   It could have been.  I just -- I don't

22  recall.  It could have been.

23       Q.   Understood.  Do you recall having any

24  communication with Mr. Kreiner about whether or

25  not a severance -- offering compensation in

Eddy Perez                                                    June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 280

1    exchange for a release of claims was a good
2    idea?
3          A.   I don't recall.
4          Q.   Okay.  Do you recall whether or not Mr.
5    Kreiner would have suggested a severance offer
6    that would have given compensation in exchange
7    for a release of claims?
8          A.   No, I don't recall.
9          Q.   Okay.  Did you ever communicate with
10   Mr. Kreiner via text message?
11         A.   Have I ever communicated with Mr.
12   Kreiner via text message?
13         Q.   Yes, sir.
14         A.   Yes, I've communicated with him via
15   text message.
16         Q.   Did you communicate with him via text
17   message during the period of time that the
18   complaint of Ms. McCart was being investigated
19   and leading up to her termination?
20         A.   I don't recall.  I'd have to look.  I
21   don't know.
22         Q.   Okay.  At any time since the beginning
23   of Ms. McCart filing her lawsuit, have you been
24   asked to evaluate your telephone records to
25   determine if any of your texts to Mr. Kreiner

Eddy Perez                          June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 281

1    still exists?

2        A.   I really am not sure.

3        Q.   Okay.  Putting aside for a moment

4    whether or not you've been asked, have you

5    actually looked in your phone records at any

6    point since litigation started to determine if

7    text messages between you and Mr. Kreiner still

8    exist?

9        A.   Once again, that's going off my memory.

10   I just don't recall.  I can't answer yes or no.

11       Q.   As you sit here today, do you have text

12   messages between you and Mr. Kreiner in your

13   phone from the period of February of 2021

14   through March of 2021?

15       A.   Mine don't go back that far.  They

16   automatically erase after a certain time period.

17       Q.   Okay.  So your response to my question

18   is, no, at this time, I do not currently have

19   any text messages from Mr. Kreiner from the

20   period of early 2021 still in my phone?

21       A.   Not to my knowledge.

22       Q.   Okay.  Do you have the same phone that

23   you had in 2021 today?

24       A.   No.

25       Q.   Okay.  The phone that you used in 2021,

Eddy Perez                                    June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 282

```
 1   is it still in your possession even though it's
 2   not active or being used?
 3        A.  No.
 4        Q.  Okay.  Did you ever communicate with
 5   Mr. Kreiner via e-mail?
 6        A.  I don't remember.
 7        Q.  Okay.  As you sit here today, you can't
 8   remember if you've ever communicated with Mr.
 9   Kreiner via e-mail?
10        A.  Yes, ever.  But I thought you were
11   talking about this case in particular.
12        Q.  Well, I am going to -- I'm starting
13   there.  I am going to get to that next.
14        A.  I've forwarded e-mails over time and
15   stuff.  I mean we've had a long relationship
16   so...
17        Q.  Okay.  Do you recall whether or not you
18   communicated with Mr. Kreiner via e-mail in
19   connection with Ms. McCart's complaint of sexual
20   harassment and her ultimate termination?
21        A.  I do not.
22        Q.  Okay.  Have you been asked to review
23   your e-mails to determine if any communications
24   between you and Mr. Kreiner from that period in
25   February to March of 2021 exist?
```

Eddy Perez                                    June 25, 2024

McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 283

1          A.   Myself?

2          Q.   Yes, sir.

3          A.   Not that I recall.

4          Q.   Okay.  Have you had anyone on your

5     behalf review your e-mails to determine whether

6     or not communications between you and Mr.

7     Kreiner from that same period exist?

8          A.   Sure, it's possible.

9          Q.   But you're not certain as you sit here

10    today whether it's been done?

11         A.   I can't say with 100 percent certainty

12    anything on that.

13         Q.   What e-mail addresses have you used

14    during the period of 2021?

15         A.   Eperez@epm.net.

16         Q.   Any other e-mail addresses you've used

17    in 2021 whether business or otherwise?

18         A.   Myself?

19         Q.   Yes, sir.

20         A.   No.

21         Q.   You don't have a personal e-mail

22    address that's not connected to EPM?

23         A.   I do not.

24         Q.   All right.  And you mentioned that you

25    don't check your e-mails.  Who checks your

Page 284

1    e-mails for you?

2         A.   My EA, Steve Bradshaw.

3         Q.   And was Steve Bradshaw your executive

4    assistant in 2021?

5         A.   No, he was not.

6         Q.   Did you have a different executive

7    assistant in 2021?

8         A.   I did.

9         Q.   Who would that have been?

10        A.   Shalonda Dixon.

11        Q.   Okay.  And so were your e-mails

12   forwarded to Ms. Dixon or did she log in

13   directly to your account?

14        A.   She had access to my e-mail.

15        Q.   So she would have had your log-in and

16   password and could have gone directly into your

17   e-mail account?

18        A.   I'm not a techie.  I think they're

19   automatically on her -- I think she has access

20   on the Outlook.  I don't think it's like -- I

21   think it's already there is what I'm trying to

22   explain.

23        Q.   You think that your e-mails

24   automatically appear for her in her Outlook

25   inbox?

Page 285

1      A.   Yeah.   Because they do for Steve.   So I
2  got to assume for this one that that's how tech
3  had it set up, access to the folder.
4      Q.   Understood.   Do you know whether or not
5  anyone has reviewed Ms. Dixon's e-mails, inbox
6  and/or other folders in her Outlook to determine
7  if e-mails between you and Mr. Kreiner exist
8  from the period of February of 2021 to March
9  2021?
10     A.  I do not.
11         MS. RAGAN:  Mr. Perez, I believe
12         those are the only questions I have for
13         you.  I appreciate your time.
14         THE WITNESS:  Thank you.
15         (Whereupon, the deposition was
16         concluded at 12:45 p.m.)
17         (Pursuant to Rule 30(e) of the
18         Federal Rules of Civil Procedure and/or
19         O.C.G.A. 9-11-30(e), signature of the
20         witness has been reserved.)
21
22
23
24
25

Page 286

1

2              C E R T I F I C A T E

3

4    STATE OF GEORGIA:

5    COUNTY OF FLOYD:

6

7           I hereby certify that the foregoing

8        transcript was taken down, as stated in

9        the caption, and the questions and

10       answers thereto were reduced to

11       typewriting under my direction; that the

12       foregoing pages 257 through 285

13       represent a true, complete, and correct

14       transcript of the evidence given upon

15       said hearing, and I further certify that

16       I am not of kin or counsel to the

17       parties in the case; am not in the

18       regular employ of counsel for any of

19       said parties; nor am I in anywise

20       interested in the result of said case.

21          This, the 1st day of July, 2024.

22              *Terri Howell*

23

24                  TERRI B. HOWELL, CCR-B-1018

25

Eddy Perez                                     June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 287

1
2                  COURT REPORTER DISCLOSURE
3
         Pursuant to Article 8.B. of the Rules
4    and Regulations of the Board of Court
     Reporting of the Judicial Council of Georgia
5    which states: "Each court reporter shall
     tender a disclosure form at the time of the
6    taking of the deposition stating the
     arrangements made for the reporting services
7    of the certified court reporter, by the
     certified court reporter, the court
8    reporter's employer, or the referral source
     for the deposition, with any party to the
9    litigation, counsel to the parties or other
     entity.  Such form shall be attached to the
10   deposition transcript," I make the following
     disclosure:
11
         I am a Georgia Certified Court Reporter.
12   I am here as a representative of Veritext
     Legal Solutions.  Veritext Legal Solutions
13   was contacted to provide court reporting
     services for the deposition.  Veritext Legal
14   Solutions will not be taking this deposition
     under any contract that is prohibited by
15   O.C.G.A. 15-14-37(a) and (b).
16       Veritext Legal Solutions has no
     contract/agreement to provide reporting
17   services with any party to the case, any
     counsel in the case, or any reporter or
18   reporting agency from whom a referral might
     have been made to cover this deposition.
19   Veritext Legal Solutions will charge its
     usual and customary rates to all parties in
20   the case, and a financial discount will not
     be given to a                           .
21
22
23
              TERRI B. HOWELL, CCR-B-1018
24
25

Eddy Perez                                    June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 288

1       DEPOSITION OF EDDY PEREZ/TBH
2       I do hereby certify that I have read all
questions propounded to me and all answers
3   given by me on the 25th day of June, 2024,
taken before Terri B. Howell, and that:
4
        1)  There are no changes noted.
5       2)  The following changes are noted:
6       Pursuant to Rule 30(e) of the Federal
Rules of Civil Procedure and/or the Official
7   Code of Georgia Annotated 9-11-30(e), both of
which read in part:  Any changes in form or
8   substance which you desire to make shall be
entered upon the deposition...with a
9   statement of the reasons given...for making
them.  Accordingly, to assist you in
10  effecting corrections, please use the form
below:
11
12  Page No.         Line No.         should read:
13
    Page No.         Line No.         should read:
14
15  Page No.         Line No.         should read:
16
    Page No.         Line No.         should read:
17
18  Page No.         Line No.         should read:
19
    Page No.         Line No.         should read:
20
21  Page No.         Line No.         should read:
22
    Page No.         Line No.         should read:
23
24  Page No.         Line No.         should read:
25

Eddy Perez                                    June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

                                                    Page 289

1          DEPOSITION OF EDDY PEREZ/TBH
2     Page No.        Line No.        should read:
3
      Page No.        Line No.        should read:
4
5     Page No.        Line No.        should read:
6
      Page No.        Line No.        should read:
7
8     Page No.        Line No.        should read:
9
      Page No.        Line No.        should read:
10
11    Page No.        Line No.        should read:
12
      Page No.        Line No.        should read:
13
14    Page No.        Line No.        should read:
15
      Page No.        Line No.        should read:
16
17    Page No.        Line No.        should read:
18
      Page No.        Line No.        should read:
19
20    Page No.        Line No.        should read:
21
      Page No.        Line No.        should read:
22
23    Page No.        Line No.        should read:
24
      Page No.        Line No.        should read:
25

Eddy Perez                              June 25, 2024
McCart, Tiar v. Equity Prime Mortgage, LLC, et al.

Page 290

1              DEPOSITION OF EDDIE PEREZ/TBH

2    Page No.          Line No.          should read:

3
     Page No.          Line No.          should read:

4
5    Page No.          Line No.          should read:

6
     Page No.          Line No.          should read:

7
8    Page No.          Line No.          should read:

9
     Page No.          Line No.          should read:

10
11   Page No.          Line No.          should read:

12
     Page No.          Line No.          should read:

13
14
     If supplemental or additional pages are
15   necessary, please furnish same in typewriting
     annexed to this deposition.

16
17
                    EDDY PEREZ

18
19
20   Sworn to and subscribed before me,
     This the      day of            , 20   .

21
22   Notary Public
     My commission expires:

23
24
25